1   **FIRST AMENDED CIVIL RIGHTS COMPLAINT FOR DAMAGES, INJUNCTIVE**

2   **RELIEF, AND RICO TREBLE DAMAGES**

3   **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**



4   **Jade Riley Burch,** Plaintiff,

5   v.

6   **HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC; MountainView Hospital;**

7   **and Southern Hills Hospital & Medical Center,** Defendants.

8   Case No. 2:25-cv-01408-JAD-MDC

9   Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order

10   **DEMAND FOR JURY TRIAL**

11   **I. INTRODUCTION**

12   1.  This action arises from systematic violations of federal emergency medical treatment

13   laws, disability discrimination statutes, and civil rights protections occurring across three

14   HCA-operated hospitals in Nevada between March and June 2025, culminating in

15   coordinated enterprise-wide retaliation within 48 hours of Plaintiff's legal complaints to

16   HCA's corporate Risk Management Director.

17   2.  Plaintiff Jade Riley Burch is a transgender woman with seizure disorder, PTSD, and other

18   disabilities who was subjected to dangerous EMTALA violations, missed life-threatening

19   diagnoses, chemical restraints without medical justification, unlawful physical restraints,

20      medical record falsification, fraudulent billing, and systematic retaliation designed to

21      suppress her federally protected civil rights complaints.

22  3.  The enterprise-wide retaliation was coordinated by HCA Risk Management Director

23      Cinthya Cook, MSN/MHA, RN, CPPS, following Plaintiff's June 22 and 26, 2025 legal

24      threat emails, resulting in a 48-hour protocol of medical abandonment, over-sedation

25      causing 32 seizures, unlawful restraints, and fraudulent billing implemented at Southern

26      Hills Hospital between June 28-29, 2025.

27  4.  Plaintiff brings federal claims under EMTALA (42 U.S.C. § 1395dd), Section 504 of the

28      Rehabilitation Act (29 U.S.C. § 794), ACA § 1557 (42 U.S.C. § 18116), ADA Title III

29      (42 U.S.C. § 12182), civil RICO (18 U.S.C. § 1962(c)), and civil rights conspiracy (42

30      U.S.C. § 1985(3)), along with Nevada tort claims. She seeks compensatory damages,

31      RICO treble damages, injunctive relief, and referral to federal prosecutors.

32  **Plaintiff Medical Privacy Waiver and Transparency Declaration**

33  Plaintiff Jade Riley Burch, as the subject of all medical records, personal health information, and

34  protected health information (PHI) under HIPAA cited herein, knowingly and voluntarily waives

35  any privacy claims, confidentiality protections, or disclosure restrictions over the contents of

36  those records submitted in this action or obtained through discovery. This comprehensive waiver

37  includes but is not limited to: (a) medical records from all treating facilities; (b) psychiatric

38  evaluations and mental health records; (c) billing and insurance communications; (d) internal

39  hospital communications regarding Plaintiff's care; (e) risk management documents referencing

40  Plaintiff; and (f) any other health information related to the incidents alleged herein.

2

41  This waiver is made with full awareness of potential public access through court filings and is
42  executed voluntarily in the interests of transparency, public health accountability, civil rights
43  enforcement, and systemic healthcare reform. Plaintiff authorizes disclosure of this information
44  to the Court, opposing counsel, expert witnesses, federal regulators, and any other parties as
45  necessary for prosecution of this action and related enforcement proceedings.

46  **II. JURISDICTION AND VENUE**

47  5.  This Court has federal question jurisdiction under 28 U.S.C. § 1331 over claims arising
48      under EMTALA (42 U.S.C. § 1395dd), Section 504 (29 U.S.C. § 794), ACA § 1557 (42
49      U.S.C. § 18116), ADA Title III (42 U.S.C. § 12182), 42 U.S.C. § 1985(3), and 18 U.S.C.
50      § 1962(c). This Court has original jurisdiction over RICO claims under 18 U.S.C. §
51      1964(c). The Court has supplemental jurisdiction over Nevada state claims under 28
52      U.S.C. § 1367.
53  6.  Venue is proper under 28 U.S.C. § 1391(b)(2) as substantial events occurred in Clark
54      County, Nevada, where all defendant hospitals operate and where the systematic
55      violations took place.

56  **III. PARTIES**

57  7.  Plaintiff Jade Riley Burch is an adult resident of Las Vegas, Nevada. She is a qualified
58      individual with disabilities under Section 504, ADA, and ACA § 1557, including seizure
59      disorder, PTSD, diabetes, and hypertension. She is transgender and protected from sex-
60      based discrimination under ACA § 1557.

8.  Defendant HCA Healthcare, Inc. ("HCA") is a Delaware corporation headquartered in Nashville, Tennessee, operating as the nation's largest for-profit hospital operator with 191 hospitals across 20 states, $70.6 billion annual revenue, 316,000 employees, and $17.7 billion in annual Medicare billing. HCA maintains centralized governance and risk management through corporate officers like Cinthya Cook, directing subsidiary hospitals' operations to execute enterprise-wide policies including patient complaint suppression and retaliation protocols.

9.  Defendant Sunrise Hospital & Medical Center, LLC ("Sunrise") is a Nevada limited liability company owned and operated by HCA, located at 3186 S Maryland Pkwy, Las Vegas, Nevada, receiving federal financial assistance and operating as a covered entity under applicable federal statutes.

10. Defendant MountainView Hospital ("MountainView") is a Nevada corporation owned and operated by HCA, located at 3100 N Tenaya Way, Las Vegas, Nevada, receiving federal financial assistance and operating as a covered entity under applicable federal statutes.

11. Defendant Southern Hills Hospital & Medical Center ("Southern Hills") is a Nevada limited liability company owned and operated by HCA, located at 9300 W Sunset Rd, Las Vegas, Nevada, receiving federal financial assistance and operating as a covered entity under applicable federal statutes.

**DOES 1-50, INCLUSIVE**

12. Plaintiff is unaware of the true names and capacities of Defendants sued herein as Does 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names.

4

83    These individuals are essential to establishing the full scope of the conspiracy and

84    enterprise violations. Plaintiff is informed and believes, and on that basis alleges, that

85    each Doe Defendant was legally responsible for specific violations including:

86    **Medical Personnel (Does 1-20):** a) Nurse Jane Doe 1: Southern Hills staff member who entered

87    false TBI diagnosis on June 29, 2025, at approximately 09:30 hours, identifiable through EHR

88    audit logs; b) Nurse Jane Doe 2: Sunrise staff member who created conflicting restraint

89    narratives on May 29, 2025, identifiable through incident report authorship data; c) Does 3-10:

90    Additional nursing staff who administered unlawful restraints, failed to monitor during hypoxic

91    episodes, and falsified required federal documentation; d) Does 11-15: Physicians who

92    authorized fraudulent billing without providing corresponding care; e) Does 16-20: Respiratory

93    therapists and technicians who witnessed but failed to intervene during life-threatening episodes;

94    **Security/Administrative Personnel (Does 21-35):** f) Does 21-25: Security officers who applied

95    physical restraints without physician orders; g) Does 26-30: Administrative staff who processed

96    billing for services never provided; h) Does 31-35: EHR administrators who may have

97    participated in record modification or access control;

98    **Corporate Coordination Personnel (Does 36-50):** i) Does 36-45: HCA corporate employees

99    who received, processed, or implemented Cook's retaliation directives; j) Does 46-50: Risk

100   management staff at individual facilities who executed enterprise-wide retaliation protocols.

101   13. These Doe defendants' identities are exclusively within Defendants' control and cannot be

102   obtained through any other means. Specifically, Plaintiff requires expedited discovery

103   under FRCP 26(d)(1) to obtain: (a) hospital staffing records and shift assignments for

104    March 22-24, May 29, and June 28-29, 2025; (b) EHR audit trails showing user access

105    and entry timestamps for false diagnoses and missing documentation; (c) security access

106    logs identifying personnel who applied restraints; (d) billing system records showing who

107    submitted fraudulent CPT codes; (e) corporate email records identifying recipients of

108    Cook's retaliation directives; and (f) incident report authorship data. This information is

109    at immediate risk of destruction under routine hospital retention policies, including 30-60

110    day email cycles and 90-day EHR audit log overwriting. Without expedited discovery,

111    crucial evidence will be permanently lost, preventing identification of individual

112    conspirators essential to establishing the full scope of federal violations and individual

113    liability under 18 U.S.C. § 1962, § 1985(3), and related statutes.

114    14. Pursuant to applicable law, the statute of limitations is tolled as to all DOE Defendants

115    named herein, pending Plaintiff's ability to discover their true names through court-

116    ordered discovery. See *Lindley v. General Elec. Co.*, 780 F.2d 797, 799-800 (9th Cir.

117    1986). Plaintiff invokes the relation-back doctrine under Fed. R. Civ. P. 15(c)(1) to

118    ensure that amendments substituting DOE names shall relate back to this filing date.

119    **IV. FACTUAL ALLEGATIONS**

120    **A. Plaintiff's Medical Background and Psychiatric Advance Directive**

121    15. Plaintiff has a documented seizure disorder requiring careful anti-epileptic medication

122    monitoring, along with PTSD, diabetes, and hypertension. Her medical conditions require

123    accommodations including recognition of postictal cognitive impairment, careful

124    medication management, and respect for advance directives during incapacitated states.

125    16. Plaintiff maintains a notarized Psychiatric Advance Directive ("PAD") executed June 6,

126         2025, designating Porscha Ryan as her medical decision-maker when incapacitated, with

127         specific instructions regarding medication preferences, restraint prohibitions, and

128         communication needs (Ex. BB). This PAD is legally binding under Nevada law and

129         federal patient rights protections.

130    **B. MountainView Hospital Violations (March 22-24, 2025)**

131    17. On March 22, 2025, at approximately 14:30 hours, Plaintiff arrived at MountainView

132         Hospital Emergency Department via ambulance with acute chest pain, breathing

133         difficulty, and active tonic-clonic seizures. EMS reported multiple seizure episodes en

134         route with postictal confusion.

135    18. MountainView staff documented ongoing seizures and administered sedatives including

136         lorazepam/Ativan, describing Plaintiff as "sedated and groggy throughout the day" in

137         nursing notes (Ex. A). Despite clear documentation of neurological impairment and

138         postictal state lasting over 48 hours, no capacity assessment was performed and no

139         accommodation was made for cognitive disabilities.

140    19. Plaintiff remained in postictal confusion with documented cognitive impairment, inability

141         to answer orientation questions correctly, and requiring assistance with basic activities.

142         Medical records show continued neurological instability with inconsistent responsiveness

143         and memory deficits (Ex. A, AAA).

144    20. On March 24, 2025, at approximately 11:15 AM, MountainView discharged Plaintiff via

145         rideshare while she remained neurologically impaired, cognitively compromised, and

146         unable to care for herself safely. No stabilization of her emergency neurological

7

147    condition occurred, no capacity evaluation was conducted, and no safe discharge

148    planning was implemented, violating EMTALA's stabilization requirements (Ex. A,

149    EEE).

150    21. Witness Melissa documented Plaintiff's post-discharge condition as dangerous and

151    unstable, requiring immediate assistance with basic functions and showing continued

152    neurological deficits (Ex. G, CC).

153    **C. Sunrise Hospital's Missed Pulmonary Embolism (April 17-22, 2025)**

154    22. On April 17, 2025, Plaintiff presented to Sunrise Hospital Emergency Department with

155    classic post-surgical pulmonary embolism symptoms: acute chest pain, shortness of

156    breath, tachycardia (heart rate 110-120 bpm), and abnormal chest X-ray findings. These

157    symptoms occurred 13 days after a 7+ hour surgical procedure, placing Plaintiff in the

158    highest risk category for PE development (Ex. B, UU).

159    23. Despite textbook PE presentation, Sunrise staff failed to order appropriate diagnostic tests

160    including D-dimer blood test (cost approximately $25) or CT pulmonary angiogram,

161    which are standard-of-care screening tools for post-surgical patients with PE symptoms

162    (Ex. VV, SS).

163    24. Sunrise discharged Plaintiff on April 22, 2025, with a pneumonia diagnosis without

164    ruling out PE, despite her continued symptoms and high-risk profile. This represented a

165    complete failure to follow post-surgical PE screening protocols and constituted dangerous

166    misdiagnosis of a life-threatening condition (Ex. B, WW).

167    25. On April 30, 2025, Summerlin Hospital (non-HCA facility) immediately performed

168    appropriate PE diagnostic testing upon Plaintiff's presentation with identical symptoms,

169   promptly diagnosing acute pulmonary embolism through CT angiogram showing clot

170   burden and elevated D-dimer of 1.32 mg/L (normal <0.50), confirming Sunrise's missed

171   diagnosis (Ex. C).

172   26. Plaintiff was immediately started on anticoagulation therapy (Eliquis), and insurer

173   Anthem subsequently confirmed Sunrise's failure to diagnose PE in coverage

174   determinations, documenting the missed diagnosis as a covered corrective treatment

175   necessity (Ex. C, RR).

176  **D. Sunrise Chemical Restraint Violations (May 29, 2025)**

177   27. On May 29, 2025, at approximately 08:45 hours, EMS transported Plaintiff to Sunrise

178   Hospital for multiple breakthrough seizures. Laboratory analysis revealed critically

179   subtherapeutic Depakote levels of 7.0 µg/mL (therapeutic range 50-125 µg/mL),

180   explaining the seizure breakthrough (Ex. L).

181   28. Plaintiff presented in postictal state with neurological compromise and cognitive

182   impairment—not violent, psychotic, or threatening behavior. Despite the clear

183   neurological etiology of her presentation and absence of psychiatric indications, Sunrise

184   administered a "B52" chemical restraint cocktail consisting of haloperidol 5 mg,

185   diphenhydramine 25 mg, and lorazepam 2 mg (Ex. L, XX).

186   29. This chemical restraint was administered without psychiatric indication, informed

187   consent, medical necessity, or consultation with Plaintiff's designated PAD agent Porscha

188   Ryan, violating both federal patient rights and Nevada advance directive laws (Ex. L,

189   YY).

190    30. Medical records contained deliberately conflicting incident narratives: one entry stating

191         Plaintiff "fell from chair" while another claimed she "threw herself on the ground,"

192         indicating systematic falsification designed to retroactively justify the unjustified

193         chemical restraint (Ex. YY).

194    31. No EEG monitoring, neurology consultation, or proper anti-epileptic medication

195         management was provided. Instead, Sunrise discharged Plaintiff while still chemically

196         impaired from the restraint medications, creating additional safety risks (Ex. ZZ).

197    **E. Legal Notices to HCA Risk Management (June 22-26, 2025)**

198    32. Following the pattern of violations across HCA facilities, Plaintiff sent formal legal

199         notices to HCA Risk Management Director Cinthya Cook, MSN/MHA, RN, CPPS, at her

200         corporate email address Cinthya.Cook@hcahealthcare.com:

201    a) **June 22, 2025**: Pre-litigation demand letter alleging systematic EMTALA violations,

202    disability discrimination, and unsafe discharges across HCA facilities, demanding policy changes

203    and monetary compensation (Ex. T);

204    b) **June 26, 2025, 8:40 PM**: Final warning email threatening media escalation and public

205    exposure via news outlets unless Defendants addressed the documented violations within 48

206    hours (Ex. T).

207    33. Cook acknowledged receipt of the June 22, 2025 complaint on June 23, 2025, via

208         interstate corporate email systems, directing hospital staff to review Plaintiff's case and

209         medical history, thereby initiating enterprise-wide coordination of response protocols

210         (Ex. V).

211 34. These communications constituted protected litigation activity and access-to-courts

212 conduct under the First Amendment and 42 U.S.C. § 1985(3), triggering Defendants'

213 retaliatory response protocol.

214 **F. Southern Hills Coordinated Retaliation (June 28-29, 2025)**

215 35. Within precisely 48 hours of Plaintiff's June 26, 2025, 8:40 PM media threat email, on

216 June 28, 2025, Plaintiff was transported to Southern Hills Hospital in critical condition:

217 postictal from seizures, with head trauma, on Eliquis anticoagulation for her PE, with

218 dangerously subtherapeutic Depakote levels (42.3 μg/mL), and hypertensive with blood

219 pressure readings up to 187/92 mmHg (Ex. D). **Notably, Plaintiff's medical**

220 **presentation was similar to her previous hospital visits, yet the treatment response**

221 **dramatically escalated in severity and dangerousness immediately following her**

222 **protected legal activity, demonstrating that the change in care was retaliatory**

223 **rather than medically indicated.**

224 36. Despite Plaintiff's bright-red, notarized PAD clearly designating Porscha Ryan as medical

225 decision-maker and containing specific restraint prohibitions, Southern Hills staff

226 systematically ignored the directive and failed to contact Ryan until she arrived

227 independently (Ex. D, BB).

228 37. **Unlawful Physical Restraints**: Plaintiff was placed in waist restraints without physician

229 orders, required monitoring documentation, or compliance with 42 C.F.R. § 482.13

230 federal restraint regulations. Staff told both Plaintiff and her POA that a doctor had

231 ordered "24/7 restraints," yet chart review revealed no such physician orders, monitoring

232 logs, or required documentation existed (Ex. DD, TT).

233    38. **Medical Abandonment During Life-Threatening Episodes**: Plaintiff's oxygen

234    saturation repeatedly dropped into the 60s with visible cyanosis (normal >95%). When

235    POA Ryan expressed alarm, nursing staff dismissed these dangerous readings as

236    "normal." Seizure episodes lasting 5-7 minutes occurred repeatedly over 48 hours, yet no

237    physician intervention was provided (Ex. D, N).

238    39. **Systematic Over-Sedation**: Every time Plaintiff regained consciousness and attempted

239    to communicate, she was re-sedated with combinations of medications causing

240    paradoxical effects that triggered additional seizures, ultimately causing 32 documented

241    seizure episodes over 48 hours and motor dysfunction requiring walker assistance upon

242    discharge (Ex. D, JJJ).

243    40. **Fraudulent Critical Care Billing**: On June 29, 2025, at 8:14 AM, Dr. Brent J. Wright

244    submitted billing for CPT 99291 claiming 37 minutes of critical care services with

245    "HIGH COMPLEXITY OF DECISION MAKING" and "vital system functions support."

246    Medical records and eyewitness testimony from POA Ryan establish that during this

247    claimed period: (a) no physician provided bedside care; (b) Plaintiff was medically

248    abandoned during hypoxic episodes; (c) nursing staff engaged in non-medical activities

249    while Plaintiff experienced life-threatening episodes; and (d) no critical care interventions

250    occurred (Ex. D, Z, Y).

251    41. **Medical Record Falsification**: On June 29, 2025, Southern Hills nursing staff, including

252    unknown Nurse Jane Doe 1, entered a false diagnosis of "DIFFUSE TBI WITH LOC

253    STATUS UNKNOWN" despite normal head CT scan results documented by Dr. Brian

254    Ellison on June 28, 2025, at 17:21 hours showing "No acute intracranial abnormality."

255    This false diagnosis was entered over 12 hours after normal CT results were available and

256    represents deliberate falsification designed to justify unlawful restraints and cover

257    medical abandonment (Ex. M, D).

258    **G. RICO Enterprise Structure and Coordination**

259    42. The HCA enterprise operates through a centralized command structure that transcends

260    individual hospital operations, consisting of: (a) HCA Healthcare, Inc. as parent

261    corporation with $70.6 billion annual revenue directing unified policies across 191

262    hospitals in 20 states; (b) centralized risk management through corporate officers like

263    Cinthya Cook who coordinate enterprise-wide responses to patient complaints using

264    interstate communication systems; (c) integrated Electronic Health Records systems

265    allowing real-time patient information sharing across state lines; (d) unified Medicare

266    billing systems processing $17.7 billion annually through centralized submission

267    protocols; (e) standardized patient complaint suppression policies implemented

268    identically across facilities regardless of state location; and (f) corporate training

269    programs teaching identical retaliation protocols to staff enterprise-wide. This structure

270    enables coordinated racketeering activity distinct from routine hospital operations.

271    43. This enterprise structure operates as an association-in-fact separate from normal

272    corporate hierarchy, united by the common purpose of suppressing patient complaints

273    through coordinated medical retaliation, systematic record falsification, and fraudulent

274    billing designed to extract federal funds while silencing whistleblowers (Ex. PP, Q,

275    KKK).

276    44. Cinthya Cook's enterprise coordination role is evidenced by: (a) her corporate authority

277    over patient safety policies across all 191 HCA facilities; (b) her June 23, 2025 interstate

278    email directing "review Plaintiff's case" to multiple hospital staff members; (c) the

279    precision timing of Southern Hills' retaliation protocol beginning exactly 48 hours after

280    her receipt of Plaintiff's media threat; (d) her access to centralized EHR systems allowing

281    real-time monitoring of Plaintiff's treatment across facilities; (e) standardized retaliation

282    protocols implemented identically at Southern Hills following her directives; and (f) her

283    2021 signed patient safety commitment demonstrating knowledge of federal requirements

284    she systematically violated. Cook's role transforms individual hospital actions into

285    coordinated enterprise racketeering through centralized command and control (Ex. AA,

286    V, Q).

**H. Pattern of Racketeering Activity - Predicate Acts**

288    45. **Healthcare Fraud (18 U.S.C. § 1347)**: The enterprise systematically submitted false

289    claims to federal healthcare programs including: (a) Dr. Wright's June 29, 2025, CPT

290    99291 billing for non-existent critical care; (b) MountainView's billing for stabilization

291    services never provided; (c) Sunrise's billing for appropriate PE screening that was

292    deliberately omitted; and (d) systematic billing for restraint monitoring that federal

293    regulations required but was never performed (Ex. Z, D).

294    46. **Wire Fraud (18 U.S.C. § 1343)**: On June 29, 2025, Defendants transmitted fraudulent

295    CPT 99291 billing claims via interstate Medicare electronic submission systems from

296    Nevada to CMS processing centers in multiple states. Additional wire fraud occurred

297    through Cook's June 23-26, 2025, coordination emails using HCA's corporate interstate

298    communication infrastructure connecting Tennessee headquarters to Nevada facilities,

299    satisfying the interstate commerce requirement for federal jurisdiction (Ex. T, V, Z).

300    47. **Mail Fraud (18 U.S.C. § 1341)**: On June 30, 2025, Southern Hills mailed fraudulent

301        billing statements and falsified medical records to Anthem and Medicare systems,

302        misrepresenting care provided June 28-29, 2025. The enterprise used interstate mail

303        systems to coordinate retaliation and transmit falsified documentation across state lines

304        (Ex. Z, YY).

305    48. **Obstruction of Justice (18 U.S.C. § 1512)**: Systematic falsification of medical records

306        including: (a) false TBI diagnosis on June 29, 2025, despite normal CT results; (b)

307        conflicting restraint narratives on May 29, 2025; (c) omission of federally-required

308        restraint documentation under 42 C.F.R. § 482.13; (d) creation of false physician care

309        documentation contradicted by eyewitness testimony. Additional falsifications occurred

310        on May 29, 2025 (Ex. YY), demonstrating pattern continuity across multiple dates and

311        facilities. Additional fraud instances to be uncovered in discovery (Ex. OO).

312    49. The pattern demonstrates both relatedness (common victims, methods, participants, and

313        goals) and continuity (ongoing enterprise policies threatening future violations across

314        191-hospital network serving 9.7 million annual emergency visits) as required under

315        *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985). The enterprise's patient complaint

316        suppression policies remain in effect, creating ongoing threat of similar violations against

317        other patients who assert federal rights, demonstrating open-ended continuity sufficient

318        for RICO liability. The threat of future criminal conduct satisfies the continuity

319        requirement under *Odom v. Microsoft*, 486 F.3d 541, 552 (9th Cir. 2007) (en banc),

320        precluding any argument that this was a single scheme.

321    **V. CAUSES OF ACTION**

322    **COUNT 1 — EMTALA (42 U.S.C. § 1395dd) (Against MountainView Hospital)**

323    50. Plaintiff incorporates all preceding paragraphs. Defendants failed to provide an

324    appropriate medical screening examination as required by 42 U.S.C. § 1395dd(a) and

325    failed to stabilize Plaintiff's known emergency medical condition before discharge, in

326    violation of 42 U.S.C. § 1395dd(b). MountainView failed to provide appropriate medical

327    screening examination and failed to stabilize Plaintiff's emergency neurological condition

328    before discharge on March 24, 2025. The hospital discharged Plaintiff by rideshare while

329    she remained in postictal state with documented cognitive impairment—conduct that

330    violates objective EMTALA standards and falls below any reasonable medical judgment.

331    Plaintiff suffered damages as direct result. 42 U.S.C. § 1395dd(d)(2)(A) provides private

332    right of action.

333    **COUNT 2 — EMTALA (42 U.S.C. § 1395dd) (Against Sunrise Hospital)**

334    51. Plaintiff incorporates all preceding paragraphs. By failing to order any standard-of-care

335    testing for PE despite classic post-surgical symptoms, Defendants' screening examination

336    was not "reasonably calculated to identify emergency medical conditions" within the

337    meaning of 42 U.S.C. § 1395dd(a). Sunrise failed to provide appropriate screening

338    examination for pulmonary embolism despite classic post-surgical symptoms and failed

339    to stabilize life-threatening emergency condition before discharge in violation of 42

340    U.S.C. § 1395dd(b). The failure to order standard PE diagnostic tests violated objective

341    EMTALA standards and reasonable medical judgment. Plaintiff suffered damages

342    including delayed treatment requiring corrective care.

343    **COUNT 3 — EMTALA (42 U.S.C. § 1395dd) (Against Southern Hills Hospital)**

344    52. Plaintiff incorporates all preceding paragraphs. Use of unlawful restraints and over-

345    sedation without addressing Plaintiff's seizures and hypoxia constituted a failure to

346    stabilize an emergency medical condition as required by § 1395dd(b). Southern Hills

347    failed to stabilize Plaintiff's emergency condition, ignored life-threatening hypoxia, used

348    unlawful restraints, and discharged her while neurologically impaired, violating

349    EMTALA stabilization requirements under 42 U.S.C. § 1395dd(b).

350    **COUNT 4 — Section 504 Rehabilitation Act (29 U.S.C. § 794) (Against All Defendants)**

351    53. Plaintiff incorporates all preceding paragraphs. Plaintiff was otherwise qualified to

352    receive emergency medical services, but Defendants denied her the benefits of those

353    services solely by reason of her disabilities, including seizure disorder and postictal

354    cognitive impairment. Defendants receive federal financial assistance and discriminated

355    against Plaintiff based on her disabilities by: (a) failing to accommodate seizure disorder

356    and postictal cognitive impairment; (b) ignoring legally binding PAD accommodations;

357    (c) discharging her while neurologically impaired; (d) denying equal access to emergency

358    medical care. **Ongoing Market Exclusion**: As direct result of Defendants' systematic

359    retaliation, Plaintiff now reasonably fears seeking emergency medical care at any HCA

360    facility due to documented enterprise-wide coordination of patient suppression protocols.

361    HCA controls the dominant share of emergency medical services in Clark County,

362    Nevada, operating MountainView, Sunrise, Southern Hills, and other major facilities that

363    collectively handle approximately 60% of regional emergency visits serving over

364    500,000 patients annually (Ex. FFF). This market dominance effectively excludes

365    Plaintiff from adequate emergency care in Las Vegas, forcing her to seek suboptimal

366    alternatives at overcrowded non-HCA facilities with longer wait times and reduced

367    specialist availability. Given Plaintiff's chronic seizure disorder requiring immediate

368    emergency intervention, this exclusion creates ongoing risk of serious injury or death and

369    constitutes continuing civil rights violations.

370    **COUNT 5 — ACA § 1557 (42 U.S.C. § 18116) (Against All Defendants)**

371    54. Plaintiff incorporates all preceding paragraphs. § 1557 prohibits discrimination based on

372    sex (including gender identity) and disability in federally funded health programs.

373    Defendants discriminated against Plaintiff on the basis of sex (including gender identity)

374    by applying gender-based diagnostic stereotypes, using false psychiatric labels tied to her

375    transgender status, and erasing her gender identity from records. Defendants also

376    discriminated based on her disabilities, evidenced by: (a) false psychiatric labeling used

377    to justify restraints (Ex. DDD); (b) gender-based diagnostic misuse denying proper care

378    (Ex. LLL); (c) systematic retaliation targeting her protected class membership.

379    **Continuing Harm from Market Exclusion**: This discrimination has created ongoing

380    exclusion from the dominant healthcare network in Las Vegas. HCA's market control

381    through multiple major facilities forces Plaintiff to seek emergency care at overcrowded,

382    understaffed non-HCA hospitals with significantly longer wait times, reduced specialist

383    availability, and suboptimal seizure management protocols. This ongoing exclusion based

384    on her transgender identity and disability status constitutes continuing § 1557 violations,

385    as she cannot access equal emergency medical services in her home community due to

386    Defendants' retaliatory conduct.

387     **COUNT 6 — ADA Title III (42 U.S.C. § 12182) (Against All Defendants)**

388     55. Plaintiff incorporates all preceding paragraphs. The discrimination is ongoing because

389     Plaintiff must routinely seek emergency care, and Defendants' policies remain in effect,

390     creating a real and immediate threat of repeated injury. Defendants operate places of

391     public accommodation and failed to provide reasonable modifications for Plaintiff's

392     disabilities including: (a) failure to accommodate communication needs during postictal

393     states; (b) failure to provide auxiliary aids for informed consent; (c) failure to honor PAD

394     accommodations; (d) policies that discriminate against psychiatric disabilities.

395     **Systematic Exclusion from Public Accommodations**: As Las Vegas resident with

396     chronic seizure disorder requiring ongoing emergency care, Plaintiff cannot safely access

397     HCA facilities due to documented retaliation risks, effectively excluding her from public

398     accommodations that dominate the local market. The fear of repeated abuse, unlawful

399     restraints, and medical abandonment documented herein creates systemic barriers to

400     accessing emergency medical public accommodations throughout Clark County. This

401     exclusion forces Plaintiff to travel greater distances for inferior care, creating unequal

402     access to public accommodations based on disability status. Plaintiff seeks injunctive

403     relief only as private damages unavailable under Title III.

404     **COUNT 7 — Civil RICO (18 U.S.C. § 1962(c)) (Against All Defendants)**

405     56. Plaintiff incorporates all preceding paragraphs. The HCA enterprise consists of the parent

406     corporation and 191 subsidiary hospitals operating through centralized risk management

407     and coordinated patient complaint suppression policies. This association-in-fact exists

408    separate from normal corporate structures, united by common purpose of suppressing

409    complaints through medical retaliation.

410    57. Defendants conducted the enterprise's affairs through pattern of racketeering activity

411    consisting of healthcare fraud under 18 U.S.C. § 1347 and wire fraud under 18 U.S.C. §

412    1343, spanning multiple months and facilities, demonstrating both relatedness and

413    continuity. **The enterprise coordination directly impacted Plaintiff through Cook's**

414    **centralized directives transforming what would have been isolated hospital incidents**

415    **into a coordinated pattern of retaliation specifically targeting her protected legal**

416    **activity.**

417    58. **Business or Property Injury**: Plaintiff's injuries include concrete financial loss—

418    fraudulent billing charges paid or incurred, costs of corrective medical treatment, and lost

419    income—which constitute injury to business or property under 18 U.S.C. § 1964(c).

420    Plaintiff's RICO damages are based on documented injury to business or property caused

421    by enterprise racketeering activity. Direct economic harm includes: (a) fraudulent billing

422    charges for CPT 99291 critical care never rendered, amount to be determined through

423    discovery of billing records; (b) corrective medical expenses for delayed PE treatment

424    and retaliation injuries, amount to be determined through discovery and expert testimony;

425    (c) lost wages and income opportunities, amount to be determined through discovery; (d)

426    future medical monitoring costs, amount to be determined through expert medical

427    testimony. Enterprise-wide damages reflect the systematic nature of HCA's 191-hospital

428    violations affecting Plaintiff through coordinated policies, with total base damages

429    subject to refinement through discovery of internal incident reports, billing audits, and

430    patient complaint data. Under 18 U.S.C. § 1964(c), these damages are trebled, with final

431     calculation dependent on expert economic testimony and discovery evidence of enterprise

432     scope.

**COUNT 8 — Civil Rights Conspiracy (42 U.S.C. § 1985(3)) (Against All Defendants)**

433

434     59. Plaintiff incorporates all preceding paragraphs. Defendants acted with invidious, class-

435     based animus toward Plaintiff as a transgender woman with disabilities, targeting her for

436     retaliation in a manner they would not target similarly situated non-transgender, non-

437     disabled patients. This invidiously discriminatory animus satisfies the class-based animus

438     requirement under Griffin v. Breckenridge, 403 U.S. 88 (1971). Defendants conspired to

439     deny Plaintiff equal protection and retaliate against her court access rights based on her

440     membership in protected classes (transgender individuals and persons with disabilities).

441     The conspiracy targeted Plaintiff not only for asserting legal rights but specifically

442     because she embodies classes Defendants sought to suppress—transgender disabled

443     patients who challenge systemic violations.

444     60. **Class-Based Animus**: The 48-hour retaliation protocol following legal threats

445     demonstrates animus toward transgender disabled individuals who assert federal rights.

446     Evidence includes: (a) false psychiatric labeling specifically targeting transgender

447     identity to justify restraints (Ex. DDD); (b) gender-based diagnostic misuse denying care

448     based on transgender status (Ex. LLL); (c) systematic denial of disability

449     accommodations through PAD violations targeting seizure disorder; (d) coordinated

450     enterprise response specifically triggered by complaints asserting ACA § 1557

451     transgender protections and Section 504 disability rights. The precision timing and

452     escalated severity of retaliation following assertion of transgender and disability rights

453    demonstrates that Plaintiff was targeted not merely for complaining, but specifically

454    because she embodies the intersection of protected classes Defendants sought to silence.

455    61. **Overt Acts**: (a) unlawful restraints without required federal documentation; (b) over-

456    sedation causing 32 seizures; (c) denial of PAD rights excluding designated agent; (d)

457    medical record falsification; (e) fraudulent billing; (f) medical abandonment during

458    hypoxic episodes. Unknown Doe defendants participated by implementing retaliation

459    through direct patient care and record falsification.

460    **COUNT 9 — Battery (Nevada Law) (Against Sunrise and Southern Hills)**

461    62. Plaintiff incorporates all preceding paragraphs. The administration of chemical and

462    physical restraints was an intentional, unauthorized touching without consent or legal

463    justification, outside the scope of medical treatment. Defendants intentionally

464    administered chemical restraints and physical restraints without consent or legal

465    justification, constituting battery. Doe defendants including nursing staff directly

466    participated in these acts.

467    **COUNT 10 — False Imprisonment (Nevada Law) (Against Southern Hills)**

468    63. Plaintiff incorporates all preceding paragraphs. Plaintiff was intentionally confined by

469    waist restraints without lawful authority, physician orders, or required federal

470    documentation, and was aware of and harmed by that confinement. Southern Hills

471    confined Plaintiff in unlawful restraints without proper orders or legal justification,

472    constituting false imprisonment.

473    **COUNT 11 — Intentional Infliction of Emotional Distress (Nevada Law) (Against All**
474    **Defendants)**

475    64. Plaintiff incorporates all preceding paragraphs. Such conduct is so extreme in degree, and
476    so outrageous in character, as to go beyond all possible bounds of decency and to be
477    regarded as atrocious and utterly intolerable in a civilized community. Defendants'
478    extreme and outrageous conduct—including dangerous drug combinations, medical
479    abandonment during hypoxic episodes, and coordinated retaliation—was intended to
480    cause severe emotional distress. Plaintiff suffered severe emotional distress manifested
481    by physical symptoms, loss of sleep, and functional impairment, as a direct and
482    proximate result of Defendants' conduct.

483    **COUNT 12 — Negligent Hiring/Retention/Supervision (Nevada Law) (Against HCA)**

484    65. Plaintiff incorporates all preceding paragraphs. HCA had actual and constructive
485    knowledge, through prior complaints, regulatory violations, and internal incident reports,
486    that its personnel had engaged in similar misconduct toward other patients, yet failed to
487    act. HCA knew or should have known its Risk Management personnel and clinical staff
488    were unfit and failed to adequately train, supervise, or discipline them.

489    **COUNT 13 — Fraud/Medical Record Falsification (Nevada Law) (Against Defendants)**

490    66. **Rule 9(b) Specificity**:

491    **False TBI Diagnosis**: On June 29, 2025, at approximately 09:30 hours, Southern Hills nursing
492    staff including unknown Nurse Jane Doe 1, RN, entered false diagnosis "DIFFUSE TBI WITH

493    LOC STATUS UNKNOWN" into Plaintiff's electronic medical record. This statement was false

494    because Dr. Brian Ellison had documented normal head CT results on June 28, 2025, at 17:21

495    hours showing "No acute intracranial abnormality." The false diagnosis was intended to be relied

496    upon by Medicare, Anthem insurance, courts, and federal regulators to justify unlawful restraints

497    and cover medical abandonment. This caused damages including additional medical treatments,

498    amounts to be determined through discovery.

499    **Conflicting Restraint Narratives**: On May 29, 2025, at approximately 11:45 hours, Sunrise

500    nursing staff including unknown Nurse Jane Doe 2, RN, created contradictory incident reports

501    documenting Plaintiff both "fell from chair" and "threw herself on ground" to justify

502    administration of B52 chemical restraint. These conflicting statements were false as they could

503    not both be true, and were intended to be relied upon by hospital administration, insurers, and

504    regulators to retroactively justify unjustified chemical restraint. This caused damages including

505    litigation costs and emotional distress, amounts to be determined through discovery.

506    Plaintiff suffered damages as direct result of these fraudulent acts.

507    **VI. PRAYER FOR RELIEF**

508    WHEREFORE, Plaintiff requests:

509    **A.** Compensatory damages in an amount to be proven at trial through discovery and expert

510    testimony, including medical expenses, pain and suffering, emotional distress, and lost wages;

511    **B.** RICO treble damages under 18 U.S.C. § 1964(c) in an amount to be proven at trial through

512    discovery and expert testimony regarding enterprise-wide violations;

513    **C.** Punitive damages under Nevada law in an amount to be proven at trial through discovery and

514    expert testimony; the limitations of NRS 42.005 do not apply because Defendants' acts

515    constituted oppression, fraud, and malice, and because the claims arise in part under federal law;

516    **D.** Injunctive relief requiring: (1) compliance with federal anti-discrimination laws; (2) PAD

517    recognition and disability accommodation policies; (3) independent monitoring of restraint

518    practices; (4) enterprise-wide corrective action for billing and documentation practices;

519    **E.** Attorneys' fees and costs under applicable federal statutes;

520    **F.** Referral to federal prosecutors and regulators including CMS, DOJ Civil Rights Division,

521    HHS-OIG, and Nevada State Board of Nursing;

522    **G. Expedited discovery under FRCP 26(d)(1)** to: (1) identify Doe defendants through hospital

523    staffing records, EHR audit trails, and security access logs; (2) preserve evidence at immediate

524    risk of destruction under routine retention policies; (3) obtain corporate communications

525    regarding the retaliation protocol; (4) secure billing records and Medicare submission data; and

526    (5) prevent spoliation of electronic evidence essential to proving enterprise coordination and

527    individual liability;

528    **H.** Such other relief as the Court deems just.

529    **VII. DEMAND FOR JURY TRIAL**

530    Plaintiff demands jury trial on all triable claims.

531    **VIII. VERIFICATION**

532    I, Jade Riley Burch, declare under penalty of perjury that the foregoing is true and correct.

533    Executed on this **8** day of **August**, 2025, in Las Vegas, Nevada.

534    Jade Riley Burch Plaintiff, Pro Se 222 Karen Ave, Unit 1207 Las Vegas, NV 89109 Email:

535    jaderburch@gmail.com Phone: (614) 725-9452

536    **COUNSEL SUCCESSION NOTICE**

537    Plaintiff, having established this action pro se, seeks to retain qualified counsel experienced in

538    complex federal litigation, including RICO, civil rights, and healthcare fraud matters, to assume

539    primary responsibility for prosecution of this case. Qualified counsel interested in representation

540    may contact Plaintiff at the address listed herein.

541    **IX. CERTIFICATE OF SERVICE**

542    I certify that on August 8, 2025, I served this Complaint on Defendants by certified mail and

543    professional process server per Rule 4.

544    Jade Riley Burch Pro Se Plaintiff

545    **X. KEY EXHIBITS SUMMARY**

546    **Core Evidence Supporting Claims:**

547    • **Ex. A-D:** Medical records from all three hospitals documenting EMTALA violations

548    • **Ex. T, V:** Cook email correspondence and 48-hour retaliation timeline

549    • **Ex. M:** False TBI diagnosis with contradicting normal CT scan results

550    • **Ex. Z:** Fraudulent CPT 99291 billing for critical care never provided

551    • **Ex. BB:** Notarized Psychiatric Advance Directive (ignored by defendants)

552    • **Ex. DD, TT:** Unlawful restraint documentation and missing physician orders

553    • **Ex. PP:** HCA enterprise structure and systematic violations pattern

554    • **Ex. JJ:** B52 chemical restraint protocol violations

555    • **Ex. Q, KKK:** Enterprise retaliation timeline and coordination evidence

556    **XI. COMPLETE EXHIBIT INDEX**

557    **Jade Riley Burch v. HCA Healthcare, Inc., et al. Date**: August 8, 2025 **Total Exhibits**: 67

558    (Comprehensive Evidence Package)

| Exhibit | Description |
|---------|-------------|
| A | MountainView Coversheet and Medical Records |
| B | Sunrise PE Complete Medical Records and Coversheet |
| C | Summerlin Hospital Diagnosed Sunrise Missed PE Medical Records |
| D | Southern Hills Cover and Complete Medical Records |
| E | Witness Statement -- Emergency Incident (MountainView) |
| F | Federal Guidelines -- CMS, EMTALA, ACA §1557, and Disability Protections |
| G | Witness Declaration - Melissa Neglectful Discharge (MountainView) |
| H | Medical Expert Analysis of Systemic Negligence & Rights Violations |
| I | Systemic Pattern of Negligence & Civil Rights Violations |
| J | Federal Patient Rights Framework -- EMTALA, ADA, ACA |

| Exhibit | Description |
|---------|-------------|
| K | Annotated Federal Standards (CMS, CFR, U.S.C. excerpts) |
| L | Sunrise Hospital - Forced Sedation Event - Chemical Restraint Record |
| M | False TBI Diagnosis, Medical Fraud, and False Pretense of Medical Care |
| N | Audio Transcript Abuse at Southern Hills Neglect, Abuse, and Torture |
| O | Enterprise Retaliation Protocol & Civil Rights Conspiracy Analysis |
| P | Coordinated Corporate Retaliation Statement -- Legal, Financial & Civil Rights Impact |
| Q | HCA Retaliation Timeline - 48 Hours from Legal Notice to Medical Harm |
| R | Enterprise Risk Flag Retaliation & Coordinated Harm Protocol |
| S | Systemic Patient Elimination Protocol -- 48 Hour Retaliation Framework |
| T | June Sunrise Letters - Prelitigation Complaints Triggering Retaliation Cinthya S. Cook |
| U | Extended Retaliation Timeline - Escalation Sequence Across HCA Facilities |
| V | Sunrise Risk Management & Patient Safety Compliance Report Cinthya S. Cook |
| W | Declaration of Authenticity and Custody of All Exhibits |
| X | Documentation Fraud & Absence of Medical Accountability (Southern Hills Hospital) |
| Y | Eyewitness Testimony - Southern Hills Abuse of Plaintiff |
| Z | False Psychiatric Labeling - Insurance Fraud - Southern Hills to Anthem 2025 |
| AA | Director of Risk, Engine of Retaliation Cinthya S. Cook Authority In HCA Response Actions |
| BB | Legally Binding Psychiatric Advance Directive (PAD) Notarized and Effective June 6 2025 |

| Exhibit | Description |
|---|---|
| CC | Witness Declaration Post-Discharge Condition of Jade Riley Burch (MountainView) |
| DD | Witness Declaration Physical Restraints and Abuse at Southern Hills Hospital |
| EE | Witness Declaration Life-Threatening Medical Abuse at Sunrise Hospital |
| FF | Pharmaceutical Misconduct and Black Box Drug Violations at Southern Hills Hospital |
| GG | Federal Criminal Referral RICO Civil Rights Violations and Healthcare Fraud by HCA Healthcare |
| HH | Evidence Preservation and Discovery Framework For Litigation and Federal Investigation |
| II | Federal Agency Enforcement Summary Multi-Jurisdictional Violations and Penalty Exposure |
| JJ | B52 Chemical Torture Protocol Human Rights, Constitutional and Criminal Law Violations |
| KK | Comprehensive Damages Valuation Framework Civil Rights RICO and Healthcare Fraud Claims |
| LL | Enterprise Retaliation Timeline Escalation from Negligence to Criminal Conspiracy |
| MM | Witness Coordination Strategy Legal Testimony Framework |
| NN | Federal Expert Coordination Case Law Foundation for Civil Rights Fraud and RICO claims |
| OO | Missing Medical Records False Documentation and Evidence Spoliation Framework |

| Exhibit | Description |
|---------|-------------|
| PP | HCA RICO Enterprise Blueprint Multi-State Retaliation Fraud and Criminal Conspiracy |
| QQ | Congressional Referral Package Civil Rights Abuse Federal Program Fraud and Advance Directive Violations |
| RR | Fatal Delay Timeline 14 Day Negligence in Diagnosing Life-Threatening Pulmonary Embolism |
| SS | Complete Failure to Follow Post-Surgical PE Protocols - Egregious Standard of Care Violations (Sunrise) |
| TT | Spoliation, Falsified Records and Missing Critical Documentation 48-Hour Obstruction Pattern (Southern Hills) |
| UU | Ignored Vital Signs Indicating Pulmonary Embolism Sunrise Hospitals Life-Threatening Failure to Act |
| VV | The 25 Dollar Test that Could Have Saved my Life - Laboratory Evidence of Gross Negligence (Sunrise) |
| WW | Failure To Diagnose PE Sunrise Hospital Multi-Domain Collapse in Protocol, Screening and Discharge Safety |
| XX | B52 Chemical Restraint Misuse Unjustified Sedation of Seizure Patient and Pattern of Rights Violations (Sunrise) |
| YY | Falsified Medical Records to Justify Chemical Restraint Coordinated Documentation Fraud (Sunrise) |

| Exhibit | Description |
|---------|-------------|
| ZZ | Dangerous Discharge of Chemically Restrained Seizure Patient Sunrise Hospitals EMTALA and Federal Safety Violations |
| AAA | Deliberate Omission of Seizure Events Mountainview Medical Record Suppression and Regulatory Breach |
| BBB | Dangerous Polypharmacy and Neurological Risk Improper Sedation of Seizure Patient (MountainView) |
| CCC | Integrated Legal Summary MountainView Hospital Regulatory Violations Medical Negligence and Civil Rights Breaches |
| DDD | Violations of Section 1557 and Section 504 Discriminatory Use of Psychiatric History To Deny Emergency Care |
| EEE | Premature Discharge of Cognitively Impaired Patient Patient Abandonment Reckless Discharge (MountainView) |
| FFF | National Class Action Blueprint Enterprise-Wide Liability Exposure Across HCA Hospital Network |
| GGG | Declaration of Authenticity Chain of Custody and Evidentiary Integrity of all Case Exhibits |
| HHH | Supplemental Witness Declaration Post-Discharge Events and Continued Harm at MountainView Hospital |
| III | Forensic Analysis of Coordinated Chemical Restraint Protocols Across HCA Facilities |
| III-2 | Coordinated Enterprise Harm Matrix Multi-Hospital Failure Map (MountainView, Sunrise, Southern Hills) |

| Exhibit | Description |
|---------|-------------|
| III-3 | Litigation Nexus Matrix Evidence-to-Claim Crosswalk for Federal Violations |
| JJJ | Medical Torture Protocol - Southern Hills Hospital |
| KKK | Enterprise Retaliation Protocol Risk Flag, Chemical Restraint, and Evidence Suppression Timeline |
| LLL | Involuntary Hold, Forced Sedation, and Gender-Based Diagnostic Misuse at Southern Hills |
| MMM | Sunrise Hospital's Smoking Gun Internal Records Prove Knowledge of Missed PE and Evidence Tampering |

559   **END OF DOCUMENT**

560