===========================================

# EXHIBIT O

# INDEX / SEPARATOR PAGE

===========================================

**\*\*\* START OF EXHIBIT O \*\*\***

**TITLE: ENTERPRISE RETALIATION PROTOCOL & CIVIL RIGHTS CONSPIRACY EVIDENCE**

**(Next Page: Formal White Cover Sheet)**

```
✓ FILED          ___ RECEIVED
___ ENTERED      ___ SERVED ON
             COUNSEL/PARTIES OF RECORD

         AUG 19 2025

    CLERK US DISTRICT COURT
       DISTRICT OF NEVADA
BY: _____ DEPUTY
```

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC; MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.
Case No.: 2:25-cv-01408-JAD-MDC

## EXHIBIT O
## ENTERPRISE RETALIATION PROTOCOL & CIVIL RIGHTS CONSPIRACY EVIDENCE

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

# EXHIBIT O - ENTERPRISE RETALIATION PROTOCOL & CIVIL RIGHTS CONSPIRACY EVIDENCE

**Plaintiff:** Jade Riley Burch
**Facility:** HCA Healthcare Enterprise (Multiple Facilities)
**Dates of Incident:** June 22 - July 9, 2025

## PRELIMINARY STATEMENT

This case involves corporate retaliation targeting patients who exercise their constitutional right to petition federal courts. The evidence suggests a deliberate enterprise protocol designed to punish patients who threaten litigation against HCA Healthcare.

The evidence is consistent with a centrally coordinated system operated by Cinthya Cook, MSN/MHA, RN, CPPS, Director of Risk Management/Patient Safety Officer. Upon information and belief, Cook used her advanced medical credentials to implement medically harmful intervention protocols against Plaintiff. The evidence suggests a fundamental departure from patient safety principles: a "Patient Safety Officer" weaponizing medical care for corporate liability management.

## THE SMOKING GUN

When Jade Riley Burch sent litigation threat communications to HCA's corporate leadership, the corporation deployed retaliation within 48 hours. While temporal proximity alone does not establish causation, the systematic nature of violations combined with the unusual timing creates a strong inference of coordinated retaliation.

Plaintiff was subjected to unauthorized physical restraints, medically harmful chemical interventions, and deliberate obstruction of her Medical Power of Attorney rights. The digital communication trail establishes direct corporate knowledge and immediate coordinated response. *(See Exhibit T - June Sunrise Letters - Prelitigation Complaints Triggering Retaliation)*

## THE EMAIL EVIDENCE - CORPORATE CONSPIRACY IN BLACK AND WHITE

Here's what happened, step by step:

**June 22, 2025, 4:34 PM**

**TO:** Cinthya.Cook@hcahealthcare.com
**SUBJECT:** "Formal Pre-Litigation Demand -- Missed PE Diagnosis"

Plaintiff sent her initial legal threat directly to Cinthya Cook, HCA's Risk Management Director. *(See Exhibit T - June Sunrise Letters - Prelitigation Complaints Triggering Retaliation)* This communication established direct corporate knowledge of pending federal litigation.

**June 26, 2025, 8:40 PM**

**TO:** Cinthya.Cook@hcahealthcare.com
**SUBJECT:** "Sunrise Hospital's Missed Diagnosis to Become Public -- Final Opportunity"

Plaintiff escalated with a media exposure threat to the same corporate recipient. *(See Exhibit T - June Sunrise Letters - Prelitigation Complaints Triggering Retaliation)* This created urgent corporate liability concerns requiring immediate response.

**June 28, 2025 - THE CORPORATE RESPONSE**

Exactly 48 hours after the final communication, Plaintiff was admitted to Southern Hills Hospital. The facility deployed intervention protocols including: *(See Exhibit D - Southern Hills Cover and Complete Medical Records)*

- Unauthorized physical restraints
- Chemical sedation using high-risk drug combinations
- Deliberate obstruction of Medical Power of Attorney rights *(See Exhibit DD - Witness Declaration Physical Restraints and Abuse at Southern Hills Hospital)*

The rapid deployment timeline suggests pre-existing enterprise infrastructure capable of coordinating retaliation across multiple facilities within 48 hours of receiving litigation threats.

**July 9, 2025 - ENTERPRISE NOTIFICATION**

**TO:** investorrelations@hcahealthcare.com, legal@hcahealthcare.com *(See Exhibit GG - Federal Criminal Referral RICO Civil Rights Violations and Healthcare Fraud by HCA Healthcare)*

Corporate executives received comprehensive documentation of the violations, establishing enterprise-wide knowledge of the coordinated retaliation protocols.

**CINTHYA COOK - THE ARCHITECT OF SYSTEMATIC RETALIATION**

Cook's professional credentials created the infrastructure for systematic patient retaliation:

**Professional Credentials:** *(See Exhibit AA - Director of Risk, Engine of Retaliation Cinthya S. Cook Authority In HCA Response Actions)*

- MSN/MHA - Master's in Nursing/Healthcare Administration
- RN, CPPS - Registered Nurse, Certified Patient Safety Professional
- Director Risk Management/Patient Safety Officer - Dual enterprise authority

Upon information and belief, Cook's dual authority over both medical protocols and liability management created a structural conflict of interest. The evidence suggests she converted patient safety expertise into instruments of corporate defense.

### Evidence of Cook's Coordination:

Cook received direct litigation threats and possessed enterprise authority to deploy facility protocols. *(See Exhibit T - June Sunrise Letters - Prelitigation Complaints Triggering Retaliation; Exhibit AA - Director of Risk, Engine of Retaliation)* Upon information and belief, she utilized her advanced nursing knowledge to design medically harmful drug combinations targeting a seizure disorder patient. Her position as Patient Safety Officer provided the medical expertise necessary to implement intervention protocols while maintaining the appearance of legitimate medical care.

The evidence suggests Cook's role represents a fundamental departure from medical ethics—utilizing advanced healthcare credentials not for healing, but for suppression of patients who exercise constitutional rights in service of corporate liability management.

## THE RETALIATION PROTOCOL - SYSTEMATIC MEDICAL HARM

The retaliation protocol deployed against Plaintiff demonstrates sophisticated medical knowledge applied for punishment rather than treatment:

### Unauthorized Physical Restraints

Immediate application of 24/7 waist restraints without medical justification, physician orders, or patient consent. *(See Exhibit D - Southern Hills Cover and Complete Medical Records; Exhibit DD - Witness Declaration Physical Restraints and Abuse at Southern Hills Hospital)* Staff acknowledged restraint orders to witnesses while failing to document any such orders in medical records. The evidence suggests deliberate concealment rather than administrative oversight.

### Medically Harmful Chemical Interventions

Simultaneous administration of Lorazepam and Oxycodone despite medical records documenting "Has not tried any pain meds for headache." *(See Exhibit D - Southern Hills Cover and Complete Medical Records; Exhibit FF - Pharmaceutical Misconduct and*

*Black Box Drug Violations at Southern Hills Hospital)* This combination creates known risks of respiratory depression, particularly dangerous for seizure disorder patients—appearing to deliberately target Plaintiff's documented medical vulnerabilities.

### Medical Abandonment During Crisis

When Plaintiff's oxygen saturation dropped to dangerous levels (60s) with visible cyanosis, staff dismissed life-threatening symptoms as "normal" rather than providing appropriate medical intervention. *(See Exhibit D - Southern Hills Cover and Complete Medical Records; Exhibit Y - Eyewitness Testimony - Southern Hills Abuse of Plaintiff)* This conduct constitutes deliberate indifference to serious medical need.

### Cognitive Suppression Through Excessive Medication

Excessive Ativan administration resulted in 32 documented seizures over 48 hours and profound memory disruption. *(See Exhibit D - Southern Hills Cover and Complete Medical Records; Exhibit JJ - B52 Chemical Torture Protocol Human Rights, Constitutional and Criminal Law Violations)* The dosages and timing appear consistent with deliberate cognitive impairment designed to prevent future testimony about the treatment.

The precision and coordination of these interventions suggests medical expertise deployed with clinical precision for non-therapeutic purposes.

## WITNESS TESTIMONY - THE UNIMPEACHABLE OBSERVER

Porscha Ryan's role as court-appointed Medical Power of Attorney provided unique legal standing that compromised Cook's intervention protocols. Ryan's designation as Medical POA was notarized and on file with the hospital prior to admission.

Ryan possessed federal legal authority to monitor care and make healthcare decisions. Her status as a federally protected healthcare proxy means her observations carry the weight of official legal testimony. Her presence invalidated any subsequent claims of medical misunderstanding or accidental treatment errors.

### Critical Witness Documentation:

1. No physician conducted meaningful bedside evaluations despite detailed consultation notes
2. Staff openly discussed restraint orders that do not exist in medical records
3. Life-threatening vital signs were dismissed as "normal"
4. Deliberate obstruction of Medical POA authority as retaliation

Ryan's legal standing and real-time documentation converted what was intended as covert abuse into documented federal violations with an unimpeachable witness whose authority could not be challenged or eliminated.

The facts are undisputed: Ryan saw everything and documented it in real time.

## RECORD FALSIFICATION - CONSCIOUSNESS OF WRONGDOING

The pattern of missing documentation establishes criminal intent, not administrative oversight.

### Federally Required Documentation Completely Absent

Under 42 C.F.R. § 482.13(e) and CMS State Operations Manual – Appendix A – Tag A-0175 to A-0214 (Restraint/Seclusion), hospitals must maintain detailed documentation for all restraint use. The following required records are completely absent:

- Physician orders for restraint application
- Medical justification for restraint necessity
- 15-minute monitoring logs required by federal regulation
- 2-hour restraint assessments mandated by CMS
- Patient consent or emergency authorization

Staff confirmations of restraint orders combined with complete absence of documentation establishes evidence suppression coordinated by someone with detailed knowledge of regulatory requirements.

The selective documentation pattern - maintaining routine medical records while eliminating evidence of controversial interventions - demonstrates concealment, not administrative error.

## FEDERAL VIOLATIONS AND CRIMINAL LIABILITY

### A. Civil Rights Conspiracy (42 U.S.C. § 1985)

**Predicate Act 1 (June 28-29, 2025):** Enterprise conspiracy to punish constitutional rights exercise. The email evidence establishes corporate knowledge. *(See Exhibit T - June Sunrise Letters - Prelitigation Complaints Triggering Retaliation)* The 48-hour timeline supports inference of coordinated response capability.

### B. RICO Violations (18 U.S.C. § 1962)

**Pattern of Racketeering Activity:** Upon information and belief, HCA operates as a criminal enterprise with Cook coordinating the conspiracy. Pattern affects interstate commerce through their multi-state hospital system (191 facilities across 20 states).[1]

---

[1] HCA Healthcare operates 191 hospitals per Q2 2025 Investor Report; Source: HCA Healthcare Investor Relations

**Predicate Acts Include:**

1. **Civil rights violations** (42 U.S.C. § 1985) - June 28-29, 2025
2. **Healthcare fraud** (18 U.S.C. § 1347) - Ongoing billing for phantom services *(See Exhibit X - Documentation Fraud & Absence of Medical Accountability)*
3. **Obstruction of justice** (18 U.S.C. § 1512) - Systematic record suppression

**Enterprise Elements:**

- **Association-in-fact:** HCA corporate structure with Cook's Risk Management authority *(See Exhibit AA - Director of Risk, Engine of Retaliation)*
- **Interstate Commerce:** Multi-state hospital operations affecting interstate commerce
- **Pattern:** Multiple predicate acts within enterprise operations across timeframe

## C. Healthcare Fraud (18 U.S.C. § 1347)

**Predicate Act 2:** Systematic billing for physician services never rendered. False documentation of medical encounters contradicted by witness testimony. *(See Exhibit X - Documentation Fraud & Absence of Medical Accountability; Exhibit D - Southern Hills Cover and Complete Medical Records)*

## D. Obstruction of Justice (18 U.S.C. § 1512)

**Predicate Act 3:** Coordinated record falsification to conceal federal violations. Enterprise-wide document suppression implemented through Cook's Risk Management authority, including systematic failure to create federally required restraint documentation. *(See Exhibit TT - Spoliation, Falsified Records and Missing Critical Documentation 48-Hour Obstruction Pattern)*

**Spoliation of Evidence:** The deliberate failure to create required documentation, rather than loss of existing records, constitutes spoliation through non-creation under federal regulations.

## ONGOING ENTERPRISE THREAT

Upon information and belief, Cook's retaliation system remains operational across HCA's 191 hospitals.[1] Plaintiff cannot safely access emergency medical care at any HCA facility due to active corporate flagging systems. The enterprise protocol threatens constitutional rights for any patient who attempts to exercise legal remedies against HCA.

Cook's continued employment as Risk Management Director suggests institutional approval of patient retaliation protocols. HCA's failure to terminate Cook or dismantle the retaliation infrastructure appears to constitute ongoing criminal enterprise activity.

## DAMAGES AND RELIEF REQUESTED

### A. Quantified Damages

| Damage Type | Estimated Amount | Basis/Evidence |
|---|---|---|
| Medical Expenses | [TBD] | Billing records (Exhibit KK) |
| Ongoing Treatment | [TBD] | Iatrogenic harm (Exhibit D) |
| Lost Capacity | [TBD] | Trauma impact (Exhibit KK) |
| Future Medical | [TBD] | Expert analysis |

**Direct Medical Expenses:** $[Amount to be calculated upon production of billing records] resulting from retaliatory interventions and delayed appropriate care *(See Exhibit KK - Comprehensive Damages Valuation Framework)*

**Ongoing Treatment Costs:** $[Amount to be determined] for continued medical treatment necessitated by systematic medical abandonment

**Lost Wages/Capacity:** $[Amount to be calculated] due to inability to work resulting from physical and psychological trauma

**Future Medical Expenses:** $[Amount to be determined by expert analysis] for ongoing treatment of iatrogenic injuries and psychological trauma

### B. Relief Requested

**Compensatory Damages** for civil rights violations, physical harm, and trauma caused by systematic retaliation coordinated by medical professionals.

**Punitive Damages** to deter enterprise conspiracy and professional credential misuse. The nature of the violations and medical expertise involved demand maximum deterrent effect.

**RICO Treble Damages** under federal racketeering statutes for criminal enterprise activity.

**Injunctive Relief** requiring immediate dismantling of retaliation protocols and termination of responsible corporate personnel.

**Regulatory Referrals** to Department of Justice, Centers for Medicare & Medicaid Services, and Nevada Board of Nursing for appropriate criminal and professional sanctions.

## CONCLUSION

The evidence supports a strong inference that HCA Healthcare operates protocols to retaliate against patients who exercise constitutional rights. Upon information and belief, Cinthya Cook utilized advanced medical credentials to coordinate enterprise-wide patient retaliation while maintaining the appearance of legitimate medical care.

The systematic destruction of required documentation suggests consciousness of wrongdoing, not administrative oversight.

### Why This Cannot Be Explained as Coincidence or Medical Error:

1. **Precise Timing:** Systematic violations occurred exactly 48 hours after litigation threats
2. **Coordinated Scope:** Multiple simultaneous protocol violations across different departments and staff
3. **Selective Documentation Pattern:** Routine care documented while controversial interventions systematically undocumented, suggesting deliberate concealment
4. **Staff Acknowledgments:** Multiple staff members confirmed restraint orders to witnesses while no such orders exist in medical records
5. **Medical Targeting:** Interventions specifically targeted Plaintiff's documented medical vulnerabilities rather than following standard care protocols

Plaintiff's Medical Power of Attorney documented violations in real-time, converting systematic retaliation into legally actionable evidence with an unimpeachable witness. Cook's sophisticated medical knowledge, when applied for punishment rather than treatment, represents a fundamental betrayal of healthcare ethics and federal patient protection laws.

The nature of the violations, combined with enterprise-wide coordination and ongoing operational capability, requires immediate judicial intervention to protect constitutional rights and prevent future systematic retaliation against vulnerable patients.

**Discovery sought in Motion for Expedited Discovery (filed August 8, 2025, ECF No. 13) will confirm Cook's coordination and the enterprise-wide scope of HCA's retaliation protocols.**

# SUPPLEMENT TO EXHIBIT O – ENTERPRISE RETALIATION ESCALATION ANALYSIS

**Plaintiff:** Jade Riley Burch
**Subject:** Life-Threatening Medical Abandonment with Intent to Harm – Withheld Oxygen Protocol
**Date:** August 11 2025

## JUDICIAL SUPPLEMENT – LIFE-THREATENING MEDICAL ABANDONMENT AS ENTERPRISE RETALIATION

This supplement is submitted in further support of Exhibit O, demonstrating that HCA Healthcare facilities, acting in coordinated retaliation under enterprise protocol, implemented a medical abandonment protocol that constituted life-threatening neglect with intent to harm through deliberate omission of life-saving care — abruptly reversed only upon confirmation of Plaintiff's preexisting oxygen use and legal liability exposure.

### I. CRITICAL EVENT TIMELINE: LETHAL WITHHOLDING OF CARE

- **June 28, 2025:** Plaintiff admitted to Southern Hills Hospital after issuing formal litigation notices.
- Plaintiff enters respiratory distress – O2 saturations documented in the 60s, cyanosis observed, altered mental status. No emergency intervention is initiated.
- Porscha Ryan, Medical Power of Attorney (POA), is present, observing distress and lack of staff engagement.
- Staff inquire: "Does she use oxygen at home?"
- POA confirms: Plaintiff is prescribed supplemental oxygen due to seizures and hypoxic episodes.
- **IMMEDIATE CHANGE:** Staff provide oxygen, and the pattern of abuse ceases abruptly. No further cognitive suppression or sedation observed.

This sequence forms the cornerstone of the Plaintiff's theory of life-threatening medical abandonment: life-saving intervention was deliberately withheld until staff confirmed that Plaintiff's survival would create documented liability for the facility.

## II. ELEMENTS OF LIFE-THREATENING MEDICAL ABANDONMENT WITH INTENT TO HARM

Under federal civil rights law and medical malpractice precedent, life-threatening medical abandonment with intent to harm may be established where:

1. There is deliberate indifference to serious medical need;
2. Standard medical protocols are intentionally withheld despite obvious distress;
3. The pattern demonstrates retaliatory rather than therapeutic purpose.

Here, the evidence suggests those elements are satisfied:

- **Deliberate Indifference:** Plaintiff had just issued litigation threats. The evidence suggests HCA had demonstrated motive to retaliate against her as a legal threat through coordinated enterprise protocol.
- **Intentional Protocol Violation:** Hospital staff withheld life-sustaining oxygen despite visible cyanosis and critical hypoxia, appearing to violate standard emergency response protocols that require immediate intervention for respiratory distress. *(See Exhibit F - Federal Guidelines -- CMS, EMTALA, ACA §1557, and Disability Protections)*
- **Retaliatory Pattern:** The evidence suggests the only reason intervention occurred was Porscha Ryan's confirmation of prescribed oxygen use — establishing that once legal liability was confirmed, standard care was immediately provided.

This appears to satisfy the standard for deliberate indifference with retaliatory intent, a recognized doctrine in civil rights and medical abandonment law.

---

## III. CONSCIOUSNESS OF GUILT: BEHAVIORAL SHIFT AFTER LIABILITY TRIGGER

If the staff's conduct had been an oversight, correction would have occurred in real-time — when vitals crashed, not after legal exposure was identified.

- Oxygen was not administered when Plaintiff's O2 dropped to life-threatening levels in the 60s.
- As Medical POA, Porscha Ryan had legal duty to monitor care and document violations - her real-time observations constitute privileged medical advocacy testimony.
- Only when Ryan confirmed home oxygen use did staff provide standard respiratory intervention.

- Ryan's legal intervention prevented escalation of life-threatening neglect and documented the facility's consciousness of wrongdoing.
- At that moment, all retaliatory behaviors ceased - demonstrating the conduct was deliberate, not medical oversight.

This abrupt behavioral shift, witnessed and documented by a federally protected Medical Power of Attorney, demonstrates consciousness of wrongdoing and establishes that defendants were willing to risk Plaintiff's life as part of coordinated retaliation.

## IV. SYSTEMIC LIABILITY – ORGANIZED ABUSE INFRASTRUCTURE

Southern Hills Hospital is not an isolated actor. This incident occurred within the broader timeline of HCA enterprise coordination:

- Plaintiff issued legal threats directly to HCA Risk Management.
- Plaintiff was admitted within 48 hours to an HCA facility where abuse escalated.
- Retaliatory patterns occurred across three HCA hospitals (Sunrise, MountainView, Southern Hills) within weeks.

This pattern reflects an enterprise protocol to neutralize legal threats through medically sophisticated means, including sedation, systematic record falsification to conceal violations, and — in this case — life-threatening abandonment during medical crisis.

## V. LEGAL CONCLUSIONS AND ENHANCED CLAIMS

The totality of evidence supports a credible theory that Plaintiff was subjected to a coordinated medical retaliation protocol that escalated to life-threatening abandonment with intent to harm:

- Systematic withholding of standard respiratory care amid life-threatening hypoxia;
- Deliberate delay in life-saving intervention until liability risk was confirmed by Medical POA;
- Immediate behavioral reversal demonstrating strategic concealment rather than care failure;
- Systematic record falsification to conceal life-threatening neglect, making Medical POA testimony more credible and necessary.

The fact that defendants failed to document critical interventions in violation of federal regulations demonstrates intent to conceal wrongdoing. Porscha Ryan's status as Medical

Power of Attorney provides her testimony with enhanced legal credibility, as she had both the legal duty and authority to monitor care and document violations.

This conduct supports enhanced legal claims including:

- **Life-Threatening Medical Abandonment** (State Medical Malpractice);
- **Deprivation of Rights Under Color of Law** (42 U.S.C. §1983);
- **Civil RICO - Pattern of Racketeering Activity** (18 U.S.C. §1962);
- **Healthcare Fraud and Systematic Record Falsification** (18 U.S.C. §1347, §1512).

---

**Respectfully Submitted,**

*/s/ Jade Riley Burch*

Jade Riley Burch
222 Karen Ave Unit 1207
Las Vegas, NV 89109
Email: jaderburch@gmail.com
Phone: 614-725-9452

**Date August 11 2025**

==========================================

# END SEPARATOR PAGE

==========================================

*** END OF EXHIBIT ***