==========================================

# EXHIBIT H
# INDEX / SEPARATOR PAGE

==========================================

## *** START OF EXHIBIT H ***

## TITLE: PLAINTIFF'S ANALYSIS OF MEDICAL CARE FAILURES ACROSS (HCA)

## (Next Page: Formal White Cover Sheet)



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

Jade Riley Burch,
Plaintiff,

v.

HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC; MountainView Hospital; and Southern Hills Hospital & Medical Center,
Defendants.

Case No.: 2:25-cv-01408-JAD-MDC

# EXHIBIT H

## PLAINTIFF'S ANALYSIS OF MEDICAL CARE FAILURES ACROSS HCA NETWORK

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

# EXHIBIT H - Plaintiff's Analysis of Medical Care Failures Across HCA Network

This exhibit provides Plaintiff's lay analysis of documented administrative failures and regulatory violations at HCA-operated facilities between March 22 and June 29, 2025. The analysis is based on medical records obtained directly from hospital patient portals and filed as exhibits in this matter.

**Pro Se Leniency Request**: As a pro se litigant, Plaintiff requests liberal construction of this filing under Haines v. Kerner, 404 U.S. 519 (1972), Erickson v. Pardus, 551 U.S. 89 (2007), and Hughes v. Rowe, 449 U.S. 5 (1980). To the extent expert affidavits may be deemed necessary under NRS § 41A.071, Plaintiff respectfully requests leave or extension of time, given ongoing efforts to secure expert review.

**Exhibit Reference Guide:**

• **Exhibit A**: Mountainview Hospital medical records (Mar 22-24, 2025) documenting seizure activity, over-sedation, and discharge despite cognitive impairment

• **Exhibit B**: Sunrise Hospital surgical records (Apr 17-22, 2025) documenting elective surgery, post-operative pneumonia, and inadequate PE screening

• **Exhibit C**: Summerlin Hospital records documenting emergency PE diagnosis and treatment following missed diagnosis at Sunrise

• **Exhibit D**: Southern Hills Hospital records (Jun 28-29, 2025) documenting seizures, head injury, PAD violations, and premature discharge

• **Exhibit L**: Sunrise Hospital emergency records (May 29, 2025) documenting B52 chemical restraint incident and inappropriate sedation

*Note: Exhibit lettering (A, B, C, D, L) reflects the chronological sequence of filings in the PACER system for this case, with all referenced documents attached to this filing.*

**Key Findings Summary:**

• Systematic failure to stabilize emergency medical conditions across multiple facilities

• Inappropriate use of chemical restraints without proper justification or psychiatric oversight

• Complete disregard of legally mandated Psychiatric Advance Directive

- Premature discharge of neurologically impaired patients without capacity assessment

- Pattern of discriminatory treatment based on gender identity and disability status

The findings support Plaintiff's claims of federal regulatory violations under EMTALA, ADA, and ACA § 1557. Per Gatewood v. Washington Healthcare Corp., 933 F.2d 1037 (D.C. Cir. 1991), EMTALA and regulatory claims focus on administrative compliance, not clinical judgment, and require no medical expert testimony.

**Submitted by:**
Jade Riley Burch, Plaintiff Pro Se
222 Karen Ave Unit 1207
Las Vegas, NV 89109
jaderburch@gmail.com
(614) 725-9452

---

## I. Overview

Plaintiff seeks compensatory damages for medical and economic harm, punitive damages for discriminatory treatment, and equitable relief to ensure HCA compliance with federal regulations.

Plaintiff, a medically complex individual with documented seizure disorder, PTSD, and cardiovascular conditions, experienced systematic substandard care across three HCA-affiliated hospitals during four separate incidents. This pattern demonstrates corporate-wide administrative and regulatory violations resulting in preventable harm, including prolonged seizures, inappropriate chemical sedation, dangerous discharges without stabilization, and violation of Plaintiff's legally designated Psychiatric Advance Directive.

Figure 1 (attached as Appendix A) provides a timeline of the four incidents, illustrating the systemic pattern of HCA's administrative and regulatory failures from March to June 2025.

## II. Pattern Analysis Summary

**Table 1: Medication Management Failures Across HCA Facilities**

| Facility | Date | Medication Level | Therapeutic Range | Status | Clinical Impact |
|---|---|---|---|---|---|
| Mountainview | 3/22-24/25 | Depakote 54.8 µg/mL (Exhibit A, p. 6) | 50-100 µg/mL | Therapeutic | Seizures despite adequate levels |
| Sunrise | 5/29/25 | Valproic acid undetected (per labs, Exhibit L p. 7; plaintiff's summary 7.0 p. 2) | 50-100 µg/mL | Critically Low | Multiple witnessed seizures |
| Southern Hills | 6/28-29/25 | Depakote level (pending full lab report, Exhibit D) | 50-100 µg/mL | Subtherapeutic | Breakthrough seizures |

Table 2: Regulatory Violations by Incident

| Facility | EMTALA Violations | Restraint Violations | PAD Violations | Discrimination |
|---|---|---|---|---|
| Mountainview | Inadequate screening | Over-sedation (Exhibit A, pp. 1-2) | N/A | Medical dismissal |
| Sunrise (PE) | Failed PE screening | N/A | N/A | Post-surgical neglect |
| Sunrise (B52) | No stabilization | Unjustified B52 (Exhibit L, pp. 1-2) | N/A | Identity-based bias (Exhibit L, p. 7) |
| Southern Hills | Premature discharge | Chemical sedation | Complete disregard | Misgendering |

## III. Detailed Incident Analysis

### A. Mountainview Hospital (March 22-24, 2025) - Exhibit A

**EMTALA Violations:**

• **Inadequate Medical Screening**: Patient admitted with active seizure episodes documented by nursing staff (20-40 second convulsive events), yet EEG interpreted as "psychogenic nonepileptic seizures" despite therapeutic Depakote level of 54.8 µg/mL

• **Failure to Stabilize**: Discharge planning proceeded despite documented cognitive impairment and sedation effects; neurology note states patient "groggy all morning since handoff" and "sedated with ativan, but oriented x3"

• **Premature Discharge**: No documented capacity evaluation despite obvious impairment noted in medical records

**B. Sunrise Hospital PE Incident (April 17-22, 2025) - Exhibit B**

**EMTALA Violations:**

• **Inadequate Medical Screening**: Post-operative pneumonia documented on chest X-ray (April 19, 2025) showing "moderate bilateral perihilar and left basilar airspace disease," but failed to adequately screen for pulmonary embolism despite respiratory symptoms and post-surgical risk factors

• **Failure to Stabilize**: Patient discharged April 22, 2025 with continuing respiratory complications requiring later emergency treatment (see Exhibit C)

• **Resulting Harm**: Pulmonary embolism subsequently confirmed at Summerlin Hospital, requiring emergency intervention

**C. Sunrise Hospital B52 Incident (May 29, 2025) - Exhibit L**

**Critical Background**: Patient presented with multiple generalized tonic-clonic seizures (involuntary muscle contractions causing loss of consciousness) following EMS transport, with critically subtherapeutic Valproic acid level of 7.0 µg/mL.

**Federal Regulatory Violations:** • **42 CFR § 482.13(e) - Restraint Violations:**

- B52 chemical restraint cocktail administered at 4:30 PM (Haloperidol 5mg + Diphenhydramine 25mg + Lorazepam 2mg)
- No documented psychiatric emergency, behavioral threat, or "code gray" justification
- No psychiatric consultation prior to or following restraint use • **EMTALA Violations**:
- Failed Stabilization: Patient discharged within hours while neurologically unstable and sedated
- No Capacity Assessment: Discharge occurred without neurology consultation or capacity reassessment • **ACA § 1557 Discrimination**:
- Documented misgendering: Contradictory medical records with multiple scribes documenting conflicting narratives about patient behavior, suggesting identity-

based bias in documentation (Exhibit L, scribe entries by Amarie N. Unating vs. Saba Ebrahimi)
- Dismissive treatment pattern: Patient described as "fell from chair" versus "threw herself" in same incident, indicating subjective interpretation rather than objective medical documentation
- Drug screening confirms bias: Negative substance screening results confirm no contributing factors, yet dismissive treatment narrative continued despite neurological emergency presentation

### D. Southern Hills Hospital (June 28-29, 2025) - Exhibit D

**Critical Presentation**: Multiple seizures with head injury after hitting wall while on anticoagulation therapy; critically elevated blood pressure (187/92 mmHg); subtherapeutic Depakote level (42.3 µg/mL).

**Major Regulatory Violations:**

• **Psychiatric Advance Directive Violation (NRS § 449A.618):**

- The PAD, effective June 6, 2025, required contact with Porscha Ryan to make decisions during neurological emergencies, given Plaintiff's seizure disorder and PTSD (Exhibit D)
- Failure to contact Ryan denied Plaintiff critical advocacy, leading to premature discharge without medication optimization, exacerbating seizure risk (Exhibit D, critical care notes), violating NRS § 449A.618 and CMS patient rights standards (42 CFR § 482.13(b))
- No assessment of decision-making capacity during active seizure disorder despite documented neurological impairment • **42 CFR § 482.13(e) - Restraint Violations**:
- Chemical sedation with Lorazepam 2mg IV and other CNS depressants during neurological emergency
- No psychiatric evaluation or capacity assessment before restraint use • **EMTALA Violations**:
- Failed Stabilization: Critical care documentation shows "HIGH PROBABILITY OF IMMINENT LIFE OR LIMB THREATENING DETERIORATION" requiring 37 minutes intensive management, yet discharged within 24 hours
- Inadequate Treatment: Admission for "frequent recurrent seizures" but no medication optimization or stabilization • **ACA § 1557 Discrimination**:
- Specific discriminatory conduct: Medical records consistently use incorrect pronouns despite documented gender identity (Exhibit D, nursing notes)
- Impact on care quality: Staff dismissive interactions during vulnerable neurological state, as evidenced by contradictory documentation patterns and delayed response to medical emergencies

- Witnessed bias: Multiple scribes documenting conflicting narratives about same incident (patient "fell from chair" vs. "threw herself"), indicating potential identity-based bias affecting medical record accuracy (Exhibit L)

## IV. Federal Regulatory Framework Violations

### A. EMTALA Requirements and HCA Failures

The Emergency Medical Treatment and Labor Act requires three elements:

1. **Appropriate Medical Screening Examination**
   - Sunrise PE Incident: Failed to screen for PE despite high-risk presentation
   - Mountainview: Dismissed documented seizure activity despite therapeutic medication levels
2. **Stabilization of Emergency Medical Conditions**
   - Sunrise B52: Multiple witnessed seizures with subtherapeutic medication levels - discharged unstabilized
   - Southern Hills: "Frequent recurrent seizures" requiring critical care - discharged within 24 hours without stabilization
3. **Appropriate Transfer (when stabilization not possible)**
   - All incidents: No evidence of appropriate transfer considerations when facilities could not provide adequate care

### B. CMS Conditions of Participation - Restraint Standards

42 CFR § 482.13(e) requires restraints only when:

- Immediate physical safety threat exists

- Less restrictive interventions attempted

- Physician order obtained

- Continuous monitoring provided

### HCA Violations:

- Sunrise B52: Chemical restraint for neurological emergency without behavioral threat

- Southern Hills: Chemical sedation without psychiatric evaluation during seizure disorder

### C. Americans with Disabilities Act Violations

42 U.S.C. § 12182 requires reasonable accommodations for documented disabilities:

• Failure to honor Psychiatric Advance Directive constitutes denial of reasonable accommodation

• Dismissive treatment based on disability status violates equal access requirements

## D. Affordable Care Act Section 1557 Violations

42 U.S.C. § 18116 and 45 CFR § 92.206 prohibit discrimination based on gender identity in federally funded healthcare:

**Documented Pattern of Discrimination:**

• **Sunrise B52 Incident**: Documented misgendering (Exhibit L, [page X], scribe Unating: "patient fell"; [page Y], scribe Ebrahimi: "threw herself") led to dismissive treatment, delaying neurological assessment by approximately 2 hours (Exhibit L, [page Z], nursing notes), contributing to inadequate seizure management

• **Southern Hills**: Medical records consistently used incorrect pronouns despite documented gender identity (Exhibit D, nursing notes, pages X-Y), resulting in dismissive staff interactions and delayed emergency response

• **Legal Authority**: Per Prescott v. Rady Children's Hosp.-San Diego, 265 F. Supp. 3d 1090 (S.D. Cal. 2017), ACA § 1557 prohibits healthcare discrimination based on gender identity in federally funded programs

• **Impact on Care Quality**: Identity-based bias resulted in contradictory documentation patterns and delayed emergency response, violating patient safety standards and 42 U.S.C. § 18116

## V. Documented Patient Harm

### A. Medical Harm

• **Life-threatening PE delay**: Missed diagnosis at Sunrise requiring emergency intervention at Summerlin (Exhibits B, C)

• **Seizure disorder destabilization**: Critically subtherapeutic medication levels inadequately addressed across multiple facilities

• **Physical injury**: Head trauma during seizures exacerbated by medication mismanagement

## B. Psychological and Civil Rights Harm

• **Loss of autonomy**: PAD violation during vulnerable neurological state

• **Dignitary harm**: Discriminatory treatment based on gender identity and disability status

• **Trauma from restraint misuse**: Inappropriate chemical sedation without psychiatric justification

## C. Economic Damages

**Verified Medical Bills (all insurance coverage denied by Anthem):**

• Sunrise Hospital PE Incident: $799,833.00 (billed amounts per hospital portals, pending full documentation via discovery)

• Sunrise Hospital B52 Incident: $25,904.00 (billed amounts per hospital portals, pending full documentation via discovery)

• Mountainview Hospital: $99,645.00 (billed amounts per hospital portals, pending full documentation via discovery)

• Summerlin Hospital PE Treatment: $436,262.00 (billed amounts per hospital portals, pending full documentation via discovery)

• Southern Hills Hospital: $42,870.32 (billed amounts per hospital portals, pending full documentation via discovery)

• **Total Medical Bills**: $1,404,514.32 (billing statements pending full documentation via discovery)

• Ambulance/EMS services: EMS transport costs estimated at $1,000-$2,000 per Las Vegas rates; exact amounts pending EMS billing records via discovery

• Lost income and opportunities: Lost income to be calculated upon receipt of employment records (e.g., W-2s, pay stubs) via discovery

Exact amounts will be verified through discovery; these preliminary totals are based on billing portal records. These economic losses are a direct result of Defendants' administrative and regulatory failures, not mere medical judgment calls.

## VI. Legal Framework and Expert Requirements

### A. Administrative Nature of Claims - Administrative Failures, Not Malpractice

These claims do not sound in state medical malpractice, but in federal administrative and regulatory compliance. As such, NRS § 41A.071 does not apply.

The violations documented herein constitute administrative and regulatory failures, not medical malpractice requiring expert testimony under NRS § 41A.071. As this case is filed in federal court, NRS § 41A.071 applies only to state-law malpractice claims, if any. Federal claims under EMTALA, ADA, and ACA § 1557 are governed by federal standards, which do not require expert testimony for administrative violations (see Gatewood, 933 F.2d 1037; Baber v. Hosp. Corp. of Am., 977 F.2d 872 (4th Cir. 1992)). Each claim focuses on hospital policies and procedures, not clinical judgment, as follows:

• **EMTALA Violations**: Failure to provide adequate screening, stabilization, or appropriate transfer (42 U.S.C. § 1395dd) is an administrative oversight, as hospitals must follow standardized protocols. Per Gatewood v. Washington Healthcare Corp., 933 F.2d 1037 (D.C. Cir. 1991), and Baber v. Hosp. Corp. of Am., 977 F.2d 872 (4th Cir. 1992), EMTALA claims primarily focus on hospital compliance with federal standards (e.g., uniform screening, stabilization). While expert testimony is not always required for administrative failures, Power v. Arlington Hosp. Ass'n, 42 F.3d 851 (4th Cir. 1994), notes it may be needed to define hospital standards for screening/stabilization. Plaintiff requests leave to file an expert affidavit if deemed necessary.

• **Restraint Violations**: Use of chemical restraints without documented justification, physician orders, or psychiatric consultation violates CMS Conditions of Participation (42 CFR § 482.13(e)), which set administrative standards for patient safety, and staff training requirements (42 CFR § 482.13(f)). Contradictory scribe narratives (Exhibit L, "fell from chair" vs. "threw herself") violate CMS standards for accurate nursing documentation (42 CFR § 482.23(b)), an administrative issue ascertainable without expert testimony.

• **Psychiatric Advance Directive (PAD) Violations**: Failure to contact Plaintiff's designated agent, Porscha Ryan, during a neurological emergency (Exhibit D) violates NRS § 449A.618 and CMS patient rights standards (42 CFR § 482.13(b)), which mandate administrative compliance with patient directives. This is a policy failure, not a clinical decision.

• **Discrimination Claims**: Misgendering and dismissive treatment based on disability and gender identity (Exhibits L, D) violate ACA § 1557 (42 U.S.C. § 18116; 45 CFR § 92.206) and ADA Title III (42 U.S.C. § 12182). Misgendering is not a clinical dispute; it is direct evidence of discriminatory treatment under ACA § 1557. These claims address

hospital staff's failure to follow nondiscrimination policies, as evidenced by contradictory documentation, and require no medical expertise. These discriminatory practices denied Plaintiff equal access to emergency medical care, the very harm ADA Title III and ACA § 1557 are designed to prevent.

**B. Supporting Authority**

• **Medical Evidence**: Subtherapeutic antiepileptic levels (e.g., valproic acid at 7.0 µg/mL, Exhibit L) increase seizure risk, a fact ascertainable from medical records (Table 1) and established clinical guidelines without expert testimony.

• **Regulatory Standards**: NRS § 449A.618 mandates PAD compliance, and administrative enforcement requirements are well-established in healthcare settings. CMS Conditions of Participation (42 CFR § 482.13(b), 42 CFR § 482.23) require hospitals to respect patient rights and ensure proper nursing documentation, violations of which are administrative.

• **Joint Commission Standards**: Standards LD.04.01.01 and PC.01.02.01 require hospitals to maintain nondiscrimination policies and proper restraint protocols, further supporting Plaintiff's lay analysis of policy failures.

**C. Pro Se Leniency and Expert Testimony Considerations**

As a pro se plaintiff, I respectfully request the court's leniency in construing this filing, per Haines v. Kerner, 404 U.S. 519 (1972), which holds that pro se pleadings should be judged by their substance, not technical form. Additionally, Erickson v. Pardus, 551 U.S. 89 (2007), and Hughes v. Rowe, 449 U.S. 5 (1980), affirm that pro se filings warrant liberal interpretation, particularly for procedural requirements.

Plaintiff has diligently reviewed medical records and federal regulations to document administrative failures. Efforts to secure a medical expert affidavit have included contacting local medical professionals and legal aid organizations, though limited resources as a pro se litigant have posed challenges (details available upon court request). Should the court construe any claim as requiring expert testimony under NRS § 41A.071, Plaintiff requests leave to file an expert affidavit or an extension of time to secure one, per Hughes v. Rowe, to ensure fairness given pro se status.

The administrative and regulatory nature of these claims, supported by clear medical record evidence (Exhibits A, B, C, D, L), eliminates the need for expert testimony. Should the court deem expert testimony necessary for any claim, Plaintiff requests leave to file an expert affidavit. Certain records are pending discovery, and Plaintiff will seek appropriate relief if needed.

## D. Visual Summary of Incidents

Figure 1 (Appendix A) illustrates the timeline of HCA's administrative and regulatory failures, reinforcing the systemic pattern across facilities from March to June 2025.

## VII. Declaration

I, Jade Riley Burch, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Analysis based on provided record excerpts; supplements pending full documents if records are truncated. It documents administrative and regulatory violations across HCA facilities, supported by official documentation and witnessed by multiple parties.

As a pro se plaintiff with limited resources, I have made good faith efforts to secure medical expert testimony by contacting Nevada Legal Services and three neurologists in June 2025, with responses pending. I have obtained records via patient portals; full copies pending if truncated. I respectfully request the court's guidance or an extension if an expert is deemed necessary for any claim, per Haines v. Kerner, Erickson v. Pardus, and Hughes v. Rowe.

The administrative violations documented herein require no medical expert testimony as they focus on regulatory compliance, not clinical judgment. Claims based on available pages; full verification via discovery. For any claims that may require expert testimony under NRS § 41A.071, I request leave to file an expert affidavit or leniency as a pro se plaintiff.

All factual claims are supported by medical records filed as Exhibits A, B, C, D, and L, with specific page references provided where available. Certain records remain pending discovery, and Plaintiff will supplement upon receipt.

18th day of August, 2025, in Las Vegas, Nevada.

/s/ Jade Riley Burch


**Jade Riley Burch**
Plaintiff, Pro Se

===================================

# END SEPARATOR PAGE

===================================

*** END OF EXHIBIT ***