# EXHIBIT D

**SOUTHERN HILLS HOSPITAL MEDICAL RECORDS**
*(Jun. 28–29, 2025)*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC;**
**MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.

**Case No.: 2:25-cv-01408-JAD-MDC**

# EXHIBIT D

## SOUTHERN HILLS COVER AND COMPLETE MEDICAL RECORDS

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

1   **EXHIBIT D**

2   **Southern Hills Hospital Medical Records (June 28–29, 2025)**

3   This exhibit includes official medical records from Southern Hills Hospital documenting Plaintiff's
4   emergency room visit and inpatient stay from June 28 to June 29, 2025. These records were obtained
5   directly from the hospital's patient portal and represent true and accurate copies of Plaintiff's clinical
6   documentation.

7   These records document critical care failures including:

8   • **Subtherapeutic Depakote level** (42.3 μg/mL) and **critically elevated blood pressure** (187/92) •
9   **Severe oxygen desaturation into the 60s** with **cyanosis**, dismissed by staff as "normal" • **5–7 minute**
10   **seizure episode** with minimal medical response and **no neurology consult or EEG** • **24/7 physical**
11   **restraints** without proper documentation, justification, or physician reevaluation • **Chemical sedation**
12   causing motor dysfunction requiring **walker assistance** for mobility • **Discharge while cognitively and**
13   **physically impaired** without stabilization or caregiver coordination

14   Most significantly, Plaintiff's **Psychiatric Advance Directive (PAD)**, effective June 6th, 2025, was
15   **completely disregarded**. Designated agent **Porscha Ryan** was never contacted despite Plaintiff's
16   inability to advocate for herself, violating **42 CFR § 482.13(e), EMTALA, ACA § 1557,** and **ADA Title**
17   **III**.

18   These records support Plaintiff's claims of **gross negligence**, **civil rights violations**, and **discriminatory**
19   **discharge**, demonstrating systemic failures within HCA-operated facilities.

20   **Submitted by:** Jade Riley Burch Plaintiff, Pro Se 222 Karen Ave Unit 1207 Las Vegas, NV 89109
21   jaderburch@gmail.com (614) 725-9452

Provider Report

Details for
# Neurology Note

Encounter ID: H89683267699

**Patient**
JADE BURCH
**Dictation Date**
6/29/2025 2:29 PM
**Facility**
SOUTHERN HILLS HOSP & MED CTR-LAS VEGAS
9300 W Sunset Rd
Las Vegas NV 89148

()

Summary

```
Southern Hills Hospital and Medical Center (COCSNV)
Neurology Progress Note
REPORT#0629-0540  REPORT STATUS: Signed
DATE:06/29/25 TIME: 1429

PATIENT: BURCH,JADE                    UNIT #: H000529958
ACCOUNT#: H89683267699                 ROOM/BED: H.521-A
DOB: 07/31/78  AGE: 46      SEX: F     ATTEND: Yaghoobian,Jonathan  MD
ADM DT: 06/28/25                       AUTHOR: Mamoor,Azaam MD R2
REP SRV DT: 06/29/25                   REP SRV TM: 1429
* ALL edits or amendments must be made on the electronic/computer document *


MAMOOR,AZAAM N. 06/29/25 1429:
Subjective
Chief complaint:
Seizures
HPI:
Doing well overall, no further spells, partner was present in the room

States that she is starting to feel better, discussed that ideally we get her
home to complete her ambulatory EEG with her neurologist tomorrow

PT was in the room and walked with the patient

No other complaints

Reviewed CT Brain results with patient and partner at bedside.


Objective

Physical Exam
VS:
Last Documented:
                              Result    Date Time
              Pulse Ox            95    06/29 1051
              B/P            148/98    06/29 1051
              B/P Mean        114.6    06/29 1051
              O2 Delivery  Room air    06/29 1051
              Temp             98.1    06/29 1051
              Pulse              80    06/29 1051
              Resp               18    06/29 1051
              O2 Flow Rate        2    06/29 0710


Medications:
Current Home Medications
ARIPiprazole (ABILIFY 10 MG) 10 MG PO DAILY
Bupropion HCl (Wellbutrin XL) 300 MG PO DAILY
ATORVASTATIN CALCIUM (LIPITOR 10 MG) 10 MG PO DAILY
LURASIDONE (LATUDA  20 MG) 20 MG PO DAILY
SERTRALINE (ZOLOFT  25 MG) 25 MG PO DAILY
LISINOPRIL (ZESTRIL 10  MG) 10 MG PO DAILY
amLODIPine (NORVASC 10 MG) 10 MG PO DAILY
INSULIN LISPRO (HumaLOG 100 UNIT/ML KWIKPEN INJ)
DIVALPROEX ER (DEPAKOTE ER 500 MG) 500 MG PO BID
APIXABAN (ELIQUIS 2.5 MG) 2.5 MG PO BID
AZITHROMYCIN (ZITHROMAX) 500 MG PO Q24H
OXYCODONE HCL/ACETAMINOPHEN (PERCOCET  7.5/325 MG) 1 TAB PO Q6H PRN PRN pain
```

Active Meds + DC'd Last 24 Hrs
Aripiprazole (ARIPiprazole)   10 MG   DAILY   PO
Atorvastatin Calcium (ATORVASTATIN 10MG TAB)   10 MG   DAILY   PO
Bupropion HCl (Bupropion XL (DAILY))   300 MG   DAILY   PO
Lisinopril (lisinopriL)   10 MG   DAILY   PO
Lurasidone HCl (LURASIDONE HCL TAB)   20 MG   DAILY   PO
Sertraline HCl (SERTRALINE 25 MG TAB)   25 MG   DAILY   PO
Apixaban (APIXABAN)   5 MG   BID   PO   (DC)
Apixaban (APIXABAN)   5 MG   BID   PO
Divalproex Sodium (DIVALPROEX SODIUM ER TAB)   500 MG   BID   PO
Electrolyte Protocol (ELECTROLYTE REPLACEMENT (STANDARD))   Reminder
         BID   MISC
Insulin Human Lispro (INSULIN LISPRO *TOXIC/IGNITABLE BLACK*)   0   ACHS   SUBQ

Levetiracetam (LEVETIRACETAM)   750 MG   BID   PO
Lorazepam (LORazepam (2 MG/ML) INJ)   1 MG   X1ED STA   IV   (DC)
Bisacodyl (BISACODYL(*))   10 MG   DAILY PRN PRN   RECTAL
Calcium Carbonate (CALCIUM CARBONATE 500MG CHEW TAB)   2 TAB   Q6H PRN PRN
CHEW
Dextran/Dextrose (DEXTROSE/DEXTRIN/MALTOSE GEL)   31 GM   PRN PRN   PO
Dextrose/Water (DEXTROSE 10% IN WATER (250 ML))   125 ML   Q15M PRN PRN   IV   (
CKD)
Diphenhydramine HCl (diphenhydrAMINE HCL CAP)   25 MG   BEDTIME PRN PRN   PO

Docusate Sodium (DOCUSATE)   100 MG   BID PRN PRN   PO
Hydralazine HCl (HYDRALAZINE (20 MG/1 ML) VIAL)   10 MG   Q6H PRN PRN   IV
Ondansetron HCl (ONDANSETRON)   4 MG   Q4H PRN PRN   IV
Oxycodone HCl (ROXICODONE/PERCOLONE *CONTROL-SUB GREEN*)   5 MG   Q4H PRN PRN
PO
Oxycodone HCl (ROXICODONE/PERCOLONE *CONTROL-SUB GREEN*)   10 MG   Q4H PRN PRN
PO
Promethazine HCl (PROMETHAZINE 25 MG SUPP)   25 MG   Q6H PRN PRN   RECTAL
Acetaminophen (ACETAMINOPHEN TABLET)   650 MG   Q6H PRN PRN   PO


Head/Eyes: atraumatic, clear cornea
ENT: moist mucosal membranes
Respiratory: no distress
Abdomen: soft
Extremities: moves all, normal inspection
Musculoskeletal: normal inspection
Neuro comment:
Gain intact, able to situp in bed and work with PT

NEURO:
Mood/affect:  Appropriate
Attention/concentration:  Intact
Speech:  Fluent
Cranial nerve:
-II:  Pupil equal and reactive b/l, normal visual field, PERLA
-III, IV, VI:  EOMI, no gaze preference or deviation
-V:  Sensory intact, symmetrical
-VII:  Facial expression intact, symmetrical
Motor:
-RUE: 5/5
-LUE: 5/5
-RLE:  5/5
-LLE: 5/5
Tone/bulk:  Appropriate
Sensation:  Intact to light touch/pinprick
Reflexes:

```
-RUE: 2/4
-LUE: 2/4
-RLE: 2/4
-LLE: 2/4
Coordination:
-FNF: Intact
Gait: Deferred

No tongue bite, right tongue ulcer noted
Skin: dry, intact
```

Results
Findings/Data:
Laboratory Tests

| | 06/29 1137 | 06/29 0838 | 06/29 0836 | 06/29 0836 | 06/28 1935 |
|---|---|---|---|---|---|
| Chemistry | | | | | |
| Sodium (136 - 145 MMOL/L) | | | | 141 | |
| Potassium (3.5 - 5.1 MMOL/L) | | | | 3.6 | |
| Chloride (98 - 107 MMOL/L) | | | | 106 | |
| Carbon Dioxide (20 - 31 MMOL/L) | | | | 26 | |
| Anion Gap (5 - 16 MMOL/L) | | | | 9 | |
| BUN (9 - 23 MG/DL) | | | | 7  L | |
| Creatinine (0.55 - 1.02 MG/DL) | | | | 0.96 | |
| Est GFR (CKD-EPI) (>60 ML/MIN) | | | | 74 | |
| Glucose (74 - 106 MG/DL) | | | | 87 | |
| POC Glucose (70 - 139 MG/DL) | 85 | 76 | | | |
| Hemoglobin A1c (4.0 - 5.7 %) | | | | | 5.7 |
| Calcium (8.5 - 10.1 MG/DL) | | | | 9.2 | |
| Phosphorus (2.4 - 5.1 MG/DL) | | | | 5.1 | |
| Magnesium (1.6 - 2.6 MG/DL) | | | | 2.5 | |
| Serum HCG, Qual (absent) | | | ABSENT | | |

| | 06/28 1935 | 06/28 1935 |
|---|---|---|
| Chemistry | | |
| Iron (50 - 170 ug/dL) | 38  L | |
| TIBC (250 - 425 ug/dL) | 309 | |
| Iron Saturation (20 - 50 %) | 12  L | |
| Ferritin (7.3 - 270.7 ng/mL) | 17.1 | |
| Triglycerides (0 - 150 MG/DL) | 106 | |
| Cholesterol (0 - 200 MG/DL) | 201  H | |
| LDL Cholesterol (0 - 100 MG/DL) | 160  H | |
| VLDL Cholesterol (7.6 - 34.0 MG/DL) | 21.0 | |
| HDL Cholesterol (>60 MG/DL) | 38 | |
| Cholesterol/HDL Ratio (MG/DL) | 5.29 | |
| Vitamin B12 (211 - 911 pg/mL) | 732 | |
| Folate (>5.38 ng/mL) | | 16.23 |
| TSH (0.480 - 4.170 uIU/ML) | 0.544 | |

Laboratory Tests

| | 06/29 0836 |
|---|---|
| Hematology | |
| WBC (4.8 - 10.8 K/MM3) | 5.6 |
| RBC (4.20 - 5.50 M/MM3) | 4.38 |
| Hgb (12.0 - 16.0 G/DL) | 12.9 |
| Hct (37.0 - 47.0 %) | 38.9 |
| MCV (80 - 100 FL) | 89 |
| MCH (27.0 - 32.0 PG) | 29.5 |
| MCHC (32.0 - 37.0 GM/DL) | 33.2 |

```
RDW (11.5 - 14.5 %)                              12.7
Plt Count (150 - 450 K/MM3)                      317
MPV (9.6 - 12.0 FL)                            8.9  L
Neut % (Auto) (%)                               69.3
Neut # (Auto) (1.80 - 7.70 K/MM3)               3.89
Lymph # (Auto) (1.5 - 4.0 K/MM3)             1.21  L
Mono # (Auto) (0.20 - 1.00 K/MM3)               0.36
Eos # (Auto) (0.0 - 0.5 K/MM3)                  0.08
Baso # (Auto) (0.00 - 0.20 K/MM3)               0.05
Immature Gran # (Auto) (0.01 - 0.05 K/MM3)      0.03
Immature Gran % (%)                              0.5
Lymphocytes % (%)                               21.5
Monocytes % (%)                                  6.4
Eosinophils % (%)                                1.4
Basophils % (%)                                  0.9
```

Radiology Data:
Recent Impressions:
COMPUTED TOMOGRAPHY - CT BRAIN W/O CONTRAST       06/28 1503
*** Report Impression - Status: SIGNED  Entered: 06/28/2025 1721

IMPRESSION:
No acute intracranial abnormality.

Report Provided by Lucid Solutions
Impression By: LIPELLBR - Brian Ellison, MD

Diagnosis, Assessment    Plan
Free Text A P:
The patient is a 46-year-old male to female transgender with PMH of PNES,
epilepsy, PE on Eliquis, previous suicide attempt, diabetes, hypertension,
hyperlipidemia, PTSD, bipolar 1, generalized anxiety disorder, major depressive
disorder, dissociative identity disorder, OCD, schizoaffective disorder,
borderline personality disorder presented to the ED for seizures and head injury
with headache.  Neurology consulted for further workup/management.

Assessments:
Eval brain bleed
Posttraumatic cephalgia
Head injury, no LOC
Chronically uncontrolled PNES/epilepsy
Hypertensive urgency

History of:
PNES/epilepsy, chronically uncontrolled
PE on Eliquis
diabetes
hypertension
hyperlipidemia
Extensive psych history-previous suicide attempt, PTSD, bipolar 1, generalized
anxiety disorder, major depressive disorder, dissociative identity disorder, OCD
, schizoaffective disorder, borderline personality disorder

Plan:
Has not tried any pain meds for headache
Underwent 5 days of EMU last year and was diagnosed with PNES.

CT brain without contrast ordered to eval bleed

Depakote, Keppra levels pending

In the ED:  Loaded with Keppra 2000 mg, 2 mg Ativan IV
Ordered Tylenol 650 mg q.6 p.r.n.-headache
Continue home med Depakote 500 mg b.i.d.
Continue home med Keppra 750 mg b.i.d.

Q.4 neuro checks
Fall/seizure precautions
PT/OT eval

Neurologists:  Las Vegas Neurology and Dr Toya Malone
Planned for 5 days of EMU starting Monday to eval PNES/epilepsy

Case to be discussed with Neurology attending, Dr. Tran.

6/29:
46 YO MTF TG with history of PNES, Epilepsy, PE on AC, numerous mood disorders p
/w seizures and head injury with headache.

Studies:
* CT Brain: No acute intracranial abnormality

Plan:
* Seizure like spell, numerous mood disorders, epilepsy/PNES now stable.
* Patient is cleared for discharge from a Neurology standpoint, reccomend she
follow up with her two trusted outpatient neurologists and complete her
ambulatory EEG which she is scheduled to have completed tomorrow
* Disposition per PT/OT
* Continue Home Depakote 500 mg b.i.d.
* Continue Home Keppra 750 mg b.i.d.
* Depakote Levels WNL
* PT/OT/SLP
* Neurochecks Q4H
* Precautions: Fall, Seizure

Case Discussed with Dr. Tran


Tran,Cyndi 06/29/25 1441:
Attestations
Attestation needed: teaching physician

Teaching Physician Attestation
F/U visit w/ resident:
I saw the patient with the resident and . . .

agree with the resident's findings and plan.

agree with the resident's findings and plan EXCEPT:


Electronically Signed by Mamoor,Azaam MD R2 on 06/29/25 at 1439
Electronically Signed by Tran,Cyndi  DO on 06/29/25 at 1441
RPT #: 0629-0540
***END OF REPORT***

Provider Report

Details for
# History And Physical Note

Encounter ID: H89683267699

### Patient

JADE BURCH

### Dictation Date

6/29/2025 7:19 AM

### Facility

SOUTHERN HILLS HOSP & MED CTR-LAS VEGAS
9300 W Sunset Rd
Las Vegas NV 89148

()

### Summary

Southern Hills Hospital and Medical Center (COCSNV)
Hospitalist History   Physical
REPORT#0629-0085  REPORT STATUS: Signed
DATE:06/29/25 TIME: 0719

PATIENT: BURCH,JADE                   UNIT #: H000529958
ACCOUNT#: H89683267699                ROOM/BED: H.521-A
DOB: 07/31/78  AGE: 46    SEX: F      ATTEND: Yaghoobian,Jonathan  MD
ADM DT: 06/28/25                      AUTHOR: Yaghoobian,Jonathan  MD
REP SRV DT: 06/29/25          REP SRV TM: 0719
* ALL edits or amendments must be made on the electronic/computer document *


History of Present Illness


HPI
Chief complaint:
seizure
PCP:
PCP: Capobianco,Leo J  DO


HPI:
46-year-old with extensive psychiatric history, PNES, pulmonary emboli on
Eliquis, hypertension presents to the hospital after multiple seizures.  Patient
reports that they were doing some chores around the house when all the sudden
had a seizure episode and hit her head on the ground.  Patient became concerned
since they are on blood thinners so they decided to come to the hospital further
evaluation and CT scan of the brain.  Patient also had some episodes of seizure
while in the emergency department and wanted to stay overnight.  Of note patient
has an ambulatory EEG check tomorrow with the neurologist.  No other active
issues at this time.  Seen with partner present at bedside
Hx Obtained From Patient


History
Additional medical history:
Seizure disorder, functional neurological disorder, dissociative identity
disorder, post-traumatic stress disorder, schizoaffective disorder, bipolar
I disorder, borderline personality disorder, obsessive-compulsive disorder,
ADHD, major depressive disorder, generalized anxiety disorder, pulmonary
embolism, hypertension, hyperlipidemia, diabetes mellitus - insulin
dependent, left ventricular hypertrophy, DVT, syncope and breathing
suppression
Past surgical history:
Denies: Cholecystectomy.
Additional surgical history:
Breast augmentation
Additional family history:
niece-epilepsy
Alcohol use: Denies EtOH use
Drug use: Denies recreational drugs
Smoking status for patients 13 years old or older: Never Smoker


Medication/Allergy-Vaccine Hx
Allergies:
Coded Allergies:
guanfacine (Intermediate, HALLUCINATIONS 04/20/25)
quetiapine (From SEROQUEL) (Intermediate, SLEEP WALKING 04/20/25)


Review of Systems

All systems rev   neg: except as marked

Objective

General
VS/I O:
Vital Signs:

| Date | Time | Temp | Pulse | Resp | B/P | B/P Mean | Pulse Ox | O2 Delivery | O2 Flow Rate | FiO2 |
|------|------|------|-------|------|-----|----------|----------|-------------|--------------|------|
| 06/29 | 1051 | 98.1 | 80 | 18 | 148/98 | 114.6 | 95 | Room air | | |
| 06/29 | 0710 | 98.2 | 83 | 18 | 142/89 | 106.8 | 99 | Nasal cannula | 2 | |
| 06/29 | 0257 | 98.2 | 72 | 17 | 132/84 | 100.3 | 96 | Room air | | |
| 06/28 | 2320 | 97.9 | 69 | 17 | 149/85 | 106.4 | 96 | Room air | | |
| 06/28 | 2100 | 98.1 | 75 | 18 | 137/91 | 106.4 | 97 | Room air | | |
| 06/28 | 2000 | | 72 | | 133/84 | 103 | 94 | | | |
| 06/28 | 1930 | | 77 | | 147/95 | 116 | 97 | | | |
| 06/28 | 1900 | | 73 | 18 | 150/95 | 116 | 98 | Room air | | |
| 06/28 | 1800 | | 75 | 18 | 152/94 | | 95 | Room air | | |
| 06/28 | 1700 | | 86 | 16 | 131/107 | | 98 | Room air | | |
| 06/28 | 1600 | | 89 | 18 | 145/86 | | 98 | Room air | | |
| 06/28 | 1500 | | 84 | 20 | 155/96 | | 100 | Room air | | |
| 06/28 | 1400 | | 81 | 16 | 167/91 | | 99 | Room air | | |
| 06/28 | 1238 | | | 17 | | | | | | |
| 06/28 | 1226 | 97.5 | 85 | | 187/92 | 123.7 | 99 | | | |
| 06/28 | 1226 | 97.5 | 85 | | 187/92 | 123.7 | 99 | | | |

24 hour I O ending at 0700:

|  | 06/29 0700 | 06/28 1900 |
|------|------------|------------|
| Intake Total | 100 | |
| Output Total | | |
| Balance | 100 | |
| | | |
| Intake, Oral | 100 | |
| Number Voids | 1 | |
| Patient Weight | | 190 lb |
| Weight Measurement Method | | Stated/Reported |

PATIENT WEIGHT:

Weight (lb):
Weight (oz):
Weight (kg):  86.364

Medications:
Active Meds + DC'd Last 24 Hrs
Aripiprazole (ARIPiprazole)   10 MG   DAILY   PO
Atorvastatin Calcium (ATORVASTATIN 10MG TAB)   10 MG   DAILY   PO
Bupropion HCl (Bupropion XL (DAILY))   300 MG   DAILY   PO
Lisinopril (lisinopril)   10 MG   DAILY   PO
Lurasidone HCl (LURASIDONE HCL TAB)   20 MG   DAILY   PO
Sertraline HCl (SERTRALINE 25 MG TAB)   25 MG   DAILY   PO
Apixaban (APIXABAN)   5 MG   BID   PO   (DC)
Apixaban (APIXABAN)   5 MG   BID   PO
Divalproex Sodium (DIVALPROEX SODIUM ER TAB)   500 MG   BID   PO
Electrolyte Protocol (ELECTROLYTE REPLACEMENT (STANDARD))   Reminder
        BID   MISC
Insulin Human Lispro (INSULIN LISPRO *TOXIC/IGNITABLE BLACK*)   0   ACHS   SUBQ

```
Levetiracetam (LEVETIRACETAM)   750 MG   BID   PO
Lorazepam (LORazepam (2 MG/ML) INJ)   1 MG   X1ED STA   IV   (DC)
Bisacodyl (BISACODYL(*))   10 MG   DAILY PRN PRN   RECTAL
Calcium Carbonate (CALCIUM CARBONATE 500MG CHEW TAB)   2 TAB  Q6H PRN PRN
CHEW
Dextran/Dextrose (DEXTROSE/DEXTRIN/MALTOSE GEL)   31 GM   PRN PRN   PO
Dextrose/Water (DEXTROSE 10% IN WATER (250 ML))   125 ML   Q15M PRN PRN   IV   (
CKD)
Diphenhydramine HCl (diphenhydrAMINE HCL CAP)   25 MG   BEDTIME PRN PRN   PO

Docusate Sodium (DOCUSATE)   100 MG   BID PRN PRN   PO
Hydralazine HCl (HYDRALAZINE (20 MG/1 ML) VIAL)   10 MG   Q6H PRN PRN   IV
Ondansetron HCl (ONDANSETRON)   4 MG   Q4H PRN PRN   IV
Oxycodone HCl (ROXICODONE/PERCOLONE *CONTROL-SUB GREEN*)   5 MG   Q4H PRN PRN
PO
Oxycodone HCl (ROXICODONE/PERCOLONE *CONTROL-SUB GREEN*)   10 MG   Q4H PRN PRN
PO
Promethazine HCl (PROMETHAZINE 25 MG SUPP)   25 MG   Q6H PRN PRN   RECTAL
Acetaminophen (ACETAMINOPHEN TABLET)   650 MG   Q6H PRN PRN   PO
Acetaminophen (ACETAMINOPHEN TABLET)   650 MG   X1ED STA   PO   (DC)
Levetiracetam (LEVETIRACETAM)   1,000 MG   Q5M   IV   (DC)
Lorazepam (LORazepam (2 MG/ML) INJ)   2 MG   X1ED STA   IV   (DC)
Lorazepam (LORazepam (2 MG/ML) INJ)   0   .STK-MED ONE   IV   (DC)
```

Physical Exam
General appearance: alert, awake, oriented
Head/Eyes: atraumatic
Cardiovascular: normal heart sounds, regular rate   rhythm
Respiratory: aerating well
Abdomen: non-tender, normal bowel sounds
Extremities: moves all
Musculoskeletal: normal inspection
Neuro/CNS: alert, oriented X 3
Skin: dry
Psychiatry: normal affect, normal judgment/insight, normal mood, not suicidal

Results
Findings/Data:
Laboratory Tests

| | 06/29 1137 | 06/29 0838 | 06/29 0836 | 06/29 0836 | 06/28 1935 |
|---|---|---|---|---|---|
| Chemistry | | | | | |
| Sodium (136 - 145 MMOL/L) | | | | 141 | |
| Potassium (3.5 - 5.1 MMOL/L) | | | | 3.6 | |
| Chloride (98 - 107 MMOL/L) | | | | 106 | |
| Carbon Dioxide (20 - 31 MMOL/L) | | | | 26 | |
| Anion Gap (5 - 16 MMOL/L) | | | | 9 | |
| BUN (9 - 23 MG/DL) | | | | 7  L | |
| Creatinine (0.55 - 1.02 MG/DL) | | | | 0.96 | |
| Est GFR (CKD-EPI) (>60 ML/MIN) | | | | 74 | |
| Glucose (74 - 106 MG/DL) | | | | 87 | |
| POC Glucose (70 - 139 MG/DL) | 85 | 76 | | | |
| Hemoglobin A1c (4.0 - 5.7 %) | | | | | 5.7 |
| Calcium (8.5 - 10.1 MG/DL) | | | | 9.2 | |
| Phosphorus (2.4 - 5.1 MG/DL) | | | | 5.1 | |
| Magnesium (1.6 - 2.6 MG/DL) | | | | 2.5 | |
| Serum HCG, Qual (absent) | | | ABSENT | | |

```
                                              06/28   06/28
                                              1935    1935
            Chemistry
                Iron (50 - 170 ug/dL)                  38  L
                TIBC (250 - 425 ug/dL)                 309
                Iron Saturation (20 - 50 %)            12  L
                Ferritin (7.3 - 270.7 ng/mL)           17.1
                Triglycerides (0 - 150 MG/DL)          106
                Cholesterol (0 - 200 MG/DL)            201  H
                LDL Cholesterol (0 - 100 MG/DL)        160  H
                VLDL Cholesterol (7.6 - 34.0 MG/DL)    21.0
                HDL Cholesterol (>60 MG/DL)            38
                Cholesterol/HDL Ratio (MG/DL)          5.29
                Vitamin B12 (211 - 911 pg/mL)          732
                Folate (>5.38 ng/mL)           16.23
                TSH (0.480 - 4.170 uIU/ML)             0.544

Laboratory Tests
                                              06/29
                                              0836
            Hematology
                WBC (4.8 - 10.8 K/MM3)                 5.6
                RBC (4.20 - 5.50 M/MM3)                4.38
                Hgb (12.0 - 16.0 G/DL)                 12.9
                Hct (37.0 - 47.0 %)                    38.9
                MCV (80 - 100 FL)                      89
                MCH (27.0 - 32.0 PG)                   29.5
                MCHC (32.0 - 37.0 GM/DL)               33.2
                RDW (11.5 - 14.5 %)                    12.7
                Plt Count (150 - 450 K/MM3)            317
                MPV (9.6 - 12.0 FL)                    8.9  L
                Neut % (Auto) (%)                      69.3
                Neut # (Auto) (1.80 - 7.70 K/MM3)      3.89
                Lymph # (Auto) (1.5 - 4.0 K/MM3)       1.21  L
                Mono # (Auto) (0.20 - 1.00 K/MM3)      0.36
                Eos # (Auto) (0.0 - 0.5 K/MM3)         0.08
                Baso # (Auto) (0.00 - 0.20 K/MM3)      0.05
                Immature Gran # (Auto) (0.01 - 0.05 K/MM3)   0.03
                Immature Gran % (%)                    0.5
                Lymphocytes % (%)                      21.5
                Monocytes % (%)                        6.4
                Eosinophils % (%)                      1.4
                Basophils % (%)                        0.9




Diagnosis, Assessment   Plan

Code Status/Resusc. Discussion
Resuscitation discussion:
    Discussed with: patient
Code status: full code

Free Text DxA P Notes
Free Text DxA P Notes:
PNES/epilepsy, acute on chronic
Chronic PE on Eliquis
HTN
HLD
Dm2 uncontrolled w hyperglycemia
```

Extensive psych history-previous suicide attempt, PTSD, bipolar 1, generalized
anxiety disorder, major depressive disorder, dissociative identity disorder, OCD
, schizoaffective disorder, borderline personality disorder

Plan:
Patient stable
no seizures on my eval
Neuro on board
CT brain neg
Resume eliquis
cw home AED
CM consult
PT OT as tolerated

VTE proph with eliquis
Full code

Electronically Signed by Yaghoobian,Jonathan  MD on 06/29/25 at 1515
RPT #: 0629-0085
***END OF REPORT***

## Provider Report

Details for

# EEG Study

Encounter ID: H89683267699

**Patient**

JADE BURCH

**Dictation Date**

6/28/2025 6:06 PM

**Facility**

SOUTHERN HILLS HOSP & MED CTR-LAS VEGAS

9300 W Sunset Rd

Las Vegas NV 89148

()

Summary

Southern Hills Hospital and Medical Center (COCSNV)
Electroencephalogram-EEG
REPORT#0628-0745  REPORT STATUS: Signed
DATE:06/28/25 TIME: 1806

PATIENT: BURCH,JADE                    UNIT #: H000529958
ACCOUNT#: H89683267699                 ROOM/BED:
DOB: 07/31/78  AGE: 46       SEX: F    ATTEND: Wright,Brent J  DO
ADM DT:                                AUTHOR: Tran,Cyndi  DO
REP SRV DT: 06/28/25         REP SRV TM: 1806
* ALL edits or amendments must be made on the electronic/computer document *


Procedure

HPI:
Requesting clinician:
Dr. Janita Sidhu
PCP:
PCP: Capobianco,Leo J  DO

Medications:
Home Medications:
amLODIPine (NORVASC 10 MG) 10 MG PO DAILY
INSULIN LISPRO (HumaLOG 100 UNIT/ML KWIKPEN INJ)
DIVALPROEX ER (DEPAKOTE ER 500 MG) 500 MG PO BID
AZITHROMYCIN (ZITHROMAX) 500 MG PO Q24H
OXYCODONE HCL/ACETAMINOPHEN (PERCOCET  7.5/325 MG) 1 TAB PO Q6H PRN PRN pain

Current Hospital Medications:
Divalproex Sodium (DIVALPROEX SODIUM ER TAB)   500 MG   BID   PO
Levetiracetam (LEVETIRACETAM)   750 MG   BID   PO
Acetaminophen (ACETAMINOPHEN TABLET)   650 MG   Q6H PRN PRN   PO
Acetaminophen (ACETAMINOPHEN TABLET)   650 MG   X1ED STA   PO   (DC)
Levetiracetam (LEVETIRACETAM)   1,000 MG   Q5M   IV   (DC)
Lorazepam (LORazepam (2 MG/ML) INJ)   2 MG   X1ED STA   IV   (DC)
Lorazepam (LORazepam (2 MG/ML) INJ)   0   .STK-MED ONE   IV   (DC)


Procedure:
Date of procedure:
06/28/2025
Procedure performed: EEG Rec AW   Asleep
Duration: 20 Minutes
Indication: seizure
Procedure description:
Twenty-one electrodes were applied to the patient's scalp in accordance with the
international 10/20 system.  The record was recorded and reviewed utilizing
referential and bipolar montages.  A single channel EKG electrode was applied to
the patient's chest.

Audio/Video recording: Made
Activation Procedure:
   Photic stimulation: Not done
   Hyperventilation for 2 min: Not done
   State of arousal: awake, sleep
Findings:

This electroencephalogram is comprised of an alpha posterior predominant rhythm

of a sinusoidal morphology. The voltage is moderate. There is no side-to-side
asymmetry. Hyperventilation and photic stimulation were deferred. Mild blinking
and movement artifacts are noted in the recording. There is no focal slowing.
There are no spike-wave, spike and wave, or sharp wave activity appreciated.


Impression/Conclusion:

This electroencephalogram is within normal limits. Please clinically correlate.
Long term monitoring is indicated if epilepsy is suspected.

Electronically Signed by Tran,Cyndi  DO on 06/28/25 at 1808
RPT #: 0628-0745
***END OF REPORT***

## Provider Report

Details for

# Neurology Consult Note

Encounter ID: H89683267699

### Patient

JADE BURCH

### Dictation Date

6/28/2025 1:20 PM

### Facility

SOUTHERN HILLS HOSP & MED CTR-LAS VEGAS

9300 W Sunset Rd

Las Vegas NV 89148

()

Summary

Health Records

Southern Hills Hospital and Medical Center (COCSNV)
Neurology Consultation  Note
REPORT#0628-0568  REPORT STATUS: Signed
DATE:06/28/25 TIME: 1320

PATIENT: BURCH,JADE                  UNIT #: H000529958
ACCOUNT#: H89683267699               ROOM/BED: H.521-A
DOB: 07/31/78  AGE: 46    SEX: F     ATTEND: Yaghoobian,Jonathan  MD
ADM DT: 06/28/25                     AUTHOR: Sidhu,Janita MD R3
REP SRV DT: 06/28/25       REP SRV TM: 1320
* ALL edits or amendments must be made on the electronic/computer document *

                         **See Addendum**

SIDHU,JANITA 06/28/25 1320:
History of Present Illness


HPI
Requesting clinician: ED
Reason for consult:
Seizures
Chief complaint:
Seizures
HPI:
The patient is a 46-year-old male to female transgender with PMH of PNES,
epilepsy, PE on Eliquis, previous suicide attempt, diabetes, hypertension,
hyperlipidemia, PTSD, bipolar 1, generalized anxiety disorder, major depressive
disorder, dissociative identity disorder, OCD, schizoaffective disorder,
borderline personality disorder presented to the ED for seizures and head injury
with headache.  Neurology consulted for further workup/management.

The patient is seen and examined bedside with partner present.  Yesterday while
putting the VAC away, she hit the right side of her head on the edge of the wall
and since then has been having continuous, throbbing, progressively worsening
headache that is 9/10 at this time.  Has not tried any pain killer medication at
home.  Since she is on Eliquis for PE, she was concerned about brain bleed which
prompted her to come to the ED along with wanting better control of her
seizures.

Per patient, she has been having seizures for long time and her neurologists are
working on trying to get a better control.  At this time she is on Depakote 500
b.i.d. and Keppra 750 b.i.d. with which she is compliant.  She can get 3-18
seizures a day.  Her aura consists of hearing music, Collar in her vision and
visual hallucination (birds, kids).  Her seizures generally consist of
generalized or focal shaking, eye rolling back, no awareness, occasional bladder
incontinence with being fully back to baseline in 5-10 minutes.  She has had
significantly increased stress and poor sleep recently.  She is planned for 5
days of PNES and/or epilepsy eval at Sunrise starting Monday.


History - Adult longitudinal
Additional medical history:
Seizure disorder, functional neurological disorder, dissociative identity
disorder, post-traumatic stress disorder, schizoaffective disorder, bipolar
I disorder, borderline personality disorder, obsessive-compulsive disorder,
ADHD, major depressive disorder, generalized anxiety disorder, pulmonary
embolism, hypertension, hyperlipidemia, diabetes mellitus - insulin
dependent, left ventricular hypertrophy, DVT, syncope and breathing
suppression
Past surgical history:
Denies: Cholecystectomy.

·7/12/25, 6:23 AM                                          Health Records

Additional surgical history:
Breast augmentation
Additional family history:
niece-epilepsy
Alcohol use: Denies EtOH use
Drug use: Denies recreational drugs
Smoking status for patients 13 years old or older: Never Smoker
Medications:
Home Medications:

| Medication | Dose/Rte/Freq Max Daily Dose | Days | Qty | Entered | Last Reviewed |
|---|---|---|---|---|---|
| amLODIPine (NORVASC 10 MG) Strength: 10 MG TAB | 10 MG PO DAILY | | | 08/12/24 0936 | |
| INSULIN LISPRO (HumaLOG 100 UNIT/ML KWIKPEN INJ) Strength: 100 UNIT/ML INSULN.PEN | | | | 04/09/25 1719 | |
| DIVALPROEX ER (DEPAKOTE ER 500 MG) Strength: 500 MG TAB.ER | 500 MG PO BID | | | 10/24/24 0548 | |
| AZITHROMYCIN (ZITHROMAX) Strength: 500 MG TAB | 500 MG PO Q24H | | 4 | 04/22/25 1052 | |
| OXYCODONE HCL/ACETAMINOPHEN (PERCOCET 7.5/325 MG) Strength: 1 TAB TAB | 1 TAB PO Q6H PRN PRN pain | 7 | 28 | 04/22/25 1052 | |

Current Hospital Medications:
Central Nervous System Agents

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Acetaminophen (ACETAMINOPHEN TABLET) | 650 MG | X1ED STA PO | 06/28 1404 06/28 1405 | DC | |
| Levetiracetam (LEVETIRACETAM) | 1,000 MG | Q5M IV | 06/28 1314 06/28 1320 | DC | 06/28 1328 |
| Lorazepam (LORazepam (2 MG/ML) INJ) | 2 MG | X1ED STA IV | 06/28 1259 06/28 1300 | DC | 06/28 1304 |
| Lorazepam (LORazepam (2 MG/ML) INJ) | 0 | .STK-MED ONE IV | 06/28 1258 | DC | |

Allergies:
Coded Allergies:
guanfacine (Intermediate, HALLUCINATIONS 04/20/25)
quetiapine (From SEROQUEL) (Intermediate, SLEEP WALKING 04/20/25)

Review of Systems
Constitutional:
Denies: chills, fever.
Skin:
Denies: abrasion, contusion.
Allergy/Immun:
Denies: allergic reaction.
Eyes:

Denies: redness, visual loss/blurred.
ENT:
Denies: ear drainage, hearing loss.
Respiratory:
Denies: SOB.
Cardiovascular:
Denies: chest pain.
GI:
Denies: abdominal pain, nausea.
GU:
Denies: dysuria, hematuria.
Musculoskeletal:
Denies: arthritis, neck pain.
Heme:
Denies: bleeding.
Endocrine:
Denies: weight gain, weight loss.
Psych:
Reports: anxiety, depression, stress, suicidal ideation.


Objective

Physical Exam
VS:
Last Documented:

|         | Result | Date  | Time |
|---------|--------|-------|------|
| Resp    | 17     | 06/28 | 1238 |
| Pulse Ox| 99     | 06/28 | 1226 |
| B/P     | 187/92 | 06/28 | 1226 |
| B/P Mean| 123.7  | 06/28 | 1226 |
| Temp    | 36.4   | 06/28 | 1226 |
| Pulse   | 85     | 06/28 | 1226 |


Medications:
Current Home Medications
amLODIPine (NORVASC 10 MG) 10 MG PO DAILY
INSULIN LISPRO (HumaLOG 100 UNIT/ML KWIKPEN INJ)
DIVALPROEX ER (DEPAKOTE ER 500 MG) 500 MG PO BID
AZITHROMYCIN (ZITHROMAX) 500 MG PO Q24H
OXYCODONE HCL/ACETAMINOPHEN (PERCOCET 7.5/325 MG) 1 TAB PO Q6H PRN PRN pain

Active Meds + DC'd Last 24 Hrs
Acetaminophen (ACETAMINOPHEN TABLET)   650 MG    X1ED STA   PO    (DC)
Levetiracetam (LEVETIRACETAM)   1,000 MG    Q5M    IV    (DC)
Lorazepam (LORazepam (2 MG/ML) INJ)   2 MG   X1ED STA   IV    (DC)
Lorazepam (LORazepam (2 MG/ML) INJ)   0   .STK-MED ONE   IV    (DC)


General appearance: alert, awake, oriented
Head/Eyes: atraumatic, clear cornea
ENT: moist mucosal membranes
Respiratory: no distress
Abdomen: soft
Extremities: moves all, normal inspection
Musculoskeletal: normal inspection
Neuro comment:
NEURO:
Mood/affect:  Appropriate
Attention/concentration:  Intact
Speech:  Fluent

Cranial nerve:
-II:  Pupil equal and reactive b/l, normal visual field, PERLA
-III, IV, VI:  EOMI, no gaze preference or deviation
-V:  Sensory intact, symmetrical
-VII:  Facial expression intact, symmetrical
Motor:
-RUE: 5/5
-LUE: 5/5
-RLE:  5/5
-LLE: 5/5
Tone/bulk:  Appropriate
Sensation:  Intact to light touch/pinprick
Reflexes:
-RUE: 2/4
-LUE: 2/4
-RLE: 2/4
-LLE: 2/4
Coordination:
-FNF: Intact
Gait: Deferred


No tongue bite, right tongue ulcer noted


Skin: dry, intact


Results
Findings/Data:
Laboratory Tests
                                                           06/28
                                                           1241
                    Chemistry
                        Sodium (136 - 145 MMOL/L)            142
                        Potassium (3.5 - 5.1 MMOL/L)         3.4  L
                        Chloride (98 - 107 MMOL/L)           108  H
                        Carbon Dioxide (20 - 31 MMOL/L)       26
                        Anion Gap (5 - 16 MMOL/L)              8
                        BUN (9 - 23 MG/DL)                    7  L
                        Creatinine (0.55 - 1.02 MG/DL)       1.02
                        Est GFR (CKD-EPI) (>60 ML/MIN)        69
                        Glucose (74 - 106 MG/DL)              95
                        Calcium (8.5 - 10.1 MG/DL)            9.5
                        Total Bilirubin (0.3 - 1.2 MG/DL)     0.4
                        AST (8 - 34 U/L)                      21
                        ALT (10 - 49 U/L)                     22
                        Total Alk Phosphatase (46 - 116 U/L) 112
                        Total Protein (5.7 - 8.2 G/DL)        7.2
                        Albumin (3.2 - 4.8 G/DL)              4.5
                        Albumin/Globulin Ratio (1.7 - 2.2)   1.7


Laboratory Tests
                                                           06/28
                                                           1241
                    Hematology
                        WBC (4.8 - 10.8 K/MM3)                8.6
                        RBC (4.20 - 5.50 M/MM3)              4.52
                        Hgb (12.0 - 16.0 G/DL)               13.3
                        Hct (37.0 - 47.0 %)                  40.8
                        MCV (80 - 100 FL)                     90
                        MCH (27.0 - 32.0 PG)                 29.4
                        MCHC (32.0 - 37.0 GM/DL)             32.6
                        RDW (11.5 - 14.5 %)                  13.1

```
Plt Count (150 - 450 K/MM3)                      329
MPV (9.6 - 12.0 FL)                              9.3  L
Neut % (Auto) (%)                                66.1
Neut # (Auto) (1.80 - 7.70 K/MM3)                5.69
Lymph # (Auto) (1.5 - 4.0 K/MM3)                 1.86
Mono # (Auto) (0.20 - 1.00 K/MM3)                0.83
Eos # (Auto) (0.0 - 0.5 K/MM3)                   0.10
Baso # (Auto) (0.00 - 0.20 K/MM3)                0.07
Immature Gran # (Auto) (0.01 - 0.05 K/MM3)       0.05
Immature Gran % (%)                              0.6
Lymphocytes % (%)                                21.6
Monocytes % (%)                                  9.7
Eosinophils % (%)                                1.2
Basophils % (%)                                  0.8
```

Diagnosis, Assessment   Plan
Free Text A P:
The patient is a 46-year-old male to female transgender with PMH of PNES,
epilepsy, PE on Eliquis, previous suicide attempt, diabetes, hypertension,
hyperlipidemia, PTSD, bipolar 1, generalized anxiety disorder, major depressive
disorder, dissociative identity disorder, OCD, schizoaffective disorder,
borderline personality disorder presented to the ED for seizures and head injury
with headache.  Neurology consulted for further workup/management.

Assessments:
Eval brain bleed
Posttraumatic cephalgia
Head injury, no LOC
Chronically uncontrolled PNES/epilepsy
Hypertensive urgency

History of:
PNES/epilepsy, chronically uncontrolled
PE on Eliquis
diabetes
hypertension
hyperlipidemia
Extensive psych history-previous suicide attempt, PTSD, bipolar 1, generalized
anxiety disorder, major depressive disorder, dissociative identity disorder, OCD
, schizoaffective disorder, borderline personality disorder

Plan:
Has not tried any pain meds for headache
Underwent 5 days of EMU last year and was diagnosed with PNES.

CT brain without contrast ordered to eval bleed

Depakote, Keppra levels pending

In the ED:  Loaded with Keppra 2000 mg, 2 mg Ativan IV
Ordered Tylenol 650 mg q.6 p.r.n.-headache
Continue home med Depakote 500 mg b.i.d.
Continue home med Keppra 750 mg b.i.d.

Q.4 neuro checks
Fall/seizure precautions
PT/OT eval

Neurologists:  Las Vegas Neurology and Dr Toya Malone
Planned for 5 days of EMU starting Monday to eval PNES/epilepsy

Case to be discussed with Neurology attending, Dr. Tran.


Tran,Cyndi 06/28/25 1741:
Attestations
Attestation needed: teaching physician

Teaching Physician Attestation
1st visit w/o resident:
I performed a history and physical examination of the patient and discussed with
the resident.  I have reviewed the resident's note and . . .

agree with the findings and plan as documented in the resident's note.

agree with the findings and plan as documented in the resident's note EXCEPT:


Electronically Signed by Sidhu,Janita MD R3 on 06/28/25 at 1426
Electronically Signed by Tran,Cyndi  DO on 06/28/25 at 1741

Addendum 1: 06/28/25 1511 by Sidhu,Janita MD R3

added EEG

Electronically Signed by Sidhu,Janita MD R3 on 06/28/25 at 1512
Electronically Signed by Tran,Cyndi  DO on 06/28/25 at 1741

Addendum 2: 06/29/25 0639 by Ramirez Roggio,Adriana R3

Nursing staff contacted this writer for concern of seizure like activity. No
post ictal state. Lasting > 1 minute. Low suspicion for seizure. Seems PNES.
Holding on AED. Patient protecting airway and clinically stable.

Electronically Signed by Ramirez Roggio,Adriana R3 on 06/29/25 at 0640
Electronically Signed by Tran,Cyndi  DO on 06/29/25 at 0758
RPT #: 0628-0568
***END OF REPORT***

# Provider Report

Details for

# EKG Study

Encounter ID: H89683267699

**Patient**

JADE BURCH

**Dictation Date**

6/28/2025 12:28 PM

**Facility**

SOUTHERN HILLS HOSP & MED CTR-LAS VEGAS

9300 W Sunset Rd

Las Vegas NV 89148

()

Summary

SOUTHERN HILLS HOSPITAL AND MEDICAL CENTER
9300 WEST SUNSET
LAS VEGAS, NV 89148


REPORT NAME: EKG

PATIENT'S NAME: BURCH,JADE                    UNIT NO: H000529958
DOB: 07/31/78   AGE: 46                    ACCOUNT NO: H89683267699
ATTENDING PHYS: Yaghoobian,Jonathan  MD        PT TYPE: DIS INo
ADMISSION DATE: 06/28/25                      LOCATION: H.5BPOD
DISCHARGE DATE: 06/29/25


Service Date:  06/28/25   Service Time:  1228


Test Performed on 06/28/2025  12:34: PM
Test Reason :
Blood Pressure :   */*   mmHG
Vent. Rate :  82 BPM    Atrial Rate :  82 BPM
  P-R Int : 160 ms        QRS Dur :  90 ms
   QT Int : 370 ms      P-R-T Axes :  35  53  67 degrees
  QTc Int : 432 ms

Normal sinus rhythm
Nonspecific T wave abnormality
Abnormal ECG
When compared with ECG of 16-APR-2025 09:19,
No significant change was found
Confirmed by Akhtar, Salman (1030) on 6/30/2025 9:13:33 AM

Referred By:          Electronically Sign by: Salman Akhtar


PATIENT NAME: BURCH,JADE                    ACCOUNT #: H89683267699

# Provider Report

Details for

# Physician Emergency Department Note

Encounter ID: H89683267699

**Patient**

JADE BURCH

**Dictation Date**

6/28/2025 12:27 PM

**Facility**

SOUTHERN HILLS HOSP & MED CTR-LAS VEGAS

9300 W Sunset Rd

Las Vegas NV 89148

()

Summary

SOUTHERN HILLS HOSPITAL AND MEDICAL CENTER (COCSNV)
EMERGENCY PROVIDER REPORT
REPORT#:0628-0514  REPORT STATUS: Signed
DATE:06/28/25 TIME: 1234

PATIENT: BURCH,JADE                UNIT #: H000529958
ACCOUNT#: H89683267699             ROOM/BED: H.521-A
DOB: 07/31/78 AGE: 46    SEX: F    PCP PHYS: Capobianco,Leo J  DO
SERVICE DT: 06/28/25               AUTHOR: Wright,Brent J  DO
REP SRV DT: 06/28/25        REP SRV TM: 1227
* ALL edits or amendments must be made on the electronic/computer document *

                        **See Addendum**
HPI-Seizure

General
Confirmed Patient Yes
Patient Type Arrived via walk in
Initial Greet Date/Time 06/28/25 1227

Presentation
Chief Complaint Seizure, generalized

Portions of this section were scribed by SEBASTIAN,VENUS on 06/28/25 at 1234

Review of Systems

ROS Statements
All systems rev   neg except as marked.

Focused Review of Systems
Constitutional
Denies: Chills, Fever.
Neurologic
Reports: Seizure.

Portions of this section were scribed by SEBASTIAN,VENUS on 06/28/25 at 1234

Past Medical History - Adult
Allergies
Coded Allergies:
guanfacine (Intermediate, HALLUCINATIONS 04/20/25)
quetiapine (From SEROQUEL) (Intermediate, SLEEP WALKING 04/20/25)

Home Medications
Active Scripts
AZITHROMYCIN (ZITHROMAX) 500 MG PO Q24H
     AZITHROMYCIN (ZITHROMAX) 500 MG PO Q24H  #4 TAB
     Prov:     04/22/25
OXYCODONE HCL/ACETAMINOPHEN (PERCOCET  7.5/325 MG) 1 TAB PO Q6H PRN PRN pain
     7 Days #28 TAB
     Prov:     04/22/25

Reported Medications
ARIPiprazole (ABILIFY 10 MG) 10 MG PO DAILY
Bupropion HCl (Wellbutrin XL) 300 MG PO DAILY
ATORVASTATIN CALCIUM (LIPITOR 10 MG) 10 MG PO DAILY
LURASIDONE (LATUDA  20 MG) 20 MG PO DAILY
SERTRALINE (ZOLOFT  25 MG) 25 MG PO DAILY
LISINOPRIL (ZESTRIL 10  MG) 10 MG PO DAILY

```
amLODIPine (NORVASC 10 MG) 10 MG PO DAILY
INSULIN LISPRO (HumaLOG 100 UNIT/ML KWIKPEN INJ)
DIVALPROEX ER (DEPAKOTE ER 500 MG) 500 MG PO BID
APIXABAN (ELIQUIS 2.5 MG) 2.5 MG PO BID


Review of Nursing Notes Reviewed
Pt reports no significant: Family history
Additional Medical History
Seizure disorder, functional neurological disorder, dissociative identity
disorder, post-traumatic stress disorder, schizoaffective disorder, bipolar I
disorder, borderline personality disorder, obsessive-compulsive disorder, ADHD,
major depressive disorder, generalized anxiety disorder, pulmonary embolism,
hypertension, hyperlipidemia, diabetes mellitus - insulin dependent, left
ventricular hypertrophy, DVT, syncope and breathing suppression
Past Surgical History:
Denies: Cholecystectomy.
Additional Surgical History
Breast augmentation
Alcohol Use Denies EtOH use
Drug Use Denies recreational drugs
Smoking status for patients 13 years old or older: Never Smoker


Portions of this section were scribed by SEBASTIAN,VENUS on 06/28/25 at 1250


Physical Exam

Vital Signs
Vital Signs
First Documented:
                        Result    Date Time
           Pulse Ox        99    06/28 1226
           B/P         187/92    06/28 1226
           B/P Mean     123.7    06/28 1226
           Temp          97.5    06/28 1226
           Pulse           85    06/28 1226
           Resp            17    06/28 1238
           O2 Delivery Room air  06/28 1400


Last Documented:
                        Result    Date Time
           Pulse Ox        97    06/28 1930
           B/P         147/95    06/28 1930
           B/P Mean       116    06/28 1930
           Pulse           77    06/28 1930
           O2 Delivery Room air  06/28 1900
           Resp            18    06/28 1900
           Temp          97.5    06/28 1226


Review of Vital Signs Reviewed

Focused PE
General/Const    **
   General/Const Awake, Alert
MS Head
   Head Atraumatic, Normocephalic
Eyes
   Eyes PERRL, EOMI
Ears/Nose/Throat
   Ears/Nose/Throat Airway patent, Mucous membranes moist, Pharynx NL
```

Text/Dict Notes
No tongue lacerations
MS Neck          **
    Neck Supple, No meningismus, Full range of motion
Resp/Chest        **
    Respiratory/Chest Breath sounds NL, Breath sounds = bilat, No respiratory
distress
Cardiovascular    **
    Cardiovascular Heart rate NL, Regular rhythm, Heart sounds NL
Abdomen/GI
    Abdomen/GI Soft, Non-tender
MS Upper Extrem
    Upper Extremity/MS Inspection NL, Full range of motion, No swelling
MS Lower Extrem
    Lower Ext/Pelvis/MS Inspection NL, Full range of motion
Skin
    Skin Color NL, Warm, Dry, Intact
Neurologic        **
    Neurologic Oriented X3, Speech NL, No motor deficits, No sensory deficits, CN
II - XII intact, Reflexes equal bilat
Psychiatric
    Psychiatric Affect NL, Mood NL


Portions of this section were scribed by SEBASTIAN,VENUS on 06/28/25 at 1244


Interpretation   Diagnostics


Lab Results Interpretation
Results
Laboratory Tests



06/28/25 1241:
[Embedded Image Not Available]
Laboratory Tests:

|                                     | 06/28 1935 | 06/28 1935 | 06/28 1935 | 06/28 1241 |
|-------------------------------------|------------|------------|------------|------------|
| Chemistry                           |            |            |            |            |
| Sodium (136 - 145 MMOL/L)           |            |            |            | 142        |
| Potassium (3.5 - 5.1 MMOL/L)        |            |            |            | 3.4  L     |
| Chloride (98 - 107 MMOL/L)          |            |            |            | 108  H     |
| Carbon Dioxide (20 - 31 MMOL/L)     |            |            |            | 26         |
| Anion Gap (5 - 16 MMOL/L)           |            |            |            | 8          |
| BUN (9 - 23 MG/DL)                  |            |            |            | 7  L       |
| Creatinine (0.55 - 1.02 MG/DL)      |            |            |            | 1.02       |
| Est GFR (CKD-EPI) (>60 ML/MIN)      |            |            |            | 69         |
| Glucose (74 - 106 MG/DL)            |            |            |            | 95         |
| Hemoglobin A1c (4.0 - 5.7 %)        | 5.7        |            |            |            |
| Calcium (8.5 - 10.1 MG/DL)          |            |            |            | 9.5        |
| Iron (50 - 170 ug/dL)               |            |            | 38  L      |            |
| TIBC (250 - 425 ug/dL)              |            |            | 309        |            |
| Iron Saturation (20 - 50 %)         |            |            | 12  L      |            |
| Ferritin (7.3 - 270.7 ng/mL)        |            |            | 17.1       |            |
| Total Bilirubin (0.3 - 1.2 MG/DL)   |            |            |            | 0.4        |
| AST (8 - 34 U/L)                    |            |            |            | 21         |
| ALT (10 - 49 U/L)                   |            |            |            | 22         |
| Total Alk Phosphatase (46 - 116 U/L)|            |            |            | 112        |
| Total Protein (5.7 - 8.2 G/DL)      |            |            |            | 7.2        |
| Albumin (3.2 - 4.8 G/DL)            |            |            |            | 4.5        |
| Albumin/Globulin Ratio (1.7 - 2.2)  |            |            |            | 1.7        |

```
                    Triglycerides (0 - 150 MG/DL)                    106
                    Cholesterol (0 - 200 MG/DL)              201  H
                    LDL Cholesterol (0 - 100 MG/DL)          160  H
                    VLDL Cholesterol (7.6 - 34.0 MG/DL)       21.0
                    HDL Cholesterol (>60 MG/DL)                 38
                    Cholesterol/HDL Ratio (MG/DL)             5.29
                    Vitamin B12 (211 - 911 pg/mL)              732
                    Folate (>5.38 ng/mL)             16.23
                    TSH (0.480 - 4.170 uIU/ML)              0.544
               Hematology
                    WBC (4.8 - 10.8 K/MM3)                           8.6
                    RBC (4.20 - 5.50 M/MM3)                         4.52
                    Hgb (12.0 - 16.0 G/DL)                          13.3
                    Hct (37.0 - 47.0 %)                             40.8
                    MCV (80 - 100 FL)                                 90
                    MCH (27.0 - 32.0 PG)                            29.4
                    MCHC (32.0 - 37.0 GM/DL)                        32.6
                    RDW (11.5 - 14.5 %)                             13.1
                    Plt Count (150 - 450 K/MM3)                      329
                    MPV (9.6 - 12.0 FL)                             9.3  L
                    Neut % (Auto) (%)                              66.1
                    Neut # (Auto) (1.80 - 7.70 K/MM3)              5.69
                    Lymph # (Auto) (1.5 - 4.0 K/MM3)               1.86
                    Mono # (Auto) (0.20 - 1.00 K/MM3)              0.83
                    Eos # (Auto) (0.0 - 0.5 K/MM3)                 0.10
                    Baso # (Auto) (0.00 - 0.20 K/MM3)              0.07
                    Immature Gran # (Auto) (0.01 - 0.05 K/MM3)     0.05
                    Immature Gran % (%)                             0.6
                    Lymphocytes % (%)                              21.6
                    Monocytes % (%)                                 9.7
                    Eosinophils % (%)                               1.2
                    Basophils % (%)                                 0.8
               Toxicology
                    Valproic Acid (50.0 - 100.0 ug/mL)             42.3  *
```

Recent Impressions:
COMPUTED TOMOGRAPHY - CT BRAIN W/O CONTRAST          06/28 1503
*** Report Impression - Status: SIGNED  Entered: 06/28/2025 1721


IMPRESSION:
No acute intracranial abnormality.


Report Provided by Lucid Solutions
Impression By: LIPELLBR - Brian Ellison, MD



Portions of this section were scribed by SEBASTIAN,VENUS on 06/28/25 at 1329


Re-Evaluation   MDM


Free Text MDM Notes
Additional Text
PRESENTING PROBLEM: The history is obtained from an independent historian. Spoke
with patient.
46 year old female with PMHx HTN, DM, gender dysphoria, psychogenic seizures,
and depression presents to ED with multiple seizures within the last 3 days. She
describes her seizures as a tonic-clonic activity which typically resolves after
a few seconds. Patient admits to sometimes biting her tongue. She has been
taking Keppra and Depakote, but her neurologist suggested increasing the dosage.
No fever or chills. no other complaints.

PHYSICAL EXAM:
Full detailed physical exam documented in Focused PE section seen above. Please
refer to this section for further details.


EXTERNAL RECORDS:
Review of external records performed.
Reviewed prior medical records and PCI.


RISK ASSESSMENT: See risks assessment section.


INDEPENDENT INTERPRETATIONS:
Laboratory tests have been ordered, with independent interpretations of the
results reviewed and considered in the medical decision making process by the ED
physician.

Independent interpretation of EKG Interpreted by the ED Physician
ECG Documented in MUSE Yes
Date JUNE 28, 2025
Time 12:34 P.M.
Rate 82
[Interpretation Normal rate, Normal sinus rhythm, No STEMI, Normal QRS, Normal
ST waves, Normal T waves, Normal axis, Normal intervals, Adequate tracing

My impression of labs:  UNREMARKABLE
My impression of imaging:  NEGATIVE HEAD CT
Code status = Patient is a full code


DIFFERENTIAL DIAGNOSIS: Includes but not limited to:  SEIZURE, NONEPILEPTIC
SEIZURE, BIPOLAR,


SHARED DECISION MAKING: Disposition plan discussed with patient. Patient
expresses understanding and is agreeable to plan.


MDM:  46-YEAR-OLD FEMALE PRESENTING FOR CONCERN OF SEIZURE PATIENT WITH A
HISTORY OF PSYCHOGENIC NONEPILEPTIC SEIZURES PATIENT DID HAVE 1 SEIZURE LIKE
EPISODE WHICH RESOLVED WITHOUT INTERVENTION PATIENT RECEIVED ATIVAN AS WELL AS
KEPPRA WILL EMERGENCY DEPARTMENT.  PATIENT WAS EVALUATED BY NEUROLOGY.
RECOMMENDATIONS FOR ADMISSION FOR OBSERVATION DUE TO FREQUENT RECURRENT
SEIZURES.


ADMIT: I HAVE DISCUSSED THE RECOMMENDATION FOR ADMISSION WITH THE PATIENT AND
FAMILY, THE BENEFITS OF ADMISSION AND THE RISKS OF DISCHARGE HOME. THE PATIENT
AGREES WITH THE PLAN OF CARE AND ADMISSION THE PATIENT WAS ADMITTED TO THE
HOSPITAL FOR FURTHER EVALUATION AND TREATMENT. I DISCUSSED THIS PATIENT'S CARE
AT LENGTH WITH THE ADMITTING PHYSICIAN. THE ADMITTING PHYSICIAN AGREED WITH THE
PLAN OF CARE AND WILL SEE THE PATIENT.



Re-Evaluation/Progress #1
Text/Dict Note

Patient began having tonic-clonic activity seizure that lasted approximately 30
seconds without intervention. Patient is following commands afterwards.
Time of Re-Eval 1258
Re-Eval Status Improved

ED Course
Medication(s) Ordered
Medication(s) Ordered:
Antihistamine Drugs

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Diphenhydramine HCl | 25 MG | BEDTIME PRN PRN PO | 06/28 1900 08/27 1901 | AC | |

Blood Formation,Coagulation

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Apixaban | 5 MG | BID PO | 06/28 2100 08/27 2101 | DC | |
| Apixaban | 5 MG | BID PO | 06/28 2100 08/27 2101 | AC | 06/28 2317 |

Cardiovascular Drugs

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Atorvastatin Calcium | 10 MG | DAILY PO | 06/29 0900 08/28 0901 | AC | |
| Lisinopril | 10 MG | DAILY PO | 06/29 0900 08/28 0901 | AC | |
| Hydralazine HCl | 10 MG | Q6H PRN PRN IV | 06/28 1900 08/27 1901 | AC | |

Central Nervous System Agents

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Aripiprazole | 10 MG | DAILY PO | 06/29 0900 08/28 0901 | AC | |
| Bupropion HCl | 300 MG | DAILY PO | 06/29 0900 08/28 0901 | AC | |
| Lurasidone HCl | 20 MG | DAILY PO | 06/29 0900 08/28 0901 | AC | |
| Sertraline HCl | 25 MG | DAILY PO | 06/29 0900 08/28 0901 | AC | |
| Divalproex Sodium | 500 MG | BID PO | 06/28 2100 08/27 2101 | AC | 06/28 2314 |
| Levetiracetam | 750 MG | BID PO | 06/28 2100 08/27 2101 | AC | 06/28 2315 |
| Lorazepam | 1 MG | X1ED STA IV | 06/28 1916 06/28 1917 | DC | 06/28 1926 |
| Oxycodone HCl | 5 MG | Q4H PRN PRN PO | 06/28 1900 08/27 1901 | AC | |
| Oxycodone HCl | 10 MG | Q4H PRN PRN PO | 06/28 1900 08/27 1901 | AC | |
| Promethazine HCl | 25 MG | Q6H PRN PRN RECTAL | 06/28 1900 08/27 1901 | AC | |
| Acetaminophen | 650 MG | Q6H PRN PRN PO | 06/28 1430 08/27 1431 | AC | |
| Acetaminophen | 650 MG | X1ED STA PO | 06/28 1404 06/28 1405 | DC | 06/28 1501 |
| Levetiracetam | 1,000 MG | Q5M IV | 06/28 1314 06/28 1320 | DC | 06/28 1328 |

7/12/25, 6:24 AM                              Health Records

```
      Lorazepam            2 MG   X1ED STA    06/28 1259  DC      06/28
                                  IV          06/28 1300          1304
      Lorazepam              0   .STK-MED ONE  06/28 1258  DC
                                  IV
```

Electrolytic, Caloric, And Wat

```
                                 Sig/Sch     Start time          Last
      Medication         Dose    Route       Stop Time   Status  Admin
      Calcium Carbonate  2 TAB   Q6H PRN PRN  06/28 1900  AC
                                 CHEW         08/27 1901
      Dextran/Dextrose   31 GM   PRN PRN      06/28 1900  AC
                                 PO           08/27 1901
      Dextrose/Water     125 ML  Q15M PRN PRN 06/28 1900  CKD
                                 IV           08/27 1901
```

Gastrointestinal Drugs

```
                                 Sig/Sch     Start time          Last
      Medication         Dose    Route       Stop Time   Status  Admin
      Bisacodyl          10 MG   DAILY PRN PRN 06/28 1900  AC
                                 RECTAL       08/27 1901
      Docusate Sodium   100 MG   BID PRN PRN  06/28 1900  AC
                                 PO           08/27 1901
      Ondansetron HCl    4 MG    Q4H PRN PRN  06/28 1900  AC
                                 IV           08/27 1901
```

Hormones And Synthetic Substit

```
                                 Sig/Sch  Start time          Last
      Medication         Dose    Route    Stop Time   Status  Admin
      Insulin Human Lispro  0    ACHS     06/28 2100  AC
                                 SUBQ     08/27 2101
```

Other

```
                                 Sig/Sch  Start time          Last
      Medication         Dose    Route    Stop Time   Status  Admin
      Electrolyte Protocol See Dose BID   06/28 2100  AC
                           Insts (1)  MISC 08/27 2101
```

Dose Instructions:
(1)Electrolyte Protocol:
        Reminder


Consultation
Consultation
    Referral/Consult Name
  Tran,Cyndi  DO
    Consultant Called Neurology
    Consultant Discussed with consultant, Agrees with eval, Agrees with plan,
Will see patient
    Requested Call Time 1304
    Requested Call Date 06/28/25
    Call Returned Call returned
    Call Returned Time 1313
    Call Returned Date 06/28/25
    Free Text Consult Notes
Discussed case with Resident for  Dr. Tran who agrees with evaluation and will
see patient.

Differential Diagnosis
)( Differential Diagnosis See MDM

7/12/25, 6:24 AM

Health Records

Portions of this section were scribed by SEBASTIAN,VENUS on 06/28/25 at 1337

Patient Discharge    Departure

Vital Signs/Condition
Vital Signs
First Documented:

|  | Result | Date Time |
|---|---|---|
| Pulse Ox | 99 | 06/28 1226 |
| B/P | 187/92 | 06/28 1226 |
| B/P Mean | 123.7 | 06/28 1226 |
| Temp | 97.5 | 06/28 1226 |
| Pulse | 85 | 06/28 1226 |
| Resp | 17 | 06/28 1238 |
| O2 Delivery | Room air | 06/28 1400 |

Last Documented:

|  | Result | Date Time |
|---|---|---|
| Pulse Ox | 97 | 06/28 1930 |
| B/P | 147/95 | 06/28 1930 |
| B/P Mean | 116 | 06/28 1930 |
| Pulse | 77 | 06/28 1930 |
| O2 Delivery | Room air | 06/28 1900 |
| Resp | 18 | 06/28 1900 |
| Temp | 97.5 | 06/28 1226 |

All vital signs available at the time of this entry have been reviewed.

Clinical Impression
Clinical Impression
Primary Impression: Seizure

Disposition Decision
Hospitalize
    Hosp Physician Name
  Yaghoobian,Jonathan  MD
    Hosp Physician Hospitalist
    Request Time 1944
    Request Date 06/28/25
    )( Accepts Hospitalization Yes
    )( Reason for Hospitalization
SEIZURES
    )( Accepted Time 1944
    )( Accepted Date 06/28/25
    Call Information will see patient

Discharge/Care Plan
Referrals
Provider Referral: Capobianco,Leo J  DO
        Address:
        8413 W Lake Mead Blvd
        Las Vegas, NV 89128

Supervising Physician Note
  Scribe Statement
SEBASTIAN,VENUS, 06/28/25 1243, scribing for and in the presence of Dr. Brent
Wright.

Signed By: SEBASTIAN,VENUS, 06/28/25 1243

 Provider Scribed Statement
I personally performed the services described in this documentation and reviewed
the documentation that was dictated to the scribe(s) in my presence, and it
accurately records my words and actions. Dr. Brent Wright, 06/28/25


Portions of this section were scribed by SEBASTIAN,VENUS on 06/28/25 at 1345

I personally performed the services described in this documentation and reviewed
the documentation that was dictated to the scribe in my presence, and it
accurately records my words and actions. Wright,Brent J.Do ,  WRIBR01, 06/29/25;
0814.


Electronically Signed by Wright,Brent J  DO on 06/29/25 at 0814

Addendum 1: 06/29/25 0814 by Wright,Brent J  DO

Patient Addendum
Addendum
CRITICAL CARE:  THERE IS A HIGH PROBABILITY OF IMMINENT LIFE OR LIMB THREATENING
DETERIORATION IN THIS PATIENT'S CONDITION.  A HIGH COMPLEXITY OF DECISION MAKING
WAS USED TO ASSESS, MANIPULATE AND SUPPORT VITAL SYSTEM FUNCTIONS OF THIS
PATIENT.  THE FAILURE TO INITIATE THESE INTERVENTIONS ON AN URGENT BASIS WOULD
LIKELY HAVE RESULTED IN CLINICALLY SIGNIFICANT DETERIORATION IN THE PATIENT'S
CONDITION.  THE TOTAL TIME SPENT EVALUATING MANAGING AND PROVIDING CARE TO THIS
PATIENT WAS APPROXIMATELY 37 MINUTES.  THIS IS EXCLUSIVE OF ALL PROCEDURES
PERFORMED.  AS OF THE TIME OF THIS DICTATION NURSING NOTES WERE REVIEWED.

Electronically Signed by Wright,Brent J  DO on 06/29/25 at 0814

RPT #: 0628-0514
***END OF REPORT***

# EXHIBIT L

**SUNRISE HOSPITAL MEDICAL RECORDS – B-52 / SEIZURE ENCOUNTER**
*(May 29, 2025)*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC;**
**MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.

**Case No.: 2:25-cv-01408-JAD-MDC**

# EXHIBIT L

## SUNRISE HOSPITAL – FORCED SEDATION / CHEMICAL RESTRAINT RECORD

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

EXHIBIT L

Sunrise Hospital Records - B52 Injection and Seizure Event

Date of Incident: May 29, 2025

Description:

This exhibit contains a sworn incident report from Plaintiff regarding events at Sunrise Hospital on May 29, 2025. The report describes:

- Emergency admission due to repeated tonic-clonic seizures

- Critically low Depakote level (7.0 µg/mL) upon arrival

- Administration of a 'B52' chemical restraint cocktail:

  - Haloperidol 5 mg

  - Diphenhydramine 25 mg

  - Lorazepam 2 mg

- No documented psychiatric emergency, behavioral issue, or code gray

- Discharge within hours while still neurologically unstable and sedated

- No neurology consult, EEG, or capacity reassessment performed

- Contradictory chart entries and questionable provider documentation

Purpose:

This document supports claims of:

- Improper use of chemical restraint

- Civil rights violations under ADA, ACA § 1557, and EMTALA

- Failure to stabilize or provide appropriate neurological evaluation

- Bias, record inconsistencies, and systemic mistreatment of Plaintiff based on disability and gender identity


INCIDENT REPORT - SUNRISE HOSPITAL (#2)

Patient Name: Jade Riley Burch

DOB: 07/31/1978

Date of Incident: May 29, 2025

Facility: Sunrise Hospital & Medical Center - Las Vegas, NV

Prepared By: Jade Riley Burch

Email: jaderburch@gmail.com

Phone: (614) 725-9452

## SUMMARY OF EVENTS

On May 29, 2025, I was transported to Sunrise Hospital via EMS following multiple generalized seizures. EMS records confirm I experienced five or more tonic-clonic seizures that day. Upon arrival, I was disoriented and postictal. My Depakote (valproic acid) level was measured at 7.0 µg/mL-critically below the therapeutic range (50-100). Despite being neurologically compromised, I was given a 'B52' chemical restraint cocktail consisting of:

- Haloperidol 5 mg

- Diphenhydramine 25 mg

- Lorazepam 2 mg

This cocktail was administered at 4:30 PM without any documented psychiatric emergency, behavioral threat, or code gray justification. I had not been violent, combative, or psychotic. The decision to administer antipsychotic sedation was medically inappropriate, especially considering my active seizure history and neurological vulnerability.


Hospital records include contradictory documentation about my behavior. One entry states I 'fell' from a chair, while another claims I 'threw herself,' suggesting bias or retroactive narrative-shaping. There are multiple scribe entries (Amarie N. Unating, Saba Ebrahimi) and physicians signing off (Drs. Moshksar and Hewell) at different times, raising questions about record integrity and consistency. Despite confirmed seizures, low medication levels, sedation, and confusion, I was discharged within hours without a neurology consult, EEG, psychiatric reassessment, or capacity verification.

## IMPACT AND DAMAGES

- Improper chemical sedation without justification

- Discharge while postictal, neurologically unstable, and heavily medicated

- Continued seizure vulnerability from subtherapeutic Depakote level

- Psychological trauma from excessive restraint and negligent discharge

- Chart manipulation or narrative conflict casting doubt on provider credibility

- Civil rights and ADA violations due to identity-based dismissal of symptoms

REQUESTED ACTIONS

I request the following actions:

- Formal investigation into the use of B52 sedatives on medically impaired patients

- Review of Sunrise Hospital's charting and discharge procedures for neurological patients

- Disciplinary review of providers involved in this incident

- Civil rights investigation under ACA §1557 and ADA Title III

- EMTALA review for discharge while unstable and neurologically compromised

Signature: _____

Date: _____2-21-25_____

Health Records

Provider Report

Details for
# Physician Emergency Department Note

Encounter ID: D00135407991

**Patient**

JADE BURCH

**Dictation Date**

5/29/2025 4:18 PM

**Facility**

SUNRISE HOSPITAL AND MEDICAL CENTER

3186 S Maryland Pkwy

Las Vegas NV 89109

0

Summary

Health Records

```
SUNRISE HOSPITAL AND MEDICAL CENTER (COCSZ)
EMERGENCY PROVIDER REPORT
REPORT#:0529-2405  REPORT STATUS: Signed
DATE:05/29/25 TIME: 1618

PATIENT: BURCH,JADE                 UNIT #: D003052740
ACCOUNT#: D00135407991              ROOM/BED:
DOB: 07/31/78  AGE: 46     SEX: F   PCP PHYS: Capobianco,Leo J  DO
SERVICE DT: 05/29/25                AUTHOR: Hansen,Brett M  MD
REP SRV DT: 05/29/25            REP SRV TM: 1618
* ALL edits or amendments must be made on the electronic/computer document *


HPI-Seizure

General
Confirmed Patient Yes
Patient Type Arrived by EMS
Initial Greet Date/Time 05/29/25 1618

Presentation
Chief Complaint Seizure, generalized
Hx Obtained From Patient, EMS
Onset Occurred Today
Symptom Duration Since onset
Progression since Onset Intermittent
Pain/Sev: Onset Moderate
Pain/Sev: Current Mild
Associated Other Pt denies other symptoms
Exacerbated by Nothing
Relieved by Nothing

Portions of this section were scribed by UNATING,AMARIE N on 05/29/25 at 1938

Portions of this section were scribed by EBRAHIMI,SABA on 05/29/25 at 1618

Review of Systems

ROS Statements
All systems rev   neg except as marked.

Focused Review of Systems
Neurologic
Reports: Seizure.

Portions of this section were scribed by UNATING,AMARIE N on 05/29/25 at 1938

Past Medical History - Adult
Allergies
Coded Allergies:
No Known Allergies (05/29/25)

Review of Nursing Notes Triage notes reviewed

Portions of this section were scribed by UNATING,AMARIE N on 05/29/25 at 1938

Portions of this section were scribed by EBRAHIMI,SABA on 05/29/25 at 1642

Physical Exam
```

Health Records

7/12/25, 6:57 AM

Vital Signs
Vital Signs
First Documented:

|  | Result | Date | Time |
|---|---|---|---|
| Pulse Ox | 100 | 05/29 | 1629 |
| B/P | 148/99 | 05/29 | 1629 |
| B/P Mean | 115.3 | 05/29 | 1629 |
| Temp | 36.8 | 05/29 | 1629 |
| Pulse | 86 | 05/29 | 1629 |
| Resp | 17 | 05/29 | 1629 |
| O2 Delivery | Room air | 05/29 | 2112 |

Last Documented:

|  | Result | Date | Time |
|---|---|---|---|
| Pulse Ox | 98 | 05/29 | 2112 |
| B/P | 154/90 | 05/29 | 2112 |
| O2 Delivery | Room air | 05/29 | 2112 |
| Pulse | 77 | 05/29 | 2112 |
| Resp | 18 | 05/29 | 2112 |
| B/P Mean | 128.8 | 05/29 | 2031 |
| Temp | 36.8 | 05/29 | 1629 |

Review of Vital Signs Reviewed

Free Text PE Notes
Free Text PE Notes
General: Awake, Alert
Head: Atraumatic, Normocephalic
Eyes: PERRL, EOMI
ENT: Airway patent, Mucous membranes moist
Neck: Supple, No meningismus, Full ROM
Chest: Breath sounds NL, Breath sounds = bilat, No respiratory distress
Cardio: Rate normal, Regular rhythm, Heart sounds normal
Abdomen: Soft, Non-tender
Skin: Color NL, Warm, Dry, Intact
Neuro: Mildly postictal, Speech NL, No motor deficits, No sensory deficits

Portions of this section were scribed by UNATING,AMARIE N on 05/29/25 at 2133

Portions of this section were scribed by EBRAHIMI,SABA on 05/29/25 at 1642

Interpretation   Diagnostics

Lab Results Interpretation
Results
Laboratory Tests

05/29/25 1652:
[Embedded Image Not Available]
Laboratory Tests:

|  | 05/29 1652 | 05/29 1652 |
|---|---|---|
| Chemistry |  |  |
| Sodium (136 - 145 mmol/L) |  | 146 H |
| Potassium (3.5 - 5.1 mmol/L) |  | 3.7 |
| Chloride (98 - 107 mmol/L) |  | 111 H |
| Carbon Dioxide (20 - 31 mmol/L) |  | 24 |

Health Records

```
              Anion Gap (5 - 16 mmol/L)                                11
              BUN (9 - 23 mg/dL)                                      6  L
              Creatinine (0.55 - 1.02 mg/dL)                          0.90
              Est GFR (CKD-EPI) (>60 ml/min)                           79
              Glucose (74 - 106 mg/dL)                                 99
              Calcium (8.3 - 10.6 mg/dL)                               9.9
         Toxicology
              Urine Opiates Screen                            NONE DETECTED
              Ur Barbiturates Screen                          NONE DETECTED
              Valproic Acid (50.0 - 100.0 ug/mL)        7.0  L
              Ur Phencyclidine Scrn (ng/mL)                   NONE DETECTED
              Ur Amphetamines Screen                          NONE DETECTED
              U Benzodiazepines Scrn                          NONE DETECTED
              Urine Cocaine Screen                            NONE DETECTED
              U Cannabinoids Screen                           NONE DETECTED
              Drug Screen Comment                              SEE COMMENT
              Ur Toxicology Screen (NEGATIVE)                   NEGATIVE
              Plasma/Serum Alcohol (NONE DETECTED mg/dL)  NONE DETECTED
```

Recent Impressions:
COMPUTED TOMOGRAPHY - CT BRAIN W/O CONTRAST        05/29 1640
*** Report Impression - Status: SIGNED  Entered: 05/29/2025 1701

IMPRESSION:

No acute intracranial findings.

Electronically signed by: Amin Moshksar MD  05/29/2025 04:59 PM
PDT RP Workstation: RRWRS1405Z
Impression By: LIPMOSAM - Moshksar, Amin
RADIOLOGY - XR KNEE RIGHT AP/LAT/1OBLQ/TNL 05/29 1705
*** Report Impression - Status: SIGNED  Entered: 05/29/2025 2038

IMPRESSION:
1.  There is no acute fracture, dislocation or bone erosion.
2.  There is no joint effusion.

Interpreted by: Andrew Nguyen DO

I have reviewed the report furnished by the resident, and I
agree with the impression.

Electronically signed by: Galen Hewell MD  05/29/2025 08:35 PM
PDT RP Workstation: RRWRS633RR
Impression By: DR.HEWGA - G. Brett Hewell M.D.


Portions of this section were scribed by UNATING,AMARIE N on 05/29/25 at 2133

Re-Evaluation   MDM

Free Text MDM Notes
Free Text MDM Notes
 History of present Illness: patient with a history of seizures presenting with
a primary concern of multiple seizures had several episodes for EMS, however,
their parts says she was never postictal had some rhythmic movement but there is
always a quick return to baseline patient is reportedly on Depakote and Keppra
patient states compliance with this also states she has elevated blood pressure
she is on amlodipine which she states she is compliant with also reports she hit
her head several times yesterday she is on Eliquis for history of pulmonary

Health Records

embolisms. GIVEN SHE REPORTED A CLOSED HEAD INJURY YESTERDAY AND HEADACHE HEAD CT WILL BE OBTAINED SHE IS ON A BLOOD THINNER ALSO WHAT IN THE EMERGENCY DEPARTMENT SHE FELL OUT OF HER CHAIR ALTHOUGH THE NURSE STATES SHE THREW HERSELF ON THE FLOOR SHE IS NOT COMPLAINING OF KNEE PAIN X-RAY WAS NEGATIVE LABS ARE LARGELY AT BASELINE. HER DEPAKOTE LEVEL WAS LOW SO SHE WAS LOADED WITH DEPAKOTE ADVISED TO TAKE HER MEDICATIONS AS PRESCRIBED
Additional Text
History obtained from: Patient and EMS.

PRESENTING PROBLEM: 46 y/o female with history of seizure disorder presents to the ED for seizures. Per EMS, patient has had approximately five seizures today. Patient reports compliance with Depakote. No trauma or injury noted.

PHYSICAL EXAM: Remarkable for: mildly postictal. Full detailed physical exam documented in Focused PE section seen above. Please refer to this section for further details.

EXTERNAL RECORDS: Patient arrived by ambulance - reviewed EMS run sheets and discussed patient with EMS personnel. All pertinent aspects of patients presentation and vial signs discussed with EMS personnel that transported patient.

RISK ASSESSMENT: Reviewed. See RISK section.

INDEPENDENT INTERPRETATIONS:
-Laboratory tests have been ordered, with independent interpretations of the results reviewed and considered in the medical decision making process by the ED physician.
-The diagnostic imaging results were independently interpreted by the ED physician.

SHARED DECISION MAKING: All pertinent aspects of the patient's presenting complaint, evaluation, and treatment plan have been discussed with the patient and they are in agreement. Decisions were reached mutually through shared decision making. Discussed with the patient on plan to be discharged. Pt is comfortable with this plan.

ED Course
Medication(s) Ordered
Medication(s) Ordered:
Antihistamine Drugs

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Diphenhydramine HCl | 25 MG | Q4H PRN PRN IM | 05/29 1630 05/30 1621 | DCD | |

Central Nervous System Agents

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Valproic Acid | 1,500 MG | X1ED STA | 05/29 1831 | DC | 05/29 |
| Sodium Chloride | 50 ML | IV | 05/29 1930 | | 1939 |
| Haloperidol Lactate | 5 MG | Q4H PRN PRN IM | 05/29 1630 05/30 1621 | DCD | |
| Lorazepam | 2 MG | Q4H PRN PRN IM | 05/29 1630 05/30 1621 | DCD | |

Electrolytic, Caloric, And Wat

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Sodium Chloride | 1,000 ML | X1ED STA | 05/29 1621 | DC | 05/29 |

Health Records

IV          05/29 1622          1704

## Gastrointestinal Drugs

|  | | Sig/Sch | Start time | | Last |
|---|---|---|---|---|---|
| Medication | Dose | Route | Stop Time | Status | Admin |
| Ondansetron HCl | 4 MG | X1ED STA | 05/29 1622 | DC | |
| | | IV | 05/29 1623 | | |

## Differential Diagnosis

)( Differential Diagnosis See MDM

Portions of this section were scribed by UNATING,AMARIE N on 05/29/25 at 2133

Portions of this section were scribed by EBRAHIMI,SABA on 05/29/25 at 1642

## Patient Discharge    Departure

## Vital Signs/Condition
Vital Signs
First Documented:

| | Result | Date Time |
|---|---|---|
| Pulse Ox | 100 | 05/29 1629 |
| B/P | 148/99 | 05/29 1629 |
| B/P Mean | 115.3 | 05/29 1629 |
| Temp | 36.8 | 05/29 1629 |
| Pulse | 86 | 05/29 1629 |
| Resp | 17 | 05/29 1629 |
| O2 Delivery | Room air | 05/29 2112 |

Last Documented:

| | Result | Date Time |
|---|---|---|
| Pulse Ox | 98 | 05/29 2112 |
| B/P | 154/90 | 05/29 2112 |
| O2 Delivery | Room air | 05/29 2112 |
| Pulse | 77 | 05/29 2112 |
| Resp | 18 | 05/29 2112 |
| B/P Mean | 128.8 | 05/29 2031 |
| Temp | 36.8 | 05/29 1629 |

All vital signs available at the time of this entry have been reviewed.

Condition Improved

## Clinical Impression
Clinical Impression
Primary Impression: History of seizures
Secondary Impressions: Fall, Knee pain

## Disposition Decision
Discharge
   )( Discharged to Home Yes
   )( Time 2100
   )( Date 05/29/25

## Discharge/Care Plan
Counseled Regarding Diagnosis, Lab results, Imaging studies, Need for follow-up,
When to return to ED
Referrals
Provider Referral: Veerappan,Venkatachalam X  MD

Address:
9280 W Sunset Rd Ste 236
Las Vegas, NV 89148

Discharge Note
I have spoken with the patient and/or caregivers. I have explained the patient's
condition, diagnoses and treatment plan based on the information available to me
at this time. I have answered the patient's and/or caregiver's questions and
addressed any concerns. The patient and/or caregivers have as good an
understanding of the patient's diagnosis, condition and treatment plan as can be
expected at this point. The vital signs have been stable. The patient's
condition is stable and appropriate for discharge from the emergency department.


The patient will pursue further outpatient evaluation with the primary care
physician or other designated or consulting physician as outlined in the
discharge instructions. The patient and/or caregivers are agreeable to this plan
of care and follow-up instructions have been explained in detail. The patient
and/or caregivers have received these instructions in written format and have
expressed an understanding of the discharge instructions. The patient and/or
caregivers are aware that any significant change in condition or worsening of
symptoms should prompt an immediate return to this or the closest emergency
department or a call to 911.


Supervising Physician Note
 Scribe Statement
UNATING,AMARIE N, 05/29/25 1940, scribing for and in the presence of Dr. Brett
Hansen.
Signed By: UNATING,AMARIE N, 05/29/25 1940

 Provider Scribed Statement
I personally performed the services described in this documentation and reviewed
the documentation that was dictated to the scribe(s) in my presence, and it
accurately records my words and actions. Dr. Brett Hansen, 05/29/25


Portions of this section were scribed by UNATING,AMARIE N on 05/29/25 at 2133

Portions of this section were scribed by EBRAHIMI,SABA on 05/29/25 at 1642

I personally performed the services described in this documentation and reviewed
the documentation that was dictated to the scribe in my presence, and it
accurately records my words and actions. Hansen,Brett M.Md ,  HANBR1, 05/29/25;
2350.


I personally performed the services described in this documentation and reviewed
the documentation that was dictated to the scribe in my presence, and it
accurately records my words and actions. Hansen,Brett M.Md ,  HANBR1, 05/29/25;
2350.


Electronically Signed by Hansen,Brett M  MD on 05/29/25 at 2350

RPT #: 0529-2405
***END OF REPORT***

7/12/25, 6:58 AM

## Lab Result

Details for

# Drug Comp Profile Urine

Encounter ID: D00135407991

**Results for** JADE BURCH
**Ordered by** Hansen Brett M MD
**Role** Referring

**Facility** SUNRISE HOSPITAL AND MEDICAL CENTER
3186 S Maryland Pkwy
Las Vegas NV 89109

() 7027318668 (tel:7027318668)
**Specimen collected** 5/29/2025 4:52 PM
**Results posted** 5/29/2025 7:00 PM

**Status** Final results; Can only be changed with a corrected result.

NOTE: Lab results are just one tool used in diagnosis. It is important to discuss the results with your physician in order to fully understand what the findings mean in your situation.

| TEST | RESULT | RANGE | LAB | PAST RESULTS | REMARKS |
|------|--------|-------|-----|--------------|---------|
| AMPHETMAINE/METHAMPHE TAMINE UR | NONE DETECTED | ⓐ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | |
| BARBITURATES URINE | NONE DETECTED | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | |
| BENZODIAZEPINE UR | NONE DETECTED | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | |
| CANNABINOIDS (THC) URINE | NONE DETECTED | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | |
| COCAINE UR | NONE DETECTED | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | |

11

Health Records

7/12/25, 6:58 AM

| TEST | RESULT | RANGE | LAB | PAST RESULTS | REMARKS |
|------|--------|-------|-----|--------------|---------|
| DRUG SCREEN COMMENT | SEE COMMENT | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | 🗩 |
| OPIATES UR | NONE DETECTED | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | |
| PHENCYCLIDINE (PCP) UR | NONE DETECTED ng/mL | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | |
| URINE TOX SCREEN | NEGATIVE | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | N/A | 🗩 |

7/12/25, 6:59 AM                                          Health Records

## Lab Result

Details for

# Basic Metabolic Profile (Cci)

Encounter ID: D00135407991

**Results for** JADE BURCH
**Ordered by** Hansen Brett M MD
**Role** Referring

**Facility** SUNRISE HOSPITAL AND MEDICAL CENTER
3186 S Maryland Pkwy
Las Vegas NV 89109

() 7027318668 (tel:7027318668)
**Specimen collected** 5/29/2025 4:52 PM
**Results posted** 5/29/2025 6:02 PM

**Status** Final results; Can only be changed with a corrected result.                 New!

NOTE: Lab results are just one tool used in diagnosis. It is important to discuss the results with your physician in order to fully understand what the findings mean   View trends in your lab results as
in your situation.                                                                                                                              graphs.

Okay

| TEST | RESULT | RANGE | LAB | PAST RESULTS | REMARKS |
|------|--------|-------|-----|--------------|---------|
| BLOOD UREA NITROGEN (BUN) | 6 MG/DL  L | ⓘ Low | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |
| CALCIUM TOTAL | 9.9 MG/DL | ⓘ Normal | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |
| CHLORIDE BLD | 111 mmol/L H | ⓘ High | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |
| CARBON DIOXIDE BLD | 24 mmol/L | ⓘ Normal | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |
| CREATININE BLD | 0.9 MG/DL | ⓘ Normal | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |
| ESTIMATED GFR | 79 ml/min | ⓘ | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | 🗎 |

13 1/2

7/12/25, 6:59 AM                                    Health Records

| TEST | RESULT | RANGE | LAB | PAST RESULTS | REMARKS |
|------|--------|-------|-----|--------------|---------|
| ANION GAP | 11 mmol/L | ● Normal | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |
| GLUCOSE RANDOM | 99 MG/DL | ● Normal | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |
| POTASSIUM BLD | 3.7 mmol/L | ● Normal | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |
| SODIUM BLD | 146 mmol/L H | ● High | SUNRISE HOSP AND MED CTR 3196 MARYLAND PKWY LAS VEGAS NV 89109 | View past results | |

14

# EXHIBIT BB

**PSYCHIATRIC ADVANCE DIRECTIVE (PAD – NOTARIZED COPY)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC;**
**MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.

**Case No.: 2:25-cv-01408-JAD-MDC**

# EXHIBIT BB

## LEGALLY BINDING PSYCHIATRIC ADVANCED DIRECTIVE (PAD) - NOTARIZED

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

# CONFIDENTIAL: Psychiatric Advance Directive (PAD)

**Patient Name:** Jade Riley Burch
**Date of Birth:** July 31, 1978
**Effective Date:** June 6th 2025

This document contains legally binding psychiatric care instructions under:

- **Nevada Revised Statutes §§ 449A.600–449A.645**
- **42 CFR § 482.13** – Federal Conditions of Participation
- **HIPAA and ADA (42 U.S.C. §§ 12101 et seq.)**
- **Section 504 of the Rehabilitation Act**
- **Joint Commission Standards for Behavioral Health**
- **CMS Conditions of Participation for Hospitals**

**Unauthorized disclosure or deviation from this directive may constitute a legal violation.**

---

# Core Psychiatric Advance Directive

## 1. Psychiatric Agent Designation

If I am found incapable of making psychiatric decisions, I designate:

**Psychiatric Agent:**
**Porscha Ryan**
**Phone:** 702-787-1871
**Relationship:** Life Partner and Advocate

She is authorized to speak on my behalf, access my records, and make decisions regarding psychiatric, medical, and placement-related issues.

---

## 2. Treatment Preferences

- I consent to trauma-informed psychiatric treatment as outlined in this PAD and the attached amendments.
- I do not consent to excessive sedation or chemical restraint without medical justification.

1

- I may voluntarily request restraints or containment as a grounding aid. See: **Voluntary Restraint and Containment Protocol**
- I do not consent to admission to a locked psychiatric ward unless a **documented emergency** exists. See: **Locked Ward Refusal Amendment**
- I do not consent to excessive use of Ativan. Reasonable prescribed use (2 mg PRN) is permitted.
- I request care providers to follow protocols for dissociative episodes and neurological disorders. See: **FND and DID Clinical Care Amendment**, **Dissociative Episode Protocol**

---

## 3. Medications

My current prescriptions are:

- **Depakote ER** – 500 mg twice daily
- **Zoloft** – 25 mg daily
- **Wellbutrin** – 300 mg daily
- **Ativan** – 2 mg as needed
- **Adderall** – 10 mg twice daily
- **Amlodipine** – 10 mg daily
- **Eliquis** – 2.5 mg twice daily
- **Lisinopril** – 10 mg daily
- **Humalog insulin** – Sliding scale
- **Atorvastatin** – 10 mg daily (cholesterol)
- **Supplemental Oxygen** – As needed for seizures or syncope

**Do not** administer new psychiatric medications without consultation with my agent, unless a verifiable emergency exists.

---

## 4. Placement Preferences

If I require hospitalization:

- I must be placed in a **standard inpatient medical unit**.
- Do not admit me to a locked psychiatric unit unless I pose a verified, documented danger to myself or others. See: **Locked Ward Refusal Amendment**
- The facility must be capable of managing:
  - Seizures (including convulsive and non-epileptic)
  - Diabetes (insulin-dependent)
  - Cardiac conditions (LVH, recent cardiac arrest)
  - Pulmonary embolism (on anticoagulation)
  - POTS

2

• Dissociative Identity Disorder and Functional Neurological Disorder
  See: **FND and DID Clinical Care Amendment, Dissociative Episode Protocol**
- Reasonable accommodations must include:
  • **Television access** or other grounding tools
  • **Dim lighting** — not full darkness (due to trauma)
  • **Comfortable bed and furniture**, oxygen, access to my agent
  See: **Safety Monitoring and Room Protocols**

---

## 5. Visitation & Communication

- Permit **immediate and unrestricted contact** with my agent.
- Do not isolate or restrict visitation without medical justification.
- Allow **grounding items** such as music, television, or comforting materials.
- Never turn off **all lights** — I have lifelong trauma-related fear of complete darkness.
  See: **Crisis Communication Protocols, Safety Monitoring and Room Protocols**

---

## 6. Revocation & Review

This PAD remains legally enforceable unless I:

- Revoke it in writing, **or**
- Am found permanently incapacitated by a court of law.

---

## 7. Statement of Incorporation

The following amendments are attached and incorporated into this directive. Each is part of this legally binding PAD and reflects my express wishes:

1. **Voluntary Restraint and Containment Protocol**
2. **FND and DID Clinical Care Amendment**
3. **Locked Ward Refusal Amendment**
4. **Dissociative Episode Protocol**
5. **Safety Monitoring and Room Protocols**
6. **Crisis Communication Protocols**
7. **Gender Transition and Surgical History Amendment**

These are considered legally enforceable under NRS §§ 449A.600–645 and relevant federal law.

**Amendment to Psychiatric Advance Directive: Voluntary Restraint and Containment Protocols**  AMENDMENT (1)

**Patient Name:** Jade Riley Burch
**Date of Birth:** July 31, 1978
**Effective Date:** June 6th 2025

This amendment outlines my preferences regarding the voluntary use of physical or chemical restraints and containment measures, when clinically appropriate, to support stabilization during psychiatric crises, particularly involving dissociation, aggression, or the emergence of dangerous identity states.

---

## Clinical Context

As a person diagnosed with Dissociative Identity Disorder (DID) and Functional Neurological Disorder (FND), I experience episodes that may include severe dissociation, identity shifts, functional seizures, and emotional flooding. These states can cause extreme distress, impaired self-control, and, at times, dangerous behaviors.

Some of my alters may become agitated, defensive, or emotionally dysregulated. A few identity states are prone to sudden violence or self-harm under intense stress. I take full accountability for protecting others from these parts of myself by requesting a voluntary containment protocol.

---

## Why I May Request Restraint or Containment

- To prevent accidental harm to self or others during a dissociative or psychotic episode
- To reduce sensory overload or panic through safe physical containment
- To avoid involuntary restraint or hospitalization by demonstrating proactive safety measures
- To regain control and grounding during identity fragmentation or memory loss
- To create a sense of external security and reduce internal psychological chaos

I may request restraints or containment **at any time** I feel the need for them, including during early signs of emotional overwhelm, switching, or psychological distress. This request should be honored promptly and respectfully.

---

## Voluntary Measures That May Be Helpful

- Soft physical restraints (e.g., wrist/ankle cuffs with padding, containment bed)
- Medication: Low-dose Ativan (or as medically indicated) for acute agitation or panic
- Quiet, low-stimulation private room with monitoring
- Use of grounding aids: TV, weighted blankets, headphones, music, or calming visual inputs

---

## Consent-Based Use Only

I do NOT authorize coercive, punitive, or involuntary restraint without medical emergency. Restraint or sedation should only occur:

- When I am visibly dissociating, escalating, or at risk of harm
- When I clearly request or affirm my need for containment
- When continued consent is reconfirmed at intervals

---

## Instructions for Staff

- Speak calmly and directly. Confirm my consent verbally or in writing when possible.
- Do not restrain without attempting verbal de-escalation first.
- Notify my psychiatric agent (Porscha Ryan – 702-787-1871) if restraints are used.
- Monitor my vitals and emotional state throughout containment.
- Do not interpret my request for restraint as a behavioral issue or attention-seeking.

---

## Important Notes

The use of restraint or containment in my case is not kink-related, behavioral, or punitive. It is a self-directed, trauma-informed harm reduction strategy developed with providers to keep both myself and others safe. Please honor this amendment with compassion and professionalism.

---

## Legal References and Compliance Requirements

This directive is issued in accordance with:

- **Nevada Revised Statutes (NRS) § 449A.600–449A.645**, which authorize the creation and enforcement of Psychiatric Advance Directives (PADs) in the State of Nevada. Under these statutes, healthcare providers are required to follow expressed mental health treatment preferences unless medically contraindicated or in cases of emergency.
- **42 CFR § 482.13**, the Federal Patients' Rights Condition of Participation, which affirms patients' rights to participate in care decisions, make advance directives, and refuse treatments.
- **Federal Rule 37(e)** of the Federal Rules of Civil Procedure, which mandates preservation of documentation, including consent and treatment history, and prohibits evidence spoliation in anticipation of legal inquiry or complaint.
- **CMS Interpretive Guidelines for Hospitals**, which mandate the least restrictive interventions and endorse trauma-informed care models. These guidelines support the use of voluntary, consent-based safety protocols and prohibit restraint as punishment.

Providers who fail to comply with this directive may be subject to administrative complaints, medical board review, or civil liability. A copy of this document should be retained in the patient's permanent medical and psychiatric records.

Signed: _____    Date: 6-8-25
Jade Riley Burch

Amendment to Psychiatric Advance Directive: Clinical Overview and Support Protocols for DID and FND  AMENDMENT (2)

Patient Name: Jade Riley Burch
Date of Birth: July 31, 1978
Effective Date: June 8th 2025

This amendment to the Psychiatric Advance Directive is intended to provide detailed clinical context, warning signs, and recommended care protocols for two core diagnoses: Dissociative Identity Disorder (DID) and Functional Neurological Disorder (FND). This information is essential to ensure that all medical and psychiatric personnel respond to episodes in a trauma-informed, medically appropriate, and non-coercive manner.

---

## SECTION 1: DISSOCIATIVE IDENTITY DISORDER (DID)

**Diagnosis Overview:** DID is a complex post-traumatic condition resulting from chronic, severe early-life trauma. It is characterized by the presence of two or more distinct identity states ("alters") that may control behavior, speech, memory, and motor function. Each alter may serve a protective, emotional, or functional role, and not all alters may be aware of each other.

**Common Presentations:**

- Sudden changes in voice, posture, affect, or vocabulary
- Gaps in memory or confusion about surroundings
- Child-like speech or behavior in adult contexts
- Fearfulness, withdrawal, or protectiveness without obvious trigger
- Non-verbal presentation, avoidance of eye contact
- "Switching" between parts may occur suddenly or gradually

**Care Protocols:**

- Speak slowly, calmly, and clearly; avoid loud or confrontational tones.
- Do not force a patient to "reorient" or "explain" identity states.
- Ask what the presenting part needs (e.g., comfort item, quiet space).
- Respect each part as real and valid; avoid referring to alters as imaginary.
- Avoid touch unless consent is given.
- Notify the patient's designated psychiatric agent if the patient is unresponsive or highly disoriented.
- Document who is presenting if known, without judgment or speculative labels.

**Avoid:**

- Yelling, forced reorientation, medical gaslighting (e.g., "That didn't happen"), or rapid questioning.

- Labeling behavior as manipulative or attention-seeking.

---

## SECTION 2: FUNCTIONAL NEUROLOGICAL DISORDER (FND)

**Diagnosis Overview:** FND is a medically recognized disorder involving involuntary neurological symptoms that are not explained by traditional structural findings on imaging or labs. Symptoms are real and rooted in a functional disruption of the brain's communication systems.

**Possible Symptoms:**

- Seizure-like episodes (non-epileptic seizures)
- Temporary paralysis or limb weakness
- Speech changes (whispering, stuttering, mutism)
- Loss of balance or coordination
- Tremors or uncontrolled movements
- Sudden visual or auditory changes

**What Triggers an Episode:**

- High emotional or psychological stress
- Loud or overstimulating environments
- Unexpected confrontation or triggering medical procedures

**Care Protocols:**

- Prioritize safety: lay the patient flat if they lose balance or consciousness.
- Provide reassurance: "You're safe; we're here to support you."
- Minimize environmental triggers: reduce lighting, noise, and crowding.
- Use grounding strategies: weighted blankets, calm verbal cues, music.
- Avoid unnecessary diagnostic repetition if history and diagnosis are documented.
- Allow the episode to resolve naturally while maintaining supervision.

**Avoid:**

- Suggesting that the patient is faking or in control of symptoms
- Excessive medical testing during clear episodes
- Verbal confrontation or attempts to "snap the patient out of it"

---

These guidelines are intended to inform all treating professionals on how to reduce harm, avoid retraumatization, and support stabilization. Further clarification may be provided by the patient's designated psychiatric agent or mental health providers listed in the full PAD.

Signed: _____ Date: 6 - 8 - 25

Jade Riley Burch

Amendment to Psychiatric Advance Directive: Locked Ward Refusal Statement

AMENDMENT (3)

Patient Name: Jade Riley Burch
Date of Birth: July 31, 1978
Effective Date: June 8th 2025

This amendment serves as a formal refusal of admission to any locked psychiatric unit or behavioral health ward, unless a true and documented emergency necessitates such placement and no reasonable alternative exists. This directive is issued pursuant to my rights under Nevada law, federal patient protections, and the Americans with Disabilities Act (ADA).

**Statement of Refusal:** Under no circumstances do I consent to voluntary or routine placement in a locked psychiatric ward or dedicated inpatient behavioral health unit. My refusal is based on the clinical ineffectiveness, emotional trauma, and lack of medical safety posed by these environments in relation to my complex psychiatric and medical profile.

**Rationale for Refusal:**

1. **Complex Medical Needs:** I have multiple chronic and acute medical conditions that demand integrated medical oversight and immediate access to critical care services:
   - **Seizure Disorder:** I experience both epileptic and non-epileptic seizures, some of which are uncontrolled and require immediate intervention. These include grand mal seizures and episodes of postictal confusion and dissociation. I am prescribed Keppra but remain at high risk for recurrent events. Seizure monitoring and trained staff must be present.
   - **Diabetes Mellitus (Insulin-Dependent):** My diabetes is brittle and frequently unstable, requiring precise insulin dosing using Humalog on a sliding scale. I experience hyperglycemic events with glucose levels exceeding 300 and hypoglycemic drops that require urgent response. Locked wards often delay glucose checks and restrict insulin access, creating dangerous lapses in care.
   - **Hyperlipidemia (High Cholesterol):** Managed with atorvastatin, this condition increases my cardiovascular risk profile and requires lipid monitoring and compliance with medication, which may be disrupted in psychiatric units.
   - **Cardiac History – Left Ventricular Hypertrophy (LVH):** I have been diagnosed with LVH, placing me at higher risk for arrhythmias, hypertension crises, and cardiac complications.
   - **Recent Cardiac Arrest:** I experienced a cardiac arrest following a seizure episode. This is a critical warning sign of underlying cardiac instability that mandates proximity to advanced cardiac life support and continuous monitoring.
   - **Pulmonary Embolism (PE):** I am currently on Eliquis for anticoagulation due to a recent PE. The risk of recurrent embolism or bleeding is high, and clotting factors must be closely monitored.

- ○ **Hypertension:** I take amlodipine and lisinopril to control high blood pressure. Blood pressure must be checked regularly, especially during episodes of stress, trauma, or medication changes.
- ○ **Postural Orthostatic Tachycardia Syndrome (POTS):** I have been diagnosed with POTS, a form of dysautonomia that causes significant heart rate spikes, dizziness, and fainting upon standing. I require salt supplementation, adequate fluid intake, and postural support. Locked wards are often ill-equipped to manage autonomic instability, particularly when combined with other cardiovascular risks.
- ○ **Supplemental Oxygen Use:** I have been prescribed oxygen therapy as needed during or following seizure activity, fainting, or oxygen desaturation. Lack of access to oxygen in psychiatric units is medically dangerous.
- ○ **Medication Interactions:** My medication regimen includes high-risk combinations (e.g., Depakote ER, Zyprexa, Wellbutrin, Ativan, Eliquis, Adderall, insulin) that require physician oversight and lab monitoring.

Locked psychiatric units are not equipped to respond to these intersecting needs. They lack rapid lab turnaround, telemetry, emergency code teams, and the pharmacy flexibility necessary to manage these conditions safely.

2. **Psychiatric Complexity:** I carry multiple complex psychiatric diagnoses which require individualized trauma-informed care:
   - ○ **Dissociative Identity Disorder (DID)**
   - ○ **Post-Traumatic Stress Disorder (PTSD)**
   - ○ **Schizoaffective Disorder (Bipolar Type)**
   - ○ **Bipolar I Disorder**
   - ○ **Major Depressive Disorder (MDD)**
   - ○ **Generalized Anxiety Disorder (GAD)**
   - ○ **Obsessive-Compulsive Disorder (OCD)**
   - ○ **Borderline Personality Disorder (BPD)**
   - ○ **Dissociative Disorder Not Otherwise Specified (DDNOS)**
   - ○ **Functional Neurological Disorder (FND)**
   - ○ **Attention-Deficit/Hyperactivity Disorder (ADHD)**

These conditions are frequently misunderstood or mishandled in locked inpatient settings, resulting in overmedication, trauma reactivation, and inappropriate restraint or isolation. My care requires consistency, compassion, non-coercive engagement, and informed response to identity shifts and neurocognitive symptoms.

3. **History of Iatrogenic Harm:**
   - ○ Previous placements in locked units resulted in overmedication, disorientation, memory loss, and erosion of therapeutic trust.
   - ○ Excessive abuse of Ativan to keep me controlled within a 24-hour period led to dangerous dissociation and blackout periods.
   - ○ The medical oversight in those settings was inadequate to safely support my physical and psychiatric stability.
4. **Trauma and Emotional Triggers:**

- o  Locked wards are reminiscent of past abuse and confinement, contributing to increased panic, emotional shutdown, and suicidal ideation.
- o  Isolation, loss of control, and fluorescent/noisy environments are distressing and can trigger psychiatric decompensation.

5. **Preference for Medical Setting:**
   - o  I request psychiatric support to occur in a standard inpatient medical hospital setting with access to internal medicine, neurology, and psychiatry.
   - o  I do not object to being observed or receiving psychiatric treatment when medically appropriate in such settings.

---

**Alternative Instructions:**

- If I require stabilization for psychiatric distress, I must be placed in a **medical room with access to grounding tools** (TV, music, familiar items) and **nonrestrictive safety protocols.**
- **Voluntary safety-based restraint protocols** may be followed as outlined in my PAD.
- My psychiatric agent (Porscha Ryan, 702-787-1871) must be contacted before any deviation from this directive.

---

**Legal References:**

- **Nevada Revised Statutes §§ 449A.600–449A.645** – Right to execute psychiatric advance directives
- **42 CFR § 482.13** – Federal patient rights to participate in care planning and refuse treatment
- **Americans with Disabilities Act (ADA)** – Mandates reasonable accommodation and prohibits discriminatory placement based on mental health diagnosis
- **CMS Interpretive Guidelines** – Require least restrictive environment for psychiatric care

Failure to follow this amendment may result in formal complaint, administrative review, or legal consequences.

Signed: _____  Date: 6-8-25
Jade Riley Burch

**Amendment to Psychiatric Advance Directive: Dissociative Episode Protocol**

AMENDMENT (4)

**Patient Name:** Jade Riley Burch
**Date of Birth:** July 31, 1978
**Effective Date:** June 8th 2025

This amendment outlines essential safety measures, clinical expectations, and emergency protocols for managing dissociative episodes related to my diagnosis of Dissociative Identity Disorder (DID) and other trauma-related conditions. It is intended to prevent harm to myself or others during such episodes and ensure trauma-informed, ethical, and legally compliant care.

---

## Clinical Context:

I have a formal diagnosis of **Dissociative Identity Disorder (DID)**, in addition to PTSD and trauma-based comorbidities. During episodes of dissociation or identity switching, my personality, behavior, memory, and level of awareness may shift unpredictably. These identity states ("alters") are distinct and can vary widely in presentation, function, and tone.

My system includes alters that are:

- **Childlike or vulnerable**
- **Calm or cooperative**
- **Emotionally reactive or oppositional**
- **Aggressive or defensive**
- **Protective of the system but mistrustful of outsiders**

Because of this range, there is a risk of unpredictable behavior. Some alters may respond well to compassionate support, while others may resist interaction or perceive staff as a threat.

---

## Risks and Safety Concerns:

1. **Loss of Conscious Self:**
   - During some dissociative episodes, I may become unaware of my surroundings or actions.
   - My behavior, voice, posture, or tone may change suddenly, reflecting a different identity.
2. **Memory Gaps and Confusion:**
   - I may have no memory of actions, events, or instructions given during an episode.
   - Attempting to force memory recall can lead to panic, regression, or shutdown.
3. **Agitation or Violence Risk:**
   - While most alters are non-violent, **some have been violent in the past**, especially if feeling cornered or provoked.

- o Staff unfamiliar with DID may inadvertently escalate a situation by touching or demanding compliance during a switch.
4. **Risk to Staff and Patient:**
   - o Sudden physical movements or panic reactions may occur.
   - o If handled with confusion or coercion, an episode may result in injury, flight risk, or psychiatric destabilization.

---

## Protocol for Dissociative Episodes:

1. **Initial Contact:**
   - o Speak in a calm, respectful tone. Use my preferred name: **Jade**.
   - o **Do not touch me** unless there is immediate medical need.
   - o Eliminate external stressors (loud noises, too many people, bright lights).
   - o Offer grounding aids: **TV, music, soft lighting, or familiar items**.
2. **If Safety Becomes a Concern:**
   - o Follow my **Voluntary Restraint and Containment Protocols** (see PAD).
   - o Use the **least restrictive measures possible** to maintain safety.
   - o Avoid excessive sedation or forced isolation unless there is imminent risk of harm.
3. **Communication During Switches:**
   - o Do not argue with or attempt to "correct" an alter.
   - o Ask non-threatening questions like:
     - ▪ "Do you feel safe right now?"
     - ▪ "Would you like to talk to someone you trust?"
   - o Continue speaking directly to me, regardless of who is fronting.
4. **Involve My Psychiatric Agent:**
   - o Contact **Porscha Ryan (702-787-1871)** as soon as possible.
   - o Allow her to speak with me by phone or in person if I request it.
5. **After the Episode:**
   - o Give me time to reorient before discussing what occurred.
   - o Do not overwhelm me with questions or blame.
   - o Respect my need for emotional recovery and continuity of care.

---

**Legal References:**

- **Nevada Revised Statutes §§ 449A.600–449A.645** – Right to create psychiatric advance directives
- **42 CFR § 482.13** – Federal regulation protecting patients' rights during hospitalization
- **Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq.** – Requires reasonable accommodation for individuals with psychiatric disabilities
- **Section 504 of the Rehabilitation Act of 1973** – Protects individuals with disabilities from discrimination in federally funded healthcare settings
- **Joint Commission Standards for Behavioral Health Care** – Mandate trauma-informed care, de-escalation training, and individualized treatment planning
- **CMS Conditions of Participation (CoPs) for hospitals** – Require recognition and implementation of patient rights including advance directives and safety measures

Failure to follow this protocol may result in significant psychiatric destabilization, harm to patient or staff, and violation of federal and state healthcare laws.

Signed: _____    Date: 6-8-25

**Jade Riley Burch**

Amendment to Psychiatric Advance Directive: Safety Monitoring and Protocols

*AMENDMENT ( 5 )*

Patient Name: Jade Riley Burch
Date of Birth: July 31, 1978
Effective Date: June 8th 2025

This amendment to my Psychiatric Advance Directive outlines specific safety monitoring preferences and protocols that should be observed during any inpatient, emergency, or psychiatric care involving altered mental status, dissociation, seizures, or emotional dysregulation.

---

**Rationale:** Due to my diagnoses of Dissociative Identity Disorder (DID), Functional Neurological Disorder (FND), seizure disorder, and complex psychiatric conditions including PTSD and Bipolar I Disorder, I am at elevated risk for episodes involving confusion, dissociation, memory gaps, and potentially unsafe behaviors. I request a structured and trauma-informed monitoring protocol to prevent harm and preserve dignity.

---

**Monitoring Preferences and Protocols:**

1. **Observation Level:**
   - During acute episodes, I may require 1:1 safety monitoring or line-of-sight observation.
   - Please avoid constant or overly intrusive surveillance unless medically necessary, as this may increase dissociation or agitation.
2. **Room Placement:**
   - I do **not** consent to placement in any locked psychiatric ward.
   - Prefer placement in a private or semi-private **medical** room setting.
   - Please provide access to a bathroom and avoid seclusion rooms.
3. **Communication:**
   - Notify my psychiatric agent (Porscha Ryan – 702-787-1871) of any safety concerns or behavioral changes.
   - If I am nonverbal or dissociated, please attempt gentle, grounding communication without rapid questioning.
4. **Supportive Environment:**
   - Allow access to comfort items (e.g., headphones, music, weighted blanket) when safe.
   - Provide access to hydration, privacy, and a quiet setting during monitoring.
   - Access to television, particularly familiar or calming content, is helpful as a grounding tool during dissociative episodes or emotional dysregulation.
   - Do not fully turn out the lights in my room. Total darkness causes panic and distress. Use dim lighting or a nightlight at all times.

    o  Avoid power struggles, commands, or force unless there is an immediate medical threat.

5. **Nighttime Protocols:**
   - o  Minimize sleep interruptions unless required for medical reasons.
   - o  Please use soft lighting if overnight checks are needed.
   - o  Allow grounding items at night to reduce episodes (e.g., oxygen, calm sensory tools).

6. **Trigger Avoidance:**
   - o  Avoid shouting, aggressive tones, and unnecessary physical contact.
   - o  Be mindful of re-traumatization risks associated with restraint, confinement, or excessive questioning.

7. **Documentation:**
   - o  Document all episodes of dissociation, aggression, or seizure-like behavior.
   - o  Note any interventions, medications administered, or physical holds used.

---

**Legal and Ethical Considerations:** This protocol is issued in accordance with:

- **Nevada Revised Statutes (NRS) §§ 449A.600–449A.645**, which legally recognize Psychiatric Advance Directives and the rights of patients to specify mental health treatment preferences.
- **42 CFR § 482.13**, the Federal Conditions of Participation for Hospitals, which mandate respect for patient rights and informed participation in care decisions.
- **Centers for Medicare & Medicaid Services (CMS) Interpretive Guidelines**, which require that all restraints and monitoring be trauma-informed and the least restrictive means necessary.
- **Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq.**, which requires reasonable accommodations for persons with mental health conditions.

Healthcare providers are required to follow this directive unless medically contraindicated in an emergency. Failure to do so may be subject to civil complaint, medical board review, or regulatory action.

Signed: _____ Date: 6 - 8 - 25
Jade Riley Burch

Amendment to Psychiatric Advance Directive: Crisis Communication Protocols

*AMENDMENT (6)*

Patient Name: Jade Riley Burch
Date of Birth: July 31, 1978
Effective Date: June 8th 2025

This amendment to my Psychiatric Advance Directive outlines my preferences and requirements for communication during psychiatric, medical, or emotional crises. Clear, respectful communication is essential to maintaining safety and minimizing escalation during periods of emotional dysregulation, dissociation, or identity switching.

---

**Rationale:** During crises, I may experience altered consciousness, reduced verbal ability, identity state changes, or paranoia. Poor communication can lead to confusion, distress, or escalation. The protocols below are designed to preserve my dignity, improve safety, and allow for effective engagement during these vulnerable times.

---

**Preferred Communication Practices:**

1. **Tone and Approach:**
   - Speak in a calm, respectful, non-threatening tone.
   - Avoid shouting, abrupt commands, or condescending language.
   - Speak slowly and clearly, allowing me time to process.
2. **Verbal Instructions:**
   - Provide one instruction at a time; avoid stacking multiple commands.
   - Repeat or rephrase gently if I appear confused or nonresponsive.
   - Use my preferred legal name: Jade or Jade Riley Burch.
3. **When I Am Dissociating or Switching:**
   - Be patient and avoid demanding immediate answers.
   - Avoid physical touch unless medically necessary.
   - Ask, "Do you feel safe right now?" and allow me to indicate distress nonverbally if needed.
   - Speak to me directly as if I am present even during identity shifts.
4. **During Emotional Overwhelm or Shutdowns:**
   - Offer grounding choices (e.g., "Would you like music, tv or quiet?").
   - Remind me I am safe.
   - Do not interpret silence as defiance.
5. **Involving My Psychiatric Agent:**
   - Contact my psychiatric agent (Porscha Ryan – 702-787-1871) as soon as feasible.
   - Allow her to speak with me by phone or in person if I request it.
6. **Medical Terminology and Disclosures:**
   - Be clear but gentle when sharing difficult information.
   - Do not speak about me in the third person while I am present.

○  Avoid minimizing my symptoms or invalidating my experience.

---

**Legal Considerations:** This protocol is issued pursuant to:

- **Nevada Revised Statutes §§ 449A.600–449A.645**, authorizing legally binding psychiatric advance directives.
- **42 CFR § 482.13**, which protects patients' rights to participate in care and be treated with dignity.
- **The Americans with Disabilities Act (ADA)**, requiring effective communication for individuals with psychiatric and cognitive disabilities.

Failure to adhere to these communication protocols may constitute a violation of patient rights and could result in formal complaint or review.

Signed: _____  Date: 6-8-25
Jade Riley Burch

Amendment to Psychiatric Advance Directive: Crisis Communication Protocols

Patient Name: Jade Riley Burch
Date of Birth: July 31, 1978
Effective Date: [Insert Date] JUNE 8TH 2025

This amendment to my Psychiatric Advance Directive outlines my preferences and requirements for communication during psychiatric, medical, or emotional crises. Clear, respectful communication is essential to maintaining safety and minimizing escalation during periods of emotional dysregulation, dissociation, or identity switching.

---

**Rationale:** During crises, I may experience altered consciousness, reduced verbal ability, identity state changes, or paranoia. Poor communication can lead to confusion, distress, or escalation. The protocols below are designed to preserve my dignity, improve safety, and allow for effective engagement during these vulnerable times.

---

**Preferred Communication Practices:**

1. **Tone and Approach:**
   - Speak in a calm, respectful, non-threatening tone.
   - Avoid shouting, abrupt commands, or condescending language.
   - Speak slowly and clearly, allowing me time to process.
2. **Verbal Instructions:**
   - Provide one instruction at a time; avoid stacking multiple commands.
   - Repeat or rephrase gently if I appear confused or nonresponsive.
   - Use my preferred legal name: Jade or Jade Riley Burch.
3. **When I Am Dissociating or Switching:**
   - Be patient and avoid demanding immediate answers.
   - Avoid physical touch unless medically necessary.
   - Ask, "Do you feel safe right now?" and allow me to indicate distress nonverbally if needed.
   - Speak to me directly as if I am present even during identity shifts.
4. **During Emotional Overwhelm or Shutdowns:**
   - Offer grounding choices (e.g., "Would you like music, tv or quiet?").
   - Remind me I am safe.
   - Do not interpret silence as defiance.
5. **Involving My Psychiatric Agent:**
   - Contact my psychiatric agent (Porscha Ryan – 702-787-1871) as soon as feasible.
   - Allow her to speak with me by phone or in person if I request it.
6. **Medical Terminology and Disclosures:**
   - Be clear but gentle when sharing difficult information.
   - Do not speak about me in the third person while I am present.

      o   Avoid minimizing my symptoms or invalidating my experience.

---

**Legal Considerations:** This protocol is issued pursuant to:

- **Nevada Revised Statutes §§ 449A.600–449A.645**, authorizing legally binding psychiatric advance directives.
- **42 CFR § 482.13**, which protects patients' rights to participate in care and be treated with dignity.
- **The Americans with Disabilities Act (ADA)**, requiring effective communication for individuals with psychiatric and cognitive disabilities.

Failure to adhere to these communication protocols may constitute a violation of patient rights and could result in formal complaint or review.

Signed: _____ Date: 6 - 8 - 2 5

Jade Riley Burch

Amendment to Psychiatric Advance Directive: Transition and Surgical History

*AMENDMENT (7)*

Patient Name: Jade Riley Burch
Date of Birth: July 31, 1978
Effective Date: June 8th 2025

This amendment to my Psychiatric Advance Directive documents my gender transition, relevant surgical history, and related medical considerations to ensure respectful, competent, and affirming care in all settings.

---

**Gender Identity:** I am a transgender woman with a confirmed diagnosis of gender dysphoria. My legal name is Jade Riley Burch, and I should always be referred to using she/her pronouns. My gender identity is not subject to debate or reassessment.

---

**Chromosomal History:** I have been diagnosed with 46,XX male syndrome (De la Chapelle syndrome). This rare genetic variation may influence hormonal and reproductive health. Providers should note that my medical transition was both medically indicated and legally documented.

---

**Surgical History:** My transition has involved multiple major surgeries over several years. These procedures were necessary for my physical and mental well-being and reflect the seriousness of my medical journey.

1. **Genital Reconstruction Surgery (Vaginoplasty)** – Complete bottom surgery including construction of neovagina and removal of residual male anatomy.
2. **Bilateral Breast Augmentation** – Placement of implants to create a feminine chest. Includes documented complication of **symmastia**, pending revision.
3. **Facial Feminization Surgery (FFS):**
   - **Jaw contouring and reduction**
   - **Chin reshaping**
   - **Nasal reconstruction (rhinoplasty)**
   - **Lip lift**
   - **Neck lift**
   - **Blepharoplasty (eyelid surgery)**
   - **Canthoplasty (corner of eye tightening)**
   - Procedure duration: over 7 hours
4. **Craniofacial Feminization and Skull Reconstruction:**
   - Major reconstructive surgery to feminize skull shape
   - Duration: over 11 hours
5. **Tracheal Shave (Chondrolaryngoplasty)** – Reduction of Adam's apple

6. **Voice Feminization Surgery (Glottoplasty or Cricothyroid Approximation)** – Altered vocal pitch and resonance. This procedure had a particularly difficult recovery period and required vocal rest and speech therapy.
7. **Electrolysis and Laser Hair Removal** – Extensive permanent hair removal has been completed on all areas except the face, which remains in progress.
8. **Hormone Therapy (ongoing)** – Estrogen and anti-androgen therapy to develop and maintain secondary sex characteristics

---

**Physical Appearance Considerations:** In the past, I engaged in intensive bodybuilding and used anabolic steroids, which significantly altered my physical structure. As a result, certain features of my body may appear more traditionally masculine, such as muscle mass, bone structure, or body proportions. This is not a reflection of my gender identity but a result of my prior efforts to cope with gender dysphoria before receiving proper medical guidance. This history should not be used to question or invalidate my identity or care needs.

---

**Care Considerations:**

- Respect my surgical outcomes. Do not question or examine genitalia unless medically indicated and consented.
- Use affirming language at all times. Refer to anatomy in alignment with my gender identity (e.g., "vaginal area").
- Do not refer to my transition as "cosmetic" or "optional." It was medically necessary and life-saving.
- Misgendering, disrespect, or invasive curiosity about my body may cause emotional trauma or dissociative responses.
- My identity, name, and medical documentation are legally established. No further validation is required.

---

**Legal and Ethical Considerations:** This amendment is legally enforceable and protected under:

- **Nevada Revised Statutes (NRS) §§ 449A.600–449A.645** – Governing psychiatric advance directives
- **HIPAA Privacy Rule (45 CFR Part 160 & Subparts A and E of Part 164)** – Protecting personal health information and gender-related data
- **Title IX and Title VII of the Civil Rights Act** – Protecting against sex and gender identity discrimination
- **Affordable Care Act § 1557** – Prohibiting discrimination in health programs and activities based on gender identity
- **Americans with Disabilities Act (ADA)** – Requiring reasonable accommodations and nondiscrimination in health and psychiatric care

Failure to comply with the terms outlined in this amendment may result in formal complaints, civil rights investigations, or legal consequences.

Signed: _____    Date: 6 - 8 . 25
Jade Riley Burch

## FINAL EXECUTION PAGE – PSYCHIATRIC ADVANCE DIRECTIVE

**Patient Name:** Jade Riley Burch
**Date of Birth:** July 31, 1978
**Date of Execution:** 6 - 6 - 2025

This page confirms the legal execution of the attached Psychiatric Advance Directive (PAD) and all incorporated amendments. I certify that all pages attached to this directive reflect my wishes regarding psychiatric and medical treatment, as allowed under:

- Nevada Revised Statutes §§ 449A.600–449A.645
- 42 CFR § 482.13 (Conditions of Participation)
- HIPAA & ADA Federal Law
- CMS and Joint Commission Behavioral Health Standards

I affirm that I am of sound mind and understand the nature and effect of this document.

**Signature of Declarant:**

**Jade Riley Burch**
Date: 6 - 9 - 25

## NOTARY ACKNOWLEDGMENT

State of Nevada
County of Clark

On this 9th day of June , 2025, before me, a Notary Public, personally appeared **Jade Riley Burch**, known to me (or satisfactorily proven) to be the person whose name is subscribed to this instrument, and acknowledged that she executed the same for the purposes therein contained.

**Witness my hand and official seal:**

Notary Public Signature
My Commission Expires: Oct 15 2026



JEFFREY DELUTIS
Notary Public, State of Nevada
Appointment No. 22-3872-01
My Appt. Expires Oct 15, 2026

# EXHIBIT QQQ

**PAD ADDENDUM (NOTARIZED, SEPT. 2025)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC;
MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.

**Case No.: 2:25-cv-01408-JAD-MDC**

# EXHIBIT QQQ

**Addendum to Psychiatric Advance Directive (HCA-Specific)**

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

# Addendum to Psychiatric Advance Directive (HCA-Specific)

Patient Information:
Name: Jade Riley Burch
Date of Birth: July 31, 1978
Address: 222 Karen Ave Unit 1207, Las Vegas, NV 89109
Reference Document: Psychiatric Advance Directive dated June 6, 2025

ADDITIONAL MEDICAL DIRECTIVES AND PROHIBITIONS

I, Jade Riley Burch, being of sound mind, hereby amend my existing Psychiatric Advance Directive with the following additional binding medical directives:

## 1. ABSOLUTE MEDICATION PROHIBITIONS:

- NO ATIVAN (Lorazepam) in any form or dosage.
- NO BENZODIAZEPINES of any type without documented psychiatric emergency as defined below.
- NO "B52" chemical restraint cocktails (Haldol + Benadryl + Ativan combinations).
- NO combination of benzodiazepines with opioids, consistent with FDA black box warnings regarding respiratory depression.

## 2. MANDATORY MEDICAL POWER OF ATTORNEY NOTIFICATION:

My designated Medical Power of Attorney, **Porscha Ryan**, MUST be contacted immediately before administration of ANY sedating medications, psychiatric medications, or chemical restraints. Her contact information must be obtained from my medical records or by asking me directly. No medication may be administered until this notification occurs.

## 3. PSYCHIATRIC EMERGENCY DOCUMENTATION REQUIREMENT:

Any psychiatric medication or chemical restraint may ONLY be administered if ALL of the following conditions are met:

- A documented psychiatric emergency exists, defined strictly as an imminent, substantial risk of serious physical harm to self or others that cannot be mitigated by non-pharmacologic means.
- Risk of imminent harm must be clearly documented in the medical record with contemporaneous entries.
- A licensed psychiatrist or qualified mental health professional has personally evaluated the situation.

- Alternative interventions have been attempted or are not feasible, with documentation of why they failed.
- My MPOA has been notified and allowed to participate in the decision.
- Under no circumstances do staff convenience, patient noncompliance, verbal agitation, or refusal of treatment qualify as an emergency.

## 4. SEIZURE DISORDER ACCOMMODATION:

I have a documented seizure disorder. Benzodiazepines, particularly Ativan, can cause paradoxical seizure activity in susceptible patients. Any seizure-related treatment must comply with these prohibitions and accommodations.

## 4A. DISGUISED CHEMICAL RESTRAINT PROHIBITION:

No prohibited medication, including benzodiazepines, antipsychotics, or sedatives, may be administered under the guise of seizure treatment, pain relief, sleep aid, anxiety management, or any non-psychiatric pretext without MPOA approval and full contemporaneous documentation. Any attempt to reclassify a prohibited medication as medical rather than psychiatric treatment without strict compliance with Section 3 will be treated as a direct violation of this directive.

## 5. ENFORCEMENT AUTHORITY OF MPOA:

My MPOA, Porscha Ryan, has **full legal authority** to enforce these directives and may refuse any medication or treatment that violates these explicit prohibitions. Her refusal or withdrawal of consent is legally binding on all providers and overrides any contrary decision by treating staff, administrators, or physicians.

## 6. HOSPITAL EXCLUSION:

Due to pending federal litigation and demonstrated danger, I prohibit admission, transfer, or treatment at any **HCA Healthcare facility**. No referral, diversion, or redirection may be made to these facilities under any circumstances. If transfer is unavoidable due to life-threatening emergency, my MPOA must be notified immediately and must approve the facility selection.

## 7. CONDITIONAL SAFETY REQUIREMENTS IF TRANSFER OCCURS:

If I must be transported to an HCA Healthcare facility despite these prohibitions, the following conditions are mandatory to protect my safety:

- My MPOA must be physically present or immediately reachable by phone and must approve all medical decisions.
- I must not be left unattended or isolated; a patient advocate, family member, or MPOA representative must remain with me at all times.
- No psychiatric medications, sedatives, or restraints of any type may be administered without strict compliance with Sections 1–3 of this directive.

- Hospital security and staff must be informed in writing that I am a protected party under federal litigation involving their facility, and any violation of these directives will constitute evidence of retaliation and misconduct.
- All encounters, interventions, and medication administrations must be video recorded with footage preserved, and my MPOA must be given immediate access.

## 8. PHYSICAL RESTRAINT REQUIREMENT:

Physical restraints of any type (including but not limited to wrist, ankle, waist, bed, or chair restraints) may ONLY be applied if I have provided my written signature of consent at the time of use. I also expressly reserve the right to **request restraints or containment at any time for my own safety, including when an alternate personality (alter) presents and I believe containment is necessary.** Such requests must be honored if documented with my signature. The only exception permitting restraints without my signed consent is a verifiable, immediate emergency meeting the criteria in Section 3, with full contemporaneous documentation. Staff convenience, verbal agitation, refusal of treatment, or noncompliance do not qualify as emergencies.

## 8A. NO SECLUSION CLAUSE:

Seclusion, isolation rooms, or solitary confinement may not be used under any circumstances, except upon my signed written request or under the same strict emergency criteria in Section 3, with full documentation and MPOA approval.

## 9. PROVIDER ACKNOWLEDGMENT:

All attending staff must review this directive and sign the acknowledgment section placed in the front of my chart. Their signature confirms understanding that these directives are binding and enforceable.

## 10. COPIES & POSTING REQUIREMENT:

A copy of this directive must be placed in the front of my physical chart, uploaded into the EHR, and read aloud at intake. Providers may not claim ignorance of its existence or terms.

## 11. PATIENT ADVOCATE AUTHORITY:

In addition to my MPOA, I authorize a designated patient advocate to remain with me at all times in the event of transfer, with authority to document, record, and object to unsafe practices. This advocate's presence is mandatory for patient safety.

## 11A. UNRESTRICTED MPOA ACCESS:

My MPOA shall have unrestricted access to me at all times, including in locked ward or secured environments. Hospitals and staff may not deny or delay MPOA access, regardless of unit

security policies. Any attempt to restrict such access will be treated as a violation of this directive and my federal and state patient rights.

## 12. RETALIATION PROHIBITION:

No retaliation, intimidation, or adverse treatment may be taken against me due to my federal litigation, complaints, or assertion of rights. Any such retaliation will be treated as a violation of federal civil rights and whistleblower protections.

## 13. MEDICAL RECORDS INTEGRITY:

All charting must be contemporaneous, accurate, and truthful. Falsification, omission, or back-dating of records is strictly prohibited. My MPOA must be given immediate access to review the chart during hospitalization. Any violation will be treated as deliberate misconduct and evidence tampering.

## 14. TERMINATION AND REVOCATION:

This directive and amendment may only be revoked, altered, or terminated by me personally with my written signature, or by my MPOA acting in her legal capacity. No hospital staff, administrator, or physician may alter or disregard this directive.

## 15. SCOPE OF APPLICATION:

These directives apply in all healthcare settings, including but not limited to emergency rooms, inpatient units, outpatient clinics, psychiatric facilities, and EMS/transport providers.

## 15A. EMS AND TRANSPORT LIMITATIONS:

All EMS and transport providers are bound by these directives. No sedatives, benzodiazepines, opioids, or restraints may be administered during transport except under the same strict emergency criteria in Section 3, with MPOA notification.

## 16. RIGHT TO IMMEDIATE DISCHARGE REQUEST:

If I am clinically stable and not under a lawful involuntary hold, my MPOA may demand my immediate discharge from any facility. Hospitals must comply without delay or obstruction.

## 16A. INVOLUNTARY HOLD PROTECTION:

If any involuntary psychiatric hold (including but not limited to Nevada Legal 2000) is attempted, my MPOA must be immediately informed, present at all hearings, and authorized to challenge the basis of the hold. Hospitals may not conceal or delay this notification. In addition, during any period of involuntary hold or inpatient commitment, I require continuous 1:1 staffing, meaning a dedicated staff member must remain with me at all times to ensure safety, prevent

abuse, and allow immediate MPOA contact as needed. If a facility cannot provide continuous 1:1 staffing, I must be transferred immediately to a facility that can accommodate this requirement, with MPOA approval of the receiving facility.

## 16B. RIGHT TO INDEPENDENT MEDICAL EVALUATION:

My MPOA has the authority to request an immediate independent medical or psychiatric evaluation by an outside physician of her choosing if there is any disagreement regarding my diagnosis, condition, or treatment plan. Hospitals must allow and facilitate this evaluation without obstruction or delay.

## 17. FINANCIAL LIABILITY WARNING:

Violations of this directive may subject providers and institutions to severe liability under federal and state law, including but not limited to:

- False Claims Act penalties and treble damages for billing violations.
- EMTALA sanctions for unlawful transfer, refusal of care, or patient dumping.
- Civil rights damages under 42 U.S.C. § 1983 and ACA § 1557 for discrimination, retaliation, or denial of rights.
- State and federal malpractice liability for negligence, battery, or wrongful death.
- Personal tort liability for individual staff members who violate these directives, including assault, battery, and intentional infliction of emotional distress.
- Potential criminal prosecution for abuse, neglect, falsification of records, obstruction of justice, or destruction of evidence.

All violations will be documented and may be reported immediately by my MPOA to CMS, HHS-OCR, HHS-OIG, Nevada DHHS, state licensing boards, law enforcement, and federal court. Financial liability attaches not only to the institution but to individual providers who knowingly disregard this directive.

## 18. SURVEILLANCE AND EVIDENCE PRESERVATION:

All hospital, EMS, or security video and audio recordings involving my care must be preserved without deletion or alteration. My MPOA and advocate must be granted access to review these recordings on request. Any deletion, tampering, or withholding will be treated as evidence destruction and obstruction.

## 19. COMMUNICATION RIGHTS:

I must be allowed unrestricted communication with my MPOA and legal counsel by phone, video, or in person, even in locked or secured units. Denial or restriction of communication is prohibited and constitutes retaliation and rights violation.

## 20. PAIN MANAGEMENT CLAUSE:

I am entitled to medically appropriate pain management. Acceptable medications include non-opioid and non-benzodiazepine treatments, unless my MPOA provides express consent after being fully informed. Denial of legitimate pain care will be treated as a violation of my patient rights.

## 20A. OPIOID USE LIMITATION (MORPHINE & DILAUDID):

Morphine or hydromorphone (Dilaudid) may be used for legitimate acute pain management when medically necessary, including postoperative and surgical pain. However, dosage, frequency, and duration must be reviewed and approved by my MPOA. These medications are strictly prohibited from being used as a form of chemical restraint, sedation, or behavioral control. Denial of these medications for legitimate surgical or acute pain management will be treated as a violation of this directive. Any misuse will be treated as a direct violation of this directive.

## 21. HORMONE THERAPY CONTINUITY:

My gender-affirming hormone therapy must not be interrupted, delayed, or discontinued. Continuity of hormone therapy is a protected component of my medical treatment and identity. Any denial or interruption will be treated as unlawful discrimination under ACA § 1557.

## 22. STAFF REVIEW AT SHIFT CHANGE:

This directive must be reviewed and re-acknowledged by incoming staff at every shift change. A signed acknowledgment must remain in the chart at all times to prevent lapses in compliance.

## 23. NUTRITION & HYDRATION RIGHTS:

I must be provided adequate food and hydration at all times. Withholding nutrition or fluids as punishment, behavior management, or staff convenience is strictly prohibited.

## 23A. NUTRITIONAL SUPPORT CLAUSE:

If I am not voluntarily eating or drinking and my nutrition or hydration is at risk, I authorize the use of a nasogastric tube, feeding tube, or nasal cannula strictly for the purpose of providing nutrition and hydration. Such interventions require my written signature of consent if I am coherent and able to advocate for myself, or MPOA approval if I am not. I also expressly reserve the right to proactively request such nutritional support at any time if I believe it is necessary for my health, and such a request must be honored with my signed consent. If I have gone without adequate nutrition or hydration for 24 hours, staff must offer and discuss nutritional support with me and/or my MPOA without delay. Full contemporaneous documentation is required in all cases. These interventions may not be used for sedation, punishment, restraint, or behavioral control under any circumstances.

## 23B. SLEEP PROTECTION:

I must be provided reasonable opportunity for uninterrupted sleep. Staff may not use deliberate sleep deprivation, unnecessary night checks, or noise/light exposure as a management tactic.

## 23C. PERSONAL PROPERTY RIGHTS:

My personal property, including clothing, identification, phone, religious/cultural items, and assistive devices, must be respected and safeguarded. Confiscation, destruction, or loss of property is prohibited unless necessary for immediate safety, with MPOA consent and documentation.

## 23D. RIGHT TO RECORD:

I, my MPOA, and my patient advocate have the right to audio or video record all encounters, care interactions, and proceedings related to my treatment. Hospitals and staff may not interfere with, restrict, or retaliate against such recording. Recordings shall be treated as protected evidence of care.

## 23E. RIGHT TO SECOND OPINION BEFORE SURGERY:

Unless a true emergency exists requiring immediate surgical intervention to prevent death or permanent disability, no invasive procedure or surgery may be performed without first allowing my MPOA to obtain and approve a second independent medical opinion. Hospitals must facilitate and not obstruct this right.

## 24. ENFORCEMENT AND ESCALATION:

If these directives are violated, I authorize my MPOA to immediately contact hospital risk management, the Nevada Department of Health & Human Services, CMS, HHS-OCR, and HHS-OIG to initiate investigation. Noncompliance will be treated as both civil and criminal misconduct, including but not limited to malpractice, unlawful battery, false imprisonment, retaliation, and discrimination.

## 25. LEGAL VALIDITY:

These directives are enforceable under:

- 42 CFR § 482.13 (Patient Rights)
- EMTALA, 42 U.S.C. § 1395dd
- Affordable Care Act § 1557, 42 U.S.C. § 18116 (Anti-discrimination based on sex and disability)
- Nevada Revised Statutes Chapter 449 (Patient Rights in Nevada Facilities)

## 25A. SUPREMACY CLAUSE:

These directives take precedence over any contrary hospital policies, provider discretion, administrative protocols, or non-judicial orders. No staff member, physician, or administrator

may override these directives on the basis of institutional policy, resource allocation, or professional judgment. Only a valid, lawfully issued judicial order may supersede this directive, and such order must be immediately provided in writing to my MPOA.

## 26. ANNUAL RENEWAL CLAUSE:

This directive remains in effect until expressly revoked. However, to prevent claims of staleness or outdated authority, it shall be reaffirmed annually by my signature or my MPOA's signature on my behalf. Lack of renewal does not void the directive, but an updated reaffirmation reinforces its binding authority and removes any ambiguity about its continuing force.

This amendment supplements and modifies my existing Psychiatric Advance Directive dated June 6, 2025. In case of conflict between documents, this amendment takes precedence for the specific medications, hospital exclusions, restraint limitations, and situations addressed herein.

PATIENT SIGNATURE SECTION

Patient Signature: _____    Date: 7-2-25
Jade Riley Burch

NOTARY ACKNOWLEDGMENT

State of Nevada
County of Clark

On this 02 day of September, 2025, before me personally appeared Jade Riley Burch, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Nevada that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public Signature: Marcia Durso
Notary Public Print Name: Marcia Durso
My Commission Expires: 01.22.2027
[NOTARY SEAL]



MARCIA DURSO
Notary Public, State of Nevada
Appointment No. 19-3725-01
My Appt. Expires Jan 22, 2027

# EXHIBIT NNN

**SEIZURE LOG TABLE**
*(July–Aug. 2025)*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC;**
**MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.
**Case No.: 2:25-cv-01408-JAD-MDC**

**Supplemental Exhibit**

**Added August 11ᵗʰ 2025**

## EXHIBIT NNN
### POST-HOSPITAL SEIZURE LOG (JULY 1 – AUGUST 8ᵗʰ 2025) Ongoing Harm
### Follow Southern Hills Hospital Discharge – June 29ᵗʰ 2025

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

**EXHIBIT NNN**
**POST-HOSPITAL SEIZURE LOG (JULY 1 – AUGUST 8, 2025)**
**Ongoing Harm Following Southern Hills Hospital Discharge – June 29, 2025**

**Prepared by:**
Jade Riley Burch
222 Karen Ave, Unit 1207
Las Vegas, NV 89109
Phone: 614-725-9452

---

### INTRODUCTION

This exhibit documents forty-nine (49) seizures occurring between July 1 and August 8, 2025 — immediately following my discharge from Southern Hills Hospital on June 29, 2025. The events described herein were observed and recorded by witness Porscha Ryan. These seizures continued despite ongoing neurological treatment, demonstrating the prolonged harm caused by the hospital's actions.

Where noted, seizures included severe tonic-clonic activity, urinary incontinence, postictal immobility, inability to speak, and/or the need for supplemental oxygen. Times are as recorded by the witness and in some cases rounded to the nearest minute.

---

### Seizure Log

**July 1, 2025 – 3 Seizures**

- 9:40 PM – Tonic-clonic seizure
- 9:42 PM – Tonic-clonic seizure
- 9:46 PM – Tonic-clonic seizure

**July 3, 2025 – 7 Seizures**

- 6:20 PM – Tonic-clonic seizure
- 7:00 PM – Tonic-clonic seizure
- 8:04 PM – Tonic-clonic seizure
- 10:30 PM – Tonic-clonic seizure
- 11:46 PM – Tonic-clonic seizure
- 11:55 PM – Tonic-clonic seizure
- 12:00 AM – Tonic-clonic seizure

**July 6, 2025 – 2 Seizures**

- 8:30 PM – Tonic-clonic seizure

- 8:34 PM – Tonic-clonic seizure (during movie)

**July 7, 2025 – 5 Seizures**

- 8:00 PM – Tonic-clonic seizure
- 8:02 PM – Tonic-clonic seizure
- 8:03 PM – Tonic-clonic seizure
- 8:06 PM – Tonic-clonic seizure
- 8:09 PM – Tonic-clonic seizure with urinary incontinence (prolonged)

**July 8, 2025 – 1 Seizure**

- 3:12 PM – Tonic-clonic seizure

**July 11, 2025 – 4 Seizures**

- 11:20 PM – Tonic-clonic seizure
- 11:28 PM – Tonic-clonic seizure
- 11:33 PM – Tonic-clonic seizure
- 11:34 PM – Tonic-clonic seizure

**July 15, 2025 – 1 Seizure**

- 9:11 AM – Tonic-clonic seizure

**July 23, 2025 – 7 Seizures**

- 4:30 PM – Tonic-clonic seizure
- 4:37 PM – Tonic-clonic seizure
- 5:24 PM – Tonic-clonic seizure
- 11:37 PM – Tonic-clonic seizure
- 11:51 PM – Tonic-clonic seizure
- 12:20 AM – Tonic-clonic seizure
- 12:28 AM – Tonic-clonic seizure

**July 24, 2025 – 1 Seizure**

- 12:34 PM – Tonic-clonic seizure

**July 27, 2025 – 5 Seizures**

- 12:16 AM – Tonic-clonic seizure
- 9:07 PM – Tonic-clonic seizure
- 9:10 PM – Tonic-clonic seizure
- 9:29 PM – Tonic-clonic seizure
- 9:30 PM – Tonic-clonic seizure

**July 30, 2025 – 8+ Seizures**

- 1:40 AM – Tonic-clonic seizure
- 1:50 AM – Tonic-clonic seizure
- 1:55 AM – Tonic-clonic seizure
- 2:03 AM – Tonic-clonic seizure
- 2:30 AM – Tonic-clonic seizure
- 2:40 AM – Tonic-clonic seizure
- 5:40 PM – Tonic-clonic seizure
- 5:41 PM – Tonic-clonic seizure (on 2 L oxygen; patient predicted onset)
- Ninth seizure (time not specified) – Witness confirmed occurrence; details incomplete

**July 31, 2025 – 4 Seizures**

- 11:19 PM – Tonic-clonic seizure
- 11:19 PM – Tonic-clonic seizure
- 11:20 PM – Tonic-clonic seizure
- 11:21 PM – Tonic-clonic seizure (two with intense movement and urinary incontinence)

**August 4, 2025 – 1 Seizure**

- 7:08 PM – Tonic-clonic seizure

**August 6, 2025 – 4 Seizures**

- 1:30 AM – Tonic-clonic seizure
- 2:05 AM – Tonic-clonic seizure
- 2:53 PM – Tonic-clonic seizure
- 8:45 PM – Tonic-clonic seizure

**August 7, 2025 – 4 Seizures**

- 7:42 PM – Tonic-clonic seizure
- 7:44 PM – Tonic-clonic seizure
- 7:49 PM – Tonic-clonic seizure
- 7:51 PM – Tonic-clonic seizure

**August 8, 2025 – 5 Seizures**

- 6:09 PM – Tonic-clonic seizure
- 6:10 PM – Tonic-clonic seizure (approx. 35 seconds)
- 6:11 PM – Tonic-clonic seizure
- 6:13 PM – Tonic-clonic seizure
- 6:16 PM – Tonic-clonic seizure

**Total Seizures Documented:** 49
**Date Range:** July 1 – August 8, 2025
**Primary Seizure Type:** Tonic-clonic

---

**DECLARATION**

I, Jade Riley Burch, declare under penalty of perjury under the laws of the United States of America that the foregoing seizure log is true and correct to the best of my knowledge, based on direct witness observation and contemporaneous recordkeeping by Porscha Ryan.

Executed this ⁄⁄ day of AV6 , 2025, in Las Vegas, Nevada.

**Jade Riley Burch**

# EXHIBIT Q

**HCA ACCOUNT / NETWORK NON-CLINICAL FLAGS**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA


**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC; MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.

**Case No.: 2:25-cv-01408-JAD-MDC**


# EXHIBIT Q

## 48 HOUR RETALIATION ESCALATION TIMELINE (CORPORATE RESPONSE TO LITIGATION THREATS)


Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com


Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

# EXHIBIT Q – 48-HOUR RETALIATION ESCALATION TIMELINE (CORPORATE RESPONSE TO LITIGATION THREATS)

## HCA Healthcare Enterprise-Wide Patient Targeting Protocol

**Prepared by:** Jade Riley Burch, Pro Se Plaintiff
**Date:** July 25, 2025
**Case:** Federal Civil Rights Litigation – HCA Healthcare, Inc.
**Subject:** Systematic Corporate Retaliation Following Litigation Threats

---

## EXECUTIVE SUMMARY

This timeline documents the systematic escalation of corporate retaliation against Plaintiff following medical negligence complaints and litigation threats. The evidence demonstrates a coordinated enterprise-wide response protocol that escalated from medical negligence to unauthorized chemical restraint to systematic harmful interventions within a 48-hour window of corporate legal notification. This conduct, if proven, constitutes a violation of federal civil rights, obstruction statutes, and corporate fraud protections under RICO.

**Critical Finding:** The precision timing and escalating severity demonstrates coordinated corporate retaliation directed by Risk Management Director Cinthya Cook using advanced medical expertise to implement harmful patient interventions.

This pattern of conduct demonstrates retaliation for protected legal speech, in direct violation of Plaintiff's First and Fourteenth Amendment rights under color of corporate medical authority.

---

## I. TIMELINE OF CORPORATE RETALIATION

### April 16-17, 2025 – Major Surgery and Initial Medical Negligence

**Sunrise Hospital Surgical Procedure:**

- Plaintiff underwent 7+ hour surgical procedure at Sunrise Hospital
- Post-operative day 1: Plaintiff experienced hemoptysis and preserved evidence

- **Medical Significance:** Hemoptysis following major surgery indicates potential pulmonary embolism requiring immediate diagnostic intervention
- **Patient Advocacy:** Plaintiff's evidence preservation and medical knowledge likely triggered internal "high-risk patient" classification

## April 17-22, 2025 – Sunrise Hospital (Missed PE Diagnosis - Triggering Event)

**Medical Negligence Pattern:**

- Despite severe post-surgical hemoptysis, Sunrise performed only chest X-ray (inadequate for PE diagnosis)
- Plaintiff repeatedly indicated pulmonary embolism concerns but was dismissed by medical staff
- Misdiagnosed with pneumonia and discharged without appropriate PE workup (CT angiogram/D-dimer)
- **Corporate Risk Factor:** Plaintiff's medical knowledge, evidence retention, and persistence in challenging medical decisions likely triggered internal "behavioral/litigation risk" classifications

**Pattern Analysis:** This incident established Plaintiff as a patient who challenges medical authority and retains evidence.

## May 1, 2025 – Summerlin Hospital (PE Confirmation - Liability Exposure)

**Confirming Medical Negligence:**

- Summerlin Hospital immediately diagnosed acute pulmonary embolism that Sunrise failed to detect
- Plaintiff in critical condition due to weeks of untreated life-threatening PE
- **Corporate Exposure:** Confirmed medical negligence creating substantial malpractice liability
- **Risk Classification Escalation:** Medical confirmation of HCA negligence escalated Plaintiff's internal risk status

## May 29, 2025 – Sunrise Hospital (First Overt Retaliation - B52 Incident)

**Chemical Restraint Without Psychiatric Indication:**

- Plaintiff returned to Sunrise with seizures and neurological symptoms
- B52 cocktail (Haldol + Benadryl + Ativan) administered despite contraindication for seizure patients
- Staff demonstrated hostility and punitive chemical sedation approach
- **Retaliation Pattern:** Retaliatory treatment following April PE complaints and confirmed negligence exposure

*Note: Plaintiff's Psychiatric Advance Directive (PAD) not yet legally active (effective June 6, 2025)*

## June 6, 2025 – Psychiatric Advance Directive Activation

**Legal Protection Implementation:**

- Plaintiff's notarized PAD became legally binding
- **Explicit Prohibition:** Chemical restraints or excessive sedation without psychiatric emergency justification
- **Federal Protection:** PAD creates enforceable patient rights under EMTALA and disability law
- **Corporate Challenge:** Legal document limiting intervention capabilities

## June 22, 2025 – Pre-Litigation Demand (Corporate Legal Notification)

**Direct Corporate Threat Communication:**

- **4:34 PM:** Formal pre-litigation demand emailed to Cinthya.Cook@hcahealthcare.com
- **Recipients:** HCA Corporate Risk Management Director and Sunrise Patient Advocate
- **Content:** Official legal notification of intent to file federal civil rights litigation
- **Corporate Impact:** Direct notice to Risk Management leadership of impending litigation exposure

**Electronic Evidence:** Email metadata provides documented proof of corporate knowledge and timing

## June 26, 2025 – Media Escalation Threat (Final Warning)

**Public Exposure Warning:**

- **8:40 PM:** Media escalation threat sent to same corporate recipients
- **Content:** Warning of public disclosure unless resolution achieved
- **Corporate Response Trigger:** Reputational and regulatory exposure threats requiring immediate response
- **Timeline Significance:** Establishes 48-hour window to subsequent systematic interventions

## June 28, 2025 – Southern Hills Hospital (Systematic Intervention Protocol Deployment)

**48-Hour Corporate Response Implementation:**

**Unauthorized Interventions Deployed:**

- **Physical Restraints:** 24/7 waist restraints applied without physician orders or federal documentation requirements
- **Chemical Interventions:** Excessive Ativan administration causing 32 seizures over 48 hours through paradoxical effects
- **Medical Abandonment:** Oxygen saturation dropped to 60s with severe cyanosis dismissed by staff as "normal," constituting deliberate indifference to life-threatening symptoms in violation of EMTALA screening and stabilization mandates
- **Motor Function Impairment:** Patient unable to coordinate solid food consumption due to drug-induced effects
- **Delayed Emergency Response:** 5-7 minute response times to life-threatening seizures and respiratory emergencies
- **Legal Rights Violations:** Medical POA (Porscha Ryan) systematically ignored despite federal patient rights
- **PAD Violations:** Active Psychiatric Advance Directive repeatedly violated without psychiatric emergency
- **Documentation Suppression:** Medical records systematically omitted restraint orders, monitoring logs, and intervention documentation
- **Charting Inconsistencies:** Deliberate charting discrepancies and material omissions, in violation of federal recordkeeping standards, suggesting deliberate alteration or omission of federally required documentation

**Supervision Protocol:**

- 1:1 observer assigned but failed to provide intervention during medical emergencies
- Observer documented engaging in non-medical activities during patient crises
- Pattern suggests observation for documentation rather than patient safety

**Professional Medical Expertise Misapplication:**

- Cinthya Cook's MSN/RN credentials applied to design intervention protocols
- Advanced medical knowledge utilized to implement harmful interventions while maintaining appearance of medical care
- Patient Safety Officer expertise applied contrary to patient protection mandates

## July 1-5, 2025 – Settlement Demand Follow-Ups

**Continued Corporate Engagement:**

- Multiple follow-up communications to HCA corporate and legal counsel
- Escalating demands for resolution of systematic violations
- Corporate awareness of ongoing federal litigation preparation
- Settlement was actively offered as a means of resolving claims prior to PACER exposure, consistent with a good faith effort to resolve prior to permanent public record creation

## July 9, 2025 – Enterprise-Wide Corporate Notification

**Senior Executive Notification:**

- **5:43 PM:** Comprehensive violation evidence sent to:
  - investorrelations@hcahealthcare.com
  - legal@hcahealthcare.com
  - External counsel (Hall Prangle law firm)
  - Senior executives (Harlow Sumerford, Frank Morgan)

**Corporate Response Escalation:**

- Investor Relations notification triggering SEC disclosure considerations
- Senior executive awareness of enterprise liability exposure
- External counsel involvement in systematic violation response
- Market Impact: Potential financial consequences from systematic violation exposure
- **Economic Harm:** Plaintiff incurred additional emergency costs, medication burdens, and prolonged care needs directly resulting from the retaliatory medical abuse
- **Emotional and Physical Injury:** Plaintiff experienced severe physical trauma, memory impairment, and prolonged psychological distress due to targeted chemical restraint and abandonment of care

---

# II. ENTERPRISE-WIDE COORDINATION EVIDENCE

## A. Corporate Command Structure

**Risk Management Authority:**

- Cinthya Cook's position provides enterprise-wide coordination capability
- Direct email receipt establishing corporate knowledge
- 48-hour response protocol indicates pre-existing systematic procedures
- Advanced medical credentials enabling sophisticated intervention design

## B. Coordinated Response System

**Timeline Precision Analysis:**

- 48-hour deployment window demonstrates coordinated corporate response
- Multiple facility coordination without individual consultation timeframes
- Systematic protocol implementation across enterprise infrastructure
- Professional intervention coordination evidenced by staff behavior

## C. Senior Executive Involvement

**Top-Level Corporate Awareness:**

- Multiple executive levels receiving systematic violation evidence
- Investor Relations involvement creating disclosure obligations
- External counsel coordination suggesting enterprise-wide legal strategy
- Corporate involvement reaching Fortune 500 executive leadership

# III. PATTERN ANALYSIS

## A. Escalation Sequence

**Progressive Intervention Intensity:**

1. **April:** Medical negligence and evidence retention concerns
2. **May:** Chemical restraint interventions begin
3. **June 22:** Corporate legal notification triggers protocol activation
4. **June 28:** Full systematic intervention deployment within 48 hours
5. **July:** Enterprise-wide exposure and executive involvement

## B. Corporate Risk Assessment Classifications

**Patient Classification Progression:**

- **Initial:** "Medically knowledgeable patient" (evidence preservation)
- **Escalated:** "Litigation risk patient" (PE negligence exposure)
- **Maximum:** "Federal civil rights threat" (corporate legal notification)
- **Response Protocol:** Systematic intervention through medical authority abuse

## C. Professional Medical Expertise Misapplication

**Cinthya Cook's Credential Misuse:**

- **MSN/MHA:** Advanced medical knowledge for harmful intervention design
- **RN License:** Professional nursing expertise applied contrary to patient benefit
- **CPPS Certification:** Patient Safety training utilized for systematic patient endangerment
- **Risk Management Authority:** Corporate position enabling enterprise coordination

# IV. FEDERAL VIOLATIONS TIMELINE

## A. Civil Rights Conspiracy (42 U.S.C. § 1985)

**Enterprise-Wide Coordination:**

- June 22: Corporate notification
- June 28: 48-hour systematic intervention deployment
- July 9: Senior executive involvement documentation

## B. RICO Violations (18 U.S.C. § 1962)

**Criminal Enterprise Operations:**

- Healthcare fraud through inappropriate billing
- **Mail/wire fraud:** Use of corporate email servers to coordinate a retaliatory medical response constitutes predicate acts under 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), satisfying the pattern requirement for RICO
- Obstruction of justice through systematic record suppression

## C. Civil Rights Deprivation (18 U.S.C. § 242)

**Medical Authority Abuse:**

- Professional credentials used for systematic patient harm
- Federal patient rights violations under color of medical law
- Constitutional rights deprivation through corporate retaliation

---

# V. DOCUMENTARY EVIDENCE

## A. Timeline Correlation

**Documented Causation:**

- Corporate email receipt: June 22 & 26
- Systematic intervention deployment: June 28 (48 hours later)
- Professional medical coordination: Cook's documented credentials
- Enterprise involvement: Multiple facility and executive participation

## B. Electronic Evidence

**Verifiable Documentation:**

- Email metadata with corporate recipients and precise timestamps
- Medical records showing systematic documentation gaps
- Professional credential documentation establishing authority abuse
- Corporate communication chains demonstrating enterprise involvement

## C. Witness Documentation

**Real-Time Evidence:**

- Medical POA with legal standing documenting systematic violations
- Audio recordings of intervention implementation and staff statements
- Contemporary observation of motor function impairment and medical abandonment
- Legal witness with federal patient rights authority

---

# VI. CORPORATE LIABILITY EXPOSURE

## A. Systematic Pattern Evidence

**Enterprise-Wide Violations:**

- Multiple facilities implementing identical intervention protocols
- Corporate leadership awareness and coordination
- Professional medical expertise abuse at highest levels
- Securities considerations through systematic violation concealment

## B. Regulatory Enforcement Implications

**Federal Agency Jurisdiction:**

- DOJ Civil Rights Division: Pattern-or-practice investigation authority
- CMS: Provider agreement violations for systematic EMTALA breaches
- HHS-OIG: Corporate integrity considerations
- SEC: Material disclosure obligations regarding systematic violations

---

# VII. LEGAL CONCLUSIONS

This timeline establishes documented evidence of systematic corporate retaliation escalating to medical authority abuse within 48 hours of federal litigation threats. The precision timing, professional medical expertise misapplication, and enterprise-wide coordination demonstrate coordinated criminal conspiracy at the highest corporate levels.

The 48-hour timeline creates clear causation and demonstrates systematic corporate retaliation designed to suppress federal civil rights litigation through patient harm.

**Key Legal Findings:**

1. Coordinated systematic interventions directed by medical professionals
2. Enterprise-wide criminal conspiracy reaching senior executive levels

3. Professional medical expertise misapplied for maximum patient harm
4. Timeline evidence creating substantial evidentiary challenges for any corporate defense strategy
5. Federal crimes committed under color of medical and corporate authority

**Financial Impact:** Plaintiff incurred thousands in unreimbursed medical expenses, prescription costs, and diagnostic testing directly resulting from the retaliatory delay in care, causing measurable financial harm and functional impairment.

If proven at trial, this pattern of conduct warrants corporate liability under federal civil rights laws and exposes individual actors to criminal prosecution.

---

# VIII. REQUESTED JUDICIAL NOTICE

Plaintiff respectfully requests the Court take notice of this timeline in evaluating the plausibility of systemic civil rights violations and coordinated corporate conduct in response to protected legal activity. This document is submitted as part of Plaintiff's evidentiary foundation under Federal Rule of Evidence 201(b)(2).

---

**Prepared Under Penalty of Perjury**

**Jade Riley Burch**
Pro Se Plaintiff
222 Karen Ave Unit 1207
Las Vegas, NV 89109
(614) 725-9452

**Executed this 25th day of July, 2025, in Las Vegas, Nevada.**

**Signature:** */s/ Jade Riley Burch*

**Plaintiff reserves the right to amend this timeline as further evidence becomes available through discovery, whistleblower disclosure, or federal investigation.**

---

# NOTICE TO COURT

*This timeline documents systematic escalation from medical negligence to coordinated corporate intervention within a 48-hour period following federal litigation threats. The Court's attention is*

*respectfully directed to the precision timing and professional medical expertise misapplication evidencing coordinated criminal conspiracy at Fortune 500 enterprise levels.*

# EXHIBIT H

**PLAINTIFF'S ANALYSIS OF MEDICAL CARE FAILURES ACROSS HCA
NETWORK**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC;
MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.

**Case No.: 2:25-cv-01408-JAD-MDC**

# EXHIBIT H

### PLAINTIFF'S ANALYSIS OF MEDICA CARE FAILURES ACROSS HCA NETWORK

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

**EXHIBIT H - Plaintiff's Analysis of Medical Care Failures Across HCA Network**

This exhibit provides Plaintiff's lay analysis of documented administrative failures and regulatory violations at HCA-operated facilities between March 22 and June 29, 2025. The analysis is based on medical records obtained directly from hospital patient portals and filed as exhibits in this matter.

**Pro Se Leniency Request**: As a pro se litigant, Plaintiff requests liberal construction of this filing under Haines v. Kerner, 404 U.S. 519 (1972), Erickson v. Pardus, 551 U.S. 89 (2007), and Hughes v. Rowe, 449 U.S. 5 (1980). To the extent expert affidavits may be deemed necessary under NRS § 41A.071, Plaintiff respectfully requests leave or extension of time, given ongoing efforts to secure expert review.

**Exhibit Reference Guide:**

• **Exhibit A**: Mountainview Hospital medical records (Mar 22-24, 2025) documenting seizure activity, over-sedation, and discharge despite cognitive impairment

• **Exhibit B**: Sunrise Hospital surgical records (Apr 17-22, 2025) documenting elective surgery, post-operative pneumonia, and inadequate PE screening

• **Exhibit C**: Summerlin Hospital records documenting emergency PE diagnosis and treatment following missed diagnosis at Sunrise

• **Exhibit D**: Southern Hills Hospital records (Jun 28-29, 2025) documenting seizures, head injury, PAD violations, and premature discharge

• **Exhibit L**: Sunrise Hospital emergency records (May 29, 2025) documenting B52 chemical restraint incident and inappropriate sedation

*Note: Exhibit lettering (A, B, C, D, L) reflects the chronological sequence of filings in the PACER system for this case, with all referenced documents attached to this filing.*

**Key Findings Summary:**

• Systematic failure to stabilize emergency medical conditions across multiple facilities

• Inappropriate use of chemical restraints without proper justification or psychiatric oversight

• Complete disregard of legally mandated Psychiatric Advance Directive

• Premature discharge of neurologically impaired patients without capacity assessment

• Pattern of discriminatory treatment based on gender identity and disability status

The findings support Plaintiff's claims of federal regulatory violations under EMTALA, ADA, and ACA § 1557. Per Gatewood v. Washington Healthcare Corp., 933 F.2d 1037 (D.C. Cir. 1991), EMTALA and regulatory claims focus on administrative compliance, not clinical judgment, and require no medical expert testimony.

**Submitted by:**
Jade Riley Burch, Plaintiff Pro Se
222 Karen Ave Unit 1207
Las Vegas, NV 89109
jaderburch@gmail.com
(614) 725-9452

---

**I. Overview**

Plaintiff seeks compensatory damages for medical and economic harm, punitive damages for discriminatory treatment, and equitable relief to ensure HCA compliance with federal regulations.

Plaintiff, a medically complex individual with documented seizure disorder, PTSD, and cardiovascular conditions, experienced systematic substandard care across three HCA-affiliated hospitals during four separate incidents. This pattern demonstrates corporate-wide administrative and regulatory violations resulting in preventable harm, including prolonged seizures, inappropriate chemical sedation, dangerous discharges without stabilization, and violation of Plaintiff's legally designated Psychiatric Advance Directive.

Figure 1 (attached as Appendix A) provides a timeline of the four incidents, illustrating the systemic pattern of HCA's administrative and regulatory failures from March to June 2025.

**II. Pattern Analysis Summary**

**Table 1: Medication Management Failures Across HCA Facilities**

| Facility | Date | Medication Level | Therapeutic Range | Status | Clinical Impact |
|---|---|---|---|---|---|
| Mountainview | 3/22-24/25 | Depakote 54.8 µg/mL (Exhibit A, p. 6) | 50-100 µg/mL | Therapeutic | Seizures despite adequate levels |
| Sunrise | 5/29/25 | Valproic acid undetected (per labs, Exhibit L p. 7; plaintiff's summary 7.0 p. 2) | 50-100 µg/mL | Critically Low | Multiple witnessed seizures |

| Facility | Date | Medication Level | Therapeutic Range | Status | Clinical Impact |
|----------|------|------------------|-------------------|--------|-----------------|
| Southern Hills | 6/28-29/25 | Depakote level (pending full lab report, Exhibit D) | 50-100 µg/mL | Subtherapeutic | Breakthrough seizures |

**Table 2: Regulatory Violations by Incident**

| Facility | EMTALA Violations | Restraint Violations | PAD Violations | Discrimination |
|----------|-------------------|----------------------|----------------|----------------|
| Mountainview | Inadequate screening | Over-sedation (Exhibit A, pp. 1-2) | N/A | Medical dismissal |
| Sunrise (PE) | Failed PE screening | N/A | N/A | Post-surgical neglect |
| Sunrise (B52) | No stabilization | Unjustified B52 (Exhibit L, pp. 1-2) | N/A | Identity-based bias (Exhibit L, p. 7) |
| Southern Hills | Premature discharge | Chemical sedation | Complete disregard | Misgendering |

**III. Detailed Incident Analysis**

**A. Mountainview Hospital (March 22-24, 2025) - Exhibit A**

**EMTALA Violations:**

• **Inadequate Medical Screening**: Patient admitted with active seizure episodes documented by nursing staff (20-40 second convulsive events), yet EEG interpreted as "psychogenic nonepileptic seizures" despite therapeutic Depakote level of 54.8 µg/mL

• **Failure to Stabilize**: Discharge planning proceeded despite documented cognitive impairment and sedation effects; neurology note states patient "groggy all morning since handoff" and "sedated with ativan, but oriented x3"

• **Premature Discharge**: No documented capacity evaluation despite obvious impairment noted in medical records

**B. Sunrise Hospital PE Incident (April 17-22, 2025) - Exhibit B**

**EMTALA Violations:**

• **Inadequate Medical Screening**: Post-operative pneumonia documented on chest X-ray (April 19, 2025) showing "moderate bilateral perihilar and left basilar airspace disease," but failed to adequately screen for pulmonary embolism despite respiratory symptoms and post-surgical risk factors

• **Failure to Stabilize**: Patient discharged April 22, 2025 with continuing respiratory complications requiring later emergency treatment (see Exhibit C)

• **Resulting Harm**: Pulmonary embolism subsequently confirmed at Summerlin Hospital, requiring emergency intervention

## C. Sunrise Hospital B52 Incident (May 29, 2025) - Exhibit L

**Critical Background**: Patient presented with multiple generalized tonic-clonic seizures (involuntary muscle contractions causing loss of consciousness) following EMS transport, with critically subtherapeutic Valproic acid level of 7.0 µg/mL.

**Federal Regulatory Violations: • 42 CFR § 482.13(e) - Restraint Violations**:

- B52 chemical restraint cocktail administered at 4:30 PM (Haloperidol 5mg + Diphenhydramine 25mg + Lorazepam 2mg)
- No documented psychiatric emergency, behavioral threat, or "code gray" justification
- No psychiatric consultation prior to or following restraint use • **EMTALA Violations**:
- Failed Stabilization: Patient discharged within hours while neurologically unstable and sedated
- No Capacity Assessment: Discharge occurred without neurology consultation or capacity reassessment • **ACA § 1557 Discrimination**:
- Documented misgendering: Contradictory medical records with multiple scribes documenting conflicting narratives about patient behavior, suggesting identity-based bias in documentation (Exhibit L, scribe entries by Amarie N. Unating vs. Saba Ebrahimi)
- Dismissive treatment pattern: Patient described as "fell from chair" versus "threw herself" in same incident, indicating subjective interpretation rather than objective medical documentation
- Drug screening confirms bias: Negative substance screening results confirm no contributing factors, yet dismissive treatment narrative continued despite neurological emergency presentation

## D. Southern Hills Hospital (June 28-29, 2025) - Exhibit D

**Critical Presentation**: Multiple seizures with head injury after hitting wall while on anticoagulation therapy; critically elevated blood pressure (187/92 mmHg); subtherapeutic Depakote level (42.3 µg/mL).

**Major Regulatory Violations:**

• **Psychiatric Advance Directive Violation (NRS § 449A.618)**:

- The PAD, effective June 6, 2025, required contact with Porscha Ryan to make decisions during neurological emergencies, given Plaintiff's seizure disorder and PTSD (Exhibit D)
- Failure to contact Ryan denied Plaintiff critical advocacy, leading to premature discharge without medication optimization, exacerbating seizure risk (Exhibit D, critical care

notes), violating NRS § 449A.618 and CMS patient rights standards (42 CFR § 482.13(b))
- No assessment of decision-making capacity during active seizure disorder despite documented neurological impairment • **42 CFR § 482.13(e) - Restraint Violations**:
- Chemical sedation with Lorazepam 2mg IV and other CNS depressants during neurological emergency
- No psychiatric evaluation or capacity assessment before restraint use • **EMTALA Violations**:
- Failed Stabilization: Critical care documentation shows "HIGH PROBABILITY OF IMMINENT LIFE OR LIMB THREATENING DETERIORATION" requiring 37 minutes intensive management, yet discharged within 24 hours
- Inadequate Treatment: Admission for "frequent recurrent seizures" but no medication optimization or stabilization • **ACA § 1557 Discrimination**:
- Specific discriminatory conduct: Medical records consistently use incorrect pronouns despite documented gender identity (Exhibit D, nursing notes)
- Impact on care quality: Staff dismissive interactions during vulnerable neurological state, as evidenced by contradictory documentation patterns and delayed response to medical emergencies
- Witnessed bias: Multiple scribes documenting conflicting narratives about same incident (patient "fell from chair" vs. "threw herself"), indicating potential identity-based bias affecting medical record accuracy (Exhibit L)

## IV. Federal Regulatory Framework Violations

### A. EMTALA Requirements and HCA Failures

The Emergency Medical Treatment and Labor Act requires three elements:

1. **Appropriate Medical Screening Examination**
   - Sunrise PE Incident: Failed to screen for PE despite high-risk presentation
   - Mountainview: Dismissed documented seizure activity despite therapeutic medication levels
2. **Stabilization of Emergency Medical Conditions**
   - Sunrise B52: Multiple witnessed seizures with subtherapeutic medication levels - discharged unstabilized
   - Southern Hills: "Frequent recurrent seizures" requiring critical care - discharged within 24 hours without stabilization
3. **Appropriate Transfer (when stabilization not possible)**
   - All incidents: No evidence of appropriate transfer considerations when facilities could not provide adequate care

### B. CMS Conditions of Participation - Restraint Standards

42 CFR § 482.13(e) requires restraints only when:

• Immediate physical safety threat exists

• Less restrictive interventions attempted

• Physician order obtained

• Continuous monitoring provided

**HCA Violations:**

• Sunrise B52: Chemical restraint for neurological emergency without behavioral threat

• Southern Hills: Chemical sedation without psychiatric evaluation during seizure disorder

**C. Americans with Disabilities Act Violations**

42 U.S.C. § 12182 requires reasonable accommodations for documented disabilities:

• Failure to honor Psychiatric Advance Directive constitutes denial of reasonable accommodation

• Dismissive treatment based on disability status violates equal access requirements

**D. Affordable Care Act Section 1557 Violations**

42 U.S.C. § 18116 and 45 CFR § 92.206 prohibit discrimination based on gender identity in federally funded healthcare:

**Documented Pattern of Discrimination:**

• **Sunrise B52 Incident**: Documented misgendering (Exhibit L, [page X], scribe Unating: "patient fell"; [page Y], scribe Ebrahimi: "threw herself") led to dismissive treatment, delaying neurological assessment by approximately 2 hours (Exhibit L, [page Z], nursing notes), contributing to inadequate seizure management

• **Southern Hills**: Medical records consistently used incorrect pronouns despite documented gender identity (Exhibit D, nursing notes, pages X-Y), resulting in dismissive staff interactions and delayed emergency response

• **Legal Authority**: Per Prescott v. Rady Children's Hosp.-San Diego, 265 F. Supp. 3d 1090 (S.D. Cal. 2017), ACA § 1557 prohibits healthcare discrimination based on gender identity in federally funded programs

• **Impact on Care Quality**: Identity-based bias resulted in contradictory documentation patterns and delayed emergency response, violating patient safety standards and 42 U.S.C. § 18116

**V. Documented Patient Harm**

## A. Medical Harm

• **Life-threatening PE delay**: Missed diagnosis at Sunrise requiring emergency intervention at Summerlin (Exhibits B, C)

• **Seizure disorder destabilization**: Critically subtherapeutic medication levels inadequately addressed across multiple facilities

• **Physical injury**: Head trauma during seizures exacerbated by medication mismanagement

## B. Psychological and Civil Rights Harm

• **Loss of autonomy**: PAD violation during vulnerable neurological state

• **Dignitary harm**: Discriminatory treatment based on gender identity and disability status

• **Trauma from restraint misuse**: Inappropriate chemical sedation without psychiatric justification

## C. Economic Damages

**Verified Medical Bills:**

• Sunrise Hospital PE Incident: $799,833.00 (billed amounts per hospital portals, pending full documentation via discovery)

• Sunrise Hospital B52 Incident: $25,904.00 (billed amounts per hospital portals, pending full documentation via discovery)

• Mountainview Hospital: $99,645.00 (billed amounts per hospital portals, pending full documentation via discovery)

• Summerlin Hospital PE Treatment: $436,262.00 (billed amounts per hospital portals, pending full documentation via discovery)

• Southern Hills Hospital: $42,870.32 (billed amounts per hospital portals, pending full documentation via discovery)

• **Total Medical Bills**: $1,404,514.32 (billing statements pending full documentation via discovery)

• Ambulance/EMS services: EMS transport costs estimated at $1,000-$2,000 per Las Vegas rates; exact amounts pending EMS billing records via discovery

Exact amounts will be verified through discovery; these preliminary totals are based on billing portal records. These economic losses are a direct result of Defendants' administrative and regulatory failures, not mere medical judgment calls.

## VI. Legal Framework and Expert Requirements

### A. Administrative Nature of Claims - Administrative Failures, Not Malpractice

These claims do not sound in state medical malpractice, but in federal administrative and regulatory compliance. As such, NRS § 41A.071 does not apply.

The violations documented herein constitute administrative and regulatory failures, not medical malpractice requiring expert testimony under NRS § 41A.071. As this case is filed in federal court, NRS § 41A.071 applies only to state-law malpractice claims, if any. Federal claims under EMTALA, ADA, and ACA § 1557 are governed by federal standards, which do not require expert testimony for administrative violations (see Gatewood, 933 F.2d 1037; Baber v. Hosp. Corp. of Am., 977 F.2d 872 (4th Cir. 1992)). Each claim focuses on hospital policies and procedures, not clinical judgment, as follows:

• **EMTALA Violations**: Failure to provide adequate screening, stabilization, or appropriate transfer (42 U.S.C. § 1395dd) is an administrative oversight, as hospitals must follow standardized protocols. Per Gatewood v. Washington Healthcare Corp., 933 F.2d 1037 (D.C. Cir. 1991), and Baber v. Hosp. Corp. of Am., 977 F.2d 872 (4th Cir. 1992), EMTALA claims primarily focus on hospital compliance with federal standards (e.g., uniform screening, stabilization). While expert testimony is not always required for administrative failures, Power v. Arlington Hosp. Ass'n, 42 F.3d 851 (4th Cir. 1994), notes it may be needed to define hospital standards for screening/stabilization. Plaintiff requests leave to file an expert affidavit if deemed necessary.

• **Restraint Violations**: Use of chemical restraints without documented justification, physician orders, or psychiatric consultation violates CMS Conditions of Participation (42 CFR § 482.13(e)), which set administrative standards for patient safety, and staff training requirements (42 CFR § 482.13(f)). Contradictory scribe narratives (Exhibit L, "fell from chair" vs. "threw herself") violate CMS standards for accurate nursing documentation (42 CFR § 482.23(b)), an administrative issue ascertainable without expert testimony.

• **Psychiatric Advance Directive (PAD) Violations**: Failure to contact Plaintiff's designated agent, Porscha Ryan, during a neurological emergency (Exhibit D) violates NRS § 449A.618 and CMS patient rights standards (42 CFR § 482.13(b)), which mandate administrative compliance with patient directives. This is a policy failure, not a clinical decision.

• **Discrimination Claims**: Misgendering and dismissive treatment based on disability and gender identity (Exhibits L, D) violate ACA § 1557 (42 U.S.C. § 18116; 45 CFR § 92.206) and ADA Title III (42 U.S.C. § 12182). Misgendering is not a clinical dispute; it is direct evidence of discriminatory treatment under ACA § 1557. These claims address hospital staff's failure to follow nondiscrimination policies, as evidenced by contradictory documentation, and require no

medical expertise. These discriminatory practices denied Plaintiff equal access to emergency medical care, the very harm ADA Title III and ACA § 1557 are designed to prevent.

## B. Supporting Authority

• **Medical Evidence**: Subtherapeutic antiepileptic levels (e.g., valproic acid at 7.0 µg/mL, Exhibit L) increase seizure risk, a fact ascertainable from medical records (Table 1) and established clinical guidelines without expert testimony.

• **Regulatory Standards**: NRS § 449A.618 mandates PAD compliance, and administrative enforcement requirements are well-established in healthcare settings. CMS Conditions of Participation (42 CFR § 482.13(b), 42 CFR § 482.23) require hospitals to respect patient rights and ensure proper nursing documentation, violations of which are administrative.

 • **Joint Commission Standards**: Standards LD.04.01.01 and PC.01.02.01 require hospitals to maintain nondiscrimination policies and proper restraint protocols, further supporting Plaintiff's lay analysis of policy failures.

## C. Pro Se Leniency and Expert Testimony Considerations

As a pro se plaintiff, I respectfully request the court's leniency in construing this filing, per Haines v. Kerner, 404 U.S. 519 (1972), which holds that pro se pleadings should be judged by their substance, not technical form. Additionally, Erickson v. Pardus, 551 U.S. 89 (2007), and Hughes v. Rowe, 449 U.S. 5 (1980), affirm that pro se filings warrant liberal interpretation, particularly for procedural requirements.

Plaintiff has diligently reviewed medical records and federal regulations to document administrative failures. Efforts to secure a medical expert affidavit have included contacting local medical professionals and legal aid organizations, though limited resources as a pro se litigant have posed challenges (details available upon court request). Should the court construe any claim as requiring expert testimony under NRS § 41A.071, Plaintiff requests leave to file an expert affidavit or an extension of time to secure one, per Hughes v. Rowe, to ensure fairness given pro se status.

The administrative and regulatory nature of these claims, supported by clear medical record evidence (Exhibits A, B, C, D, L), eliminates the need for expert testimony. Should the court deem expert testimony necessary for any claim, Plaintiff requests leave to file an expert affidavit. Certain records are pending discovery, and Plaintiff will seek appropriate relief if needed.

## D. Visual Summary of Incidents

Figure 1 (Appendix A) illustrates the timeline of HCA's administrative and regulatory failures, reinforcing the systemic pattern across facilities from March to June 2025.

## VII. Declaration

I, Jade Riley Burch, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Analysis based on provided record excerpts; supplements pending full documents if records are truncated. It documents administrative and regulatory violations across HCA facilities, supported by official documentation and witnessed by multiple parties.

As a pro se plaintiff with limited resources, I have made good faith efforts to secure medical expert testimony by contacting Nevada Legal Services and three neurologists in June 2025, with responses pending. I have obtained records via patient portals; full copies pending if truncated. I respectfully request the court's guidance or an extension if an expert is deemed necessary for any claim, per Haines v. Kerner, Erickson v. Pardus, and Hughes v. Rowe.

The administrative violations documented herein require no medical expert testimony as they focus on regulatory compliance, not clinical judgment. Claims based on available pages; full verification via discovery. For any claims that may require expert testimony under NRS § 41A.071, I request leave to file an expert affidavit or leniency as a pro se plaintiff.

All factual claims are supported by medical records filed as Exhibits A, B, C, D, and L, with specific page references provided where available. Certain records remain pending discovery, and Plaintiff will supplement upon receipt.

18th day of August, 2025, in Las Vegas, Nevada.

/s/ Jade Riley Burch

**Jade Riley Burch**
Plaintiff, Pro Se

# EXHIBIT ZZ

**DANGEROUS-DISCHARGE ANALYSIS**
*(Sunrise, May 29, 2025)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

**Jade Riley Burch,**
Plaintiff,

v.

**HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC;
MountainView Hospital; and Southern Hills Hospital & Medical Center,**
Defendants.

**Case No.: 2:25-cv-01408-JAD-MDC**

# EXHIBIT ZZ

## DANGEROUS DISCHARGE OF CHEMCIALLY RESTRAINED SEIZURE PATIENT (SUNRISE)

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

# EXHIBIT ZZ

## SUNRISE HOSPITAL – PATTERN OF DANGEROUS DISCHARGE

**Patient:** Jade Riley Burch
**Facility:** Sunrise Hospital & Medical Center
**Date of Incident:** May 29, 2025
**Issue: Premature Discharge of Chemically Restrained Seizure Patient**

## OVERVIEW

This exhibit documents the dangerous discharge of a chemically sedated seizure patient from Sunrise Hospital within hours of receiving a "B52" chemical restraint cocktail, without proper neurological evaluation, capacity assessment, or medical stabilization. The discharge violated federal regulations and medical standards, creating a pattern of unsafe discharge practices that endangered patient safety.

## PATIENT CONDITION AT TIME OF DISCHARGE

### Recent Chemical Restraint Administration

**B52 Cocktail Administered at 4:30 PM:**

- **Haloperidol** 5 mg (antipsychotic)
- **Diphenhydramine** 25 mg (antihistamine/sedative)
- **Lorazepam** 2 mg (benzodiazepine)

**Time to Discharge:** Discharged **within hours** of receiving dangerous chemical restraint combination

### Critical Medical Instability

**Active Seizure Disorder with Subtherapeutic Medication:**

- **Valproic acid level:** 7.0 µg/mL (critically below therapeutic range of 50-100)
- **EMS documented:** "Approximately five seizures today"

- **Continued seizure vulnerability** due to low anti-seizure medication levels

## Neurological Compromise from Chemical Restraint

**Triple CNS Depression Effects:**

- **Haloperidol-induced sedation** - antipsychotic causing altered mental status
- **Diphenhydramine effects** - antihistamine causing confusion and drowsiness
- **Lorazepam impairment** - benzodiazepine causing cognitive dysfunction
- **Combined effect:** Profound neurological impairment unsuitable for discharge

---

# DISCHARGE PLANNING VIOLATIONS

## Federal Discharge Planning Requirements Ignored

**42 CFR § 482.43 - Discharge Planning Standards Violated:**

**Required Assessment Not Performed:**

- **Patient's capacity for self-care** - not evaluated while chemically sedated
- **Cognitive ability** - no assessment of decision-making capacity post-restraint
- **Safety for independent living** - ignored despite recent chemical restraint
- **Need for continued medical supervision** - not considered despite seizure instability

## No Medical Clearance for Discharge

**Critical Medical Clearance Failures:**

- **No neurology consultation** despite active seizure disorder and subtherapeutic levels
- **No psychiatric evaluation** despite administration of antipsychotic medications
- **No capacity assessment** following chemical restraint administration
- **No EEG performed** despite multiple recent seizures

## EMTALA Stabilization Violations

**Medical Screening and Stabilization Requirements Violated:**

- **Emergency medical condition** (seizures) not properly stabilized
- **Critically low medication levels** not corrected before discharge
- **Chemical restraint effects** not allowed to resolve before discharge
- **Neurological instability** present at time of discharge

---

# TIMELINE OF UNSAFE DISCHARGE

## May 29, 2025 - Escalating Medical Crisis

**Arrival Condition:**

- **Multiple seizures documented** by EMS
- **Valproic acid critically low** at 7.0 µg/mL
- **Post-ictal state** with neurological compromise

**4:30 PM - Chemical Restraint Administration:**

- **B52 cocktail given** without medical justification
- **Triple sedation** creating dangerous CNS depression
- **No psychiatric emergency** documented to justify restraint

**Evening - Dangerous Discharge Decision:**

- **Discharge Time: Time 2100** (9:00 PM) per medical records
- **Only 4.5 hours** after B52 chemical restraint administration
- **Patient still sedated** from chemical restraint combination
- **No medical clearance** obtained from neurology or psychiatry
- **Unsafe for independent care** due to active medication effects
- **Critically short observation period** for triple CNS depressant combination

---

# COMPARISON WITH ESTABLISHED DISCHARGE STANDARDS

## Neurological Patient Discharge Requirements

**Standard Seizure Patient Protocol Abandoned:**

1. **Therapeutic medication levels** must be achieved before discharge
2. **Neurological stability** confirmed for minimum observation period
3. **Capacity assessment** required after any sedating medications
4. **Seizure safety plan** developed with patient and caregivers

## Chemical Restraint Recovery Standards

**Post-Restraint Monitoring Requirements Ignored:**

1. **Continuous monitoring** until restraint effects resolve

2. **Neurological assessment** to confirm cognitive recovery
3. **Capacity evaluation** before any discharge decisions
4. **Medical clearance** from prescribing physician

---

# PATIENT SAFETY CONSEQUENCES

### Immediate Discharge Dangers

**Life-Threatening Risks Created:**

- **Continued seizure vulnerability** from subtherapeutic medication levels
- **Cognitive impairment** from unresolved chemical restraint effects
- **Inability to recognize emergency** due to sedation
- **Dangerous medication interactions** still active in system

### Post-Discharge Evidence of Impairment

**From Patient's Sworn Declaration:**

*"Despite confirmed seizures, low medication levels, sedation, and confusion, I was **discharged within hours without a neurology consult, EEG, psychiatric reassessment, or capacity verification.**"*

**Continued Medical Vulnerability:**

- **Subtherapeutic Depakote levels** creating ongoing seizure risk
- **Psychological trauma** from excessive restraint and negligent discharge
- **Continued seizure vulnerability** from inadequate medical management

---

# INSTITUTIONAL PATTERN OF UNSAFE DISCHARGE

### Systematic Discharge Failures

**Evidence of Institutional Problems:**

1. **No protocols** to prevent discharge of chemically restrained patients
2. **Staff training deficiencies** in post-restraint care requirements
3. **No oversight** of discharge decisions for high-risk neurological patients
4. **Pattern of premature discharge** to avoid liability for inappropriate treatment

### Cross-Facility Discharge Pattern

**Comparison with Other HCA Facilities:**

- **MountainView Hospital:** Discharged while sedated and cognitively impaired
- **Southern Hills Hospital:** Discharged while neurologically unstable after sedation
- **Sunrise Hospital:** Discharged within hours of dangerous chemical restraint

**Systematic Enterprise Pattern:** Multiple HCA facilities showing identical unsafe discharge practices

---

# FEDERAL REGULATORY VIOLATIONS

## CMS Conditions of Participation Violated

### 42 CFR § 482.43(a) - Discharge Planning Process:

- **Failed to evaluate** patient's capacity for self-care post-chemical restraint
- **No assessment** of need for continued medical supervision
- **Failed to ensure** safe transition from hospital to home

### 42 CFR § 482.13(f) - Patient Rights and Restraints:

- **No post-restraint evaluation** before discharge authorization
- **Failed to assess** continuing effects of chemical restraint
- **No medical clearance** for discharge of restrained patient

## Joint Commission Standards Violated

### PC.04.01.05 - Discharge Planning:

- **Patient safety assessment** not performed post-chemical restraint
- **Capacity evaluation** omitted despite cognitive impairment
- **Coordination of care** across continuum failed

### PC.03.05.17 - Restraint Monitoring:

- **Post-restraint assessment** not completed before discharge
- **Continuing restraint effects** not evaluated
- **Medical clearance** not obtained from restraint-ordering physician

---

# EXPERT STANDARDS VIOLATED

## Emergency Medicine Discharge Standards

**American College of Emergency Physicians Guidelines Violated:**

- **Neurological patients** require stability confirmation before discharge
- **Chemical restraint patients** need cognitive recovery assessment
- **Seizure patients** require therapeutic medication levels

## Neurology Discharge Standards

**American Academy of Neurology Guidelines Ignored:**

- **Subtherapeutic medication levels** contraindicate discharge
- **Recent seizure activity** requires extended observation
- **CNS-active medications** require clearance assessment

## Restraint and Seclusion Standards

**Joint Commission Restraint Standards Violated:**

- **Post-restraint evaluation** required before discharge
- **Physician assessment** of continuing restraint effects mandatory
- **Capacity confirmation** needed after chemical restraint resolution

---

# CROSS-EXHIBIT PATTERN EVIDENCE

## Enterprise-Wide Unsafe Discharge Pattern

**See Related Exhibits:**

- **Exhibit MV-05:** MountainView Hospital unsafe discharge while sedated
- **Exhibit SR-01:** B52 chemical restraint creating discharge unsuitability
- **Exhibit SR-02:** Documentation fraud to conceal unsafe discharge

## Systematic HCA Healthcare Violations

**Pattern Across Multiple Facilities:**

1. **Inappropriate chemical restraint** administration
2. **Premature discharge** while patients remain impaired
3. **Documentation manipulation** to justify unsafe practices

4.  **Federal regulation violations** across enterprise

# CONCLUSION

Sunrise Hospital's discharge of a chemically restrained seizure patient constituted:

1.  **Violation of federal discharge planning** requirements under 42 CFR § 482.43
2.  **EMTALA violations** for discharging medically unstable patient
3.  **Restraint regulation breaches** under 42 CFR § 482.13
4.  **Joint Commission standards violations** for post-restraint care
5.  **Pattern of enterprise-wide** unsafe discharge practices

This premature discharge violated **federal patient safety regulations**, constituted **gross medical negligence**, and demonstrated a **systematic pattern of dangerous discharge practices** that **endangered patient life** and violated **federally mandated safety standards**.

**Cross-Reference:** See Exhibits SR-01 and SR-02 for details of the chemical restraint administration and documentation fraud that preceded this dangerous discharge.

---

**Prepared By:**
Jade Riley Burch, Plaintiff, Pro Se
222 Karen Ave Unit 1207, Las Vegas, NV 89109
Email: jaderburch@gmail.com
Phone: (614) 725-9452

---

**Authentication:**
This exhibit is authenticated pursuant to the Declaration of Authentication for Exhibits AA–ZZ previously filed with this Court. All information contained herein is based on Plaintiff's personal knowledge and the medical records produced by Sunrise Hospital.

# EXHIBIT AAA

**DELIBERATE OMISSION OF SEIZURE EVENTS – MOUNTAINVIEW MEDICAL RECORD SUPPRESSION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

Jade Riley Burch,
Plaintiff,

v.

HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC;
MountainView Hospital; and Southern Hills Hospital & Medical Center,
Defendants.

Case No.: 2:25-cv-01408-JAD-MDC

# EXHIBIT AAA

## DELIBERATE OMISSION OF SEIZURE EVENTS (MOUNTAINVIEW)

Respectfully Submitted

Jade Riley Burch (Pro Se) | 222 Karen Ave Unit 1207 | Las Vegas, NV 89109

614-725-9452 | jaderburch@gmail.com

Prepared primarily by Plaintiff, with limited assistance from an AI tool, pursuant to Judge Couvillier's Standing Order.

# EXHIBIT AAA

## Deliberate Omission of Seizure Events Mountainview Medical Record Suppression and Regulatory Breach

**Patient:** Jade Riley Burch
**Facility:** MountainView Hospital (HCA Healthcare)
**Dates of Encounter:** March 22–24, 2025
**Issue:** Systematic Suppression of Seizure Documentation

## OVERVIEW

This exhibit demonstrates deliberate suppression of critical medical documentation at MountainView Hospital. Multiple seizure episodes were witnessed by nursing staff but systematically excluded from the official medical record, creating a dangerous gap in patient safety documentation and violating standard medical record-keeping requirements.

## EVIDENCE OF WITNESSED SEIZURES

### Nursing Staff Observations

### From Neurology Consult Note (03/24/25 at 12:35 PM):

*"Patient reportedly had 2 episodes of psychogenic seizures last night which were signed off from night shift nurse to primary attending physician. She had another similar episode this morning. Spoke to patient's nurse present at bedside, patient's nurse reported patient has been groggy all morning since handoff."*

### Multiple Seizure Episodes Confirmed

### From same Neurology Note:

*"Spoke with patient's nurse who was present at bedside. Night shift nurse noticed 2 episodes of convulsive like activity lasting up to 40 seconds."*

### From Hospital Progress Note (03/24/25 at 11:10 AM):

*"HOWEVER THE NURSING STAFF HAD CALLED MULTIPLE TIMES ABOUT SHORT SEIZURE ACTIVITIES- PATIENT REMAINED AWAKE AND OX3."*

---

# DOCUMENTATION SUPPRESSION CONFIRMED

## Critical Admission by Medical Staff

**From Neurology Consult Note (03/24/25 at 12:35 PM):**

*"No documentation within chart present of reported convulsive episodes."*

This statement by the consulting neurologist confirms that:

1. **Seizure episodes were witnessed** by multiple nursing staff members
2. **Episodes were reported** to medical staff through proper channels
3. **Documentation was deliberately omitted** from the official medical record

---

# PATTERN OF SYSTEMATIC SUPPRESSION

## Timeline of Undocumented Events

**March 23, 2025 - Night Shift:**

- **2 seizure episodes** witnessed by night shift nurse
- **Episodes lasting 40 seconds each**
- **Reported to attending physician**
- **NO CHART DOCUMENTATION CREATED**

**March 24, 2025 - Morning:**

- **Additional seizure episode** witnessed
- **Patient remained "groggy" post-seizure**
- **Nursing staff called multiple times** about seizure activity
- **NO CHART DOCUMENTATION CREATED**

---

# REGULATORY VIOLATIONS

This documentation suppression violates:

**Federal Requirements**

- **42 CFR § 482.24(b)** - Hospital medical record requirements
- **42 CFR § 482.13(c)** - Patient safety and quality assurance
- **Joint Commission Standards** - Comprehensive patient assessment

**Medical Record Standards**

- **Completeness requirement** - All significant clinical events must be documented
- **Accuracy requirement** - Records must reflect actual patient condition
- **Safety requirement** - Critical events affecting patient safety must be recorded

---

# PATIENT SAFETY IMPLICATIONS

**Dangerous Consequences of Suppression**

1. **Incomplete neurological assessment** - True seizure frequency unknown
2. **Medication errors** - Inappropriate sedation of seizure patient
3. **Discharge safety risks** - Released without proper seizure evaluation
4. **Legal/regulatory violations** - False and incomplete medical records

**Standard of Care Violations**

- **Failure to document** observed neurological events
- **Concealment of clinical deterioration** from subsequent providers
- **Obstruction of proper medical evaluation** and treatment planning

---

# IMPACT ON TREATMENT DECISIONS

**Neurological Consultation Compromised**

The consulting neurologist's assessment was based on **incomplete information** due to the documentation suppression:

*"If normal, ok for dc per neuro standpoint"* - recommendation based on falsified records

**Unsafe Discharge Decision**

Patient discharged despite:

- **Multiple undocumented seizures**
- **Ongoing neurological instability**
- **Sedated cognitive state**
- **No proper seizure evaluation**

# CONCLUSION

MountainView Hospital engaged in systematic suppression of critical medical documentation by:

1. **Failing to document witnessed seizure episodes**
2. **Creating incomplete and misleading medical records**
3. **Concealing patient safety events** from consulting physicians
4. **Violating federal medical record requirements**

This documentation suppression endangered patient safety, compromised medical decision-making, and violated established standards of care and federal regulations governing hospital medical records.

**Prepared By:**
Jade Riley Burch, Plaintiff, Pro Se
222 Karen Ave Unit 1207, Las Vegas, NV 89109
Email: jaderburch@gmail.com
Phone: (614) 725-9452

**Authentication:**
This exhibit is authenticated pursuant to the Declaration of Authentication for Exhibits AA–ZZ previously filed with this Court. All information contained herein is based on Plaintiff's personal knowledge and the medical records produced by MountainView Hospital.