1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JADE RILEY BURCH
PLAINTIFF, PRO SE
222 KAREN AVENUE, UNIT 1207
LAS VEGAS, NV 89109
EMAIL: JADERBURCH@GMAIL.COM
PHONE: (614) 725-9452

```
FILED          RECEIVED
ENTERED        SERVED ON
            COUNSEL/PARTIES OF RECORD

        OCT - 3 2025

    CLERK US DISTRICT COURT
      DISTRICT OF NEVADA
BY: _____ DEPUTY
```

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

Jade Riley Burch,

　　　　　Plaintiff, Pro Se,

vs.

HCA Healthcare, Inc., et al.,

　　　　　Defendants.

Case No.: 2:25-cv-01408-JAD-MDC

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS (ECF NOS. 50 & 51)**

*Prepared primarily by Plaintiff, with minimal assistance from an AI Tool*

## I. INTRODUCTION

Defendants call the FAC a kitchen-sink pleading. It isn't. The FAC alleges four discrete hospital encounters (plus an ongoing insurer-record harm), each tied to a specific statutory duty and supported by contemporaneous records and sworn declarations. Rule 8 permits alternative theories. Fed. R. Civ. P. 8(d)(2)–(3).

On Rule 12(b)(6), the Court accepts well-pleaded facts as true and draws reasonable inferences for the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claims arise from:

- **MountainView (Mar. 22–24, 2025):** unstable rideshare discharge while neurologically impaired after seizures, violating 42 U.S.C. § 1395dd(b).

- **Sunrise (Apr. 17–22, 2025):** failure to provide pre-admission PE screening despite textbook symptoms; eight days later, Summerlin diagnosed PE requiring $436,262 inpatient treatment.

- **Sunrise (May 29, 2025):** failure to provide disability accommodations during postictal impairment (PAD not yet executed).

- **Southern Hills (Jun. 28–29, 2025):** restraints/over-sedation without orders, missing restraint documentation, PAD ignored, unstable discharge.

- **Ongoing:** false "DIFFUSE TBI WITH LOC STATUS UNKNOWN INI" in insurer records without clinical basis.

Plaintiff executed the PAD on June 6, 2025. PAD duties apply to Southern Hills. May 29 proceeds under general reasonable-modification duties.

**Issues Presented:**

**NRS 41A.071** – Does Nevada's medical-affidavit statute apply to federal EMTALA, § 504, and § 1557 claims or to intentional torts pled in the alternative?

**EMTALA – Screening** – Has Plaintiff plausibly alleged a pre-admission screening deviation at Sunrise (Apr. 17–22) under *Jackson/Baker*?

**EMTALA – Stabilization/Discharge** – Has Plaintiff plausibly alleged unstable discharges at MountainView and Southern Hills under § 1395dd(b)?

**Disability Statutes** – Do the allegations challenge required processes (PAD recognition, capacity assessment, safe discharge) rather than medical-quality outcomes under *Bax*?

**Personal Jurisdiction (ECF 51)** – Has Plaintiff alleged facts establishing specific jurisdiction over HCA Healthcare, Inc., or, at minimum, entitlement to jurisdictional discovery?

**RJN/Extrinsic** – Should the Court notice HCA's 10-K and the 8-K press release for the fact of the statements, and, if not, disregard ECF 51-1 or convert under Rule 12(d)?

**Procedural Posture.** Defendants filed two motions to dismiss: ECF 50 (the hospital defendants) under Rule 12(b)(6), and ECF 51 (HCA Healthcare, Inc.) under Rule 12(b)(2) and, alternatively, 12(b)(6). This consolidated opposition addresses both.

## II. LEGAL STANDARD

Dismissal is proper only if the complaint lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Pro se pleadings are construed liberally; leave

1  to amend should be granted unless futility is clear. *Lopez v. Smith*, 203 F.3d 1122,
2  1130–31 (9th Cir. 2000) (en banc).

3

4  _____

5

6  ### III. ARGUMENT

7
8  **A. NRS 41A.071 Does Not Apply**

9
10  Nevada's affidavit statute applies only to professional negligence, not intentional
11  torts or administrative violations. *Szymborski v. Spring Mountain Treatment Ctr.*,
12  403 P.3d 1280, 1287–89 (Nev. 2017). Federal claims proceed under federal pleading
13  rules. *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1256–57 (9th Cir. 1995).
14

15  **B. EMTALA Claims Are Plausible**
16
17  **1. Screening Violation — Sunrise (Apr. 17–22, 2025)**
18
19  EMTALA requires uniform screening examinations "within the capability" of the
20  ED. 42 C.F.R. § 489.24(a)(1)(i). Departure from uniform protocol states a claim.
21
22  *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001). Admission does not
23  retroactively sanitize deficient pre-admission screening. *Baker v. Adventist Health,*
24  *Inc.*, 260 F.3d 987, 994 (9th Cir. 2001).
25
26  Defendants cite *Dalavai v. The Regents*, 2024 WL 3842100 (9th Cir. Aug. 16, 2024),
27  claiming admission ends EMTALA liability.[1] Defendants mischaracterize *Dalavai*.
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

That unpublished decision addressed post-admission quality of care. Here, Plaintiff challenges pre-admission screening (Sunrise's failure to apply PE pathway) and unstable discharge (MountainView and Southern Hills). *Dalavai* does not immunize pre-admission screening failures or permit unstable discharge. Defendants cite no case—and none exists—holding that admission and subsequent unstable discharge bars EMTALA claims. Admission may satisfy stabilization absent subterfuge, *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1168 (9th Cir. 2002), but it does not cure a deficient pre-admission screening. *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 994 (9th Cir. 2001); *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001).

[1] *Dalavai* is unpublished and non-precedential. See 9th Cir. R. 36-3(a). Addressed post-admission care, not pre-admission EMTALA screening or unstable discharge.

Sunrise failed to provide its chest-pain screening protocol despite textbook symptoms: acute chest pain, shortness of breath, tachycardia, abnormal chest x-ray, recent surgery. When Plaintiff presented to Summerlin eight days later, PE was immediately diagnosed, requiring five-day inpatient treatment costing $436,262. This demonstrates Sunrise's screening failed to identify an existing emergency.

Plaintiff alleges Sunrise departed from its PE pathway requiring D-dimer/CTPA for patients with these risk factors. CMS's EMTALA Interpretive Guidelines (Appendix V to the State Operations Manual) require that screening be "reasonably calculated

to identify emergency medical conditions" and "uniformly applied" to similarly situated patients; Plaintiff plausibly alleges Sunrise deviated from its PE pathway.

**2. Unstable/Forced Discharge — MountainView (Mar. 22–24, 2025)**

On March 22, 2025, Plaintiff presented to MountainView's emergency department with acute chest pain. She was admitted for evaluation but, while inpatient, experienced multiple seizures and was repeatedly administered heavy doses of Ativan. Staff informed Plaintiff she faced an administratively driven discharge to clear the bed, despite sedation and active seizure risk. Taken as true, those facts plausibly allege an unstable discharge under § 1395dd(b).[2]

On March 24, 2025, MountainView discharged Plaintiff prematurely. She recalls stumbling through hallways, striking walls, and barely making it to the elevator while still sedated and postictal. She was not accompanied by staff, provided no safe discharge plan, and her memory of reaching the car and much of that day is blank. Ultimately, she summoned an Uber on her phone only because staff insisted she vacate her room.

Plaintiff's condition was corroborated by Melissa Ryan, who submitted a sworn declaration describing Plaintiff as "heavily sedated, slow to speak, visibly impaired, confused, and under the influence of strong sedatives," and stating she was "shocked" that Plaintiff had been released without supervision or a discharge plan.

1   Ms. Ryan further confirmed Plaintiff reported taking an Uber without recalling
2   how, and verified the Uber charge herself. (Ex. G, Ryan Declaration.)
3
4   Under EMTALA, a patient is "stabilized" only when no material deterioration is
5   likely upon discharge. 42 U.S.C. § 1395dd(e)(3)(B). Forcing a sedated, seizure-prone
6
7   patient into discharge motivated by bed turnover rather than medical stability
8   created a substantial risk of material deterioration, injury, or death (including
9   potential harm to others had Plaintiff attempted to drive). These allegations,
10  supported by contemporaneous witness testimony, state a plausible unstable-
11
12  discharge claim under EMTALA.
13
14  [2] *See, e.g.*, U.S. Dep't of Health & Human Servs., Office of Inspector General,
15  "Hospital Discharge Planning: A Review of Medicare's Requirements" (2017)
16  (describing concerns about premature or administratively driven discharges,
17  including cases where patients were released early to free hospital capacity).
18
19  **3. Failure to Stabilize — Southern Hills (Jun. 28–29, 2025)**
20
21  Southern Hills used restraints/over-sedation and failed to stabilize before discharge.
22  Oxygen saturation dropped into the 60s, which is life-threatening, and her MPOA
23
24  had to demand oxygen intervention. Given breakthrough seizures and respiratory
25  compromise, material deterioration was reasonably probable. These allegations
26  state a plausible failure-to-stabilize claim. 42 U.S.C. § 1395dd(b).
27
28  **C. Disability Discrimination Claims Are Plausible**

1
2
3
4
5

Defendants argue Plaintiff "disagrees with medical care quality." This mischaracterizes the claims, which challenge process-based accommodations federal law requires (PAD recognition, capacity assessment, safe discharge), not clinical outcomes.

6
7
8
9
10
11
12
13

Plaintiff's PAD was executed June 6, 2025. PAD-based duties attached to Southern Hills (June 28–29); May 29 proceeds on general reasonable-modification duties. Psychiatric Advance Directives are recognized under Nevada's Uniform Health-Care Decisions Act (NRS 449A.400–.740) and the Patient Self-Determination Act (42 U.S.C. § 1395cc(f)). Plaintiff presented a notarized PAD at Southern Hills June 28-29, yet records show no notation, acknowledgment, or compliance.

14
15
16
17
18
19
20
21
22
23

Section 504 requires: "(1) individual with disability; (2) qualified to receive benefit; (3) denied benefits solely by reason of disability; (4) program receives federal assistance." *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 866 (9th Cir. 2022). Plaintiff alleges: seizure disorder, PTSD, postictal cognitive impairment (disabilities); sought emergency treatment (benefit); denied reasonable modifications (PAD recognition, capacity assessment, safe discharge); all Defendants receive Medicare/Medicaid funding.

24
25
26
27
28

Defendants never dispute: (1) PAD was presented and not documented; (2) no capacity assessment despite postictal impairment; (3) MPOA physically present but excluded. These are process-based denials under *Bax*, 52 F.4th at 866, 871–72, not medical judgment disputes. For damages, Plaintiff alleges deliberate indifference—

notice of accommodation need and failure to act. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). Plaintiff's June 26, 2025 notice to Sunrise risk management provided explicit knowledge of her disabilities and risks. Defendants' failure to act despite this notice constitutes deliberate indifference.

Section 1557 prohibits discrimination "on the ground prohibited under ... [the Rehabilitation Act]" in health programs receiving federal assistance. 42 U.S.C. § 18116(a). Each Defendant is a "health program" receiving federal assistance; allegations state a § 1557 claim. *Bax*, 52 F.4th at 871-72.

For ADA Title III, Plaintiff seeks only prospective injunctive relief. Plaintiff resides in Defendants' service areas, presented multiple times in 2025, and intends to seek emergency care if needed, establishing real and immediate threat of recurrence. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 949–50 (9th Cir. 2011) (en banc).

## D. Missing Restraint Documentation Supports Claims

Federal regulations require documentation of each restraint episode. 42 C.F.R. § 482.13(e), (e)(12)(i)–(ii). Restraints were used June 28–29; no orders/episodes/durations appear in eMAR or flowsheets; no restraint log produced; witness confirms restraints. This recordkeeping noncompliance is probative of liability.

## E. State Law Claims Are Plausible

Rule 8(d)(2)–(3) permits alternative theories. Plaintiff pleads Nevada tort claims in the alternative to federal statutory claims.

**1. Battery & False Imprisonment (Southern Hills, June 28–29, 2025)**

Nevada recognizes battery when physicians perform procedures without consent. *Humboldt Gen. Hosp. v. Sixth Jud. Dist. Ct.*, 376 P.3d 167, 171 (2016). Chemical restraints were administered June 28–29 without contemporaneous orders and outside consent scope. No attending physician evaluated Plaintiff; PAD agent wasn't consulted. Administration of chemical restraints without physician orders exceeds implied consent to emergency evaluation. False imprisonment is restraint without sufficient legal authority. *Lerner Shops of Nev., Inc. v. Marin*, 423 P.2d 398, 400 (1967). Plaintiff was physically restrained June 28–29 without proper orders. Plaintiff named Doe Defendants 1–20 to preserve claims against individual actors whose identities are ascertainable from eMAR, restraint logs, staffing records, and audit trails. Plaintiff will move for early targeted discovery within 30 days. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).

**2. Intentional Infliction of Emotional Distress (Southern Hills, June 28–29, 2025)**

IIED requires "(1) extreme and outrageous conduct with intention of, or reckless disregard for, causing emotional distress, (2) severe emotional distress, and (3) causation." *Olivero v. Lowe*, 995 P.2d 1023, 1025-26 (Nev. 2000). Conduct is extreme

and outrageous when "outside all possible bounds of decency and utterly intolerable in a civilized community." *Star v. Rabello*, 625 P.2d 90, 92 (Nev. 1981). Allegations meet this standard: oxygen saturation dropped into the 60s while staff ignored MPOA's pleas; chemical restraints administered without justification; PAD not acknowledged. Near-death hypoxia combined with detention exceeds "all possible bounds of decency."

**3. Fraud/Medical Record Falsification (Southern Hills, June 28, 2025)**

Nevada fraud requires: "(1) false representation; (2) knowledge representation is false; (3) intention to induce reliance; (4) justifiable reliance; (5) resulting damage." *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592 (Nev. 1992).

Defendants inserted false diagnosis "DIFFUSE TBI WITH LOC STATUS UNKNOWN INI" into records June 28, 2025, despite normal CT scan, no documented LOC, and no attending physician evaluation. Exhibit C shows Southern Hills imported 19 diagnoses without clinical evaluation, including stigmatizing psychiatric labels copied from historical records without assessment. This systematic diagnosis dumping serves multiple improper purposes: inflating billing codes, justifying restraint use, and discrediting Plaintiff's complaints.

Plaintiff personally viewed the false TBI diagnosis in her Anthem portal mid-July 2025, tied to the June 28, 2025 Southern Hills encounter. (Ex. C, Anthem portal record, Burch Declaration.) The FAC pleads the who/what/when/where/why: **who**

(Jane Doe RN identifiable via audit logs), **what** ("DIFFUSE TBI WITH LOC STATUS UNKNOWN INI"), **when** (~21:14, June 28, 2025), **where** (Problem List transmitted from Southern Hills to Anthem portal), and **why false** (normal CT, no documented LOC, no physician evaluation). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Rule 9(b) permits allegations "on information and belief" when underlying facts are within Defendants' exclusive control. *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993). Audit logs will identify the user, workstation, timestamp. Plaintiff will substitute the responsible individual upon production. *Gillespie*, 629 F.2d at 642.

**4. Permanent Neurological Injury Supports All Claims**

231 seizures in the next three months (≈2.5/day, 17/week, 75/month) following the June 28–29 hypoxic event demonstrate a lowered seizure threshold and permanent deterioration.[3] Her MPOA maintains contemporaneous seizure logs documenting this marked increase beginning immediately after oxygen deprivation. Oxygen saturation in the 60s causes hypoxic brain injury; the temporal relationship supports causation. This permanent injury is compensable under EMTALA (failure to stabilize caused material deterioration), § 504 (denial of accommodations caused permanent disability worsening), and all state tort claims.

[3] Plaintiff documented 231 seizures in the three months post–Southern Hills (≈2.5/day, 17/week, 75/month).

**F. RICO Allegations Are Plausible**

The FAC alleges wire fraud predicate acts with particularity. False diagnosis "DIFFUSE TBI WITH LOC STATUS UNKNOWN INI" was inserted into records June 28, 2025, despite normal CT and no documented LOC. The scheme involves at least two wire fraud acts: (a) initial electronic transmission of the false TBI entry into Anthem's systems on June 28, 2025 from Southern Hills' EHR through billing interfaces; (b) ongoing republication in Anthem's member portal, discovered by Plaintiff mid-July 2025. (Ex. C.) Each synchronization and display to the member portal is a new interstate wire transmission. *United States v. Blixt*, 548 F.3d 882, 887 (9th Cir. 2008).

Plaintiff alleges association-in-fact enterprise: HCA Healthcare, Inc.; Sunrise, MountainView, Southern Hills; and HCA's Nevada risk-management and revenue-cycle departments, functioning with common purpose using shared policies and personnel. The FAC alleges HCA Healthcare, subsidiary hospitals, and centralized departments function as a unit with common purpose using shared policies, billing systems, EMR platforms. *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). That Defendants continued transmitting the false TBI diagnosis after receiving explicit June 26 and July 2025 notices strengthens the inference of intent and enterprise purpose. If the Court requires greater particularity, Plaintiff requests leave to amend after initial disclosures and limited billing/audit-log discovery. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012).

## G. Section 1985(3) Should Be Dismissed Without Prejudice

Plaintiff acknowledges § 1985(3) requires conspiracy motivated by class-based, invidious discriminatory animus and intent to deprive equal protection. To the extent the Court concludes current allegations don't satisfy § 1985(3)'s animus and agreement elements as distinguished from general retaliation, Plaintiff requests dismissal without prejudice and leave to amend if discovery reveals evidence satisfying *Griffin v. Breckenridge*, 403 U.S. 88 (1971).

## H. HCA Healthcare's Personal Jurisdiction Argument Fails (Response to ECF 51)

**Legal Standard.** Specific jurisdiction exists when (1) the defendant purposefully directed activities at the forum or purposefully availed itself of the privilege of conducting activities there; (2) the claim arises out of or relates to the defendant's forum-related conduct; and (3) the exercise of jurisdiction is reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362–63 (2021). Purposeful direction may be shown under the *Calder* "effects" test where the defendant's intentional acts are expressly aimed at the forum and cause foreseeable harm there. *Calder v. Jones*, 465 U.S. 783, 789–90 (1984).

**Jurisdictional Discovery (Alternative).** If the Court finds Plaintiff's allegations borderline, Plaintiff requests narrowly tailored jurisdictional discovery into HCA's

Nevada-facing policy control, EMR/billing interfaces, and risk-management communications. *See Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (abuse of discretion to deny jurisdictional discovery where "pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary").

HCA argues it lacks sufficient contacts with Nevada for personal jurisdiction. ECF 51 at 5-7. This argument fails on both the facts and the law.

**1. General Jurisdiction**

HCA concedes it is incorporated in Delaware with its principal place of business in Tennessee. ECF 51-1, Curvin Aff. ¶ 4(b)-(c). General jurisdiction therefore does not apply. *Daimler AG v. Bauman*, 571 U.S. 117, 137-39 (2014).

**2. Specific Jurisdiction**

HCA's specific jurisdiction argument fails because the FAC alleges HCA's corporate policies caused foreseeable harm in Nevada through its three Nevada hospital subsidiaries. HCA purposefully directed activities at Nevada by promulgating and enforcing corporate-wide policies through centralized risk management and compliance departments that govern Sunrise, MountainView, and Southern Hills. FAC ¶¶ 42-43. These policies include PAD non-recognition protocols, restraint practices, billing systems, and EMR platforms implemented uniformly across all HCA facilities, including the three Nevada hospitals where Plaintiff suffered harm.

Plaintiff's claims arise directly from HCA's Nevada-directed conduct. The retaliation at Southern Hills on June 28, 2025, occurred 48 hours after Plaintiff contacted HCA's centralized risk management. FAC ¶¶ 32-35. This temporal proximity and cross-facility coordination plausibly establishes that HCA's corporate directives caused Plaintiff's injuries in Nevada.

Exercising jurisdiction is reasonable. HCA cannot segregate itself from hospitals it controls through centralized policies while claiming no Nevada contacts. The forum has a strong interest in regulating healthcare provided within its borders.

### 3. The Curvin Affidavit Contradicts HCA's Public Filings

The Curvin affidavit (ECF 51-1) asserts HCA is "a non-operating holding company without employees" that "did not conduct business in Nevada." Id. ¶ 4(a). This directly contradicts HCA's sworn SEC filings stating "we operated 190 hospitals" (2024 10-K) and "HCA Healthcare operated 191 hospitals" (July 2025 8-K). Courts do not credit affidavits that contradict sworn public disclosures. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999-1002 (9th Cir. 2018). If the Court considers ECF 51-1, it should convert the motion under Rule 12(d) and permit targeted discovery on HCA's operational control over its Nevada hospitals.

HCA cannot have it both ways. It tells investors and the SEC it "operates" 191 hospitals to command a premium stock price, then tells this Court it is merely a

passive holding company to avoid liability. The Court should reject this transparent attempt to evade jurisdiction.

## I. HCA Corporate Liability Is Plausibly Pled

Defendants seek to carve out HCA Healthcare as "non-operating holding company," but the FAC alleges corporate policies implemented across Sunrise, MountainView, and Southern Hills: PAD erasure, rideshare discharge of neurologically impaired patients, restraint/over-sedation without orders or logs. HCA promulgates and enforces common clinical and compliance policies through centralized risk management and compliance departments. These allegations support both direct liability under "policy or custom" theory and agency/vicarious liability in the alternative. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012); *Iqbal*, 556 U.S. at 678. Whether HCA's policy arm "operates" facilities is a factual question inappropriate for Rule 12(b)(6).

## J. The Court Should Retain Supplemental Jurisdiction

Defendants ask the Court to decline supplemental jurisdiction under 28 U.S.C. § 1367(c)(3). That request fails for two reasons.

First, multiple federal claims survive: EMTALA, § 504, § 1557. The Court should retain supplemental jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

1   Second, judicial economy favors retention. State tort claims arise from the same

2   hospital encounters, missing restraint documentation, and detention. Discovery will

3   substantially overlap (same witnesses, charts/audit logs, policies), so retaining all

4   claims serves economy and avoids inconsistent verdicts. Declining jurisdiction

5   would force parallel litigation, wasting resources and risking inconsistent outcomes.

6   *Executive Software N. Am., Inc. v. U.S. Dist. Court*, 24 F.3d 1545, 1556 (9th Cir.

7   1994).

9

10  **K. Defendants' Motions Contain Procedural Defects**

11

12  Defendants filed two motions (ECF Nos. 50 and 51). ECF 50 (hospitals) advances

13  EMTALA, disability, and state-law arguments; ECF 51 (HCA corporate) overlaps on

14  some Rule 12(b)(6) points and adds a Rule 12(b)(2) personal-jurisdiction challenge

15  supported by the Curvin affidavit. This consolidated opposition addresses the

16  overlapping issues together and the corporate-specific issues in Sections H–I.

18

19  **1. Failure to Distinguish Defendants**

20

21  Defendants' motions collapse distinct hospitals into "Defendants," despite facility-

22  specific violations: Sunrise's PE screening failure, MountainView's unstable

23  rideshare discharge, Southern Hills' restraints and falsified records. The Ninth

24  Circuit condemns "lumping" multiple defendants without clarifying roles. *Destfino*

25  *v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011). Their undifferentiated briefing

26  confirms they haven't met Plaintiff's facility-specific allegations.

27

28

**2. The Curvin Affidavit Conflicts with SEC Filings**

ECF 51-1 asserts HCA Healthcare is "a holding company only" that "does not

operate hospitals." This contradicts HCA's 2024 Form 10-K ("At December 31, 2024,

we operated 190 hospitals...") and July 25, 2025 Form 8-K ("As of June 30, 2025,

HCA Healthcare operated 191 hospitals..."). Courts may notice SEC filings at

12(b)(6). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999–1002 (9th Cir.

2018). The Court should not credit an affidavit that is irreconcilable with sworn

disclosures without converting under Rule 12(d).

**3. Duplicative Motions**

Defendants filed overlapping motions (ECF Nos. 50, 51) raising identical § 41A.071

and EMTALA theories.

**L. Corporate Notice, Protected Activity, and Retaliation**

On June 24, 2025, Plaintiff sent a certified letter to Sunrise Hospital via UPS

(tracking 1Z296V5Y2497956361), delivered at 10:25 AM. On June 26, 2025,

Plaintiff emailed Sunrise Hospital's Patient Advocate and Risk Management

Director, Cinthya S. Cook, subject line: "Sunrise Hospital's Missed Diagnosis to

Become Public – Final Opportunity to Prevent Media Escalation," warning of the

PE misdiagnosis and imminent litigation/media exposure. On June 28, 2025, a

second certified letter to Sunrise was delivered via USPS (tracking

ER206813992US).

1    That same day, June 28, 2025, at Southern Hills (an HCA facility then unknown to

2    Plaintiff to be under common ownership with Sunrise), Plaintiff was restrained,

3    sedated, and subjected to a falsified "Diffuse TBI" diagnosis. At the pleading stage,

4
5    this temporal proximity plausibly alleges retaliation under Section 504 and ACA §

6    1557. *See* 45 C.F.R. § 92.302(d); 42 U.S.C. § 12203. That the retaliation occurred at

7    a different HCA facility supports Plaintiff's enterprise allegations: a coordinated

8
9    response across HCA's Nevada hospitals, Sunrise, MountainView, and Southern

10   Hills.

11   Plaintiff subsequently sent July 2025 emails to HCA corporate legal and investor-

12
13   relations functions after discovering the common ownership ("URGENT – Systemic

14   Pattern Evidence Submitted: HCA Corporate Exposure – 4 Lawsuits Enclosed" on

15   July 9; "Global Settlement Proposal" on July 12). All communications (the June 24

16
17   letter, June 26 email, June 28 letter, and July emails) were ignored. These facts

18   show Defendants had actual notice of Plaintiff's complaints and disabilities, and

19   that mistreatment escalated rather than ceased following protected activity,

20   supporting deliberate indifference, retaliation, and enterprise liability.

21
22
23
24                          **REQUEST FOR JUDICIAL NOTICE**

25
26   Plaintiff requests judicial notice of SEC filings and related materials not subject to

27   reasonable dispute. *See* Fed. R. Evid. 201(b); *Khoja v. Orexigen Therapeutics, Inc.*,

28

899 F.3d 988, 999–1002 (9th Cir. 2018); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). The exhibits confirm HCA's own descriptions of the scope of its hospital operations during the relevant period.

- **Exhibit A (2024 Form 10-K):** HCA Healthcare, Inc., Form 10-K for year ended Dec. 31, 2024, Item 1 ("At December 31, 2024, we operated 190 hospitals, comprised of 180 general, acute care hospitals; six behavioral hospitals; and four rehabilitation hospitals.").

- **Exhibit B (Press Release filed as Ex. 99.1 to July 25, 2025 Form 8-K):** *HCA Healthcare Reports Second Quarter 2025 Results* (Business Wire release furnished to the SEC on July 25, 2025) ("As of June 30, 2025, HCA Healthcare operated 191 hospitals and approximately 2,500 ambulatory sites of care.").

For avoidance of doubt, Exhibit B is offered solely to show what HCA represented to investors and the market on July 25, 2025, not for the truth of the matters asserted. *See Khoja*, 899 F.3d at 1002 (court may notice documents for the fact of their statements, not their truth).

These documents bear directly on both motions: (i) HCA's Rule 12(b)(2) argument, because public filings describing hospital "operations" show Nevada-directed corporate conduct relevant to specific jurisdiction; and (ii) Rule 12(b)(6), because they contradict the Curvin affidavit on the scope of HCA's operations and control.

1  If judicial notice is denied as to Exhibit B, the Court should disregard Defendants'

2  ECF 51-1 as extrinsic at Rule 12(b)(6), or alternatively convert under Rule 12(d)

3  and permit limited, targeted discovery. *See Lee v. City of Los Angeles*, 250 F.3d 668,

4
   688 (9th Cir. 2001).
5

6
                              **IV. CONCLUSION**
7

8  Pursuant to D. Nev. LR 78-1, this matter is suitable for decision without oral

9
   argument.
10

11
   If the Court has any doubt regarding specific jurisdiction over HCA, Plaintiff
12

13 alternatively requests jurisdictional discovery and defers ruling on ECF 51 until

14 that discovery is completed. *See Laub*, 342 F.3d at 1093.

15

16 Defendants' Motions should be denied. The FAC pleads detailed, dated, well-

17 supported violations backed by contemporaneous records and sworn declarations.

18
   Rule 8 doesn't require Plaintiff to plead more; it requires Defendants to engage with
19

20 what has been pled.

21
   For the reasons above, the Court should:
22

23
      1.  Deny ECF Nos. 50 and 51 in their entirety;
24

25    2.  Disregard ECF 51-1 as outside pleadings; alternatively, if considered, convert

26         under Rule 12(d) and permit limited discovery on affidavit topics.

27

28

1   Plaintiff has stated plausible claims for: EMTALA violations (inadequate screening,

2   unstable discharge); disability discrimination (PAD non-recognition, denial of

3   accommodations); missing federally required restraint documentation (supporting

4   adverse inferences); state law torts (battery, false imprisonment, IIED, fraud).

5

6   Defendants' motions repeatedly characterize specific statutory violations as

7   "disagreement with medical care" without addressing actual allegations. They don't

8   dispute: PAD was presented and ignored; MPOA was present and excluded;

9   restraints were used without documented orders; Plaintiff personally viewed false

10  TBI diagnosis in her Anthem portal. Instead, they ask this Court to dismiss

11  detailed, dated, facility-specific allegations as "conclusory"—while their own motion

12  lumps all three hospitals together without addressing distinct violations at each

13  facility. This is exactly the "impermissible lumping" the Ninth Circuit condemned in

14  *Destfino*, 630 F.3d at 958.

15

16  Alternatively, if the Court identifies any curable pleading deficiency, Plaintiff

17  requests leave to amend. If the Court dismisses any portion of the FAC, Plaintiff

18  respectfully requests dismissal without prejudice and leave to amend consistent

19  with *Lopez v. Smith*, 203 F.3d 1122, 1130–31 (9th Cir. 2000) (en banc).

20

21  Respectfully submitted,

22

23  Dated this 3rd day of October, 2025.

24   /s/ Jade Riley Burch
     **Jade Riley Burch**
     Plaintiff, Pro Se

1
2
3

## CERTIFICATE OF SERVICE

4
5
6
7

I certify that on October 3rd, 2025, I delivered the foregoing by hand to the Clerk of Court for filing. After docketing, the Court's CM/ECF system will send notice to all registered counsel of record.

8
9

Dated: October 3rd, 2025

10
11
12

/s/ Jade Riley Burch
**Jade Riley Burch**
Plaintiff, Pro Se

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT INDEX

**Exhibit A** – Excerpts from HCA Healthcare, Inc. 2024 Form 10-K, Item 1 (Business and Hospital Utilization), filed with the U.S. Securities and Exchange Commission.

**Exhibit B** – HCA Healthcare, Inc. Form 8-K (Press Release), July 25, 2025, reporting "HCA operated 191 hospitals."

**Exhibit C** – Anthem Insurance Portal Screenshot, reflecting false diagnostic entry of "Diffuse TBI."

**Exhibit G** – Declaration of Melissa Ryan, corroborating unsafe discharge from MountainView Hospital, March 2025.

# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

(Mark One)

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2024

Or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____
Commission File Number 1-11239

# HCA Healthcare, Inc.

(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Delaware | 27-3865930 |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| One Park Plaza | |
| Nashville, Tennessee | 37203 |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: (615) 344-9551

Securities Registered Pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, $0.01 Par Value | HCA | New York Stock Exchange |

Securities Registered Pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer ☐ | | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

Auditor PCAOB ID Number: 42   Auditor Name: Ernst & Young LLP   Auditor Location: Nashville, Tennessee, United States of America

As of January 31, 2025, there were 248,341,900 outstanding shares of the Registrant's common stock. As of June 30, 2024, the aggregate market value of the common stock held by nonaffiliates was approximately $60.369 billion. For purposes of the foregoing calculation only, Hercules Holding II and the Registrant's directors and executive officers have been deemed to be affiliates.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's definitive proxy materials for its 2025 Annual Meeting of Stockholders are incorporated by reference into Part III hereof.

## INDEX

|  |  | Page Reference |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 32 |
| Item 1B. | Unresolved Staff Comments | 50 |
| Item 1C. | Cybersecurity | 50 |
| Item 2. | Properties | 52 |
| Item 3. | Legal Proceedings | 52 |
| Item 4. | Mine Safety Disclosures | 52 |
| | | |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
| Item 6. | [Reserved] | 54 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 55 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 69 |
| Item 8. | Financial Statements and Supplementary Data | 70 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 70 |
| Item 9A. | Controls and Procedures | 70 |
| Item 9B. | Other Information | 72 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 72 |
| | | |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 73 |
| Item 11. | Executive Compensation | 73 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 73 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 74 |
| Item 14. | Principal Accountant Fees and Services | 74 |
| | | |
| **Part IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 75 |
| Item 16. | Form 10-K Summary | 87 |
| | Signatures | 88 |

## PART I

Item 1.    *Business*

### General

HCA Healthcare, Inc. is one of the leading health care services companies in the United States. At December 31, 2024, we operated 190 hospitals, comprised of 180 general, acute care hospitals; six behavioral hospitals; and four rehabilitation hospitals. In addition, we operated 124 freestanding ambulatory surgery centers ("ASCs") and 26 freestanding endoscopy centers. Our facilities are located in 20 states and England.

The terms "Company," "HCA," "HCA Healthcare," "we," "our" or "us," as used herein and unless otherwise stated or indicated by context, refer to HCA Healthcare, Inc. and its affiliates. The term "affiliates" means direct and indirect subsidiaries of HCA Healthcare, Inc. and partnerships and joint ventures in which such subsidiaries are partners. The terms "facilities" or "hospitals" refer to entities owned and operated by affiliates of HCA, and the term "employees" refers to employees of affiliates of HCA.

Our primary objective is to provide a comprehensive array of quality health care services in the most cost-effective manner possible. Our general, acute care hospitals typically provide a full range of services to accommodate such medical specialties as internal medicine, general surgery, cardiology, oncology, neurosurgery, orthopedics and obstetrics, as well as diagnostic and emergency services. Outpatient and ancillary health care services are provided by our general, acute care hospitals, ASCs, freestanding emergency care facilities, urgent care facilities, walk-in clinics, physician practices, diagnostic centers, home health agencies, hospices and rehabilitation facilities and various other facilities. Our behavioral hospitals provide a full range of mental health care services through inpatient, partial hospitalization and outpatient settings.

Our common stock is traded on the New York Stock Exchange (symbol "HCA"). Through our predecessors, we commenced operations in 1968. HCA Healthcare, Inc. was incorporated in Delaware in October 2010. Our principal executive offices are located at One Park Plaza, Nashville, Tennessee 37203, and our telephone number is (615) 344-9551.

### Available Information

We file certain reports with the Securities and Exchange Commission (the "SEC"), including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K. The SEC maintains an Internet site at http://www.sec.gov that contains the reports, proxy and information statements and other information we file. Our website address is www.hcahealthcare.com. Please note that our website address is provided throughout this report as an inactive textual reference only. We make available free of charge, through our website, our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments to those reports filed or furnished pursuant to Section 13 or 15(d) of the Exchange Act, as soon as reasonably practicable after such material is electronically filed with or furnished to the SEC. The information provided on our website is not part of this report, and is therefore not incorporated by reference unless such information is specifically referenced elsewhere in this report.

Our Code of Conduct is available free of charge upon request to our Investor Relations Department, HCA Healthcare, Inc., One Park Plaza, Nashville, Tennessee 37203, and is also available on the Ethics and Compliance and Governance Documents portion of our website at www.hcahealthcare.com.

### Business Strategy

We are committed to providing the communities we serve with high-quality, convenient and cost-effective health care while growing our business and creating long-term value for our stockholders. We strive to be the health care system of choice in the communities we serve by developing comprehensive networks locally and supporting these networks with enterprise expertise and economies of scale. Our strategy is organized around a framework that seeks to drive sustained growth by delivering operational excellence, attracting exceptional physicians and other health care professionals, developing comprehensive services, creating greater access and coordinating higher quality care for patients.

3

To achieve these objectives, we align our efforts around the following growth agenda:

- grow our presence in existing markets;
- achieve industry-leading performance in clinical, operational and satisfaction measures;
- recruit and retain physicians and other health care professionals to meet the need for high-quality health services;
- continue to utilize economies of scale to grow the Company; and
- pursue a disciplined development strategy.

Our strategy also emphasizes investments that seek to advance our clinical systems and digital capabilities, transform care models with innovative care solutions, expand our workforce development programs and enhance our health care networks and partnerships.

**Health Care Facilities**

We currently own, manage or operate hospitals, ASCs, freestanding emergency care facilities, urgent care facilities, walk-in clinics, diagnostic and imaging centers, radiation and oncology therapy centers, comprehensive rehabilitation and physical therapy centers, physician practices, home health agencies, hospices, outpatient physical therapy providers, home and community-based services providers, and various other facilities.

At December 31, 2024, we owned and operated 180 general, acute care hospitals with 49,114 licensed beds. Most of our general, acute care hospitals provide medical and surgical services, including inpatient care, intensive care, cardiac care, diagnostic services and emergency services. The general, acute care hospitals also provide outpatient services such as outpatient surgery, laboratory, radiology, respiratory therapy, cardiology and physical therapy. Each hospital has an organized medical staff and a local board of trustees or governing board comprised of members of the local community.

At December 31, 2024, we operated six behavioral hospitals with 602 licensed beds. Our behavioral hospitals provide therapeutic programs, including child, adolescent and adult psychiatric care and adolescent and adult alcohol and drug abuse treatment and counseling.

We also operate outpatient health care facilities, which include ASCs, freestanding emergency care facilities, urgent care facilities, walk-in clinics, diagnostic and imaging centers, comprehensive rehabilitation and physical therapy centers, radiation and oncology therapy centers, physician practices and various other facilities. These outpatient services are an integral component of our strategy to develop comprehensive health care networks in select communities. Most of our ASCs are operated through partnerships or limited liability companies, with majority ownership of each partnership or limited liability company typically held by a general partner or member that is an affiliate of HCA.

Certain of our affiliates provide a variety of management services to our health care facilities, including patient safety programs, ethics and compliance programs, national supply contracts, equipment purchasing and leasing contracts, accounting, financial and clinical systems, governmental reimbursement assistance, construction planning and coordination, information technology systems and solutions, legal counsel, human resources services and internal audit services.

**Summary Risk Factors**

You should carefully read and consider the risk factors set forth under Item 1A, "Risk Factors," as well as all other information contained in this annual report on Form 10-K. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also affect us. If any of these risks occur, our business, financial position, results of operations, cash flows or prospects could be materially, adversely affected. Our business is subject to the following principal risks and uncertainties:

4

Risks related to our indebtedness:

- We have significant indebtedness and may incur further indebtedness in the future. Our indebtedness could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting our obligations.
- We may not be able to generate sufficient cash to service all of our indebtedness and may not be able to refinance our indebtedness on favorable terms. If we are unable to do so, we may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful.
- Our debt agreements contain restrictions that limit our flexibility in operating our business.

Risks related to human capital:

- Our results of operations may be adversely affected by competition for staffing, the shortage of experienced nurses and other health care professionals and labor union activity.
- Our performance depends on our ability to recruit and retain quality physicians.
- We may be unable to attract, hire and retain a highly qualified workforce, including key management.

Risks related to technology, data privacy and cybersecurity:

- Cybersecurity incidents or other forms of data breaches could result in the compromise of our facilities, confidential data or critical data systems, causing our operations to be impaired or impacted. A cybersecurity incident or other form of data breach could also give rise to potential harm to patients; remediation and other expenses; and exposure to liability under privacy and security laws, consumer protection laws, common law theories or other laws. Such incidents could subject us to litigation and foreign, federal and state governmental inquiries, damage our reputation, and otherwise be disruptive to our business.
- Our operations could be impaired by a failure of our information systems.
- Health care technology initiatives, particularly those related to sharing patient data and interoperability and artificial intelligence ("AI"), involve risks that may adversely affect our operations.
- We may not be adequately reimbursed by third-party payers for services involving new technology.

Risks related to public health crises:

- The emergence and effects related to a potential future pandemic, epidemic or outbreak of an infectious disease could adversely affect our business and operations.

Risks related to governmental regulation and other legal matters:

- Our business, financial condition and results of operations may be adversely affected by changes and uncertainty in the health care industry, including health care public policy developments and other changes to laws and regulations. We are unable to predict whether, what, and when changes in the health care industry may occur, and the effects and ultimate impact of any changes are uncertain and may adversely affect our business and results of operations.
- Changes in government health care programs may adversely affect our revenues and business.
- If we fail to comply with extensive laws and government regulations, we could suffer penalties or be required to make significant changes to our operations.
- State efforts to regulate the construction or expansion of health care facilities could impair our ability to operate and expand our operations.
- We may incur additional tax liabilities.
- We have been and could become the subject of government investigations, claims and litigation, as well as governmental and commercial payer audits.
- We may be subject to liabilities from claims brought against our facilities, which are costly to defend and may require us to pay significant damages if not covered by insurance.

5

Risks related to operations, strategy, demand and competition:

- Our hospitals and other facilities face competition for patients from other hospitals and health care providers.

- Any increase in the volume of uninsured patients or deterioration in the collectability of uninsured and patient due accounts could adversely affect our results of operations.

- If our volume of patients with private health insurance coverage declines or we are unable to retain and negotiate favorable contracts with private third-party payers, including managed care plans, our revenues may be adversely affected.

- Changes to physician utilization practices and treatment methodologies and other factors outside our control that impact demand for medical services may reduce our revenues.

- Third-party payer controls designed to reduce costs and other payer practices intended to decrease inpatient services, surgical procedure volumes or reimbursement for services rendered may reduce our revenues.

- We may encounter difficulty acquiring hospitals and other health care businesses, encounter challenges integrating the operations of acquired hospitals and other health care businesses and/or become liable for unknown or contingent liabilities as a result of acquisitions.

- Our facilities are heavily concentrated in Florida and Texas, which makes us sensitive to regulatory, economic, public health, environmental and competitive conditions and changes in those states.

- Our business and operations are subject to risks related to changing global weather patterns.

- The industry trend toward value-based purchasing may negatively impact our revenues.

Risks related to macroeconomic conditions:

- Our overall business results may suffer during periods of general economic weakness or recessions.

- We are exposed to market risk related to changes in the market values of securities and interest rates.

Risks related to ownership of our common stock:

- There can be no assurance that we will continue to pay dividends.

- Certain of our investors may continue to have influence over us.

**Sources of Revenue**

Hospital revenues depend upon inpatient occupancy levels, the medical and ancillary services ordered by physicians and provided to patients, the volume of outpatient procedures and the charges or reimbursement rates for such services. Reimbursement rates for inpatient and outpatient services vary significantly depending on the type of third-party payer, the type of service (e.g., medical/surgical, intensive care or psychiatric) and the geographic location of the hospital. Inpatient occupancy levels fluctuate for various reasons, many of which are beyond our control.

6

We receive payments for patient services from the federal government under the Medicare program, state governments under their respective Medicaid or similar programs, managed care plans (including plans offered through federal and state-based health insurance marketplaces ("Exchanges")), private insurers and directly from patients. Our revenues by primary third-party payer classification and other (including uninsured patients) for the years ended December 31, 2024, 2023 and 2022 are summarized in the following table (dollars in millions):

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2024 | Ratio | 2023 | Ratio | 2022 | Ratio |
| Medicare | $ 10,780 | 15.3 % | $ 10,585 | 16.3 % | $ 10,447 | 17.3 % |
| Managed Medicare | 11,987 | 17.0 | 10,496 | 16.2 | 9,201 | 15.3 |
| Medicaid | 4,678 | 6.6 | 3,606 | 5.6 | 2,636 | 4.4 |
| Managed Medicaid | 3,980 | 5.6 | 3,879 | 6.0 | 3,998 | 6.6 |
| Managed care and other insurers | 34,954 | 49.5 | 31,819 | 49.0 | 29,120 | 48.3 |
| International (managed care and other insurers) | 1,682 | 2.4 | 1,509 | 2.3 | 1,317 | 2.2 |
| Other | 2,542 | 3.6 | 3,074 | 4.6 | 3,514 | 5.9 |
| Revenues | $ 70,603 | 100.0 % | $ 64,968 | 100.0 % | $ 60,233 | 100.0 % |

Medicare is a federal program that provides certain hospital and medical insurance benefits to persons age 65 and over, some disabled persons, persons with end-stage renal disease and persons with amyotrophic lateral sclerosis. Medicaid is a federal-state program, administered by the states, that provides hospital and medical benefits to qualifying low-income individuals. Payment under the Medicare and Medicaid programs is conditioned on satisfaction of extensive provider enrollment requirements. All of our general, acute care hospitals located in the United States are eligible and enrolled to participate in Medicare and Medicaid programs. Amounts received under Medicare and Medicaid programs are generally significantly less than established hospital gross charges for the services provided.

Our hospitals generally offer discounts from established charges to certain group purchasers of health care services, including private health insurers, employers, health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and other managed care plans, including health plans offered through the Exchanges. These discount programs generally limit our ability to increase revenues in response to increasing costs. See Item 1, "Business — Competition." For services under Medicare, Medicaid, HMOs, PPOs and other managed care plans, patients are generally responsible for any exclusions, deductibles or coinsurance features of their coverage. The amounts of such exclusions, deductibles and coinsurance continue to increase. Collection of amounts due from individuals is typically more difficult than from government health care programs or other third-party payers. We provide discounts to uninsured patients who do not qualify for Medicaid or for financial relief under our charity care policy. We may provide assistance to uninsured patients to help determine whether they may qualify for Medicaid, other federal or state assistance or charity care under our charity care policy. If an uninsured patient does not qualify for these programs, the uninsured discount is applied.

*Medicare*

In addition to the reimbursement reductions and adjustments discussed below, the Budget Control Act of 2011 (the "BCA") requires automatic spending reductions to reduce the federal deficit, resulting in a uniform percentage reduction across all Medicare programs of 2% per fiscal year that extends through the first eight months of federal fiscal year 2032. We anticipate that the federal deficit will continue to place pressure on government health care programs, and it is possible that future deficit reduction legislation will impose additional spending reductions.

<u>*Inpatient Acute Care*</u>

Under the Medicare program, we receive reimbursement under a prospective payment system ("PPS") for general, acute care hospital inpatient services. Under the hospital inpatient PPS, fixed payment amounts per inpatient discharge are established based on the patient's assigned Medicare severity diagnosis-related group ("MS-DRG"). MS-DRGs classify treatments for illnesses according to the estimated intensity of hospital resources necessary to furnish care for each principal diagnosis. MS-DRG weights represent the average resources for a given MS-DRG relative to the average resources for all MS-DRGs. MS-DRG payments are adjusted for area wage differentials. Hospitals, other than those defined as "new," receive PPS reimbursement for inpatient capital costs based on MS-DRG weights multiplied by a geographically adjusted federal rate. When the cost to treat certain patients falls well outside the normal distribution, providers typically receive additional "outlier" payments. These payments are financed by offsetting reductions in the inpatient PPS rates. A high-cost outlier threshold is set annually at a level that targets estimated outlier payments equaling 5.1% of total inpatient PPS payments for the federal fiscal year.

MS-DRG payment rates are updated, and MS-DRG weights are recalibrated, using cost-relative weights each federal fiscal year (which begins October 1). The index used to update the MS-DRG payment rates (the "market basket") gives consideration to the inflation experienced by hospitals and entities outside the health care industry in purchasing goods and services. Each federal fiscal year, the annual market basket update is reduced by a productivity adjustment based on the Bureau of Labor Statistics ("BLS") 10-year moving average of changes in specified economy-wide productivity. A decrease in payment rates or an increase in rates that is below the increase in our costs may adversely affect our results of operations.

For federal fiscal year 2024, the Centers for Medicare & Medicaid Services ("CMS") increased the MS-DRG payment rates by approximately 3.1%. This increase reflected a market basket update of 3.3%, reduced by a 0.2 percentage point productivity adjustment. For federal fiscal year 2025, CMS increased the MS-DRG payment rates by approximately 2.9%. This increase reflects a market basket update of 3.4%, reduced by a 0.5 percentage point productivity adjustment. Additional adjustments may apply, depending on patient-specific or hospital-specific factors. For example, the two-midnight rule limits payments to hospitals when services to Medicare beneficiaries are payable as inpatient services. In addition, under transfer policies, Medicare reimbursement rates may be reduced when an inpatient hospital discharges a patient to another hospital or, for specified MS-DRGs, to certain post-acute care settings. We anticipate that additional adjustments may apply in future payment years as a result of 2024 court decisions that vacated a low wage index policy CMS adopted in 2020. The policy had funded an increase to the wage index value for hospitals with low wage indexes by decreasing reimbursement for all other hospitals. CMS addressed the impact of the decision prospectively in its final rule updating inpatient hospital payment rates and policies for federal fiscal year 2025, but it is not yet clear how the agency will address the impact the low wage policy had in 2020 through 2024.

CMS has implemented and is implementing a number of programs and requirements intended to transform Medicare from a passive payer to an active purchaser of quality goods and services. For example, hospitals that do not successfully participate in the Hospital Inpatient Quality Reporting Program are subject to a 25% reduction of the market basket update. Hospitals that do not demonstrate meaningful use of electronic health records ("EHRs") are subject to a 75% reduction of the market basket update.

Further, Medicare does not allow an inpatient hospital discharge to be assigned to a higher paying MS-DRG if certain designated hospital acquired conditions ("HACs") were not present on admission and the identified HAC is the only condition resulting in the assignment of the higher paying MS-DRG. In this situation, the case is paid as though the secondary diagnosis was not present. There are currently 14 categories of conditions on the list of HACs. In addition, the 25% of hospitals with the worst risk-adjusted HAC scores in the designated performance period receive a 1.0% reduction in their inpatient PPS Medicare payments in the applicable federal fiscal year. CMS has also established three National Coverage Determinations that prohibit Medicare reimbursement for erroneous surgical procedures performed on an inpatient or outpatient basis.

Under the Hospital Readmission Reduction Program, payments to hospitals may also be reduced based on readmission rates. Each federal fiscal year, inpatient payments are reduced if a hospital experiences "excess" readmissions within the 30-day time period from the date of discharge for conditions or procedures designated by CMS during the prior performance review period. CMS has designated six conditions or procedures under the program, including heart attack, pneumonia and total hip arthroplasty. Hospitals with what CMS defines as excess readmissions for these conditions or procedures receive reduced payments for all inpatient discharges in the federal fiscal year, not just discharges relating to the conditions or procedures subject to the excess readmission standard. The amount by which payments are reduced is determined by assessing a hospital's performance relative to hospitals with similar proportions of dual eligible patients, subject to a cap established by CMS. The reduction in payments to hospitals with excess readmissions can be up to 3% of a hospital's base payments. Each hospital's performance is publicly reported by CMS.

In addition, under the Hospital Value-Based Purchasing Program, CMS reduces the inpatient PPS payment amount for all discharges by 2.0% in each federal fiscal year. The total amount collected from these reductions is pooled, and the entire amount collected is redistributed as incentive payments to reward hospitals that meet certain quality performance standards established by CMS. CMS scores each hospital based on achievement (relative to other hospitals) and improvement ranges (relative to the hospital's own past performance) for each applicable performance standard. Hospitals that meet or exceed the quality performance standards receive greater reimbursement under the value-based purchasing program than they would have otherwise. Hospitals that do not achieve the necessary level of quality performance receive reduced Medicare inpatient hospital payments. Hospitals are scored on a number of individual measures that are categorized into four domains: clinical outcomes; efficiency and cost reduction; safety; and person and community engagement.

*Outpatient*

CMS reimburses hospital outpatient services (and certain Medicare Part B services furnished to hospital inpatients who have no Part A coverage) on a PPS basis. Hospital outpatient services paid under PPS are classified into groups called ambulatory payment classifications ("APCs"). Services for each APC are similar clinically and in terms of the resources they require. Depending on the services provided, a hospital may be paid for more than one APC for a patient visit. A payment rate is established for each APC and updated for each calendar year. Each calendar year, the annual market basket update is further reduced by a productivity adjustment based on the BLS 10-year moving average of changes in specified economy-wide productivity. For calendar year 2024, CMS increased payment rates under the outpatient PPS by an estimated 3.1%. This increase reflected a market basket increase of 3.3%, reduced by a 0.2 percentage point productivity adjustment. For calendar year 2025, CMS increased payment rates by an estimated 2.9%. This increase reflects a market basket increase of 3.4%, reduced by a 0.5 percentage point productivity adjustment. CMS requires hospitals to submit quality data relating to outpatient care to avoid receiving a 2.0 percentage point reduction in the annual payment update under the outpatient PPS.

Medicare reimbursement for outpatient services may also be affected by broad shifts in payment policy. For example, the 340B Drug Pricing Program allows participating hospitals to purchase certain outpatient drugs from manufacturers at discounted rates. These hospitals are reimbursed for the discounted drugs under the same Medicare payment methodology and rates that apply to non-340B hospitals. In 2018, CMS implemented a payment policy that reduced Medicare payments for 340B hospitals for most drugs obtained at 340B-discounted rates and that resulted in increased payments for non-340B hospitals. Most of our facilities are non-340B hospitals. In June 2022, the U.S. Supreme Court invalidated this 340B program payment policy. In light of this U.S. Supreme Court decision and to achieve budget neutrality, CMS reduced payment rates for non-drug services under the outpatient PPS for calendar year 2023, and lump sum payments were distributed to affected 340B hospitals as the remedy for calendar years 2018 through 2022. In order to comply with budget neutrality requirements, the U.S. Department of Health and Human Services ("HHS") finalized a corresponding offset in future non-drug item and service payments for all outpatient PPS providers (except new providers) that will reduce the outpatient PPS conversion factor by 0.5% annually. This adjustment will start in calendar year 2026 and continue for approximately 16 years.

In addition, CMS has implemented an expanded site-neutral payment policy for clinic visit services provided at all off-campus provider-based departments. Under the policy, clinic visit services provided at all off-campus provider-based departments are generally not covered as outpatient department services under the outpatient PPS, but rather are reimbursed at the Medicare Physician Fee Schedule ("Physician Fee Schedule") rate, which is generally lower than the outpatient PPS rate.

*Rehabilitation*

CMS reimburses inpatient rehabilitation facilities ("IRFs") on a PPS basis. Under the IRF PPS, patients are classified into case mix groups that reflect the relative resource intensity typically associated with the patient's clinical condition. The case mix groups are based upon impairment, age, functional motor and cognitive scores, and comorbidities (additional diseases or disorders from which the patient suffers). IRFs are paid a predetermined amount per discharge that reflects the patient's case mix group and is adjusted for facility-specific factors, such as area wage levels, proportion of low-income patients, and location in a rural area. Each federal fiscal year, the IRF rates are updated using a market basket index, which is reduced by a productivity adjustment based on the BLS 10-year moving average of changes in specified economy-wide productivity. For federal fiscal year 2024, CMS increased IRF payment rates by an estimated 3.4%, reflecting an IRF market basket update of 3.6%, reduced by a 0.2 percentage point productivity adjustment. For federal fiscal year 2025, CMS increased IRF payment rates by an estimated 3.0%, reflecting an IRF market basket update of 3.5%, reduced by a 0.5 percentage point productivity adjustment. CMS requires IRFs to report quality measures to avoid receiving a reduction of 2.0 percentage points to the market basket update.

In order to qualify for classification as an IRF, at least 60% of a facility's inpatients during the most recent 12-month CMS-defined review period must have required intensive rehabilitation services for one or more of 13 specified conditions. IRFs must also meet additional coverage criteria, including patient selection and care requirements relating to pre-admission screenings, post-admission evaluations, ongoing coordination of care and involvement of rehabilitation physicians. A facility that fails to meet the 60% threshold, or other criteria to be classified as an IRF, will be paid under either the acute care hospital inpatient or outpatient PPS, which generally provide for lower payment amounts. As of December 31, 2024, we had four rehabilitation hospitals and 71 hospital rehabilitation units.

### Psychiatric

Inpatient hospital services furnished in behavioral hospitals and behavioral units of general, acute care hospitals and critical access hospitals are reimbursed on a PPS basis. The inpatient psychiatric facility ("IPF") PPS is based upon a per diem payment, with adjustments to account for certain patient and facility characteristics. The IPF PPS contains an "outlier" policy for extraordinarily costly cases and an adjustment to a facility's base payment if it maintains a full-service emergency department. CMS has established the IPF PPS payment rate in a manner intended to be budget neutral. Each federal fiscal year, IPF payment rates are updated using a market basket index, which is reduced by a productivity adjustment based on the BLS 10-year moving average of changes in specified economy-wide productivity. For federal fiscal year 2024, CMS increased IPF payment rates by an estimated 3.3%, which reflected a 3.5% IPF market basket increase with a negative 0.2 percentage point productivity adjustment. For federal fiscal year 2025, CMS increased the IPF payment rates by 2.8%, which reflects a 3.3% IPF market basket increase, reduced by a 0.5 percentage point productivity adjustment. Together with other policy changes, total Medicare payments to IPFs are anticipated to increase by 2.5% in federal fiscal year 2025. Inpatient psychiatric facilities are required to report quality measures to CMS to avoid receiving a 2.0 percentage point reduction to the market basket update. As of December 31, 2024, we had six behavioral hospitals and 43 hospital behavioral units.

### Ambulatory Surgery Centers

CMS reimburses ASCs using a predetermined fee schedule. Reimbursements for ASC overhead costs are limited to no more than the overhead costs paid to hospital outpatient departments under the Medicare hospital outpatient PPS for the same procedure. If CMS determines that a procedure is commonly performed in a physician's office, the ASC reimbursement for that procedure is limited to the reimbursement allowable under the Physician Fee Schedule, with limited exceptions. All surgical procedures, other than those that pose a significant safety risk or generally require an overnight stay, are payable as ASC procedures. From time to time, CMS expands the services that may be performed in ASCs, which may result in more Medicare procedures that historically have been performed in hospitals being moved to ASCs, reducing surgical volume in our hospitals. Also, more Medicare procedures that historically have been performed in ASCs may be moved to physicians' offices. Some commercial third-party payers have adopted similar policies.

Historically, CMS updated reimbursement rates for ASCs based on changes to the consumer price index. However, for calendar years through 2025, CMS updates to ASC reimbursement rates are based on the hospital market basket index, partly to promote site-neutrality between hospitals and ASCs. For each federal fiscal year, the ASC payment system update is reduced by a productivity adjustment based on the BLS 10-year moving average of changes in specified economy-wide productivity. For calendar year 2024, CMS increased ASC payment rates by 3.1%, which reflected a market basket increase of 3.3%, reduced by a 0.2 percentage point productivity adjustment. For calendar year 2025, CMS increased payment rates by 2.9%, which reflects a market basket increase of 3.4%, reduced by a 0.5 percentage point productivity adjustment. In addition, CMS has established a quality reporting program for ASCs under which ASCs that fail to report on specified quality measures receive a 2.0 percentage point reduction to the market basket update.

### Home Health

CMS reimburses home health agencies under the Home Health PPS. Home health agencies are paid a national, standardized 30-day period payment rate if a period of care meets a certain threshold of home health visits (periods of care that do not meet the visit threshold are paid a per-visit payment rate for the discipline providing care). The daily home health payment rate is adjusted for case-mix and area wage levels. An outlier adjustment may be paid for periods of care where costs exceed a specific threshold amount. Each calendar year, home health payment rates are updated using a market basket index, which is reduced by a productivity adjustment based on the BLS 10-year moving average of changes in specified economy-wide productivity. For calendar year 2024, CMS increased home health payment rates by 0.8%, based on a home health payment update percentage of 3.0%, which reflected a 3.3% market basket increase, reduced by a 0.3 percentage point productivity adjustment, among other changes. For calendar year 2025, total Medicare payments to home health agencies are anticipated to increase by 0.5%. This increase is based on a home health payment update percentage of 2.7%, which reflects a 3.2% market basket increase, reduced by a 0.5 percentage point productivity adjustment, among other adjustments. Home health agencies that do not submit required quality data are subject to a 2.0 percentage point reduction to the market basket update. In addition, home health agencies are required to submit a one-time Notice of Admission ("NOA") for each patient that establishes that the beneficiary is under a Medicare home health period of care. Failure to submit the NOA within five calendar days from the start of care results in a reduction to the 30-day period payment amount for each day from the start of care date until the date the NOA is submitted.

Under the nationwide Home Health Value-Based Purchasing ("HHVBP") Model, home health agencies receive increases or reductions to their Medicare fee-for-service payments of up to 5%, based on performance against specific quality measures relative to the performance of other home health providers. Data collected in each performance year will impact Medicare payments two years later.

Payment of claims for home health services may be impacted by the Review Choice Demonstration, a program intended to identify and prevent home health services fraud, reduce the number of Medicare appeals, and improve provider compliance with Medicare program requirements. The program currently applies only to home health agencies in certain states, including North Carolina, Florida and Texas. Providers in these states may select either pre-claim review or post-payment review. Home health agencies that maintain high levels of compliance are eligible for additional options that may be less burdensome.

### Hospice

Medicare beneficiaries who have a terminal illness and a life expectancy of six months or less may elect to receive hospice benefits (palliative care) instead of standard coverage of treatment for the terminal illness and related conditions. Hospice services are paid under the Hospice PPS, under which CMS sets a daily rate for each day a patient is enrolled in the hospice benefit. The daily rate depends on the level of care provided to a patient (routine home care, continuous home care, inpatient respite care, or general inpatient care). Daily rates are adjusted for factors such as area wage levels. Each federal fiscal year, hospice payment rates are updated using the hospital inpatient market basket index, which is reduced by a productivity adjustment based on the BLS 10-year moving average of changes in specified economy-wide productivity. For federal fiscal year 2024, CMS increased hospice payment rates by 3.1%, which reflected a 3.3% market basket update, reduced by a 0.2 percentage point productivity adjustment. For federal fiscal year 2025, CMS increased hospice payment rates by 2.9%, which reflects a 3.4% market basket update, reduced by a 0.5 percentage point productivity adjustment. Hospices that fail to satisfy quality reporting requirements receive a 4.0 percentage point reduction to the market basket update.

Overall payments made by Medicare to each hospice are subject to an inpatient cap and an aggregate cap. The inpatient cap limits the number of days of inpatient care (general inpatient and respite) for which Medicare will pay up to a maximum of 20% of total patient care days. Days in excess of the limitation are paid at the routine home care rate. The aggregate cap limits the amount of Medicare reimbursement a hospice may receive for an individual patient in a given year. The aggregate cap is updated annually. In federal fiscal year 2025, the aggregate cap is $34,465.34. If a hospice's Medicare payments exceed its inpatient or aggregate caps, it must repay Medicare for the excess amount.

### Physician Services

Physician services are reimbursed under the Physician Fee Schedule system, under which CMS has assigned a national relative value unit ("RVU") to most medical procedures and services that reflects the various resources required by a physician to provide the services, relative to all other services. Each RVU is calculated based on a combination of work required in terms of time and intensity of effort for the service, practice expense (overhead) attributable to the service and malpractice insurance expense attributable to the service. These three elements are each modified by a geographic adjustment factor to account for local practice costs and are then aggregated. While RVUs for various services may change in a given year, any alterations are required by statute to be virtually budget neutral, such that total payments made under the Physician Fee Schedule may not differ by more than $20 million from what payments would have been if adjustments were not made. CMS annually reviews resource inputs for select services as part of the potentially misvalued code initiative. To determine the payment rate for a particular service, the sum of the geographically adjusted RVUs is multiplied by a conversion factor. For calendar year 2024, CMS reduced the conversion factor by approximately 2.8%. Average payment rates under the Physician Fee Schedule will be reduced by approximately 2.9% in calendar year 2025.

Medicare payments are adjusted based on participation in the Quality Payment Program ("QPP"), a payment methodology intended to reward high-quality patient care. Physicians and certain other health care clinicians are required to participate in one of two QPP tracks. Under both tracks, performance data collected in each performance year affects Medicare payments two years later. CMS expects to transition increasing financial risk to providers as the QPP evolves. The Advanced Alternative Payment Model ("Advanced APM") track encourages participation in specific innovative payment models approved by CMS through financial incentives, which are paid two years after the relevant performance period, if a provider has sufficient participation (based on percentage of payments or patients) in an Advanced APM. The incentive payments were initially set to expire after the 2023 performance year (with associated payments in 2025), but were extended for one year at a lower rate. After the 2024 performance year and associated payments in 2026, Advanced APM incentive payments will no longer be available. Instead, qualifying providers will receive positive adjustments to their Physician Fee Schedule payment rates. Providers participating in the Advanced APM track are exempt from the reporting requirements and payment adjustments imposed under the Merit-Based Incentive Payment System ("MIPS"),

11

the other QPP participation track. Providers electing the MIPS option receive payment incentives or are subject to payment reductions based on their performance with respect to clinical quality, resource use, clinical improvement activities, and meeting Promoting Interoperability standards related to the meaningful use of EHRs. Positive payment adjustments are subject to a scaling factor to meet budget neutrality requirements; the maximum negative payment adjustment is 9%.

### Other

CMS uses fee schedules to pay for physical, occupational and speech therapies, durable medical equipment, clinical diagnostic laboratory services, nonimplantable orthotics and prosthetics, services provided by independent diagnostic testing facilities and ambulance services.

Under the various PPS structures, the payment rates are adjusted for area differences in wage levels by a factor reflecting the relative wage level in the geographic area compared to the national average wage level and taking into account occupational mix ("wage index"). To smooth variations and decrease volatility, CMS has implemented permanent, budget-neutral caps on year-to-year decreases in the wage indexes under certain PPS structures, including the hospital inpatient PPS and home health PPS.

Medicare reimburses hospitals for a portion (65%) of deductible and coinsurance amounts that are uncollectable from Medicare beneficiaries.

CMS competitively bids the Medicare fiscal intermediary and Medicare carrier functions to Medicare Administrative Contractors ("MACs"), which are geographically assigned across 12 jurisdictions to service both Part A and Part B providers. Home health and hospice providers are serviced across four MAC jurisdictions. While hospitals with operations across multiple geographies have the option of having all hospitals use one home office MAC, we have chosen, in most cases, to use the MACs assigned to the geographic areas in which our hospitals are located. CMS periodically re-solicits bids, and the MAC servicing a geographic area can change as a result of the bid competition. MAC transition periods can impact claims processing functions and the resulting cash flows.

CMS contracts with third parties to promote the integrity of the Medicare program through reviews of quality concerns and detections, and corrections of improper payments. Quality Improvement Organizations, for example, are groups of physicians and other health care quality experts that work on behalf of CMS to ensure that Medicare pays only for goods and services that are reasonable and necessary, and that are provided in the most appropriate setting. Under the Recovery Audit Contractor ("RAC") program, CMS contracts with RACs on a contingency basis to conduct post-payment reviews to detect and correct improper payments in the fee-for-service Medicare program. The compensation for RACs is based on their review of claims submitted to Medicare for billing compliance, including correct coding and medical necessity, and the amount of overpayments and underpayments they identify. CMS limits the number of claims that RACs may audit by limiting the number of records that RACs may request from hospitals based on each provider's claim denial rate for the previous year. CMS has implemented the RAC program on a permanent, nationwide basis and expanded the RAC program to the Managed Medicare program and Medicare Part D. CMS has transitioned some of its other integrity programs to a consolidated model by engaging Unified Program Integrity Contractors ("UPICs") to perform audits, investigations and other integrity activities.

We have established policies and procedures to respond to requests from and payment denials by RACs and other Medicare contractors. Payment recoveries resulting from reviews and denials are appealable through administrative and judicial processes, and we pursue reversal of adverse determinations at appropriate appeal levels. We incur additional costs related to responding to requests and denials, including costs associated with responding to requests for records and pursuing the reversal of payment denials and losses associated with overpayments that are not reversed upon appeal. Depending upon changes to and the growth of the RAC program and other Medicare integrity programs, our success in appealing claims in future periods, and potential future delays in the appeals process, our cash flows and results of operations could be negatively impacted.

Medicare reimburses teaching hospitals for portions of the direct and indirect costs of graduate medical education ("GME") through statutory formulas that are generally based on the number of medical residents and which take into account patient volume or the number of hospital beds. Accrediting organizations review GME programs for compliance with educational standards. Many of our hospitals operate GME or other residency programs to train physicians and other allied health professionals.

### Managed Medicare

Under the Managed Medicare program (also known as Medicare Part C, or Medicare Advantage), the federal government contracts with private health insurers to provide members with Medicare Part A, Part B and Part D benefits. Managed Medicare plans can be structured as HMOs, PPOs or private fee-for-service plans. In addition to covering Part A and Part B benefits, the health insurers may choose to offer supplemental benefits and impose higher premiums and

plan costs on beneficiaries. CMS makes fee payment adjustments based on service benchmarks and quality ratings and publishes star ratings to assist beneficiaries with plan selection. According to CMS data, approximately half of all Medicare enrollees participate in managed Medicare plans. Starting January 1, 2024, managed Medicare plans must adhere to the two-midnight rule, which requires managed Medicare plans provide coverage for an inpatient admission when the admitting physician expects the patient to require hospital care that crosses over two midnights. The implementation of the two-midnight rule had a modest impact on our 2024 admissions growth. Medicare Advantage enrollment is projected to continue to increase over the next decade.

*Medicaid*

Medicaid programs are funded jointly by the federal government and the states. These programs are administered by states under approved plans and waivers. Most state Medicaid program payments are made under a PPS or are based on negotiated payment levels with individual hospitals. Medicaid reimbursement is often less than a hospital's cost of services. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010 (collectively, the "Affordable Care Act") requires states to expand Medicaid coverage to all individuals under age 65 with incomes effectively at or below 138% of the federal poverty level. However, states may opt out of the expansion without losing existing federal Medicaid funding. The majority of states adopted Medicaid expansion; however, a number of states, including Texas and Florida, have opted out of the expansion. Among the non-expansion states, the maximum income level required for individuals and families to qualify for Medicaid varies.

The number of individuals enrolled in Medicaid declined in 2024 in comparison to 2023. This decline reversed a trend of increased enrollment that occurred as a result of COVID-19 relief legislation that authorized a temporary increase in federal funds for certain Medicaid expenditures in states that maintained continuous Medicaid enrollment, among other requirements. The end of the continuous enrollment requirement in 2023, including the resumption of redeterminations for Medicaid enrollees, resulted in significant coverage disruptions and dis-enrollments of Medicaid beneficiaries. To increase state compliance with renewal, redetermination and reporting requirements, CMS has issued guidance to states and published an interim final rule establishing an enforcement framework, including potential monetary penalties for states that fail to comply.

Because most states must operate with balanced budgets and because the Medicaid program is often a state's largest budget expenditure, many states have adopted or may consider adopting various strategies to reduce their Medicaid expenditures. Budgetary pressures have historically resulted and likely will continue to result in decreased spending, or decreased spending growth, for Medicaid programs in many states. Most states in which we operate have adopted statewide provider taxes to fund the non-federal share of Medicaid programs within the state. Some states that use provider taxes, including Florida and Texas, rely on local provider taxes that are administered by local governments. Many states have also adopted, or are considering, legislation designed to reduce coverage, enroll Medicaid recipients in managed care programs and/or impose additional taxes on hospitals to help finance or expand the states' Medicaid systems. Some states use, or have applied to use, waivers granted by CMS to implement Medicaid expansion, impose different eligibility or enrollment restrictions, or otherwise implement programs that vary from federal standards. For example, the Texas Healthcare Transformation and Quality Improvement Program, which is operated under a Medicaid waiver, enables the expansion of Medicaid managed care programs in the state and provides funding for uncompensated care. The funding amount to each hospital for uncompensated care is recalculated annually by the state and subject to changes in state policies. The total uncompensated care funding for the state is periodically reassessed by CMS and the state. In recent years, aspects of existing or proposed Medicaid programs have been subject to legal challenge, resulting in uncertainty. Additionally, federal legislation and administrative policies that shape administration of the Medicaid programs at the state level are subject to change, including as a result of changes in the presidential administration. For example, a federal court permitted Georgia to impose work and community engagement requirements under a Medicaid demonstration program that launched in mid-2023, and CMS administrators may in the future allow states to impose such conditions on enrollment or permit other eligibility restrictions. Changes to the federal funding formula for Medicaid could also have a significant impact on Medicaid programs and enrollment, particularly if federal contributions for Medicaid expansion populations decrease and those states are unable to offset the reductions. Further, some states have trigger laws that would end their Medicaid expansion or require other changes if federal funding is reduced. These issues are further discussed in Item 1A, "Risk Factors."

Many state Medicaid programs incorporate value-based purchasing models and related payment and delivery system reform initiatives that incentivize improvements in quality of care and cost-effectiveness. For example, federal funds under the Medicaid program may not be used to reimburse providers for treatment of certain provider-preventable conditions. Each state Medicaid program must deny payments to providers for the treatment of health care-acquired conditions designated by CMS as well as other provider-preventable conditions that may be designated by the state.

Congress has expanded the federal government's involvement in fighting fraud, waste and abuse in the Medicaid program through the Medicaid Integrity Program. CMS employs UPICs to perform post-payment audits of Medicaid

13

claims, identify overpayments and perform other program integrity activities. The UPICs collaborate with states and coordinate provider investigations across the Medicare and Medicaid programs. In addition, state Medicaid agencies are required to establish Medicaid RAC programs. These programs vary by state in design and operation.

*Managed Medicaid*

Enrollment in managed Medicaid plans has increased in recent years, as state governments seek to control the cost of Medicaid programs. Managed Medicaid programs enable states to contract with one or more entities for patient enrollment, care management and claims adjudication. The states usually do not relinquish program responsibilities for financing, eligibility criteria and core benefit plan design. We generally contract directly with one or more of the designated entities, usually a managed care organization. The provisions of these programs are state-specific. Certain states may direct managed care plans to pass through supplemental payments to designated providers, independent of services rendered, to ensure consistent funding of providers that serve large numbers of low-income patients. In an effort to more closely tie funds to delivery and outcomes, CMS is limiting these "pass-through payments" that are paid by states under managed Medicaid plan contracts and will generally prohibit such payments by 2027. However, CMS permits new pass-throughs of supplemental provider payments for up to a three-year period when states are transitioning Medicaid populations or services from a fee-for-service system to a managed care system.

*Medicaid State Directed and Supplemental Payments*

Some states make additional payments to providers through the Medicaid program that are separate from base payments and not specifically tied to an individual's care. Medicaid supplemental payments may be in the form of payments, such as upper payment limit payments, that are intended to address the difference between Medicaid fee-for-service payments and Medicare reimbursement rates, or payments under other programs that vary by state under Section 1115 waivers. These supplemental reimbursement programs are generally authorized by CMS for a specified period of time and require CMS' approval to be extended.

In addition, many states have implemented state directed payment ("SDP") arrangements to direct certain Medicaid managed care plan expenditures. These arrangements, which are generally subject to annual approval by CMS, allow states to implement delivery system and provider payment initiatives by requiring Medicaid managed care organizations to pay providers according to specific rates or methods. For example, SDP arrangements may require managed care plans to implement value-based purchasing models or performance improvement initiatives, or may direct managed care plans to adopt specific payment parameters, such as minimum or maximum fee schedules for specific types of providers. States are increasingly using SDP arrangements, and some states have converted supplemental payment programs to SDP arrangements, diverting previously available funding. SDP arrangements can be limited to a specific subset of providers, and providers that do not satisfy applicable criteria may be ineligible for payments. If a state is unable to obtain future CMS approvals of these programs, our revenues could be negatively impacted. In addition, the use and nature of SDP arrangements are subject to policy changes. For example, CMS published a rule (the "Medicaid Managed Care Rule") in May 2024 that addresses access, financing and quality within Medicaid managed care programs. The rule includes new and updated requirements for SDP arrangements intended to ensure a more consistent and transparent approach for participating states. The rule removes regulatory barriers to help states use SDP arrangements to implement value-based purchasing payment arrangements and include non-network providers in SDP arrangements. The rule also requires provider payment levels for SDPs for certain services, including inpatient and outpatient hospital services, to not exceed the average commercial rate. Further, the rule requires states to ensure each provider receiving an SDP attest by January 1, 2028 that they do not participate in any arrangement that holds taxpayers harmless for the cost of a tax. The various elements of the rule take effect between issuance and early 2028. It is possible that these developments and program reviews will result in the restructuring of or other significant changes to supplemental payment programs and SDP arrangements. We are unable to estimate the financial impact that program structure modifications and other program changes, if any, may have on our results of operations.

Over the last three years, states in which the majority of our hospitals operate have implemented or enhanced their Medicaid supplemental payment programs and SDP arrangements. Revenues from these programs totaled approximately $4.9 billion and $3.9 billion in 2024 and 2023, respectively.

*Disproportionate Share Hospital Payments*

Separate from the state-administered programs outlined above, the federal Medicare program makes additional payments to hospitals that treat a disproportionately large number of low-income patients (Medicaid and Medicare patients eligible to receive Supplemental Security Income ("SSI")). Disproportionate Share Hospital ("DSH") payment adjustments are determined annually based on certain statistical information required by HHS and are paid as a percentage addition to MS-DRG payments. The methodology for calculating DSH payment adjustments is affected by shifts in payment policy and is also subject to ongoing litigation. For example, in August 2023, CMS finalized changes to the

14

treatment of patient days paid under demonstrations authorized under Section 1115 of the Social Security Act ("Section 1115") (including through demonstration-authorized uncompensated and undercompensated care pools) in the Medicaid fraction of the DSH payment formula in a manner that will effectively lower DSH payments for many hospitals. However, in August 2024, a district court in Texas vacated the regulation, determining that CMS' exclusion of patient days paid under such demonstrations was unlawful. Separately, in November 2024, the U.S. Supreme Court heard oral arguments in a dispute focused on whether all patients enrolled in SSI assistance, even if no SSI payments were made during the month of a patient's hospital admission, should be counted in the DSH methodology. These and other regulatory changes and court rulings could adversely impact our results of operations. CMS also distributes a payment to each DSH hospital that is allocated according to the hospital's proportion of uncompensated care costs relative to the uncompensated care amount of other DSH hospitals.

The Medicaid program also provides for DSH payments, funded by both the federal government and state governments, which are intended to offset hospital uncompensated care costs. The federal government distributes federal Medicaid DSH funds to each state based on a statutory formula. The states then distribute the DSH funding among qualifying hospitals. States have broad discretion to define which hospitals qualify for Medicaid DSH payments and the amount of such payments. Medicaid DSH payments are also affected by shifts in payment policy. For example, CMS published a final rule in February 2024 affecting how states calculate hospital-specific caps for Medicaid DSH payments. The Affordable Care Act and subsequent legislation provided for reductions to the Medicaid DSH hospital program. Under current law, Medicaid DSH payments will be reduced by $8 billion for the period from April 1, 2025, through September 30, 2025, and in federal fiscal years 2026 and 2027.

*Value-Based Care Arrangements*

CMS has indicated that promoting value-based, person-centered care is among its top priorities, and commercial payers are also increasingly using value-based care arrangements. Generally, value-based care aims to hold providers accountable for delivering efficient, effective care, tying provider reimbursement to patient outcomes or related measures. Value-based care arrangements vary in the method for determining payments and the level of risk assumed, among other factors. For example, Medicare reimbursement may be adjusted based on quality and efficiency measures and/or compliance with quality reporting requirements. In addition, CMS websites make available to the public data submitted by hospitals, home health agencies, hospices, and other Medicare-certified providers in connection with Medicare reimbursement claims, including performance data on quality measures and patient satisfaction.

An Accountable Care Organization ("ACO"), an example of a value-based arrangement, is a group of providers and suppliers that work together to invest in infrastructure and redesign delivery processes to attempt to achieve high quality and efficient delivery of services. ACOs are intended to promote accountability, coordinate care and produce savings as a result of improved quality and operational efficiency. There are several types of ACO programs, including the Medicare Shared Savings Program ("MSSP"), which is Medicare's permanent ACO program. Medicare-approved ACOs that achieve quality performance standards while lowering growth in expenditures are eligible to share in a portion of the amounts saved by the Medicare program. Conversely, under some MSSP payment tracks, ACOs may be required to pay shared losses if expenditures exceed an established benchmark. Failure to meet quality performance standards may result in an ACO's termination from the MSSP. CMS continues to explore strategies to accelerate the growth of and access to ACOs.

The CMS Innovation Center is responsible for establishing demonstration projects and other initiatives in order to identify, develop, test and encourage the adoption of new methods of delivering and paying for health care that create savings under the Medicare and Medicaid programs, while improving quality of care. For example, providers participating in bundled payment initiatives agree to receive one payment for services provided to Medicare patients for certain medical conditions or episodes of care, accepting accountability for costs and quality of care. By rewarding providers for increasing quality and reducing costs and penalizing providers if costs exceed a set amount, these models are intended to lead to higher quality, more coordinated care at a lower cost to the Medicare program. Hospitals may receive supplemental Medicare payments or owe repayments to CMS depending on whether overall CMS spending per episode exceeds or falls below a target specified by CMS and whether quality standards are met. The CMS Innovation Center has implemented bundled payment models, including the Bundled Payment Care Improvement Advanced program, which is voluntary and expected to run through December 2025. Participation in bundled payment programs is generally voluntary, but CMS required hospitals in selected geographic areas to participate in a mandatory bundled payment program for specified orthopedic procedures, which ended December 31, 2024. Hospitals in selected markets will be required to participate in a new model focused on five specified surgical procedure episodes beginning in January 2026.

By 2030, the CMS Innovation Center aims to have all fee-for-service Medicare beneficiaries and most Medicaid beneficiaries in a care relationship with accountability for quality and total cost of care. CMS also indicated it will streamline its payment model portfolio and consider how to ensure broad provider participation, including by

15

implementing more mandatory models. Several private third-party payers are increasingly employing alternative payment models, which may increasingly shift financial risk to providers.

*TRICARE*

TRICARE is the Department of Defense's health care program for members of the armed forces. For inpatient services, TRICARE reimburses hospitals based on a DRG system modeled on the Medicare inpatient PPS. For outpatient services, TRICARE reimburses hospitals based on a PPS that is similar to that utilized for outpatient services furnished to Medicare beneficiaries.

*Annual Cost Reports*

All hospitals, home health agencies, hospice providers and other institutional providers participating in the Medicare, Medicaid and TRICARE programs, whether paid on a reasonable cost basis or under a PPS, are required to meet certain financial reporting requirements. Federal and, where applicable, state regulations require the submission of annual cost reports covering the revenues, costs and expenses associated with the services provided by each provider type to Medicare beneficiaries and Medicaid recipients.

Annual cost reports required under the Medicare and Medicaid programs are subject to routine audits, which may result in adjustments to the amounts ultimately determined to be due to us under these reimbursement programs. These audits often require several years to reach the final determination of amounts due to or from us under these programs. Providers also have rights of appeal, and it is common to contest issues raised in audits of cost reports.

*Managed Care and Other Discounted Plans*

Most of our hospitals offer discounts from established charges to certain large group purchasers of health care services, including managed care plans and private health insurers. Admissions reimbursed by commercial managed care and other insurers were 32%, 30% and 30% of our total admissions for the years ended December 31, 2024, 2023 and 2022, respectively. Managed care contracts are typically negotiated for terms between one and three years. While we generally have received contracted annual increases to payment rates from managed care payers, there can be no assurance that we will continue to receive increases in the future. Price transparency initiatives may impact our relationships with payers and ability to obtain or maintain favorable contract terms. For example, hospitals are required to publish a list of their standard charges for all items and services, including gross charges, discounted cash prices and payer-specific and de-identified minimum and maximum negotiated charges, in a machine-readable, publicly accessible online file. Further, CMS requires most health insurers to publish online charges negotiated with providers for health care services.

*Uninsured and Self-Pay Patients*

Self-pay revenues are derived from providing health care services to patients without health insurance coverage and from the patient responsibility portion of payments for our health care services that are not covered by an individual's health plan. Collection of amounts due from individuals is typically more difficult than collection of amounts due from government health care programs or private third-party payers. Any increases in uninsured individuals, changes to the payer mix or greater adoption of health plan structures that result in higher patient responsibility amounts could increase amounts due from individuals. The No Surprises Act requires providers to provide uninsured and self-pay patients, in advance of the scheduled date for the item or service or upon request of the individual, a good faith estimate of the expected charges for furnishing scheduled items or services, including billing and diagnostic codes. HHS is delaying enforcement with regard to good faith estimates to uninsured individuals that do not include expected charges for co-providers or co-facilities until the agency issues additional regulations. If the actual charges to the uninsured or self-pay patient exceed the good faith estimate by an amount deemed to be substantial by regulation (which is currently $400) or the provider furnishes an item or service that was not included in the estimate, the patient can invoke a patient-provider dispute resolution process to challenge the higher amount.

A high percentage of our uninsured patients are initially admitted through our emergency rooms. For the year ended December 31, 2024, approximately 86% of our admissions of uninsured patients occurred through our emergency rooms. The Emergency Medical Treatment and Labor Act ("EMTALA") requires any hospital that participates in the Medicare program to conduct an appropriate medical screening examination of every person who presents to the hospital's emergency room for treatment and, if the individual is suffering from an emergency medical condition, to either stabilize that condition or make an appropriate transfer of the individual to a facility that can handle the condition. The obligation to screen and stabilize emergency medical conditions exists regardless of an individual's ability to pay for treatment. In addition, federal and some state laws require health insurers to reimburse hospitals for emergency services provided to enrollees without prior authorization and without regard to whether a participating provider contract is in place.

16

**Hospital Utilization**

We believe the most important factors relating to the overall utilization of a hospital are the quality and market position of the hospital and the number and quality of physicians and other health care professionals providing patient care within the facility. Generally, we believe the ability of a hospital to be a market leader is determined by its breadth of services, level of technology, quality and condition of the facilities, emphasis on quality of care and convenience for patients and physicians. Other factors that impact utilization include the growth in local population, local economic conditions and market penetration of managed care programs.

The following table sets forth certain operating statistics for our health care facilities. Health care facility operations are subject to certain seasonal fluctuations, including decreases in patient utilization during holiday periods and increases in the cold weather months.

| | 2024 | 2023 | 2022 |
|---|---|---|---|
| Number of hospitals at end of period | 190 | 186 | 182 |
| Number of freestanding outpatient surgery centers at end of period(a) | 124 | 124 | 126 |
| Number of licensed beds at end of period(b) | 49,985 | 49,588 | 49,281 |
| Weighted average beds in service(c) | 42,633 | 41,873 | 41,982 |
| Admissions(d) | 2,236,595 | 2,130,728 | 2,075,459 |
| Equivalent admissions(e) | 3,990,085 | 3,788,434 | 3,611,299 |
| Average length of stay (days)(f) | 4.8 | 4.9 | 5.1 |
| Average daily census(g) | 29,581 | 28,721 | 28,778 |
| Occupancy rate(h) | 73 % | 72 % | 72 % |
| Emergency room visits(i) | 9,789,265 | 9,342,783 | 8,971,951 |
| Outpatient surgeries(j) | 1,024,998 | 1,044,415 | 1,023,239 |
| Inpatient surgeries(k) | 540,704 | 528,845 | 522,151 |
| Days revenues in accounts receivable(l) | 54 | 53 | 53 |
| Outpatient revenues as a % of patient revenues(m) | 38 % | 38 % | 38 % |

---

(a) Excludes freestanding endoscopy centers (26 at December 31, 2024, 24 at December 31, 2023 and 21 at December 31, 2022).

(b) Licensed beds are those beds for which a facility has been granted approval to operate from the applicable state licensing agency.

(c) Represents the average number of beds in service, weighted based on periods owned.

(d) Represents the total number of patients admitted to our hospitals and is used by management and certain investors as a general measure of inpatient volume.

(e) Equivalent admissions are used by management and certain investors as a general measure of combined inpatient and outpatient volume. Equivalent admissions are computed by multiplying admissions (inpatient volume) by the sum of gross inpatient revenue and gross outpatient revenue and then dividing the resulting amount by gross inpatient revenue. The equivalent admissions computation "equates" outpatient revenue to the volume measure (admissions) used to measure inpatient volume, resulting in a general measure of combined inpatient and outpatient volume.

(f) Represents the average number of days admitted patients stay in our hospitals.

(g) Represents the average number of admitted patients in our hospital beds each day.

(h) Represents the percentage of hospital beds in service that are occupied by patients (admitted and observations). Both average daily census and occupancy rate provide measures of the utilization of inpatient rooms.

(i) Represents the number of patients treated in our emergency rooms.

(j) Represents the number of surgeries performed on patients who were not admitted to our hospitals. Pain management and endoscopy procedures are not included in outpatient surgeries.

(k) Represents the number of surgeries performed on patients who have been admitted to our hospitals. Pain management and endoscopy procedures are not included in inpatient surgeries.

(l) Revenues per day is calculated by dividing the revenues for the fourth quarter of each year by the days in the quarter. Days revenues in accounts receivable is then calculated as accounts receivable at the end of the period divided by revenues per day.

(m) Represents the percentage of patient revenues related to patients who are not admitted to our hospitals.

17

# EXHIBIT B



FOR IMMEDIATE RELEASE

**INVESTOR CONTACT:**
Frank Morgan
615-344-2688

**MEDIA CONTACT:**
Harlow Sumerford
615-344-1851

# HCA HEALTHCARE REPORTS SECOND QUARTER 2025 RESULTS RAISES 2025 GUIDANCE

**Nashville, Tenn., July 25, 2025 –** HCA Healthcare, Inc. (NYSE: HCA) today announced financial and operating results for the second quarter ended June 30, 2025.

**Key second quarter metrics** (all percentage changes compare 2Q 2025 to 2Q 2024 unless otherwise noted):

- *Revenues increased 6.4 percent to $18.605 billion*
- *Net income attributable to HCA Healthcare, Inc. increased 13.1 percent to $1.653 billion*
- *Diluted earnings per share increased 23.5 percent to $6.83 per diluted share, and diluted earnings per share, as adjusted, increased 24.4 percent to $6.84 per diluted share*
- *Adjusted EBITDA increased 8.4 percent to $3.849 billion*
- *Cash flows from operating activities totaled $4.210 billion, compared to $1.971 billion in the second quarter of 2024*
- *Same facility admissions increased 1.8 percent and same facility equivalent admissions increased 1.7 percent*

"We are pleased to report strong financial results for the second quarter. They reflected solid revenue growth, improved margins, and better outcomes for our patients. I want to thank our exceptional colleagues for their great work and continuous efforts to improve," said Sam Hazen, Chief Executive Officer of HCA Healthcare.

Revenues in the second quarter of 2025 totaled $18.605 billion, compared to $17.492 billion in the second quarter of 2024. Net income attributable to HCA Healthcare, Inc. totaled $1.653 billion, or $6.83 per diluted share, compared to $1.461 billion, or $5.53 per diluted share, in the second quarter of 2024. Results for the second quarter of 2025 include losses on sales of facilities of $3 million, or $0.01 per diluted share, compared to gains on sales of facilities of $12 million, or $0.03 per diluted share, in the second quarter of 2024.

For the second quarter of 2025, Adjusted EBITDA totaled $3.849 billion, compared to $3.550 billion in the second quarter of 2024. Diluted earnings per share, as adjusted, and Adjusted EBITDA are non-GAAP financial measures. A table providing supplemental information on these non-GAAP financial measures and reconciling GAAP measures of financial performance to them is included in this release.

Same facility admissions increased 1.8 percent and same facility equivalent admissions increased 1.7 percent in the second quarter of 2025, compared to the prior year period. Same facility emergency room visits increased 1.3 percent in the second quarter of 2025, compared to

the prior year period. Same facility inpatient surgeries declined 0.3 percent, and same facility outpatient surgeries declined 0.6 percent in the second quarter of 2025, compared to the same period of 2024. Same facility revenue per equivalent admission increased 4.0 percent in the second quarter of 2025, compared to the second quarter of 2024.

**Balance Sheet and Cash Flows from Operations**

As of June 30, 2025, HCA Healthcare, Inc.'s balance sheet reflected cash and cash equivalents of $939 million, total debt of $44.483 billion, and total assets of $59.536 billion. During the second quarter of 2025, capital expenditures totaled $1.176 billion, excluding acquisitions. Cash flows provided by operating activities in the second quarter of 2025 totaled $4.210 billion, compared to $1.971 billion in the second quarter of 2024.

During the second quarter of 2025, the Company repurchased 7.031 million shares of its common stock at a cost of $2.505 billion. The Company had $5.753 billion remaining under its repurchase authorization as of June 30, 2025. As of June 30, 2025, the Company had $6.208 billion of availability under its credit facility (after giving effect to letters of credit and amounts reserved to backstop our commercial paper program).

**Dividend**

HCA today announced that its Board of Directors declared a quarterly cash dividend of $0.72 per share on the Company's common stock. The dividend will be paid on September 30, 2025 to stockholders of record at the close of business on September 16, 2025.

The declaration and payment of any future dividend will be subject to the discretion of the Board of Directors and will depend on a variety of factors, including the Company's financial condition and results of operations. Future dividends are expected to be funded by cash balances and future cash flows from operations.

**2025 Guidance Update**

Today, the Company is updating its 2025 estimated guidance ranges issued on January 24, 2025.

| | Previous 2025 Guidance Range, as of January 24, 2025 | Revised 2025 Guidance Range, as of July 25, 2025 |
|---|---|---|
| Revenues | $72.80 to $75.80 billion | $74.00 to $76.00 billion |
| Net Income Attributable to HCA Healthcare, Inc. | $5.85 to $6.29 billion | $6.11 to $6.48 billion |
| Adjusted EBITDA | $14.30 to $15.10 billion | $14.70 to $15.30 billion |
| EPS (diluted) | $24.05 to $25.85 per diluted share | $25.50 to $27.00 per diluted share |

Capital expenditures for 2025, excluding acquisitions, are estimated to be approximately $5.0 billion.

The Company's guidance contains a number of assumptions, including, among others, the Company's current expectations regarding volume growth coupled with an anticipated mostly stable operating environment, payer mix, the ongoing impacts of the two major 2024 hurricanes, the impact of current and future health care public policy developments, as well as general business or economic conditions, including inflation, and the impact of trade policies, including tariffs, and excludes the impact of items such as, but not limited to, gains or losses on sales of facilities, losses on retirement of debt, legal claims costs and impairment of long-lived assets.

Adjusted EBITDA is a non-GAAP financial measure. A table reconciling forecasted net income attributable to HCA Healthcare, Inc. to forecasted Adjusted EBITDA is included in this release.

The Company's guidance is based on current plans and expectations and are subject to a number of known and unknown uncertainties and risks, including those set forth below in the Company's "Forward-Looking Statements."

**Earnings Conference Call**

HCA Healthcare will host a conference call for investors at 9:00 a.m. Central Time today. All interested investors are invited to access a live audio broadcast of the call via webcast. The broadcast also will be available on a replay basis beginning this afternoon. The webcast can be accessed through the Company's Investor Relations web page at

https://investor.hcahealthcare.com/events-and-presentations/default.aspx.

**About the Company**

As of June 30, 2025, HCA operated 191 hospitals and approximately 2,500 ambulatory sites of care, including surgery centers, freestanding emergency rooms, urgent care centers and physician clinics, in 20 states and the United Kingdom.

**Forward-Looking Statements**

This press release contains forward-looking statements within the meaning of the federal securities laws, which involve risks and uncertainties. Forward-looking statements include the Company's financial guidance for the year ending December 31, 2025, as well as other statements that do not relate solely to historical or current facts. Forward-looking statements can be identified by the use of words like "may," "believe," "will," "expect," "project," "estimate," "anticipate," "plan," "initiative" or "continue." These forward-looking statements are based on our current plans and expectations and are subject to a number of known and unknown uncertainties and risks, many of which are beyond our control, which could significantly affect current plans and expectations and our future financial position and results of operations. These factors include, but are not limited to, (1) changes in or related to general economic or business conditions nationally and regionally in our markets, including inflation, and the impact of trade policies, including changes in, or the imposition of, tariffs and/or trade barriers; changes in revenues resulting from declining patient volumes; changes in payer mix (including increases in uninsured and underinsured patients); potential increased expenses related to labor, pharmaceuticals, supply chain or other expenditures; workforce disruptions; supply and pharmaceutical shortages and disruptions (including as a result of tariffs or geopolitical disruptions); and the impact of potential federal government shutdowns, holds on or cancellations of congressionally authorized spending and interruptions in the distribution of governmental funds, (2) the impact of current and future health care public policy developments and the implementation of new, and possible changes to existing, federal, state or local laws and regulations affecting the health care industry, including the expiration of enhanced premium tax credits ("EPTCs") for individuals eligible to purchase insurance coverage through federal and state-based health insurance marketplaces, changes in the structure and administration of, and funding for, federal and state agencies and programs, and effects of the One Big Beautiful Bill Act ("OBBBA"), (3) the impact of our significant indebtedness and the ability to refinance such indebtedness on acceptable terms, (4) the effects related to the implementation of sequestration spending reductions required under the Budget Control Act of 2011, related legislation extending these reductions, and those that may be required under the Pay-As-You-Go Act of 2010 as a result of the federal budget deficit impact of OBBBA, and the potential for future

3

deficit reduction legislation that may alter these spending reductions, which include cuts to Medicare payments, or create additional spending reductions, (5) the ability to achieve operating and financial targets, develop and execute resiliency plans to offset to the extent possible impacts from OBBBA, the scheduled expiration of EPTCs and tariffs, attain expected levels of patient volumes and revenues, and control the costs of providing services, (6) possible reductions or other changes in Medicare, Medicaid and other state programs, including Medicaid supplemental payment programs, Medicaid waiver programs and state directed payment arrangements, any of which may negatively impact reimbursements to health care providers and insurers and the size of the uninsured or underinsured population, (7) increases in the amount and risk of collectability of uninsured accounts and deductibles and copayment amounts for insured accounts, (8) personnel-related capacity constraints, increases in wages and the ability to attract, utilize and retain qualified management and other personnel, including affiliated physicians, nurses and medical and technical support personnel, (9) the highly competitive nature of the health care business, (10) changes in service mix, revenue mix and surgical volumes, including potential declines in the population covered under third-party payer agreements, the ability to enter into and renew third-party payer provider agreements on acceptable terms and the impact of consumer-driven health plans and physician utilization trends and practices, (11) the efforts of health insurers, health care providers, large employer groups and others to contain health care costs, (12) the outcome of our continuing efforts to monitor, maintain and comply with appropriate laws, regulations, policies and procedures, (13) the availability and terms of capital to fund the expansion of our business and improvements to our existing facilities, (14) changes in accounting practices, (15) the emergence of and effects related to pandemics, epidemics and outbreaks of infectious diseases or other public health crises, (16) future divestitures which may result in charges and possible impairments of long-lived assets, (17) changes in business strategy or development plans, (18) delays in receiving payments for services provided, (19) the outcome of pending and any future tax audits, disputes and litigation associated with our tax positions, (20) the impact of known and unknown government investigations, litigation and other claims that may be made against us, (21) the impact of actual and potential cybersecurity incidents or security breaches involving us or our vendors and other third parties, (22) our ongoing ability to demonstrate meaningful use of certified electronic health record technology and the impact of interoperability requirements, (23) the impact of natural disasters, such as hurricanes and floods, including Hurricanes Milton and Helene, physical risks from changing global weather patterns or similar events beyond our control on our assets and activities and the communities we serve, (24) changes in U.S. federal, state, or foreign tax laws, interpretations of tax laws by taxing authorities, other standard setting bodies or judicial decisions, (25) the results of our efforts to use technology and resilience initiatives, including artificial intelligence and machine learning, to drive efficiencies, better outcomes and an enhanced patient experience and (26) other risk factors described in our annual report on Form 10-K for the year ended December 31, 2024 and our other filings with the Securities and Exchange Commission. Many of the factors that will determine our future results are beyond our ability to control or predict. In light of the significant uncertainties inherent in the forward-looking statements contained herein, readers should not place undue reliance on forward-looking statements, which reflect management's views only as of the date hereof. We undertake no obligation to revise or update any forward-looking statements, or to make any other forward-looking statements, whether as a result of new information, future events or otherwise. All references to "Company," "HCA" and "HCA Healthcare" as used throughout this release refer to HCA Healthcare, Inc. and its affiliates.

**HCA Healthcare, Inc.**
**Condensed Consolidated Comprehensive Income Statements**
**Second Quarter**
**Unaudited**
**(Dollars in millions, except per share amounts)**

| | 2025 | | 2024 | |
|---|---|---|---|---|
| | Amount | Ratio | Amount | Ratio |
| Revenues | $ 18,605 | 100.0 % | $ 17,492 | 100.0 % |
| | | | | |
| Salaries and benefits | 8,138 | 43.7 | 7,685 | 43.9 |
| Supplies | 2,844 | 15.3 | 2,634 | 15.1 |
| Other operating expenses | 3,793 | 20.4 | 3,623 | 20.7 |
| Equity in earnings of affiliates | (19) | (0.1) | — | — |
| Depreciation and amortization | 863 | 4.7 | 819 | 4.7 |
| Interest expense | 568 | 3.0 | 506 | 2.9 |
| Losses (gains) on sales of facilities | 3 | — | (12) | (0.1) |
| | 16,190 | 87.0 | 15,255 | 87.2 |
| | | | | |
| Income before income taxes | 2,415 | 13.0 | 2,237 | 12.8 |
| | | | | |
| Provision for income taxes | 524 | 2.8 | 550 | 3.2 |
| | | | | |
| Net income | 1,891 | 10.2 | 1,687 | 9.6 |
| | | | | |
| Net income attributable to noncontrolling interests | 238 | 1.3 | 226 | 1.2 |
| | | | | |
| Net income attributable to HCA Healthcare, Inc. | $ 1,653 | 8.9 | $ 1,461 | 8.4 |
| | | | | |
| Diluted earnings per share | $ 6.83 | | $ 5.53 | |
| | | | | |
| Shares used in computing diluted earnings per share (millions) | 241.911 | | 264.071 | |
| | | | | |
| Comprehensive income attributable to HCA Healthcare, Inc. | $ 1,701 | | $ 1,461 | |

5

**HCA Healthcare, Inc.**
**Condensed Consolidated Comprehensive Income Statements**
**For the Six Months Ended June 30, 2025 and 2024**
**Unaudited**
**(Dollars in millions, except per share amounts)**

| | 2025 | | 2024 | |
| --- | --- | --- | --- | --- |
| | Amount | Ratio | Amount | Ratio |
| Revenues | $ 36,926 | 100.0 % | $ 34,831 | 100.0 % |
| | | | | |
| Salaries and benefits | 16,135 | 43.7 | 15,392 | 44.2 |
| Supplies | 5,608 | 15.2 | 5,305 | 15.2 |
| Other operating expenses | 7,638 | 20.7 | 7,229 | 20.8 |
| Equity in (earnings) losses of affiliates | (37) | (0.1) | 2 | — |
| Depreciation and amortization | 1,723 | 4.7 | 1,614 | 4.6 |
| Interest expense | 1,115 | 3.0 | 1,018 | 2.9 |
| Losses (gains) on sales of facilities | 2 | — | (213) | (0.6) |
| | 32,184 | 87.2 | 30,347 | 87.1 |
| Income before income taxes | 4,742 | 12.8 | 4,484 | 12.9 |
| Provision for income taxes | 1,026 | 2.7 | 995 | 2.9 |
| Net income | 3,716 | 10.1 | 3,489 | 10.0 |
| Net income attributable to noncontrolling interests | 453 | 1.3 | 437 | 1.2 |
| Net income attributable to HCA Healthcare, Inc. | $ 3,263 | 8.8 | $ 3,052 | 8.8 |
| Diluted earnings per share | $ 13.28 | | $ 11.47 | |
| Shares used in computing diluted earnings per share (millions) | 245.654 | | 266.044 | |
| Comprehensive income attributable to HCA Healthcare, Inc. | $ 3,341 | | $ 3,044 | |

## HCA Healthcare, Inc.
## Condensed Consolidated Balance Sheets
## Unaudited
## (Dollars in millions)

| | June 30, 2025 | March 31, 2025 | December 31, 2024 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 939 | $ 1,060 | $ 1,933 |
| Accounts receivable | 10,459 | 11,088 | 10,751 |
| Inventories | 1,792 | 1,794 | 1,738 |
| Other | 2,373 | 2,316 | 1,992 |
| | 15,563 | 16,258 | 16,414 |
| | | | |
| Property and equipment, at cost | 64,388 | 63,680 | 62,514 |
| Accumulated depreciation | (34,265) | (33,942) | (33,100) |
| | 30,123 | 29,738 | 29,414 |
| | | | |
| Investments of insurance subsidiaries | 531 | 550 | 569 |
| Investments in and advances to affiliates | 654 | 657 | 662 |
| Goodwill and other intangible assets | 10,273 | 10,237 | 10,093 |
| Right-of-use operating lease assets | 2,156 | 2,132 | 2,131 |
| Other | 236 | 226 | 230 |
| | $ 59,536 | $ 59,798 | $ 59,513 |
| | | | |
| **LIABILITIES AND STOCKHOLDERS' (DEFICIT) EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 4,250 | $ 4,488 | $ 4,276 |
| Accrued salaries | 2,072 | 1,857 | 2,304 |
| Other accrued expenses | 4,513 | 3,767 | 3,899 |
| Short-term borrowings and long-term debt due within one year | 5,104 | 3,519 | 4,698 |
| | 15,939 | 13,631 | 15,177 |
| | | | |
| Long-term debt, less debt issuance costs and discounts of $429, $432 and $369 | 39,379 | 41,057 | 38,333 |
| Professional liability risks | 1,506 | 1,497 | 1,544 |
| Right-of-use operating lease obligations | 1,881 | 1,860 | 1,863 |
| Income taxes and other liabilities | 2,069 | 2,191 | 2,041 |
| | | | |
| Stockholders' (deficit) equity: | | | |
| Stockholders' deficit attributable to HCA Healthcare, Inc. | (4,394) | (3,519) | (2,499) |
| Noncontrolling interests | 3,156 | 3,081 | 3,054 |
| | (1,238) | (438) | 555 |
| | $ 59,536 | $ 59,798 | $ 59,513 |

7

**HCA Healthcare, Inc.**
**Condensed Consolidated Statements of Cash Flows**
**For the Six Months Ended June 30, 2025 and 2024**
**Unaudited**
**(Dollars in millions)**

|  | 2025 | 2024 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income | $ 3,716 | $ 3,489 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Increase (decrease) in cash from operating assets and liabilities: | | |
| Accounts receivable | 320 | (285) |
| Inventories and other assets | (427) | (68) |
| Accounts payable and accrued expenses | (676) | (459) |
| Depreciation and amortization | 1,723 | 1,614 |
| Income taxes | 880 | (4) |
| Losses (gains) on sales of facilities | 2 | (213) |
| Amortization of debt issuance costs and discounts | 25 | 17 |
| Share-based compensation | 197 | 199 |
| Other | 101 | 150 |
| Net cash provided by operating activities | 5,861 | 4,440 |
| | | |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (2,167) | (2,399) |
| Acquisition of hospitals and health care entities | (326) | (131) |
| Sales of hospitals and health care entities | 167 | 311 |
| Change in investments | 41 | (14) |
| Other | 2 | (2) |
| Net cash used in investing activities | (2,283) | (2,235) |
| | | |
| Cash flows from financing activities: | | |
| Issuances of long-term debt | 5,233 | 4,483 |
| Net change in short-term borrowings and revolving credit facilities | 1,768 | (1,030) |
| Repayment of long-term debt | (5,660) | (2,269) |
| Distributions to noncontrolling interests | (394) | (338) |
| Payment of debt issuance costs | (57) | (40) |
| Payment of dividends | (351) | (356) |
| Repurchase of common stock | (5,011) | (2,547) |
| Other | (112) | (212) |
| Net cash used in financing activities | (4,584) | (2,309) |
| | | |
| Effect of exchange rate changes on cash and cash equivalents | 12 | - |
| | | |
| Change in cash and cash equivalents | (994) | (104) |
| Cash and cash equivalents at beginning of period | 1,933 | 935 |
| | | |
| Cash and cash equivalents at end of period | $ 939 | $ 831 |
| | | |
| Interest payments | $ 1,074 | $ 943 |
| Income tax payments, net | $ 146 | $ 999 |

**HCA Healthcare, Inc.**
**Operating Statistics**

| | Second Quarter | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| **Operations:** | | | | |
| Number of Hospitals | 191 | 188 | 191 | 188 |
| Number of Freestanding Outpatient Surgery Centers* | 124 | 123 | 124 | 123 |
| Licensed Beds at End of Period | 50,485 | 49,844 | 50,485 | 49,844 |
| Weighted Average Beds in Service | 42,858 | 42,624 | 42,860 | 42,594 |
| **Reported:** | | | | |
| Admissions | 566,061 | 554,456 | 1,142,422 | 1,115,325 |
| % Change | 2.1% | | 2.4% | |
| Equivalent Admissions | 1,017,994 | 994,835 | 2,030,084 | 1,976,356 |
| % Change | 2.3% | | 2.7% | |
| Revenue per Equivalent Admission | $ 18,276 | $ 17,583 | $ 18,189 | $ 17,624 |
| % Change | 3.9% | | 3.2% | |
| Inpatient Revenue per Admission | $ 19,656 | $ 18,814 | $ 19,501 | $ 18,869 |
| % Change | 4.5% | | 3.3% | |
| Patient Days | 2,675,284 | 2,662,550 | 5,511,900 | 5,444,146 |
| % Change | 0.5% | | 1.2% | |
| Equivalent Patient Days | 4,813,548 | 4,779,234 | 9,794,646 | 9,647,027 |
| % Change | 0.7% | | 1.5% | |
| Inpatient Surgery Cases | 136,122 | 135,860 | 269,881 | 269,258 |
| % Change | 0.2% | | 0.2% | |
| Outpatient Surgery Cases | 258,365 | 258,967 | 504,985 | 511,802 |
| % Change | -0.2% | | -1.3% | |
| Emergency Room Visits | 2,439,763 | 2,414,960 | 4,958,479 | 4,843,874 |
| % Change | 1.0% | | 2.4% | |
| Outpatient Revenues as a Percentage of Patient Revenues | 38.4% | 38.2% | 37.9% | 37.6% |
| Average Length of Stay (days) | 4.726 | 4.802 | 4.825 | 4.881 |
| Occupancy** | 72.0% | 71.9% | 74.4% | 73.6% |
| **Same Facility:** | | | | |
| Admissions | 556,544 | 546,945 | 1,123,176 | 1,098,367 |
| % Change | 1.8% | | 2.3% | |
| Equivalent Admissions | 990,092 | 973,562 | 1,974,543 | 1,930,929 |
| % Change | 1.7% | | 2.3% | |
| Revenue per Equivalent Admission | $ 18,110 | $ 17,408 | $ 18,080 | $ 17,456 |
| % Change | 4.0% | | 3.6% | |
| Inpatient Revenue per Admission | $ 19,576 | $ 18,741 | $ 19,470 | $ 18,800 |
| % Change | 4.5% | | 3.6% | |
| Inpatient Surgery Cases | 134,307 | 134,662 | 266,330 | 266,321 |
| % Change | -0.3% | | 0.0% | |
| Outpatient Surgery Cases | 253,006 | 254,599 | 495,316 | 502,037 |
| % Change | -0.6% | | -1.3% | |
| Emergency Room Visits | 2,401,684 | 2,370,754 | 4,868,579 | 4,741,737 |
| % Change | 1.3% | | 2.7% | |

\* Excludes freestanding endoscopy centers (29 centers at June 30, 2025 and 23 centers at June 30, 2024).
\*\* Reflects the rate of occupancy (patient days and observations) based on weighted average beds in service.

**HCA Healthcare, Inc.**
**Supplemental Non-GAAP Disclosures**
**Operating Results Summary**
**(Dollars in millions, except per share amounts)**

|  | Second Quarter | | | | For the Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
|  | 2025 | | 2024 | | 2025 | | 2024 | |
| Revenues | $ | 18,605 | $ | 17,492 | $ | 36,926 | $ | 34,831 |
|  |  |  |  |  |  |  |  |  |
| Net income attributable to HCA Healthcare, Inc. | $ | 1,653 | $ | 1,461 | $ | 3,263 | $ | 3,052 |
| Losses (gains) on sales of facilities (net of tax) |  | 3 |  | (9) |  | 2 |  | (163) |
| Net income attributable to HCA Healthcare, Inc., as adjusted (a) |  | 1,656 |  | 1,452 |  | 3,265 |  | 2,889 |
| Depreciation and amortization |  | 863 |  | 819 |  | 1,723 |  | 1,614 |
| Interest expense |  | 568 |  | 506 |  | 1,115 |  | 1,018 |
| Provision for income taxes |  | 524 |  | 547 |  | 1,026 |  | 945 |
| Net income attributable to noncontrolling interests |  | 238 |  | 226 |  | 453 |  | 437 |
|  |  |  |  |  |  |  |  |  |
| Adjusted EBITDA (a) |  | 3,849 | $ | 3,550 | $ | 7,582 | $ | 6,903 |
|  |  |  |  |  |  |  |  |  |
| Adjusted EBITDA margin (a) |  | 20.7% |  | 20.3% |  | 20.5% |  | 19.8% |
|  |  |  |  |  |  |  |  |  |
| Diluted earnings per share: |  |  |  |  |  |  |  |  |
| Net income attributable to HCA Healthcare, Inc. | $ | 6.83 | $ | 5.53 | $ | 13.28 | $ | 11.47 |
| Losses (gains) on sales of facilities |  | 0.01 |  | (0.03) |  | 0.01 |  | (0.61) |
| Net income attributable to HCA Healthcare, Inc., as adjusted (a) | $ | 6.84 | $ | 5.50 | $ | 13.29 | $ | 10.86 |
|  |  |  |  |  |  |  |  |  |
| Shares used in computing diluted earnings per share (millions) |  | 241.911 |  | 264.071 |  | 245.654 |  | 266.044 |

(a)  Net income attributable to HCA Healthcare, Inc., as adjusted, diluted earnings per share, as adjusted, and Adjusted EBITDA should not be considered as measures of financial performance under generally accepted accounting principles ("GAAP"). These non-GAAP financial measures are adjusted to exclude losses (gains) on sales of facilities and losses on retirement of debt. We believe net income attributable to HCA Healthcare, Inc., as adjusted, diluted earnings per share, as adjusted, and Adjusted EBITDA are important measures that supplement discussions and analysis of our results of operations. We believe it is useful to investors to provide disclosures of our results of operations on the same basis used by management. Management relies upon net income attributable to HCA Healthcare, Inc., as adjusted, diluted earnings per share, as adjusted, and Adjusted EBITDA as the primary measures to review and assess operating performance of its health care facilities and their management teams.

Management and investors review both the overall performance (including net income attributable to HCA Healthcare, Inc., as adjusted, diluted earnings per share, as adjusted, and GAAP net income attributable to HCA Healthcare, Inc.) and operating performance (Adjusted EBITDA) of our health care facilities. Adjusted EBITDA and the Adjusted EBITDA margin (Adjusted EBITDA divided by revenues) are utilized by management and investors to compare our current operating results with the corresponding periods during the previous year and to compare our operating results with other companies in the health care industry. It is reasonable to expect that adjustments, including losses (gains) on sales of facilities and losses on retirement of debt will occur in future periods, but the amounts recognized can vary significantly from period to period, do not directly relate to the ongoing operations of our health care facilities and complicate period comparisons of our results of operations and operations comparisons with other health care companies.

Net income attributable to HCA Healthcare, Inc., as adjusted, diluted earnings per share, as adjusted, and Adjusted EBITDA are not measures of financial performance under GAAP, and should not be considered as alternatives to net income attributable to HCA Healthcare, Inc. as a measure of operating performance or cash flows from operating, investing and financing activities as a measure of liquidity. Because net income attributable to HCA Healthcare, Inc., as adjusted, diluted earnings per share, as adjusted, and Adjusted EBITDA are not measurements determined in accordance with GAAP and are susceptible to varying calculations, net income attributable to HCA Healthcare, Inc., as adjusted, diluted earnings per share, as adjusted, and Adjusted EBITDA, as presented, may not be comparable to other similarly titled measures presented by other companies.

**HCA Healthcare, Inc.**
**Supplemental Non-GAAP Disclosures**
**2025 Operating Results Forecast**
**(Dollars in millions, except per share amounts)**

| | For the Year Ending December 31, 2025 | |
| | Low | High |
|---|---|---|
| Revenues | $ 74,000 | $ 76,000 |
| | | |
| Net income attributable to HCA Healthcare, Inc. (a) | $ 6,110 | $ 6,480 |
| Depreciation and amortization | 3,450 | 3,495 |
| Interest expense | 2,250 | 2,300 |
| Provision for income taxes | 1,930 | 2,035 |
| Net income attributable to noncontrolling interests | 960 | 990 |
| | | |
| Adjusted EBITDA (a) (b) | $ 14,700 | $ 15,300 |
| | | |
| Diluted earnings per share: | | |
| Net income attributable to HCA Healthcare, Inc. | $ 25.50 | $ 27.00 |
| | | |
| Shares used in computing diluted earnings per share (millions) | 240.000 | 240.000 |

The Company's forecasted guidance is based on current plans and expectations and is subject to a number of known and unknown uncertainties and risks.

(a) The Company does not forecast the impact of items such as, but not limited to, losses (gains) on sales of facilities, losses on retirement of debt, legal claim costs (benefits) and impairments of long-lived assets because the Company does not believe that it can forecast these items with sufficient accuracy.

(b) Adjusted EBITDA should not be considered a measure of financial performance under generally accepted accounting principles ("GAAP"). We believe Adjusted EBITDA is an important measure that supplements discussions and analysis of our results of operations. We believe it is useful to investors to provide disclosures of our results of operations on the same basis used by management. Management relies upon Adjusted EBITDA as a primary measure to review and assess operating performance of its health care facilities and their management teams.

Management and investors review both the overall performance (including net income attributable to HCA Healthcare, Inc.) and operating performance (Adjusted EBITDA) of our healthcare facilities. Adjusted EBITDA is utilized by management and investors to compare our current operating results with the corresponding periods during the previous year and to compare our operating results with other companies in the health care industry.

Adjusted EBITDA is not a measure of financial performance under GAAP and should not be considered as an alternative to net income attributable to HCA Healthcare, Inc. as a measure of operating performance or cash flows from operating, investing and financing activities as a measure of liquidity. Because Adjusted EBITDA is not a measurement determined in accordance with GAAP and is susceptible to varying calculations, Adjusted EBITDA, as presented, may not be comparable to other similarly titled measures presented by other companies.

# EXHIBIT C

## My Health Records

| Condition | Provider | Facility | Date |
|---|---|---|---|
| Essential (primary) hypertension | LEO CAPOBIANCO | | 6/30/2025 |
| Borderline personality disorder | LEO CAPOBIANCO | | 6/30/2025 |
| Seizure disorder | Andrea Castillo | | 6/30/2025 |
| Bipolar disorder, unspecified | LEO CAPOBIANCO | | 6/30/2025 |
| Need for assistance at home and no other household member able to render care | LEO CAPOBIANCO | | 6/30/2025 |
| Unspecified convulsions | PAUL JANDA | | 6/30/2025 |
| Seizure disorder | Andrea Castillo | | 6/30/2025 |
| BIPOLAR DISORDER UNSPECIFIED | | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| OTHER SEIZURES | | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| ESSENTIAL (PRIMARY) HYPERTENSION | | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| TRANSSEXUALISM | | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| HYPERLIPIDEMIA UNSPECIFIED | | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| Chronic pulmonary embolism (disorder) | Jonathan Yaghoobian | | 6/28/2025 |
| EXPOSURE TO OTHER SPECIFIED FACTORS INI | | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| PERSONAL HISTORY OF SUICIDAL BEHAVIOR | | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |

Chat With Us

My Health Records

| Condition | Provider/Facility | Date |
|---|---|---|
| SCHIZOAFFECTIVE DISORDER UNSPECIFIED | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| Seizure (finding) | Jonathan Yaghoobian | 6/28/2025 |
| Seizure (finding) | Jonathan Yaghoobian | 6/28/2025 |
| LONG TERM (CURRENT) USE OF INSULIN | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| PERSONAL HISTORY OF OTHER VENOUS THROMBO | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| PERSONAL HISTORY OF OTHER MENTAL AND BEH | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| CONVERSION DISORDER WITH SEIZURES OR CON | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| Essential hypertension (disorder) | Jonathan Yaghoobian | 6/28/2025 |
| DIFFUSE TBI WITH LOC STATUS UNKNOWN INI | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| LONG TERM (CURRENT) USE OF ANTICOAGULANT | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| HYPERTENSIVE URGENCY | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| GENERALIZED ANXIETY DISORDER | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| CHRONIC PULMONARY EMBOLISM | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| Dissociative neurological symptom disorder (disorder) | Jonathan Yaghoobian | 6/28/2025 |
| I KEEP HAVING SEIZURES | Jonathan Yaghoobian | 6/28/2025 |

Chat With Us

10/25/25, 9:36 AM

My Health Records

| Condition | Provider | Date |
|---|---|---|
| Bipolar disorder, current episode manic severe with psychotic features | STEPHANIE RIDEOUT | 6/28/2025 |
| Chronic pulmonary embolism | Southern Hills Hospital Medical Center | 6/28/2025 |
| TYPE 2 DIABETES MELLITUS WITH HYPERGLYCE | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| ATTENTION-DEFICIT HYPERACTIVITY DISORDER | SOUTHERN HILLS HOSP & MEDCTR-LAS VEGAS | 6/28/2025 |
| Epilepsy, unspecified, not intractable, without status epilepticus | CYNDI TRAN | 6/28/2025 |
| Unspecified convulsions | BRENT WRIGHT | 6/28/2025 |
| Post-traumatic headache, unspecified, not intractable | CYNDI TRAN | 6/28/2025 |
| Unspecified injury of head, initial encounter | BRIAN ELLISON | 6/28/2025 |
| Dissociative identity disorder | STEPHANIE RIDEOUT | 6/28/2025 |
| Attention-deficit hyperactivity disorder, unspecified type | CYNDI TRAN | 6/28/2025 |
| Other pulmonary embolism without acute cor pulmonale | CYNDI TRAN | 6/28/2025 |
| Unspecified intracranial injury with loss of consciousness status unknown, initial encounter | CYNDI TRAN | 6/28/2025 |
| Essential (primary) hypertension | SALMAN AKHTAR | 6/26/2025 |
| Bipolar disorder, current episode manic severe with psychotic features | STEPHANIE RIDEOUT | 6/25/2025 |
| Borderline personality disorder | SAMANTHA ROTH | 6/25/2025 |

Chat With Us

https://membersecure.anthem.com/member/my-health-records#health-conditions

# EXHIBIT G

1    **DECLARATION OF WITNESS**

2    **Re: Observations of Jade Riley Burch Post-Discharge**

3    **Facility: MountainView Hospital – March 24, 2025**

4    I, **Melissa Ryan**, declare under penalty of perjury that the following is true and based on my own

5    personal knowledge:

6    1. I am an adult resident of Las Vegas, Nevada. I am the mother of Porscha Ryan, who was

7        hospitalized at MountainView Hospital on or around March 23, 2025.

8    2. On or around March 24, 2025, I personally observed Jade Riley Burch shortly after she

9        had been discharged from MountainView Hospital, a facility operated by HCA

10       Healthcare.

11   3. When I saw Jade, she appeared **heavily sedated, slow to speak, and visibly impaired**.

12       Her body language, responses, and overall presentation gave me immediate concern. She

13       seemed unaware of her surroundings, confused, and unable to engage in meaningful

14       conversation. Her eyes were unfocused, and her speech was slurred. She appeared to be

15       under the influence of strong sedatives or psychiatric medications.

16   4. I was told that Jade had been discharged from the hospital that same morning. I was

17       shocked that she had been released in that condition, with no medical escort or clear plan

18       for supervision.

19   5. Jade told me that she had taken an Uber home after her discharge. She could not recall

20       how she arranged for it and expressed confusion about what had happened between

21       leaving the hospital and arriving home. I later confirmed that an Uber charge had been

22       posted to her account, consistent with her statement.

1

23    6. Based on my direct observation of her condition, it is my strong belief that Jade should

24       **not** have been discharged without supervision, follow-up planning, or a cognitive

25       evaluation. She was clearly unable to safely care for herself at the time and appeared

26       medically compromised.

27    7. This situation was especially disturbing given that my daughter Porscha had just been

28       admitted to the ICU the day before after suffering a grand mal seizure at the same

29       hospital. Jade had witnessed that event and stayed to support her. For both of them to be

30       medically harmed by the same facility within the same 24-hour period is alarming.

31    8. I submit this sworn declaration voluntarily to support Jade Riley Burch's legal claims

32       against HCA Healthcare and Mountain View Hospital. I do so based on what I personally

33       observed and verified, and because I believe this was a clear case of medical negligence,

34       improper discharge, and disregard for patient safety.

35    _____

36    **Executed this** 5th**day of** Sept **, 2025, in Las Vegas, Nevada.**

37    Signature of Declarant: _____

38    Printed Name: **Melissa Ryan**

39    _____

40    **NOTARY ACKNOWLEDGMENT – STATE OF NEVADA**

41    **State of Nevada**

42    **County of** Clark

43   On this __5th__ day of __September__ 2025, before me, the undersigned Notary Public, personally

44   appeared **Melissa Ryan,** known to me or satisfactorily proven to be the person whose name is

45   subscribed to the foregoing declaration, and acknowledged that she executed it for the purposes

46   stated therein.

47   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal.

48   Notary Public Signature: _____

49   Printed Name: __K. Bayard__

50   My Commission Expires: __4/15/2028__

K. BAYARD
Notary Public, State of Nevada
Appointment No. 16-2097-1
My Appt. Expires Apr 15, 2028

51