Jade Riley Burch
Plaintiff, Pro Se
222 Karen Avenue, Unit 1207
Las Vegas, NV 89109
Tel: (614) 725-9452
Email: jaderburch@gmail.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Jade Riley Burch,

         Plaintiff.

vs.

HCA Healthcare, Inc., et al.,

         Defendants.

Case No.: 2:25-cv-01408-JAD-MDC

**MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

       Plaintiff Jade Riley Burch, proceeding pro se, respectfully moves this Court for leave to file a Second Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(2). The proposed Second Amended Complaint is attached as Exhibit A. In support, Plaintiff states as follows:

## I. PROCEDURAL BACKGROUND

1. Plaintiff filed the original Complaint on August 4, 2025 (ECF 1). Plaintiff filed the First Amended Complaint as of right on August 8, 2025 (ECF 9).

2. Defendants filed Motions to Dismiss on September 30, 2025 (ECF 50, 51). Those motions are fully briefed and pending. Plaintiff's Motion to Strike New Evidence in Defendants' Reply or, Alternatively, for Leave to File a Limited Sur-Reply (ECF 59) remains pending.

3. The Scheduling Order (ECF 71), adopting the parties' proposed discovery plan (ECF 70), sets the deadline to amend pleadings or add parties at 90 days before the discovery cutoff. With discovery cutoff on December 18, 2026, the amendment deadline is approximately September 19, 2026.

4. On February 3, 2026, Plaintiff filed a Notice of Intent to File Second Amended Complaint (ECF 72), informing the Court and all parties that she intended to seek leave to amend on or before February 21, 2026.

5. After the Rule 26(f) conference (ECF 69) and entry of the Scheduling Order (ECF 71), Plaintiff received materials produced by Defendants in discovery, including certified record productions, that materially inform the proposed amendments.

## II. LEGAL STANDARD

Under Rule 15(a)(2), courts "should freely give leave when justice so requires." The Ninth Circuit applies this standard liberally. Leave to amend should be granted unless the amendment would cause undue delay, bad faith, undue prejudice to the opposing party, futility of amendment, or the plaintiff has previously failed to cure deficiencies. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Because this motion is filed within the Scheduling Order's amendment deadline, Rule 16(b)(4) does not apply. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992).

/

/

/

### III. AMENDMENT IS PROPER

**A. No Undue Delay**

The amendment is timely. The scheduling order's amendment deadline is approximately September 19, 2026. This motion is filed seven months before that deadline. Plaintiff filed her Notice of Intent on February 3, 2026 (ECF 72) and now files within the timeframe she indicated to the Court. Defendants have been on notice since February 3, 2026 (ECF 72) that Plaintiff would seek leave to amend, eliminating any claim of surprise. Discovery commenced only after the Scheduling Order entered on January 13, 2026. No depositions have been taken. No trial date has been set.

**B. No Bad Faith**

The amendments are based on factual development arising from Defendants' own certified litigation productions, initial disclosures, and the Rule 26(f) conference conducted December 18, 2025. The proposed SAC does not assert frivolous claims or seek to harass.

**C. No Undue Prejudice**

Defendants will not be prejudiced. The case is in early discovery. No depositions have been taken. No trial date exists. Defendants will have full opportunity to respond to the proposed SAC. To the extent Defendants have invested in briefing the pending Motions to Dismiss, that investment was directed at the First Amended Complaint, and Defendants always face the possibility that an operative complaint will be superseded by amendment. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1546 (9th Cir. 1989). Any additional briefing is a normal consequence of Rule 15's liberal amendment policy, especially at this early stage of litigation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D. Amendment Is Not Futile**

The proposed SAC cures potential deficiencies identified in Defendants' Motions to Dismiss, incorporates factual development from Defendants' own certified litigation productions, and substantially strengthens the factual and legal basis for this action:

**(i) Additional Defendants.** The FAC named four defendants: HCA Healthcare, Inc., Sunrise Hospital, MountainView Hospital, and Southern Hills Hospital. The SAC adds ten defendants whose identities and roles were confirmed through Defendants' certified litigation productions, initial disclosures, and post-filing investigation: Parallon Business Solutions, LLC (HCA's revenue-cycle subsidiary that coded and submitted claims); HealthTrust Workforce Solutions, LLC (HCA's staffing subsidiary that supplied personnel to the encounters); Cinthya S. Cook, MSN/MHA, RN, CPPS (HCA's Director of Risk Management who received Plaintiff's complaints and initiated an enterprise-wide response); Jonathan Yaghoobian, MD (attending physician, Southern Hills June 2025); Brent J. Wright, DO (physician who documented critical care an eyewitness will testify was not performed); James Bindrup, MD (treating physician, Southern Hills November 2023); Rowena E. Achin, MD (attending physician, MountainView March 2025); Alexander F. Akhavan, MD (requesting physician, Sunrise April 2025); Tarik Alshaikh, DO (attending psychiatrist for the inpatient admission, Southern Hills December 2023, whose role was documented in the certified litigation production SHH-M000202 through SHH-M000451); and Michael A. Orber and Michael A. Orber & Associates, Inc. (identified in the complaint-response chain preceding the June 2025 encounter). Each individual Defendant is sued in their individual capacity for specific conduct identified in the SAC.

**(ii) Refined and Additional Causes of Action.** The FAC asserted federal claims including EMTALA, disability-discrimination, civil RICO, and civil rights conspiracy claims,

along with state tort claims. The proposed SAC retains and substantially refines and particularizes each of those claims and adds causes of action based on facts confirmed through Defendants' productions, including a standalone Retaliation count (42 U.S.C. § 12203; 29 U.S.C. § 794a), RICO Conspiracy (18 U.S.C. § 1962(d)), Fraud and Record Falsification supported by forensic comparison of pre-litigation and litigation-produced records, False Imprisonment against specific individual defendants, and Negligent Corporate Policy Implementation against HCA and HealthTrust.

**(iii) RICO Pleaded with Rule 9(b) Particularity.** The SAC identifies ten predicate acts across five encounters, three facilities, and four calendar years. Each predicate specifies the date, facility, payor, claim type, false representation, amount, and factual basis for falsity. The interstate wire transmission foundation is pled with particularity. The association-in-fact enterprise is defined by the integrated operational workflow connecting HCA's centralized risk management, Parallon's revenue-cycle operations, HealthTrust's staffing, and facility-level administration. The SAC alleges, for each Defendant, facts showing participation in the operation or management of the enterprise within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993).

**(iv) Strengthened Record Alteration Allegations.** The SAC details, encounter by encounter, the specific material differences between pre-litigation portal records and Defendants' certified litigation productions across all five encounters at three facilities. This comparison was only possible after Defendants' litigation productions were received. The identified pattern is unidirectional: every modification escalates pathology, acuity, psychiatric framing, billing justification, or implied consent, while minimizing seizure severity, restraint exposure, and screening failures. No change in any litigation-produced version reduces acuity, corrects a

screening failure, acknowledges a restraint violation, or contradicts Defendants' litigation position.

**(v) Tightened NRS 41A.071 Framing.** The SAC clarifies that no federal claim turns on breach of clinical standard of care, but rather on consent, access, documentation, orders, and compliance, foreclosing any malpractice recharacterization.

**(vi) Refined EMTALA Claims.** The SAC distinguishes between the disparate screening claim against Sunrise (42 U.S.C. § 1395dd(a)) and the failure-to-stabilize claims against Southern Hills and MountainView (42 U.S.C. § 1395dd(b) and (c)), with specific factual support for each.

**(vii) Additional Factual Detail from Productions.** The SAC incorporates specific Bates-stamped references, audit trail analysis (343 modification events, three document replacement events), restraint documentation vacuum analysis (4,293 minutes of restraint with zero pages of restraint documentation in 201-page certified production), and timeline discrepancies — none of which was available at the time the FAC was filed.

**(viii) Retaliation Claim with Temporal Proximity.** The SAC identifies protected activity (pre-litigation notices to Cook on June 22 and 26, 2025) and adverse action within 48 hours (the June 28–29, 2025 Southern Hills encounter), with per-defendant causal chain allegations.

**E. No Failure to Cure**

This is Plaintiff's first motion for leave to amend. The Court has not previously granted leave and identified deficiencies that Plaintiff failed to correct.

/

/

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV. THE PENDING MOTIONS TO DISMISS SHOULD BE DENIED WITHOUT PREJUDICE AS MOOT

The proposed SAC supersedes the First Amended Complaint. An amended complaint supersedes the original, rendering the earlier pleading nonexistent. *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc); *Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015). Because the SAC will be the operative pleading upon filing, Defendants' pending Motions to Dismiss (ECF 50, 51) are directed at a complaint that will no longer be operative and should be denied without prejudice as moot. Defendants may file new responsive pleadings to the SAC within the time permitted by Fed. R. Civ. P. 15(a)(3).

## V. CONCLUSION

No factor weighing against amendment is present. The motion is filed seven months before the scheduling order's amendment deadline. No party is prejudiced. The amendments arise from Defendants' own productions. The proposed SAC strengthens the factual basis for each claim, adds defendants and causes of action confirmed through Defendants' productions and investigation, and addresses potential deficiencies identified in the pending Motions to Dismiss. Plaintiff respectfully requests that the Court:

1. Grant leave to file the Second Amended Complaint (attached as Exhibit A);

2. Deny without prejudice as moot the pending Motions to Dismiss (ECF 50, 51); and

3. Order Defendants to respond to the Second Amended Complaint within the time permitted by Fed. R. Civ. P. 15(a)(3).

DATED: February 21, 2026
Respectfully submitted,
/s/ Jade Riley Burch
**JADE RILEY BURCH**

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2026, I electronically filed the foregoing **Motion for Leave to File Second Amended Complaint**, together with the proposed **Second Amended Complaint** (Exhibit A), with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<div style="margin-left:2em">

Michael E. Prangle, Esq.
Zach Thompson, Esq.
HALL PRANGLE LLC
1140 N. Town Center Dr., Suite 350
Las Vegas, NV 89144

</div>

/s/ Jade Riley Burch
**Jade Riley Burch**
Plaintiff, Pro Se

# EXHIBIT A

1  Jade Riley Burch
2  Plaintiff, Pro Se
   222 Karen Avenue, Unit 1207
3  Las Vegas, NV 89109
   Tel: (614) 725-9452
4  Email: jaderburch@gmail.com
5
                    **UNITED STATES DISTRICT COURT**
6                        **DISTRICT OF NEVADA**
7
8  Jade Riley Burch,                          Case No.: 2:25-cv-01408-JAD-MDC
9              Plaintiff.
10                                            **SECOND AMENDED COMPLAINT FOR**
11 vs.                                        **CIVIL RIGHTS VIOLATIONS, EMTALA**
                                              **VIOLATIONS, CIVIL RICO AND**
12 HCA HEALTHCARE, INC.; SUNRISE             **RELATED STATE CLAIMS**
   HOSPITAL & MEDICAL CENTER, LLC;
13 MOUNTAINVIEW HOSPITAL, INC.;
   SOUTHERN HILLS HOSPITAL & MEDICAL
14 CENTER, LLC; PARALLON BUSINESS
   SOLUTIONS, LLC; HEALTHTRUST
15 WORKFORCE SOLUTIONS, LLC;
   PLATINUM HOSPITALISTS, LLC;
16 FREMONT EMERGENCY SERVICES
   (SCHERR), LTD.; RELIANT PHYSICIANS,
17 LLC; ALEXANDER F. AKHAVAN, MD,
   LTD.; CINTHYA S. COOK, MSN/MHA, RN,
18 CPPS, in her individual capacity; JONATHAN
   YAGHOOBIAN, MD, in his individual
19 capacity; BRENT J. WRIGHT, DO, in his
   individual capacity; JAMES BINDRUP, MD, in
20 his individual capacity; ROWENA E. ACHIN,
   MD, in her individual capacity; ALEXANDER
21
   F. AKHAVAN, MD, in his individual capacity;
22 TARIK ALSHAIKH, DO, in his individual
   capacity; MICHAEL A. ORBER, an individual;
23 MICHAEL A. ORBER & ASSOCIATES, INC.,
   a California corporation; DOES 1-50, inclusive
24 (physicians, nurses, coders, administrators, and
   risk management personnel),
25
26
27              Defendants.
28

# I. INTRODUCTION

1. This case is about a healthcare conglomerate that refused, five times across three hospitals over nineteen months, to accommodate a patient with a known seizure disorder. Every federal claim turns on objective compliance questions that can be answered from the medical record alone: Was a contraindication review performed or documented before staff administered seizure-threshold-lowering drugs? Was consent obtained? Was a legally binding Psychiatric Advance Directive ("**PAD**") reviewed at the one encounter where it was on file? Did the billing match what actually happened? **These are yes-or-no questions. The missing documentation is itself the violation.** This is not a dispute about whether a particular drug or dosage was clinically optimal. It is a dispute about whether legal requirements for access and consent were met.

2. Plaintiff **Jade Riley Burch** is a transgender woman with a documented seizure disorder and PTSD. Between November 2023 and June 2025, she was subjected to the same pattern of operational noncompliance at three HCA Healthcare hospitals in Nevada. At each facility, staff administered chemical restraints without assessing seizure contraindications, without obtaining consent, and, at the one encounter where a legally binding PAD was in effect, without reviewing or honoring that directive. Staff refused to contact designated decision-makers during postictal incapacity. Staff entered pretextual psychiatric diagnoses to justify the restraints. Staff discharged Plaintiff without the capacity assessments her neurological condition required. At each facility, the noncompliant treatment generated billing that Parallon Business Solutions, LLC submitted electronically to CMS and private insurers as facility claims. At multiple encounters, physician Defendants independently submitted or caused to be submitted

professional claims through their own corporate billing entities, including out-of-network professional claims processed separately from the facility claims, creating parallel billing streams from the same underlying documentation.

3.  **The pattern culminated in retaliation.** Within 48 hours of Plaintiff's final written complaint to HCA's Director of Risk Management in Nashville, staff at Southern Hills Hospital & Medical Center administered chemical restraints in violation of a legally binding PAD that had been in the EHR for 22 days, using drugs contraindicated for her known seizure disorder. The result was **at least 32 induced seizures** and hypoxic episodes with oxygen saturation dropping into the 60s. The facility restraint tracking system recorded a single non-violent restraint episode totaling **4,293 minutes** attributed to the episode of care, and the system's own compliance fields indicate that orders were entered and monitoring was performed, yet the 201-page certified litigation production contains **zero restraint orders, zero flowsheets, zero monitoring entries, and zero renewal orders**. Wright documented 37 minutes of critical care that an eyewitness will testify never occurred, and his billing entity, Fremont Emergency Services (Scherr), Ltd., submitted a separate out-of-network professional claim for those fabricated services. More than 12 hours after a CT scan confirmed no acute intracranial abnormality, a nurse entered a diagnosis of "DIFFUSE TBI." Parallon assigned codes and submitted facility claims electronically from Nevada.

4.  Plaintiff asserts claims under **EMTALA**, the **ADA**, **Section 504**, **Section 1557**, the ADA and Rehabilitation Act anti-retaliation provisions, the **Civil RICO Act**, and **42 U.S.C. Section 1985(3)**, together with supplemental state claims for battery, false imprisonment,

fraud, and intentional infliction of emotional distress. She seeks compensatory and treble damages, injunctive relief, and costs.

5. **No federal claim turns on breach of clinical standard of care**; they turn on consent, access, documentation, orders, and compliance. No federal claim requires an expert affidavit under NRS 41A.071. *Egan v. Chambers*, 129 Nev. 239, 242 (2013). Plaintiff alleges each claim against each Defendant only to the extent that Defendant's own conduct is specifically pled.

6. **Organization of this Complaint.** Sections I through III establish jurisdiction and identify the parties. Section IV defines key terms. Section V presents the factual allegations chronologically by encounter, followed by the billing predicates, the enterprise structure, and the post-litigation record alteration evidence. Section VI presents fourteen causes of action, each identifying the specific defendants and specific conduct at issue.

## II. JURISDICTION AND VENUE

1. This Court has federal question jurisdiction under **28 U.S.C. Section 1331** over claims arising under 42 U.S.C. Section 1395dd (EMTALA), 29 U.S.C. Section 794 (Section 504), 42 U.S.C. Section 18116 (Section 1557), 42 U.S.C. Section 12182 (ADA), 42 U.S.C. Section 12203 (ADA retaliation), 42 U.S.C. Section 1985(3), and 18 U.S.C. Sections 1962(c) and (d) (RICO). Supplemental jurisdiction over state claims lies under 28 U.S.C. Section 1367.

2. Venue is proper under **28 U.S.C. Section 1391(b)(2)**.

3. Personal jurisdiction over **HCA Healthcare, Inc.** is proper under *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). HCA purposefully directed conduct at Nevada through its agent Cook, who received Plaintiff's complaints at Nashville headquarters, and within 48 hours, Southern Hills Hospital & Medical Center escalated the same protocol with increased severity. HCA's direction and control are reflected in three ways: centralized risk management handling of Plaintiff's complaints; centralized policies governing advance directives and restraints applied at Nevada facilities; and integrated revenue-cycle governance through Parallon that submits Nevada facility claims to out-of-state payors.

4. **Defendants themselves confirmed HCA's control.** In their Certificate of Interested Parties (ECF 42), Defendants stated under penalty of perjury that HCA "indirectly owns at least 10% of the Co-Defendants" and holds a "direct, pecuniary interest in the outcome of this case," detailing **100% ownership** of each hospital: Sunrise Hospital & Medical Center, LLC (legal entity: Sunrise Hospital and Medical Center, LLC) through AC Med, LLC through Healthtrust, Inc., The Hospital Company through HCA Inc. through HCA Healthcare, Inc.; MountainView Hospital (legal entity: Sunrise Mountainview Hospital, Inc.) through Galen Holdco, LLC through Healthtrust, Inc., The Hospital Company through HCA Inc. through HCA Healthcare, Inc.; Southern Hills Hospital & Medical Center (legal entity: Southern Hills Medical Center, LLC) through Healthtrust, Inc., The Hospital Company through HCA Inc. through HCA Healthcare, Inc. ECF 42 at 2. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

5. HCA's public representations are inconsistent with any litigation position that it functions solely as a passive holding company. HCA publicly represents that it operates or has an

ownership interest in a national hospital system generating approximately **$75 billion in annual revenues**. Exhibit T (HCA Healthcare, Inc. 2024 Form 10-K, excerpted).

6.  Jurisdiction comports with fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985). Plaintiff is a disabled Nevada resident who cannot reasonably litigate in Tennessee.

7.  Specific personal jurisdiction is proper over **Michael A. Orber** and **Michael A. Orber & Associates, Inc.** under *Calder*, 465 U.S. at 789-90. On information and belief, Orber directed or participated in communications intentionally aimed at Nevada decision-makers and Nevada treatment operations, and the foreseeable effects of those communications were felt in Nevada during the June 28-29, 2025 encounter. Specific personal jurisdiction is also proper over **Parallon Business Solutions, LLC**, which directs billing operations into and from Nevada; **HealthTrust Workforce Solutions, LLC**, which maintains staffing operations in Nevada; and **Cook**, who directed communications from Tennessee to Nevada hospitals. The physician billing entities (Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Reliant Physicians, LLC; and Alexander F. Akhavan, MD, Ltd.) each transact business in Nevada and bill for physician services rendered at Nevada facilities to Nevada and out-of-state payors. Jurisdictional discovery will confirm the full extent of Orber's Nevada-directed communications.

### III. PARTIES

**A. Plaintiff**

1. **Jade Riley Burch** is an adult resident of Las Vegas, Nevada. She has a documented seizure disorder and PTSD, qualifying her as an individual with a disability under the ADA, Section 504, and Section 1557. Her seizure disorder creates functional limitations relevant to every encounter at issue: postictal cognitive impairment that renders her unable to process information or consent to treatment; susceptibility to seizure induction by Haldol and benzodiazepines; heightened injury risk during and after episodes; and the need for a designated decision-maker during postictal incapacity. She is a transgender woman, a protected class under Section 1557.

**B. The HCA Enterprise**

1. **HCA Healthcare, Inc.** is a Delaware corporation headquartered in Nashville, Tennessee. It is the 100% indirect owner of each defendant hospital. ECF 42. Its enterprise role is centralized command: risk management, complaint-response escalation, PAD and restraint policy, and revenue-cycle governance.

2. **Cinthya S. Cook, MSN/MHA, RN, CPPS** is HCA's Director of Risk Management in Nashville. She received Plaintiff's complaints and initiated what she described as an "enterprise-wide response." Sued in her individual capacity.

3. **Sunrise Hospital & Medical Center, LLC** (legal entity: Sunrise Hospital and Medical Center, LLC, per ECF 42) is a Delaware limited liability company operating in Nevada and owned by HCA through AC Med, LLC and Healthtrust, Inc., The Hospital Company. It is a federal financial assistance recipient and EMTALA participating hospital.

4. **MountainView Hospital** (legal entity: Sunrise Mountainview Hospital, Inc., per ECF 42) is a Nevada corporation owned by HCA through Galen Holdco, LLC and Healthtrust, Inc., The Hospital Company. It is a federal financial assistance recipient and EMTALA participating hospital.

5. **Southern Hills Hospital & Medical Center** (legal entity: Southern Hills Medical Center, LLC, per ECF 42) is a Nevada limited liability company owned by HCA through Healthtrust, Inc., The Hospital Company. It is a federal financial assistance recipient and EMTALA participating hospital.

6. **Parallon Business Solutions, LLC** is a Tennessee limited liability company registered to transact business in Nevada as a foreign limited liability company. It directs billing operations into and from Nevada and performs revenue-cycle functions including coding validation, claims assembly, and electronic submission of facility claims (837I/UB-04) to CMS and private insurers. Tiffaney Jackson, an Account Specialist at HCA's Richmond Shared Services Center in Virginia, attested under penalty of perjury that **$799,833.00** in Sunrise charges was "reasonable." Exhibit P.

7. **HealthTrust Workforce Solutions, LLC** is a Delaware limited liability company that maintains staffing operations in Nevada. Its enterprise role is personnel supply to defendant hospitals. Its Privacy Policy directs inquiries to the "HCA Healthcare Data Protection Officer" in Nashville, confirming unified governance. Exhibit U. On information and belief, HealthTrust supplied the nursing and ancillary staff who administered chemical and physical restraints at the encounters at issue. HealthTrust's onboarding, training, and credentialing processes did not include protocols for seizure

contraindication review, PAD compliance, or decision-maker contact procedures for patients with documented seizure disorders.

**C. Physician Defendants and Their Billing Entities**

1. **Jonathan Yaghoobian, MD** was the attending physician at Southern Hills Hospital & Medical Center on June 28-29, 2025. He had supervisory authority over the encounter and failed to intervene despite at least 32 induced seizures and SpO2 in the 60s. Sued in his individual capacity. Yaghoobian bills through Platinum Hospitalists, LLC.

2. **Platinum Hospitalists, LLC** is, on information and belief, a Nevada limited liability company that provides hospitalist physician services at HCA facilities. It is not owned by HCA. It maintains its own billing relationship with payors and submits professional claims (837P/CMS-1500) independently of Parallon's facility claims. Platinum Hospitalists billed for Yaghoobian's services at the June 28-29, 2025 Southern Hills Hospital & Medical Center encounter. **Enterprise role:** physician billing entity that independently monetized the encounter documentation and received direct financial benefit from claims generated by fabricated or noncompliant documentation at the June 2025 encounter. Platinum Hospitalists, LLC is a **RICO "person" distinct from HCA**.

3. **Brent J. Wright, DO** was a physician at Southern Hills Hospital & Medical Center on June 28-29, 2025. He entered documentation claiming 37 minutes of CPT 99291 critical care that an eyewitness will testify never occurred. Sued in his individual capacity. Wright bills through Fremont Emergency Services (Scherr), Ltd.

4. **Fremont Emergency Services (Scherr), Ltd.** is a Nevada limited company that provides emergency physician services at HCA facilities. It is not owned by HCA. It maintains its own billing relationship with payors, billed out of network, and submits

professional claims (837P/CMS-1500) through a separate billing channel independent of Parallon's facility claims. Fremont Emergency Services (Scherr), Ltd. separately billed for Wright's fabricated CPT 99291 critical care as an out-of-network professional claim, processed independently of Parallon's facility claim for the same June 28-29, 2025 encounter. The professional claim and the facility claim constitute separate interstate wire transmissions to separate payor processing queues, each containing false representations derived from the same fabricated documentation. **Enterprise role:** physician billing entity that independently monetized the encounter documentation and received direct financial benefit from a professional claim for services an eyewitness will testify were never rendered. Fremont Emergency Services (Scherr), Ltd. is a **RICO "person" distinct from HCA**.

5. **James Bindrup, MD** was the treating and supervising provider at Southern Hills Hospital & Medical Center from November 30 through December 4, 2023. His provider authority sustained detention and billing after the patient was documented as calm, cooperative, and low risk. Sued in his individual capacity. On information and belief, Bindrup bills through a corporate entity whose identity will be confirmed through discovery and whose identity is reserved under Does 1 through 50.

6. **Rowena E. Achin, MD** was the attending physician at MountainView Hospital from March 22 through 24, 2025. She authorized the rideshare discharge of a postictal seizure patient without a capacity assessment. Sued in her individual capacity. Achin bills through Reliant Physicians, LLC.

7. **Reliant Physicians, LLC** is, on information and belief, a Nevada limited liability company that provides physician services at HCA facilities. It is not owned by HCA. It

maintains its own billing relationship with payors and submits professional claims (837P/CMS-1500) independently of Parallon's facility claims. Reliant Physicians billed for Achin's services at the March 22-24, 2025 MountainView Hospital encounter.

**Enterprise role:** physician billing entity that independently monetized the encounter documentation and received direct financial benefit from claims generated by noncompliant documentation at the March 2025 encounter. Reliant Physicians, LLC is a **RICO "person" distinct from HCA**.

8. **Alexander F. Akhavan, MD** was the requesting physician at Sunrise Hospital & Medical Center, LLC from April 17 through 22, 2025. He controlled the screening scope and ordered no pulmonary embolism workup despite post-surgical status, chest pain, dyspnea, supplemental oxygen, abnormal imaging, and reported hemoptysis. Sued in his individual capacity. Akhavan bills through Alexander F. Akhavan, MD, Ltd.

9. **Alexander F. Akhavan, MD, Ltd.** is, on information and belief, a Nevada professional corporation through which Akhavan bills for physician services at HCA facilities. It is not owned by HCA. It maintains its own billing relationship with payors and submits professional claims (837P/CMS-1500) independently of Parallon's facility claims. Akhavan Ltd. billed for Akhavan's services at the April 17-22, 2025 Sunrise Hospital & Medical Center, LLC encounter. **Enterprise role:** physician billing entity that independently monetized the encounter documentation and received direct financial benefit from claims generated by documentation that omitted hemoptysis, behavioralized seizures, and foreclosed PE screening. Alexander F. Akhavan, MD, Ltd. is a **RICO "person" distinct from HCA**.

10. **Tarik Alshaikh, DO** was the attending physician for Plaintiff's inpatient psychiatric admission at Southern Hills Hospital & Medical Center from December 1 through December 4, 2023. As attending physician, Alshaikh was responsible for Plaintiff's treatment plan, medication management, monitoring, and continuation of the involuntary Legal 2000 hold during the hospitalization. Sued in his individual capacity.

**D. Outside Participants**

1. **Michael A. Orber** and **Michael A. Orber & Associates, Inc.** Orber is an individual and the principal of a California corporation based in Culver City, California. Orber is identified in the complaint-response chain and records-production pathway as a participant outside HCA's corporate family whose communications were directed at Nevada decision-makers and Nevada treatment operations in the period preceding the June 28, 2025 encounter. On information and belief, Orber participated in complaint-response and retaliation communications with Cook and/or Nevada facility leadership preceding the June 28, 2025 encounter and acted in coordination with HCA risk management and Nevada facility personnel. Plaintiff will seek confirmation through discovery, including communications, call logs, and EHR audit trails. Should Defendant Orber challenge jurisdiction, Plaintiff will seek targeted jurisdictional discovery to confirm the factual basis for jurisdiction that is currently within Defendants' exclusive control.

2. **Does 1 through 50** are unknown participants whose identities will be established through discovery, including the Sunrise nurse who received physical evidence of hemoptysis and failed to document it, and physician billing entities not yet identified.

1

## IV. DEFINITIONS

2 As used in this Complaint, the following terms have the meanings set forth below:

3 **"PAD"** means the Psychiatric Advance Directive executed by Plaintiff on June 6, 2025,

4 notarized and filed in the HCA EHR, enforceable under NRS 449A.600 through 449A.645 and

5 the Patient Self-Determination Act.

6

7 **"Portal Version"** means the medical records obtained by Plaintiff directly from each

8 facility's patient portal before this action was filed.

9 **"Litigation Production"** or **"Discovery Production"** means the certified or Bates-

10 stamped medical records subsequently produced by Defendants through litigation and discovery

11 channels.

12 **"B52"** means the combination chemical restraint of Haloperidol (Haldol), Lorazepam

13

14 (Ativan), and Diphenhydramine (Benadryl), administered by intramuscular injection.

15 **"EHR"** means the unified electronic health record system maintained by HCA

16 Healthcare across its Nevada facilities.

17

18 **"Facility Claims"** means insurance claims (837I/UB-04) assembled and submitted by

19 Parallon on behalf of HCA hospitals. **"Professional Claims"** means insurance claims

20 (837P/CMS-1500) submitted independently by physician billing entities through their own

21 billing channels for physician services rendered at the same encounters.

22

23

24

25

26

27

28

## V. FACTUAL ALLEGATIONS

**A. Plaintiff's Disabilities, Functional Limitations, and Advance Directive**

1. Plaintiff has a documented seizure disorder and PTSD. At all relevant times, Defendants had actual notice of Plaintiff's seizure disorder through the unified HCA EHR problem list and through Plaintiff's presenting condition at each encounter.

2. Plaintiff's seizure disorder creates functional limitations that require specific operational accommodations in emergency settings. These accommodations are obvious from the disability itself, regardless of whether a formal written request exists. During postictal periods, Plaintiff cannot process information, communicate effectively, or consent to treatment, which requires a designated decision-maker. Haldol and benzodiazepines lower her seizure threshold and are contraindicated without seizure-risk assessment, a fact ascertainable from the EHR problem list and standard pharmacological references. Discharge following seizure activity requires neurological capacity assessment because postictal impairment may persist for hours or days.

3. On June 6, 2025, after nineteen months of repeated failures to accommodate her known seizure disorder across three HCA facilities, Plaintiff executed a legally notarized PAD. The PAD was in effect and present in the unified HCA EHR as of the June 28-29, 2025 Southern Hills Hospital & Medical Center encounter, **22 days after execution**. The PAD requires **Porscha Ryan** designated as medical decision-maker; no chemical restraints without first contacting Ryan; no physical restraints except under documented conditions of imminent harm; staff review of the PAD before administering sedatives; and seizure contraindication assessment before any chemical intervention. The PAD is enforceable under Nevada's advance directive framework, NRS 449A.600 through 449A.645, and

under the Patient Self-Determination Act, which requires Medicare-participating hospitals to document and comply with advance directives under state law. 42 U.S.C. Section 1395cc(f); 42 C.F.R. Sections 482.13(b)(3) and 489.102. Defendants' own EHR intake process accepted and stored the PAD, confirming institutional recognition of the directive.

4.  For the pre-PAD encounters from November 2023 through May 2025, no formal written accommodation request was required. The ADA and Section 504 do not require one when the need for modification is obvious from the disability itself. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). Plaintiff's seizure disorder was documented in the EHR at every encounter. That Defendants failed to provide these modifications at the pre-PAD encounters establishes that the problem was not lack of a written request but **systemic refusal to accommodate**.

5.  For the June 2025 encounter, when the PAD was active, Defendants had the formal written directive in the EHR and still refused to review it, contact the designated decision-maker, or assess seizure contraindications. After nineteen months of identical failures without a formal directive, and after a formal directive was executed and ignored, **this constitutes deliberate indifference**.

**B. The Two Lanes**

1.  **Lane A: Federal Discrimination.** Plaintiff's federal claims challenge operational failures: failure to perform or document any contraindication review; failure to obtain consent or contact a designated person; failure to modify standard restraint protocols; refusal to review and honor a legally binding PAD; and discharge without capacity

assessment. These are denials of meaningful access to emergency services on equal terms.

2. **Lane B: Intentional Misconduct.** Plaintiff's state and RICO claims challenge intentional conduct: fabrication of billing for services not rendered; fabrication of diagnoses contradicted by imaging; entry of pretextual psychiatric labels; retaliation for protected activity; and battery through restraints administered without consent before the PAD, and after consent was expressly withdrawn once the PAD was in effect. No claim asks the Court to evaluate clinical reasonableness.

3. **No claim requires expert testimony** to establish that no contraindication review was performed or documented, that consent was not obtained, that a PAD was not reviewed, that a diagnosis was fabricated after negative imaging, or that billed services were not provided.

## C. NRS 41A.071: The Malpractice Line

1. **No NRS 41A.071 trigger exists for the federal counts.** Plaintiff does not plead medical negligence as the basis for any federal claim. Those claims turn on administrative and operational acts: failure to perform or document contraindication review before administering chemical restraints, failure to obtain consent, refusal to review and honor a PAD, use of restraints without required orders or monitoring per 42 C.F.R. Section 482.13, post-hoc fabrication of diagnoses, and billing for services not rendered.

2. Plaintiff's battery claim rests on two distinct theories depending on the encounter. For the June 28-29, 2025 Southern Hills Hospital & Medical Center encounter, the claim is premised on the **express withdrawal of consent** by a legally executed PAD. The PAD contains explicit conditional refusals and prerequisites. Defendants proceeded without

satisfying those prerequisites and without obtaining any lawful substitute consent. This is intentional restraint after express refusal, not a consent-medical-judgment dispute. *De Becker v. UHS of Delaware, Inc.*, 140 Nev. Adv. Op. 58 (2024) (reaffirming gravamen test; informed-consent failures as battery where claim does not require professional-judgment evaluation). For the pre-PAD encounters at Southern Hills Hospital & Medical Center in November 2023 and Sunrise Hospital & Medical Center, LLC in May 2025, the battery claim is premised on the **complete absence of consent**: no informed consent for chemical restraint was obtained, no emergency justification sufficient to bypass consent was documented, and no substitute consent was sought. The battery claim here does not challenge the manner in which services were rendered. It challenges the complete absence of lawful authorization under PAD statutes and federal regulations to render them at all. Administering chemical restraints after express refusal through a legally binding PAD is unauthorized touching and confinement after express refusal, not a dispute over professional judgment, and falls outside the meaning of NRS 41A.071.

3.   To the extent any state-law count is construed as "professional negligence" under Nevada law, Plaintiff pleads that characterization in the alternative only. Such recharacterization does not convert the federal civil rights, EMTALA, or RICO claims into medical malpractice claims.

4.   **Severability and Preservation of Federal Claims.** Should this Court determine that any state-law claim sounds in professional negligence and requires an expert affidavit under NRS 41A.071, Plaintiff respectfully requests that any such dismissal be entered without prejudice and with leave to seek amendment to attach a supporting affidavit in compliance with state procedural requirements. Plaintiff's federal claims under EMTALA

(42 U.S.C. Section 1395dd), the ADA (42 U.S.C. Sections 12182 and 12203), Section 504 (29 U.S.C. Section 794), Section 1557 (42 U.S.C. Section 18116), RICO (18 U.S.C. Sections 1962(c) and (d)), and Section 1985(3) (42 U.S.C. Section 1985(3)) are independent of any state-law affidavit requirement and survive regardless of any recharacterization of the supplemental state counts. The state-law claims are supplemental under 28 U.S.C. Section 1367 and severable from the federal causes of action. No federal claim in this Complaint turns on breach of a professional standard of care, and no federal claim is subject to NRS 41A.071 under any characterization.

**D. Encounter One: Southern Hills Hospital & Medical Center, November 30 through December 4, 2023**

1. Plaintiff presented on November 30, 2023 at the Southern Hills Hospital & Medical Center ED and was held in the psychiatric unit through December 4, 2023. The PAD did not exist at the time.

2. Plaintiff's seizure disorder was documented in the EHR. The need for operational modifications was obvious from the disability itself: assess seizure contraindications before chemical restraint, obtain consent or contact a designated person before administering forced medication, refrain from physical restraints absent documented imminent harm, and maintain gender-affirming care.

3. The charge nurse, ED staff, Dr. James Bindrup, and Dr. Tarik Alshaikh had constructive notice of Plaintiff's seizure disorder through the unified HCA EHR problem list.

4. **What Defendants did.** Staff did not perform or document any seizure contraindication review before administering B52 (Haldol 5 mg, Lorazepam 2 mg, Diphenhydramine 25 mg), despite the documented seizure disorder. Staff did not obtain informed consent for

chemical restraint and did not document any emergency justification sufficient to bypass consent. Staff did not contact any designated person or advocate despite Plaintiff's postictal impairment. Staff continued the Legal 2000 hold despite contemporaneous documentation reflecting calm, cooperative, and low-risk presentation and documented improvement, without documentation of ongoing imminent risk justifying continued detention. Staff documented "Schizoaffective disorder" and "Gender Identity Disorder," the latter having been removed from the DSM in 2013. Dr. Veerappan withheld gender-affirming hormone therapy without medical necessity. Dr. Alshaikh's December 1 evaluation noted "calm and cooperative" and "low risk." Notes from December 2 and 3 documented "euthymic," "sleeping well," and "significant improvement." Despite this documented resolution, detention was extended through December 4 without any documentation of emergent risk.

5. On or about December 1, 2023, Defendant **Tarik Alshaikh, DO** served as the attending physician for Plaintiff's inpatient psychiatric admission at Southern Hills Hospital & Medical Center. As attending physician, Alshaikh was responsible for Plaintiff's treatment plan, monitoring, and continuation of the involuntary Legal 2000 hold. Alshaikh personally evaluated Plaintiff on December 1 and documented "calm and cooperative" and "low risk," yet continued the involuntary hold and did not order discontinuation of chemical restraints, did not ensure a seizure contraindication review was performed, and did not document ongoing imminent risk justifying continued detention. Despite serving as the attending physician during the inpatient stay, the produced records do not contain physician restraint orders, clinical justification for

restrictive interventions, or required documentation associated with the administration of chemical restraints and continued involuntary detention.

6. **What the records reveal.** The certified litigation production (SHH-M000202 through SHH-M000451, 249 pages) contains material discrepancies from the pre-litigation portal version (6 pages, Encounter ID H89681403926). The portal version documents B52 administration on November 30, 2023 at 16:21. The litigation version contains no record of a B52 administration on November 30; the earliest documented administration is December 1, 2023 at 15:48, approximately **23.5 hours later**. The portal version lists a dictation date of November 30, 2023; the litigation version lists December 2, 2023 for the same clinical note. Dr. Bindrup's electronic signature was not applied until January 26, 2024, **fifty-five days after dictation**, with no edit history, signature event metadata, or audit trail produced for the interval. The litigation version classifies the B52 medications as PRN despite HCA Policy COG.COG.001's prohibition on PRN restraint orders. No audit trail documents were produced for this encounter. Exhibits A (portal version), G (certified litigation production).

7. Bindrup's provider authority appears on documentation supporting continued detention and chemical restraints. Contemporaneous entries show the patient was calm, cooperative, and low risk, yet Bindrup took no steps to discontinue the hold or ensure that a contraindication review was performed or documented. On information and belief, Bindrup authorized, ratified, or knowingly permitted these decisions.

8. **Injury.** Forced chemical restraint without consent or contraindication review. Four-day detention beyond documented necessity. Gender-affirming care withheld. Obsolete stigmatizing diagnoses entered in permanent record.

9. The 2023 encounter placed HCA on actual notice that its standard B52 protocol was being applied to seizure patients without contraindication review, without consent, and with pretextual psychiatric diagnoses. **This encounter established the baseline failure pattern that repeated at every subsequent facility.**

**E. Encounter Two: MountainView Hospital, March 22 through 24, 2025**

1. Plaintiff presented on March 22, 2025 at the MountainView Hospital ED and remained inpatient through March 24, 2025. The PAD did not exist at the time.

2. Plaintiff presented with active seizures and remained in a postictal state throughout the hospitalization. She was unable to process information, communicate, or consent. The impairment was directly observable.

3. Dr. Achin and nursing staff had constructive notice of the seizure disorder through the EHR and actual notice through presenting condition.

4. **What Defendants did.** Staff did not contact any designated person or advocate despite Plaintiff's postictal incapacity. No evaluation of administered sedatives' impact on neurological status or discharge safety was performed. The record was populated with cardiac-focused testing (Rubidium PET, EKG, both negative), shifting clinical focus away from the seizure emergency. No contemporaneous capacity assessment preceded discharge. **Plaintiff was discharged via rideshare** without caregiver handoff, supervised transfer, or postictal resolution confirmation.

5. Achin authorized discharge without documenting that Plaintiff was alert, oriented, or capable of consent. The only proximate clinical justification is a cardiac stress test dictated on March 25, the day after discharge, by non-attending Dr. Majidi, addressing ischemia only. **The clinical basis for release was backfilled.**

**6. What the records reveal.** The certified litigation production (MVH-M000001 through MVH-M000254, 254 pages) contains material discrepancies from the pre-litigation portal version. The portal version contains a "Deprecated Plan of Care Note" dictated at 3:25 PM on March 24, 2025 that does not appear in the litigation production. In hospital EHR systems, a note is marked "Deprecated" when it has been retracted or replaced. The only orientation assessment in the record ("Alert and Oriented x4") was documented at 1:38 AM on March 23, 2025, before the administration of 8 mg of IV Lorazepam across four doses. No updated capacity or orientation assessment was performed after the sedation and before discharge. The stress test interpretation was dictated by Dr. Farzad Majidi on March 25, 2025 at 8:03 AM, the day after discharge, meaning the clinical conclusion supporting discharge did not exist in the medical record at the time the patient was released. No audit trail documents were produced for this encounter despite production of summary audit trail documents for the Southern Hills encounter. Exhibits B (portal version), I (certified litigation production).

**7. Injury.** Discharge while cognitively impaired. Exposure to foreseeable seizure risk in unsupervised transit.

**8.** MountainView Hospital replicated the Southern Hills 2023 pattern: no contraindication review performed or documented, no designated person contacted during postictal incapacity, discharge without capacity assessment. HCA's unified EHR contained the November 2023 encounter records.

**F. Encounter Three: Sunrise Hospital & Medical Center, LLC, April 17 through May 29, 2025**

**EMTALA Pre-Admission Screening Failure (April 17 through 22)**

1. Plaintiff presented on April 17, 2025 to the Sunrise Hospital & Medical Center, LLC ED with chest pain and respiratory compromise following elective surgery, including more than 30 hours of major surgery (including 11-hour craniofacial reconstruction) with no DVT, PE, or hypercoagulability history.

2. On information and belief, Sunrise's standard medical screening examination for post-surgical patients presenting with chest pain, dyspnea, hypoxia, abnormal chest imaging, and reported hemoptysis includes PE-rule-out testing. Sunrise provides this screening to similarly situated non-disabled post-surgical patients.

3. Plaintiff received a portable chest X-ray only. **No CTPA, D-dimer, V/Q, or any PE workup was performed.** Sunrise ruled in "pneumonia" without performing any PE-rule-out testing despite symptoms that trigger PE screening in non-disabled comparators and despite objective findings in its own imaging. The screening omission occurred at the ED stage, before any inpatient admission decision.

4. **How the omission happened.** The record introduced "nonepileptic psychogenic seizures," recasting Plaintiff's documented seizure disorder as behavioral. Once seizure activity was relabeled as psychogenic, concurrent chest pain, hypoxia, and respiratory distress were discounted as non-organic, and the PE workup that a non-disabled patient would have received was foreclosed.

5. Akhavan ordered a portable chest X-ray but no PE workup. The April 20 chest X-ray showed "moderate bilateral perihilar and left basilar airspace disease." Plaintiff reported

hemoptysis and provided a blood container to nursing staff. The record documents dyspnea but **contains no reference to hemoptysis**, removing the strongest PE indicator from the chart.

6. **What the records reveal.** The certified litigation production (SH-M000001 through SH-M000350, 350 pages) contains additional discrepancies. The April 20 Portable Chest X-Ray (SH-M000100) was performed at 8:33 PM CDT. The clinical interpretation was electronically signed by Dr. Galen Hewell at 6:35 PM PDT (8:35 PM CDT), approximately **two minutes** after the X-ray was taken, a timeline that requires image upload, transmission, viewing, and formal interpretation. The 350-page production contains no documentation of the hemoptysis specimen Plaintiff reports providing to nursing staff: no specimen collection record, no laboratory order, no lab accession, no chain-of-custody record, and no disposition record. The hospital generated a bill of **$799,833.00** on April 27, 2025, five days after discharge, treating the record as final for billing purposes, while the Custodian of Records later certified the same production as potentially incomplete. No audit trail documents were produced for any Sunrise Hospital encounter. Exhibits C (portal version), J (certified litigation production).

7. **Injury.** Undiagnosed pulmonary embolism. Discharge on April 22 with a pneumonia diagnosis. **PE confirmed nine days later at Summerlin Hospital.**

### Sunrise Hospital & Medical Center, LLC: May 29, 2025

1. Plaintiff was transported via 911 for repeated tonic-clonic seizures. Her Depakote (Valproic Acid) level was **7.0 micrograms per mL**, approximately 86% below the minimum therapeutic range of 50 to 100 micrograms per mL. Staff administered B52 (Haloperidol 5mg, Diphenhydramine 50mg, Lorazepam 2mg) without contacting Ryan,

without performing or documenting a contraindication review, and without documented necessity. Contradictory entries ("fell from chair" and "found on floor" versus "threw themselves from the chair") behavioralized seizure activity, a distinction that determines whether chemical restraint is justified under HCA Policy COG.COG.001. The restraint induced additional seizures. The 52-page certified production (SH-M000351 through SH-M000403) contains no neurology consult, no EEG, and no post-loading-dose Depakote level despite administration of a loading dose. The Provider Report in the litigation version focuses on "Acute Knee Pain" rather than the seizure presentation that prompted the 911 call. The discharge signature page (SH-M000403) contains "Verbal" in the patient signature field, an illegible caregiver/RN signature, and a blank date field, with no formal capacity assessment following the administration of Haloperidol and Lorazepam. Plaintiff's toxicology screen was negative for opioids. The discharge instructions contain specific opioid medication warnings. Exhibits D (portal version), K (certified litigation production).

### G. Encounter Four: Southern Hills Hospital & Medical Center, June 28 through 29, 2025 (Retaliation)

**Protected Activity and Temporal Proximity**

1. On June 22 and 26, 2025, Plaintiff sent pre-litigation notices by email to Cook in Tennessee detailing the violation pattern across all HCA facilities. **This constitutes protected activity** under the ADA, Section 504, and Section 1557.

2. On information and belief, Cook received the June 22 notice and initiated an enterprise-wide response from Nashville directed to Nevada personnel. The inference is drawn from the temporal proximity between Plaintiff's complaints and the subsequent conduct at

Southern Hills Hospital & Medical Center, and will be confirmed through discovery of internal communications, email logs, and escalation records.

3. On information and belief, Cook and Orber exchanged communications between June 23 and June 28 that preceded the Southern Hills conduct. **The temporal proximity is less than 48 hours**, establishing prima facie causation.

**EMTALA Screening and Stabilization Failure**

1. Plaintiff arrived at the Southern Hills Hospital & Medical Center ED on June 28, 2025, post-seizure. The PAD was in the unified EHR.

2. Rather than stabilize, staff administered B52 contraindicated for her known seizure disorder, inducing **at least 32 additional seizures** and hypoxic episodes with **SpO2 in the 60s**. Staff created a new emergency more severe than the presenting condition.

3. Plaintiff alleges that any nominal "admission" status recorded in the chart was not a bona fide inpatient admission terminating EMTALA duties. The record reflects the following: Plaintiff was not assigned an inpatient bed; she was not transferred from the Emergency Department to an inpatient unit; she received no inpatient-level attending orders; and she remained under Emergency Department management at the observation level throughout the encounter while Defendants administered restraints and generated the destabilization.

4. EMTALA defines "transfer" to include discharge and any movement outside the hospital's facilities. 42 C.F.R. Section 489.24(b). **Defendants released Plaintiff while materially unstable**, constituting a transfer without stabilization.

**Accommodation and Denial**

1. The PAD was executed June 6, 2025. It was legally binding. It was present in the unified EHR. It constituted a formal written accommodation request specifying four requirements: contact Porscha Ryan before treatment decisions, review seizure contraindications before any chemical intervention, no physical restraints absent documented imminent harm, and maintain gender-affirming care. **Defendants had 22 days' notice.**

2. Yaghoobian (attending), Wright (treating), and ED nursing all had constructive notice of both the seizure disorder and the PAD through the EHR.

3. **What Defendants did.** The PAD was not reviewed before chemical restraints despite being in the EHR for 22 days. Ryan was not contacted. No contraindication review was performed or documented before B52 administration. The identical B52 protocol used on non-disabled patients was applied with no modification. Physical restraints were applied without required physician orders or monitoring per 42 C.F.R. Section 482.13. Unsupported psychiatric diagnoses were entered to justify the restraints. The record misgenders Plaintiff. Gender-affirming hormone therapy was withheld. Yaghoobian did not intervene despite at least 32 induced seizures and SpO2 in the 60s.

4. **Record fabrication.** Wright documented 37 minutes of CPT 99291 critical care on June 29. Eyewitness Ryan was continuously present in the room. **Wright did not perform the billed services**, was not present for the claimed duration, and did not engage in the face-to-face care required by CPT 99291. Contemporaneous nursing assessments corroborate this account. More than 12 hours after the June 28 CT scan confirmed "No acute

intracranial abnormality," a nurse entered **"DIFFUSE TBI with LOC STATUS UNKNOWN"** with no intervening trauma, imaging, or neurological exam.

5. **Injury.** At least 32 induced seizures. SpO2 in the 60s. Physical restraints without physician orders. Fabricated records. Fabricated billing. Gender-affirming care withheld. Misgendering. Pretextual psychiatric diagnoses.

6. **What the records reveal.** The certified litigation production (SHH-M000001 through SHH-M000201, 201 pages) and accompanying summary audit trail documents (SHH-AT000001 through SHH-AT000012) reveal the following:

(a) **The restraint documentation vacuum.** The facility restraint tracking system (Exhibit V) recorded a single non-violent restraint episode totaling **4,293 minutes** attributed to the episode of care. The system's own compliance fields report zero episodes without an order within 60 minutes, zero instances of RN monitoring not documented every two hours, and zero order/documentation mismatches, asserting that orders were entered, monitoring was performed, and documentation was compliant. Yet neither the portal version nor the 201-page certified litigation production contains any reference to restraint: **no physician orders, no restraint flowsheets, no monitoring entries, no renewal orders, no documentation of less restrictive alternatives, and no discontinuation criteria**. Either the underlying documentation exists and was not produced, or the system's compliance assertions are themselves fabricated. Under HCA Policy COG.COG.001, a non-violent restraint of this duration requires a minimum of 3 physician order renewals (every 24 hours), a minimum of 36 documented monitoring intervals (2-hour checks), and associated reassessments. **Zero pages of restraint documentation appear in the certified production.**

**(b) Document replacements.** The Consultation Report was replaced twice within 18 hours (June 28 at 4:33 PM and June 29 at 10:04 AM). The ED Physician Record was replaced once (June 29 at 10:18 AM), growing from 12 pages (Batch ID 10878075) to 13 pages (Batch ID 10950345). The additional page corresponds to the Critical Care Addendum. **Original versions of all replaced documents were not produced.**

**(c) Modification volume.** The summary audit reports document **343 total modification events** across multiple staff members, with actions occurring multiple times per minute in several instances.

**(d) The native log gap.** Plaintiff requested native EHR audit logs. Defendants produced summary audit reports generated through a reporting interface that allows parameter selection and filtering. If the underlying native logs contain deletion events, backdating, late authentication, or suppressed document types, the summary reports cannot reveal it.

**(e) The PAD audit gap.** The clinical narrative references Plaintiff's MPOA/PAD. But the audit trail documents contain **no log entry for any staff member accessing, viewing, or reviewing legal documents, advance directives, or PAD records**.

**(f) Sub-therapeutic Depakote mischaracterized.** The Depakote level was documented at 42.3 micrograms per mL, below the standard therapeutic range of 50 to 100. The Neurology Note characterizes this result as **"WNL" (Within Normal Limits)**.

**(g) TBI diagnosis contradicted by imaging.** ICD-10 code S06.2XAA (Diffuse Traumatic Brain Injury) was applied to the encounter on July 2, 2025. The imaging report for the same encounter states **"no acute intracranial abnormality."**

Exhibits E (portal version), H (certified litigation production), V (restraint report), W (summary audit trail documents).

**Deliberate Indifference: Cumulative Notice**

1. By June 28, 2025, HCA had actual notice of the identical pattern at Southern Hills Hospital & Medical Center (2023), MountainView Hospital (2025), and Sunrise Hospital & Medical Center, LLC (April and May 2025). Plaintiff then executed a PAD on June 6, 2025, formalizing those accommodations in a legally binding directive, and it was still ignored 22 days later. Formal complaints to Cook constituted additional direct notice. **HCA's response was not remediation but an "enterprise-wide response" from Nashville.** Within 48 hours of Plaintiff's final complaint, the identical pattern repeated with at least 32 induced seizures and fabricated billing.

2. Decision-makers with authority to correct the problem had notice and failed. At the pre-PAD encounters, facility leadership and attending physicians had the documented seizure disorder in the EHR and failed to modify protocols despite the obvious need. At the June 2025 encounter, the PAD was in the EHR for 22 days, and Yaghoobian as attending had both the documented disability and the formal written directive, yet took no steps to review the PAD, contact Ryan, or halt the B52 despite witnessing at least 32 seizures and critical desaturation. After Plaintiff's corporate complaints, Cook acknowledged receipt, yet no accommodation mechanism was implemented before the June 28 event.

**H. Billing and Claims: RICO Predicate Acts**

1. The following identifies each of the **twelve predicate acts** with Rule 9(b) particularity.

2. **Interstate Transmission Allegations.** Facility claims were transmitted through interstate wires using standardized HIPAA EDI transactions routed through third-party claims infrastructure to payors located outside Nevada. Parallon assigned and validated codes based on physician documentation in HCA's integrated Meditech/HCIS EHR and

submitted each facility claim electronically from Nevada. HCA's Shared Services Center in Richmond, Virginia provided sworn attestation supporting the Sunrise billing. Independent physician billing entities submitted or caused to be submitted separate professional claims through their own billing channels for the same encounters, creating parallel wire transmissions from the same underlying documentation. Each transmission constituted use of interstate wires within the meaning of 18 U.S.C. Sections 1343 and 1347. Dates, locations, actors, claim lanes, and the nature of the false representations are pled with particularity in Paragraphs 85 through 88 and Predicates 1 through 12.

**Predicate 1** | November 30 through December 4, 2023 | Southern Hills Hospital & Medical Center | Parallon (facility) | CMS/insurer | 837I. **False Representation:** Psychiatric hold and B52 medically necessary; "Schizoaffective disorder" and "GID" supported. **Why False:** Patient documented as "calm, cooperative, low risk" by December 1. "Gender Identity Disorder" removed from DSM in 2013. No consent obtained. No contraindication review performed or documented. No documented imminent harm. Detention continued three days past documented resolution.

**Predicate 2** | November 30 through December 4, 2023 (post-litigation) | Southern Hills Hospital & Medical Center | Parallon (facility) | CMS/insurer | 837I; certified record. **False Representation:** Psychiatric evaluation upgraded with psychosis-coded "grandiose themes" not present in pre-litigation version. **Why False:** Portal version lacks "grandiose themes." Contemporaneous observations unchanged in both versions: calm, cooperative, goal-directed. Alteration supports billing posture contradicted by the facility's own data.

**Predicate 3** | March 22 through 24, 2025 | MountainView Hospital | Parallon (facility); Reliant Physicians, LLC (professional) | CMS/insurer | 837I; 837P. **False Representation:** Inpatient services with compliant discharge. **Why False:** No capacity assessment. No neurological clearance. Rideshare discharge of postictal patient. Clinical basis backfilled by non-attending physician the day after discharge.

**Predicate 4** | March 22 through 24, 2025 (post-litigation) | MountainView Hospital | Parallon (facility); Reliant Physicians, LLC (professional) | CMS/insurer | 837I; DRG 880. **False Representation:** Admission reframed from cardiac to psychiatric. DRG 880 assigned. F64.0 "Transsexualism" inserted without clinical purpose. PNES elevated from historical consideration to primary diagnosis. **Why False:** Portal version reflects cardiac narrative with PNES as history and sedation impact documented. Discovery version reframes to psychiatric primary, minimizes cardiac workup, sanitizes sedation documentation, and inserts gender-identity diagnosis code.

**Predicate 5** | April 17 through 22, 2025 | Sunrise Hospital & Medical Center, LLC | Parallon (facility); Alexander F. Akhavan, MD, Ltd. (professional) | CMS/Anthem | UB-04/837I; 837P. **False Representation:** $799,833.00 billed as "reasonable." Diagnosis: pneumonia (stable). **Why False:** Hemoptysis omitted from the record. PE screening not performed. Seizures behavioralized. PE confirmed nine days later at non-HCA facility.

**Predicate 6** | April 17 through 22, 2025 (post-litigation) | Sunrise Hospital & Medical Center, LLC | Parallon (facility); Alexander F. Akhavan, MD, Ltd. (professional) | CMS/Anthem | 837I; discovery production. **False Representation:** PNES elevated to structural diagnosis. "No shortness of breath" inserted contradicting oxygen data. Clinical timeline smoothed. **Why False:**

Record conditioned to justify billing and retroactively justify PE screening failure. Custodian certification admits records may not reflect the timing of entries.

**Predicate 7** | May 29, 2025 | Sunrise Hospital & Medical Center, LLC | Parallon (facility) | CMS/insurer | 837I. **False Representation:** Chemical restraint medically necessary. Seizure activity characterized as behavioral. **Why False:** No consent obtained. No contraindication review performed or documented. Depakote level 7.0 micrograms per mL with no neurology consult or post-loading-dose level. Contradictory entries behavioralize seizure-related fall. Negative toxicology screen contradicts substance insinuation. Discharge signature page contains "Verbal" consent, illegible RN signature, and blank date field with no post-sedation capacity assessment.

**Predicate 8** | May 29, 2025 (post-litigation) | Sunrise Hospital & Medical Center, LLC | Parallon (facility) | CMS/insurer | 837I; discovery production. **False Representation:** B52 relabeled as routine treatment. Capacity fabricated post-sedation. Opioid involvement insinuated despite negative toxicology. Seizure severity minimized. **Why False:** Portal version describes B52 as restraint and flags neurological vulnerability. Discovery version relabels restraint, removes exposure elements, and attributes false substance involvement.

**Predicate 9** | June 28 through 29, 2025 | Southern Hills Hospital & Medical Center | Parallon (facility) | CMS/Anthem | 837I. **False Representation:** Facility services including restraints, monitoring, "DIFFUSE TBI WITH LOC STATUS UNKNOWN." **Why False:** "DIFFUSE TBI" entered more than 12 hours after negative CT with no intervening trauma, imaging, or exam. PAD not reviewed. At least 32 induced seizures. 71.5 hours of restraint documented in hospital logs with zero restraint documentation in 201-page certified production.

Depakote 42.3 micrograms per mL characterized as "WNL" against 50 to 100 therapeutic range. ICD-10 S06.2XAA (Diffuse TBI) applied to encounter where imaging confirmed no acute intracranial abnormality.

**Predicate 10** | June 28 through 29, 2025 | Southern Hills Hospital & Medical Center | Fremont Emergency Services (Scherr), Ltd. (professional, out of network) | Anthem | 837P; CPT 99291. **False Representation:** 37 minutes of critical care by Wright. **Why False:** Eyewitness testimony that Wright was not present and did not perform billed services. Out-of-network professional claim processed through separate billing channel for fabricated services.

**Predicate 11** | June 28 through 29, 2025 | Southern Hills Hospital & Medical Center | Platinum Hospitalists, LLC (professional) | CMS/Anthem | 837P. **False Representation:** Attending hospitalist services by Yaghoobian during a period in which the patient experienced at least 32 induced seizures and oxygen saturation in the 60s. The professional claim necessarily represented that Yaghoobian provided attending-level oversight, management, and stabilizing intervention consistent with the billed service. **Why False:** The contemporaneous record documents at least 32 induced seizures and SpO2 in the 60s with no documented stabilizing intervention, no documented PAD review, no documented seizure contraindication assessment, and no documented contact with the designated decision-maker by the attending physician. Specific claim fields to be confirmed through discovery of CMS-1500/837P claim data.

**Predicate 12** | June 28 through 29, 2025 (post-litigation) | Southern Hills Hospital & Medical Center | Parallon (facility); Fremont Emergency Services (Scherr), Ltd.; Platinum Hospitalists, LLC | CMS/Anthem | 837I; CPT 99291; Bates production. **False Representation:** Narrative smoothing. Retroactive restraint justification. Acuity-support signaling. **Why False:**

Portal version shows restraint was abrupt and justification thin. Litigation version presents restraint as routine and implies stronger justification. Record conditioned to survive CPT 99291 audit.

Amounts for all predicates will be established through claim forms, remittance advice, UB-04 and 837 data, CMS-1500 data, Parallon billing extracts, and professional claim records obtainable through discovery.

1. **Parallel Billing Infrastructure.** The parallel billing structure was not unique to the June 2025 encounter. It was the normal operating model. At MountainView Hospital in March 2025, the same encounter documentation generated both Parallon's facility claim (837I) and Reliant Physicians' professional claim (837P). At Sunrise Hospital & Medical Center, LLC in April 2025, the same encounter documentation generated both Parallon's facility claim (837I/UB-04) and Akhavan Ltd.'s professional claim (837P). At Southern Hills Hospital & Medical Center in June 2025, the same fabricated documentation generated **three separate claims through three separate billing channels**: (a) Parallon's facility claim (837I) to CMS/Anthem; (b) Fremont Emergency Services' out-of-network professional claim (837P/CPT 99291) to Anthem; and (c) Platinum Hospitalists' professional claim (837P) to CMS/Anthem. At each encounter, the facility claim and the professional claim(s) traversed separate interstate wire pathways and arrived at separate payor processing queues. These lanes are parallel, separately monetized, and independently transmitted. The parallel billing structure multiplied the wire transmissions and the fraud, and establishes that the scheme operated through legally independent entities, not through a single corporate actor.

2. **Continuity.** Twelve predicate acts across five encounters, three facilities, and four calendar years (2023 through 2025), involving multiple actors and multiple billing entities operating through the same enterprise infrastructure. The pattern is open-ended, with nothing preventing repetition. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

## I. The RICO Enterprise

1. The enterprise is an **association-in-fact**: the integrated operational workflow connecting HCA's centralized risk management, Parallon's facility-level revenue-cycle operations, independent physician billing entities' professional-claim submissions, HealthTrust's staffing, and market-level hospital administration and clinical staff. The enterprise existed for the ostensibly legitimate purposes of providing emergency healthcare, staffing hospitals, and processing insurance claims. The enterprise was used to shape documentation and coding in a manner that supports reimbursement and litigation posture rather than reflecting the underlying events as recorded contemporaneously. The enterprise is the operational workflow itself (risk management, staffing, EHR documentation, coding validation, facility claims submission, and parallel professional claims submission), not any single corporate defendant in isolation.

2. **Common Purpose.** To shape documentation and coding through the enterprise workflow in a manner that supports reimbursement and litigation posture, rather than reflecting the underlying events as recorded contemporaneously.

3. **The Two Revenue Lanes.** The enterprise generates revenue through two parallel, separately monetized billing lanes that operate from the same underlying EHR documentation. The facility lane runs through Parallon, which assembles 837I/UB-04

claims, assigns DRG and ICD-10 codes, and transmits facility claims electronically to CMS and private insurers. The professional lane runs through the independent physician billing entities (Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Reliant Physicians, LLC; and Alexander F. Akhavan, MD, Ltd.), which assemble 837P/CMS-1500 claims, assign CPT codes, and transmit professional claims through their own billing channels to the same or different payors. These lanes are parallel, separately monetized, and independently transmitted. When the underlying documentation is fabricated or noncompliant, both lanes transmit false claims, multiplying the fraud.

4. **Ongoing Organization and Roles.** HCA provides centralized command, risk management, and policy. Parallon provides coding validation and facility claims submission. The independent physician billing entities submit professional claims through separate channels using the same underlying EHR documentation. HealthTrust provides personnel supply. The hospitals provide facility infrastructure and administration. Individual Defendants provide physician authority, documentation, and orders.

5. **Distinct RICO Persons.** The independent physician billing entities are not HCA subsidiaries. They maintain separate corporate identities, separate billing relationships with payors, and separate revenue streams. Fremont Emergency Services (Scherr), Ltd. billed out of network through a separate processing channel. Each entity's participation in the enterprise is voluntary and produces independent financial benefit. Each of these entities is a separate "person" that profited from the same episode of care through independent claim submission. This structure, legally independent entities coordinating

through shared infrastructure to generate and monetize fraudulent documentation, satisfies the association-in-fact standard. The presence of non-HCA billing entities demonstrates that the enterprise is not reducible to a single corporation or its subsidiaries.

6. **Longevity.** Five encounters, three facilities, November 2023 through June 2025, with multiple rotating actors and billing entities cycling through the same infrastructure.

7. Each Defendant is a RICO "person" distinct from the enterprise. Per-defendant Reves participation is specified in Count Seven below.

**J. Post-Litigation Record Alteration**

1. Plaintiff possesses **two versions of the medical records for every encounter at issue**. Pre-litigation versions were obtained from each facility's patient portal before this action was filed. Litigation-produced versions were subsequently provided through Defendants' certified records and discovery channels. **In every comparison, the litigation-produced version contains material alterations not present in the portal version.**

2. The alteration pattern is consistent across all five encounters at three facilities. **Every change operates in one direction**: escalating pathology, acuity, psychiatric framing, billing justification, or implied consent, while minimizing seizure severity, restraint exposure, and screening failures. No change in any litigation-produced version reduces acuity, corrects a screening failure, acknowledges a restraint violation, or contradicts Defendants' litigation position.

3. **Specific alterations by encounter:**

(a) **Southern Hills Hospital & Medical Center, November 2023** (Exhibits A, G). The litigation-produced version (SHH-M000202 through SHH-M000451, 249 pages, certified

October 24, 2025) materially differs in scope and content from the 6-page pre-litigation portal version. The portal version contains only the Emergency Department provider report. The litigation production includes a Psychiatry Initial Evaluation (Report No. 1201-0321) containing psychosis-coded terminology ("grandiose themes") not present in the portal-accessible record. Behavioral observations documented contemporaneously in both records remain consistent: calm, cooperative, and goal-directed. The portal version documents B52 administration on November 30, 2023 at 16:21. The certified litigation production contains no documented administration on November 30, 2023, with the earliest recorded administration appearing on December 1, 2023 at 15:48, approximately 23.5 hours later. The litigation version classifies the B52 medications as PRN despite HCA Policy COG.COG.001's prohibition on PRN restraint orders. No corresponding restraint order, flowsheet, or monitoring documentation for that PRN chemical restraint was produced. The dictation date for the same clinical note differs between versions by two days. Dr. Bindrup's electronic signature was applied 55 days after dictation. No edit history or audit trail documentation was produced. The Custodian of Records certified the production as "complete records" while including a disclaimer that the record may be "incomplete and/or preliminary." No audit trail documents were produced for this encounter.

**(b) MountainView Hospital, March 2025** (Exhibits B, I). The discovery production reframes a cardiac-driven admission as psychiatric DRG 880, elevates PNES from historical consideration to primary diagnosis, inserts ICD-10 F64.0 "Transsexualism" into the psychiatric coding cluster without clinical purpose, sanitizes sedation impact while the MAR still documents the sedating medications, and compresses the timeline into an outcome-driven narrative. **The clinical workup was cardiac. The billing is psychiatric.**

**(c) Sunrise Hospital & Medical Center, LLC, April 2025** (Exhibits C, J). The discovery production retroactively stabilizes the diagnostic framework that caused the PE screening failure by formalizing pneumonia as the explanatory cause, entrenching PNES as a structural diagnosis, smoothing the clinical timeline, and inserting "no shortness of breath" assertions contradicting earlier oxygen and hypoxia documentation. The custodian certification admits the records may not reflect the timing of entries.

**(d) Sunrise Hospital & Medical Center, LLC, May 2025** (Exhibits D, K). The discovery production relabels the B52 from "chemical restraint" to routine ED treatment, injects psychiatric framing post-sedation, insinuates opioid involvement despite a negative urine toxicology (opiates: NOT DETECTED) with no correction entered, minimizes seizure severity, and fabricates capacity with boilerplate consent language inserted after sedation.

**(e) Southern Hills Hospital & Medical Center, June 2025** (Exhibits E, H, V, W). The Bates-stamped production (SHH-M000001 through SHH-M000201) adds structural metadata, introduces clinical narrative smoothing, supplies retroactive restraint justification framing absent from the contemporaneous portal record, and adds acuity-support signaling consistent with conditioning to survive CPT 99291 audit. The summary audit trail documents 343 modification events, three document replacement events with originals not produced, and a Critical Care Addendum electronically signed approximately 20 hours after admission that was incorporated by replacing the ED Physician Record. An administrative user executed a "Print Patient Audit Log" command on December 23, 2025, approximately six months after discharge and after litigation commenced. **Native EHR audit logs were requested but not produced.**

1. The repetition of the same modification signature across every encounter, at every facility, involving different clinical staff but the same centralized coding, abstracting, and production infrastructure, establishes **enterprise-level process**. The common signature of unidirectional, post-litigation conditioning across separate facilities is consistent with enterprise governance, not isolated clinician judgment.

2. Only native EHR audit trails and metadata can establish when the altered language was inserted, by whom, under what authority, and whether the changes were tied to litigation, billing escalation, or corporate risk management. Defendants had a duty to preserve native ESI once litigation was reasonably foreseeable. To the extent audit trails are missing, incomplete, or produced in non-native form, Plaintiff will seek relief under **Fed. R. Civ. P. 37(e)**. To the extent altered records were produced as certified business records with knowledge of the alterations, Plaintiff reserves the right to seek appropriate relief for fraud upon the court. The post-litigation alterations identified in Predicates 2, 4, 6, 8, and 12 independently support wire fraud predicates, and in the alternative, they constitute evidence of spoliation and obstruction that supports adverse inferences under Rule 37(e)(2).

## K. Permanent Physiological Injury

1. Prior to April 2025, Plaintiff required no anticoagulation and had no hypercoagulability history despite more than 30 hours of surgery. Following Sunrise's failure to diagnose PE, Plaintiff was diagnosed at Summerlin Hospital on May 1, 2025 and later suffered severe upper-extremity DVT. **Hematology has recommended long-term or lifelong anticoagulation.**

2. Lifetime anticoagulation combined with a seizure disorder creates materially increased risk of **fatal intracranial hemorrhage**. Post-Southern Hills, neurologists documented decreased seizure threshold and increased frequency. Each seizure now carries elevated mortality risk.

3. The harm is cascading and irreversible: undiagnosed PE, subsequent thrombotic events, lifetime anticoagulation, decreased seizure threshold, elevated mortality. **This is permanent physiological alteration, not speculative future harm.**

4. On November 6 and 7, 2025, Plaintiff suffered a second clotting event. Anthem denied coverage under Reason Code B67, assigning personal liability of **$47,530.00**.

**L. Concrete Financial Injury**

1. **Plaintiff's assigned personal liability and related financial injury exceeds $483,000.** The Sunrise Hospital & Medical Center, LLC April 2025 encounter was billed at $799,833.00, supported by Jackson's sworn affidavit from Virginia. Summerlin PE treatment was denied by Anthem as "not medically necessary," with personal liability assigned to Plaintiff. The November 2025 clotting event resulted in an additional Anthem denial of $47,530.00.

2. Anthem's denial and assignment of personal liability were proximately caused by Defendants' false discharge narrative and coding. Anthem relied on Sunrise's "stable/pneumonia" characterization and the absence of PE-rule-out workup to treat later PE care as non-covered, assigning the resulting liability to Plaintiff. *Canyon County v. Syngenta Seeds*, 519 F.3d 969, 975 (9th Cir. 2008).

**M. Ongoing Risk and Prospective Relief**

1. Plaintiff's seizure disorder, anticoagulation status, and recurrent emergency episodes make future ED presentation medically foreseeable. The defendant hospitals are among the primary emergency facilities serving Plaintiff's geographic area. Plaintiff cannot guarantee avoidance of Defendants' facilities during emergency transport, and Defendants have not implemented any verifiable enterprise-wide mechanism ensuring PAD compliance.

2. Plaintiff therefore faces a non-hypothetical, imminent risk of being subjected to the same denied modifications and restraint practices, satisfying Article III standing for prospective relief. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

**N. Timeliness**

1. All federal claims are timely. To the extent any state-law claim arising from the November 30 through December 4, 2023 encounter is subject to a two-year limitation period, that period is tolled by fraudulent concealment. Plaintiff did not discover, and could not have discovered through reasonable diligence, the material discrepancies between the portal version and the litigation-produced version of the Southern Hills Hospital & Medical Center 2023 records until Defendants produced the certified litigation version on or about October 24, 2025. The record alterations identified in Exhibit 22, including the insertion of psychosis-coded terminology not present in the portal version, the 23.5-hour shift in the documented B52 administration time, and the reclassification of chemical restraints as PRN medications, were concealed within records exclusively within Defendants' custody and control. Additionally, the pattern of

noncompliance constitutes a continuing violation spanning November 2023 through June 2025 across three facilities, with each subsequent encounter renewing the limitation period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

## VI. CAUSES OF ACTION

**Count One: EMTALA, Disparate Screening, 42 U.S.C. Section 1395dd(a) (Against Sunrise Hospital & Medical Center, LLC)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. Sunrise Hospital & Medical Center, LLC is a participating EMTALA hospital. Plaintiff presented on April 17, 2025 with chest pain, dyspnea, supplemental oxygen requirement, abnormal imaging, and hemoptysis following more than 30 hours of prior surgery.

3. Sunrise's standard screening for similarly situated post-surgical patients includes PE-rule-out testing. **Sunrise provided Plaintiff a materially different screening**: portable chest X-ray only, no PE workup. The disparity was caused by behavioralization of Plaintiff's seizure disorder as "psychogenic," which permitted dismissal of concurrent physiological symptoms.

4. The violation was complete at the ED screening stage, before any inpatient admission decision. The litigation discovery production confirms that the behavioralization was retroactively reinforced after litigation commenced by entrenching PNES from historical consideration to structural diagnosis and inserting "no shortness of breath" assertions contradicting the record's own oxygen data.

5. **Result:** undiagnosed PE, confirmed nine days later at a non-HCA facility.

**Count Two: EMTALA, Failure to Stabilize, 42 U.S.C. Section 1395dd(b) and (c) (Against Southern Hills Hospital & Medical Center)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. On June 28, 2025, Plaintiff presented post-seizure. Rather than stabilize, ED staff administered B52 contraindicated for her seizure disorder, inducing at least 32 additional seizures and SpO2 in the 60s. **Plaintiff was materially less stable at discharge than upon arrival.** *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162 (9th Cir. 2002); *Cleland v. Bronson Health Care Grp.*, 917 F.2d 266, 269 (6th Cir. 1990).

3. Any nominal "admission" was not a bona fide inpatient admission terminating EMTALA duties. EMTALA defines "transfer" to include discharge. 42 C.F.R. Section 489.24(b). Defendants discharged Plaintiff while materially unstable. The record confirms: no inpatient bed was assigned; Plaintiff was never transferred from the Emergency Department to an inpatient unit; no inpatient attending orders were entered; and Plaintiff remained under ED-level management throughout the encounter. Unlike the genuine inpatient admission in *Bryant*, where the patient was transferred to an inpatient unit and received inpatient-level care, Plaintiff was destabilized rather than stabilized while remaining under ED management. **The "admission" was a billing status, not a clinical reality.**

**Count Three: EMTALA, Failure to Stabilize, 42 U.S.C. Section 1395dd(b) and (c) (Against MountainView Hospital)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. On March 22, 2025, Plaintiff presented with active seizures and remained postictal throughout the hospitalization. MountainView Hospital discharged Plaintiff via rideshare without contemporaneous capacity assessment, neurological clearance, or postictal resolution confirmation.

3. Plaintiff acknowledges that MountainView Hospital maintained inpatient status from March 22 through 24, 2025. The MountainView EMTALA claim is pleaded in the alternative. If the Court determines that bona fide inpatient admission terminated EMTALA's stabilization duty, Plaintiff's disability discrimination and state tort claims under Counts Four, Six, Eleven, Thirteen, and Fourteen independently reach the identical discharge conduct as failures of access, accommodation, and consent. The discharge functioned as an EMTALA "transfer" because it moved Plaintiff outside the hospital while the emergency condition persisted. 42 C.F.R. Section 489.24(b). Plaintiff's postictal state following active seizures constituted an ongoing emergency medical condition because material deterioration, including recurrent seizures, was reasonably likely to occur during unsupervised transit, which is the stabilization standard under 42 U.S.C. Section 1395dd(e)(3)(A).

**Count Four: Disability Discrimination, Denial of Meaningful Access, Section 504, 29 U.S.C. Section 794; ADA Title III, 42 U.S.C. Section 12182 (Against HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC; MountainView Hospital; Southern Hills Hospital & Medical Center; Parallon Business Solutions, LLC; and HealthTrust Workforce Solutions, LLC)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. Plaintiff is a qualified individual with a disability who sought emergency services, a federally funded program. At each encounter, Defendants denied her the benefits of that program through the operational failures detailed in the encounter allegations above. At Southern Hills Hospital & Medical Center in November 2023: no contraindication review performed or documented, consent not obtained, designated person not contacted, detention sustained beyond necessity. At MountainView Hospital in March 2025: designated person not contacted, no capacity assessment, rideshare discharge. At Sunrise Hospital & Medical Center, LLC in April 2025: seizure disorder behavioralized, PE screening denied. At Sunrise Hospital & Medical Center, LLC in May 2025: B52 administered without PAD review, Ryan contact, or contraindication review. At Southern Hills Hospital & Medical Center in June 2025: PAD not reviewed, Ryan not contacted, B52 administered, inducing at least 32 seizures and SpO2 in the 60s.

3. Defendants had actual notice through the PAD in the EHR, the documented seizure disorder, the November 2023 encounter establishing the pattern, and formal complaints to Cook in June 2025. Despite repeated notice and known risk, Defendants failed to implement PAD review procedures, modify restraint protocols, or ensure decision-maker contact. *Duvall*, 260 F.3d at 1139.

4. **These failures are operational, not clinical judgment.** HCA failed to modify policies. Each hospital failed to implement PAD procedures. Parallon processed noncompliant billing. HealthTrust supplied personnel without required training or protocols.

5. **Remedial framework.** Plaintiff seeks compensatory damages under Section 504 and Section 1557. Plaintiff seeks injunctive relief under ADA Title III, Section 504, and Section 1557. Plaintiff does not seek damages under ADA Title III. To the extent any

element of this Count is recharacterized as professional negligence, the recharacterization applies only to the supplemental state-law theory, and the federal statutory claims survive independently.

**Count Five: Retaliation, 42 U.S.C. Section 12203; 29 U.S.C. Section 794a (Against HCA Healthcare, Inc.; Southern Hills Hospital & Medical Center; Cinthya S. Cook; Jonathan Yaghoobian, MD; Brent J. Wright, DO; Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Michael A. Orber; and Michael A. Orber & Associates, Inc.)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. **Protected activity:** pre-litigation notices to Cook on June 22 and 26, 2025.

3. **Adverse action within 48 hours:** chemical restraints, physical restraints, PAD override, at least 32 induced seizures, SpO2 in the 60s, unsupported diagnoses, misgendering, gender-affirming care withheld, and fabricated CPT 99291 billing.

4. **Causal chain per Defendant:** Cook directed the enterprise-wide response. Yaghoobian failed to intervene as attending. Wright fabricated billing. Platinum Hospitalists, LLC and Fremont Emergency Services (Scherr), Ltd. submitted professional claims derived from the retaliatory encounter. On information and belief, Orber participated in complaint-response and retaliation communications with Cook and/or Nevada facility leadership preceding the June 28-29, 2025 encounter. Discovery will clarify the full chain, including call logs, emails, and EHR audit-trail access and change history.

**Count Six: Sex and Disability Discrimination, ACA Section 1557, 42 U.S.C. Section 18116 (Against HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC; MountainView Hospital; Southern Hills Hospital & Medical Center; Parallon Business Solutions, LLC; and HealthTrust Workforce Solutions, LLC)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. **Disability discrimination:** accommodation denials as detailed in Count Four constitute independent violations of Section 1557's prohibition on disability discrimination in federally funded healthcare programs. **Sex discrimination**, as an independent and alternative theory: obsolete "Gender Identity Disorder" diagnosis at Southern Hills Hospital & Medical Center in 2023; withholding gender-affirming therapy at Southern Hills Hospital & Medical Center in 2023 and 2025; misgendering at Southern Hills Hospital & Medical Center in 2025; and post-litigation insertion of ICD-10 F64.0 "Transsexualism" into MountainView Hospital's psychiatric DRG coding cluster for a cardiac admission without clinical purpose, using a gender-identity diagnosis code as billing infrastructure. Section 1557 prohibits discrimination on the basis of sex. The Supreme Court held in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020), that discrimination based on transgender status is necessarily discrimination "because of sex." Multiple circuits have applied *Bostock* to healthcare contexts. *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024). Regardless of the current regulatory enforcement posture, *Bostock* is a statutory interpretation binding on this Court. In the further alternative, the conduct alleged, including sex-stereotyping documentation, withholding gender-affirming treatment, and using gender-identity diagnoses as billing infrastructure, constitutes sex-

stereotyping discrimination actionable under Section 1557 even under a reading of "sex" that does not expressly encompass gender identity. These claims are independent of one another.

**Count Seven: Civil RICO, 18 U.S.C. Section 1962(c) (Against All Defendants and Does 1 through 50)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein, including the predicate act identifications, parallel billing infrastructure, and enterprise structure.

2. Each Defendant conducted or participated in the enterprise's affairs through predicate violations of 18 U.S.C. Sections 1347 and 1343, related by common purpose, participants, methods, and victim. Open-ended continuity. *H.J. Inc.*, 492 U.S. at 239.

3. **Per-Defendant Reves Participation.**

**HCA Healthcare, Inc.:** Management-level direction through policies, risk management, and Cook's escalation.

**Parallon Business Solutions, LLC:** Operational execution; validated codes and submitted each facility claim.

**HealthTrust Workforce Solutions, LLC:** Personnel supply; staffed the restraint administration and documentation at each encounter without training or credentialing protocols for seizure contraindication review, PAD compliance, or decision-maker contact, enabling the enterprise's noncompliant documentation to be generated at the point of care.

**Sunrise Hospital & Medical Center, LLC; MountainView Hospital; and Southern Hills Hospital & Medical Center:** Facility-level administration for their respective predicates.

**Cinthya S. Cook:** Management-level direction of complaint-response preceding Predicates 9 through 12.

**Jonathan Yaghoobian, MD:** Physician authority sustaining the Predicate 9 encounter.

**Platinum Hospitalists, LLC:** Submitted separate professional claim (Predicate 11) for Yaghoobian's attending services; received direct financial benefit from claims generated by fabricated or noncompliant documentation while the attending failed to intervene during 32 induced seizures and SpO2 in the 60s.

**Brent J. Wright, DO:** Direct commission; fabricated CPT 99291 (Predicate 10).

**Fremont Emergency Services (Scherr), Ltd.:** Submitted separate out-of-network professional claim (Predicate 10) for Wright's fabricated CPT 99291 critical care; received direct financial benefit from a professional claim for services an eyewitness will testify were never rendered.

**James Bindrup, MD:** Physician authority sustaining Predicate 1 detention and billing.

**Tarik Alshaikh, DO:** Attending physician authority over inpatient psychiatric admission, treatment plan, medication management, and continued detention generating Predicate 1.

**Rowena E. Achin, MD:** Physician authority; noncompliant discharge generating Predicate 3.

**Reliant Physicians, LLC:** Submitted separate professional claim (Predicate 3) for Achin's attending services at MountainView Hospital; received direct financial benefit from claims generated by documentation supporting noncompliant rideshare discharge of a postictal patient.

**Alexander F. Akhavan, MD:** Physician authority; screening scope creating the Predicate 5 diagnostic gap by omitting PE workup.

**Alexander F. Akhavan, MD, Ltd.:** Submitted separate professional claim (Predicate 5) for Akhavan's services at Sunrise Hospital & Medical Center, LLC; received direct financial benefit

from claims generated by documentation that omitted hemoptysis, behavioralized seizures, and foreclosed PE screening.

**Michael A. Orber and Michael A. Orber & Associates, Inc.:** On information and belief, based on timing and subsequent conduct, participated in complaint-response and retaliation communications preceding Predicates 9 through 12.

1. Plaintiff's assigned personal liability and related financial injury exceeds **$483,000**. Anthem's denial was proximately caused by Defendants' false discharge narrative and coding. **Treble damages under Section 1964(c).**

## Count Eight: RICO Conspiracy, 18 U.S.C. Section 1962(d) (Against All Defendants and Does 1 through 50)

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. Each Defendant agreed to the enterprise's objective and committed overt acts as specified in Count Seven.

## Count Nine: Civil Rights Conspiracy, 42 U.S.C. Section 1985(3) (Against All Defendants)

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein. This count is pleaded in the alternative.

2. Defendants conspired to deprive Plaintiff of equal protection in access to emergency medical services and to punish her for invoking federal disability and sex-discrimination rights. *Griffin v. Breckenridge*, 403 U.S. 88 (1971). The agreement is inferred from coordinated documentation practices, parallel billing behavior, and retaliatory escalation immediately following protected activity.

3. **Class-based animus** is evidenced by the following: use of obsolete "Gender Identity Disorder" diagnosis at Southern Hills Hospital & Medical Center in 2023; post-litigation insertion of ICD-10 F64.0 "Transsexualism" into a psychiatric DRG billing cluster for a cardiac admission at MountainView Hospital without clinical purpose; repeated misgendering and sex-stereotyping documentation; use of psychiatric labels to justify coercive restraints against a transgender woman asserting disability-rights protections; and withholding gender-affirming care. Michael A. Orber, Platinum Hospitalists, LLC, Fremont Emergency Services (Scherr), Ltd., Reliant Physicians, LLC, and Alexander F. Akhavan, MD, Ltd., entities outside HCA's corporate family, participated in or profited from the conduct through independent billing and interstate communications, defeating any intra-corporate conspiracy defense.

4. In the further alternative, Plaintiff invokes the hindrance clause: Defendants conspired to hinder access to federal protections by making complaint dangerous and futile. *Kush v. Rutledge*, 460 U.S. 719, 726 (1983).

**Count Ten: Fraud, Record Falsification, and Billing Misrepresentation (Against All Defendants)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. Each Defendant knowingly made or enabled material misrepresentations as identified in the Predicate Acts section above. Insurers and CMS relied on these representations. Anthem relied on Sunrise's "stable/pneumonia" characterization to deny PE treatment coverage. Subsequent providers relied on the corrupted chart. Plaintiff relied on the integrity of her medical record in seeking follow-up care and insurance coverage, and

suffered damages when that record's false representations caused Anthem to deny coverage and assign personal liability.

3. Plaintiff's forensic comparison of pre-litigation and litigation-produced records identified narrative insertions, terminology escalations, and coding-layer fabrications across all five encounters at three facilities, each operating in the same direction: escalating pathology, acuity, and billing justification. **Every identified modification supports Defendants' reimbursement posture and litigation defense. None reduces acuity, corrects a screening failure, acknowledges a restraint violation, or contradicts Defendants' position.** The pattern of unidirectional, outcome-driven alteration, documented across every encounter at every HCA facility involved in this case over nineteen months, constitutes systematic record falsification in furtherance of the fraudulent billing scheme and obstruction of the fact-finding process.

**Count Eleven: Battery (Against Sunrise Hospital & Medical Center, LLC and Southern Hills Hospital & Medical Center)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. Administration of chemical and physical restraints at Sunrise Hospital & Medical Center, LLC on May 29, 2025 and at Southern Hills Hospital & Medical Center in November 2023 and June 2025 constituted intentional, unauthorized, harmful touching. For the June 2025 encounter, the PAD explicitly withdrew consent and specified prerequisites that were not met. *Humboldt Gen. Hosp. v. Sixth Jud. Dist. Ct.*, 376 P.3d 167, 171 (Nev. 2016). For the November 2023 and May 2025 encounters, no informed consent was obtained and no emergency justification to bypass consent was documented. Hospitals

are vicariously liable for employees' intentional torts committed within scope. *Rockwell v. Sun Harbor Budget Suites*, 112 Nev. 1217, 1223 (1996).

3. **Plaintiff's theory is not failure to obtain informed consent. It is the absence of consent and intentional restraint after consent was expressly withheld unless specified prerequisites were met.**

**Count Twelve: False Imprisonment (Against Southern Hills Hospital & Medical Center; James Bindrup, MD; and Tarik Alshaikh, DO)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. Intentional confinement by restraints and involuntary holds without consent or lawful authority in November 2023 and June 2025. Bindrup's provider authority sustained the November 2023 detention after documented resolution of the emergency condition. Alshaikh, as attending physician for the inpatient psychiatric admission from December 1 through December 4, 2023, maintained the involuntary hold despite contemporaneous documentation reflecting calm, cooperative, and low-risk presentation, without documentation of ongoing imminent risk justifying continued detention.

**Count Thirteen: Intentional Infliction of Emotional Distress (Against All Defendants)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. **The following conduct was extreme and outrageous.** At Southern Hills Hospital & Medical Center in June 2025: abandoning a seizing patient with SpO2 in the 60s during at least 32 induced seizures (Yaghoobian, Wright, Southern Hills Hospital & Medical

Center, HealthTrust staff); fabricating CPT 99291 billing (Wright, Fremont Emergency Services (Scherr), Ltd.); fabricating "DIFFUSE TBI" after negative imaging (Jane Doe, RN; Southern Hills Hospital & Medical Center); billing for attending services while the attending failed to intervene (Platinum Hospitalists, LLC). At Southern Hills Hospital & Medical Center in November 2023: entering obsolete stigmatizing diagnoses, detaining Plaintiff three days past documented necessity, and continuing involuntary detention without required documentation (Bindrup, Alshaikh, Southern Hills Hospital & Medical Center). At Sunrise Hospital & Medical Center, LLC in April 2025: omitting hemoptysis, narrowing the narrative to avoid PE screening, and billing $799,833.00 through facility and professional channels (Akhavan, Alexander F. Akhavan, MD, Ltd., Sunrise Hospital & Medical Center, LLC, Parallon Business Solutions, LLC). At MountainView Hospital in March 2025: rideshare discharge of a postictal patient (Achin, Reliant Physicians, LLC, MountainView Hospital). At the enterprise level: Cook responding to complaints with an "enterprise-wide response" that preceded the most severe retaliatory encounter (HCA Healthcare, Inc., Cook). Across all encounters: Parallon Business Solutions, LLC validating and submitting facility claims assembled from fabricated documentation.

3. **No expert is required. Each act is attributed to specific Defendants.**

## Count Fourteen: Failure of Corporate Governance and Administrative Oversight (Against HCA Healthcare, Inc. and HealthTrust Workforce Solutions, LLC)

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

2. **This claim challenges corporate governance and administrative policy decisions, not clinical judgment.** The November 2023 encounter placed HCA and HealthTrust on

actual notice that their operational systems failed to ensure PAD review, seizure-related documentation compliance, designated decision-maker contact, and documented authorization before discharge of patients with active seizure disorders.

3. Despite that notice, HCA and HealthTrust failed to implement PAD hard-stop alerts, modify restraint protocol training, implement decision-maker contact procedures, or audit restraint documentation practices. These are corporate governance functions, not exercises of professional medical judgment.

4. This failure caused the foreseeable repetition at MountainView Hospital in March 2025, at Sunrise Hospital & Medical Center, LLC in April and May 2025, and at Southern Hills Hospital & Medical Center in June 2025. Claims challenging institutional administrative failures and corporate governance deficiencies, rather than the professional judgment of individual providers rendering patient care, fall outside the scope of NRS Chapter 41A's affidavit requirements. NRS 41A.015 (defining the professional negligence trigger by reference to providers of health care rendering services); *Egan*, 129 Nev. at 242. HCA Healthcare, Inc. and HealthTrust Workforce Solutions, LLC are sued here for failures of enterprise policy, training infrastructure, and compliance governance, not for individual clinical decisions at the bedside. Even if this Court were to characterize this claim as sounding in professional negligence under Nevada law, it is pled only as a supplemental state-law claim under 28 U.S.C. Section 1367. The federal claims in Counts One through Nine are independent of this Count and are not predicated on any breach of professional standard of care.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests:

**A.** Compensatory damages including permanent physiological injury, lifetime anticoagulation, elevated mortality risk, loss of surgical safety, and reduced life expectancy;

**B.** Treble damages under 18 U.S.C. Section 1964(c);

**C.** Punitive damages under Nevada law;

**D.** Injunctive relief, narrowly tailored to preserve evidence and prevent recurrence:

**Evidence Preservation and Production:** (i) Order Defendants to produce native EHR audit logs, note-history exports, and version metadata for each document identified in Paragraphs 96 through 99; (ii) order Defendants to append a corrective addendum without altering original entries to Plaintiff's medical records, in accordance with 45 C.F.R. Section 164.526, identifying each document for which the pre-litigation portal version and the litigation-produced version materially differ, with complete audit trails documenting the timing, authorship, and authorization for each alteration;

**Prospective Accommodation and Operational Hard-Stops:** (iii) flag Plaintiff's PAD as a hard-stop alert in the EHR requiring documented physician acknowledgment before any sedative or physical restraint, and implement enterprise-wide protocols requiring seizure contraindication assessment before B52 or equivalent chemical restraint administration to any patient with a documented seizure disorder; (iv) require neurological capacity assessment before unsupervised discharge of seizure patients; (v) prohibit B52 absent documented contraindication review for patients with seizure disorders; (vi) implement PE screening protocols for post-surgical patients presenting with chest pain and dyspnea; (vii) cease administering chemical

restraints to Plaintiff absent PAD compliance and seizure contraindication review, and cease sex-stereotyping and misgendering in Plaintiff's medical record;

**E.** Attorneys' Fees and Costs: As provided by 18 U.S.C. Section 1964(c), 42 U.S.C. Section 12205, 29 U.S.C. Section 794a, 42 U.S.C. Section 1988, and any other applicable statute. In the event Plaintiff retains counsel or assigns this action at any stage, such counsel shall be entitled to recover reasonable attorneys' fees from the date of retention forward;

**F.** Pre-judgment and post-judgment interest;

**G.** Such further relief as the Court deems just.

## VIII. EXHIBIT INDEX

Plaintiff's exhibits are limited to source documents. Witness declarations are filed separately. This exhibit index is a living table that will be supplemented as additional exhibits are identified or produced through discovery.

**Medical Records (Pre-Litigation Portal Versions)**

| Ex. | Description |
|---|---|
| **A** | Southern Hills Hospital & Medical Center Records, Nov. 30 to Dec. 4, 2023 (pre-litigation portal version) |
| **B** | MountainView Hospital Records, Mar. 22-24, 2025 (pre-litigation portal version) |
| **C** | Sunrise Hospital & Medical Center, LLC Records, Apr. 17-22, 2025 (pre-litigation portal version) |

| Ex. | Description |
|-----|-------------|
| D | Sunrise Hospital & Medical Center, LLC Records, May 29, 2025 (pre-litigation portal version) |
| E | Southern Hills Hospital & Medical Center Records, Jun. 28-29, 2025 (pre-litigation portal version) |
| F | Summerlin Hospital Records, PE Confirmation, May 1, 2025 (pre-litigation portal version) |

**Medical Records (Discovery Productions)**

| Ex. | Description |
|-----|-------------|
| G | Southern Hills Hospital & Medical Center, Admit 11/30/23-12/04/23 (SHH-M000202 through SHH-M000451, 249 pages, certified litigation production) |
| H | Southern Hills Hospital & Medical Center, Admit 06/28/25 (SHH-M000001 through SHH-M000201, 201 pages, certified litigation production) |
| I | MountainView Hospital, Admit 03/22/25-03/24/25 (MVH-M000001 through MVH-M000254, 254 pages, certified litigation production) |
| J | Sunrise Hospital & Medical Center, LLC, Admit 04/17/25 (SH-M000001 through SH-M000350, 350 pages, certified litigation production) |
| K | Sunrise Hospital & Medical Center, LLC, Admit 05/29/25 (SH-M000351 through SH-M000403, 52 pages, certified litigation production) |

**Advance Directives**

| Ex. | Description |
| --- | --- |
| L | Psychiatric Advance Directive (Notarized, June 6, 2025) |
| M | PAD Addendum (Notarized, Sept. 2025) |

**Correspondence and Notices**

| Ex. | Description |
| --- | --- |
| N | Plaintiff's Pre-Litigation Notice to Cook, June 22, 2025 (with media escalation attachment) |
| O | Plaintiff's Final Pre-Litigation Notice to Cook, June 26, 2025 |

**Billing and Financial Documents**

| Ex. | Description |
| --- | --- |
| P | Jackson Affidavit of Business Records, $799,833.00 (Richmond, Virginia) |
| Q | Anthem EOB / Denial Letter, Summerlin PE Treatment ("not medically necessary") |
| R | Anthem EOB / Denial Letter, November 2025 Clotting Event (Reason Code B67, $47,530.00) |
| S | Physician Billing Entity Identification (EOBs, NPI records, and billing data identifying Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Reliant Physicians, LLC; and Alexander F. Akhavan, MD, Ltd.) |

**Corporate and Institutional Documents**

| Ex. | Description |
|-----|-------------|
| T | HCA Healthcare, Inc. 2024 Form 10-K (Excerpted) |
| U | HealthTrust Privacy Policy (reference to "HCA Healthcare Data Protection Officer," Nashville) |

**Facility-Generated Reports**

| Ex. | Description |
|-----|-------------|
| V | Southern Hills Hospital & Medical Center Restraint Report, June 28-30, 2025 (SHH-RESRPT000001) |
| W | Southern Hills Hospital & Medical Center Summary Audit Trail Documents (SHH-AT000001 through SHH-AT000012) |

### DEMAND FOR JURY TRIAL

**Plaintiff demands trial by jury on all issues so triable.**

I certify that Artificial Intelligence was used to prepare the foregoing document.

DATED: February 21, 2026

Respectfully submitted,

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2026, I electronically filed the foregoing **Second Amended Complaint** with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record registered to receive electronic notifications in this case, including:

                    Michael E. Prangle
                    Zachary J. Thompson
                    Hall Prangle, LLC
                    1140 N. Town Center Drive, Suite 350
                    Las Vegas, NV 89144

                    *Counsel for HCA Healthcare, Inc.;*
                    *Sunrise Hospital & Medical Center, LLC;*
                    *MountainView Hospital;*
                    *and Southern Hills Hospital & Medical Center*

I further certify that the following Defendants, who have not yet appeared in this action, will be served with process in accordance with Federal Rule of Civil Procedure 4:

          Parallon Business Solutions, LLC; HealthTrust Workforce Solutions, LLC; Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Reliant Physicians, LLC; Alexander F. Akhavan, MD, Ltd.; Cinthya S. Cook, MSN/MHA, RN, CPPS; Jonathan Yaghoobian, MD; Brent J. Wright, DO; James Bindrup, MD; Rowena E. Achin, MD; Alexander F. Akhavan, MD; Tarik Alshaikh, DO; Michael A. Orber; and Michael A. Orber & Associates, Inc.

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se