Jade Riley Burch
Plaintiff, Pro Se
222 Karen Avenue, Unit 1207
Las Vegas, NV 89109
Tel: (614) 725-9452
Email: jaderburch@gmail.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Jade Riley Burch,

               Plaintiff.

vs.

HCA Healthcare, Inc., et al.,

               Defendants.

Case No.: 2:25-cv-01408-JAD-MDC

**PLAINTIFF'S NOTICE OF ERRATA REGARDING PROPOSED SECOND AMENDED COMPLAINT**
*(Exhibit to Motion for Leave to Amend, ECF No. 74)*

      Plaintiff Jade Riley Burch, proceeding pro se, respectfully submits this Notice of Errata to correct the proposed Second Amended Complaint attached as an exhibit to Plaintiff's Motion for Leave to File Second Amended Complaint (ECF No. 74).

### I. BASIS FOR CORRECTION

1. The proposed Second Amended Complaint filed with the Motion for Leave was a draft version that did not include two individual defendants whose involvement was identified through Plaintiff's ongoing review of Defendants' certified medical records production.

2. Specifically, Defendants' certified litigation production for the November 30 through December 4, 2023 Southern Hills Hospital encounter consisted of 250 pages produced as non-searchable, image-based PDF files. Because the production was not text-searchable as received, Plaintiff was required to perform optical character recognition ("OCR")

processing on the documents independently before meaningful review and analysis could be conducted.

3. Only after completing OCR processing and conducting a detailed forensic comparison of the now-searchable litigation production against Plaintiff's pre-litigation patient portal records (37 pages) did the documentary evidence identifying the direct roles of Nicole Mann, RN, and Jonathan Wirjo, DO, in the initiation and maintenance of Plaintiff's involuntary psychiatric detention become apparent.

4. This evidence was contained exclusively within the certified litigation production -- specifically, the Application for Emergency Admission (L2K) forms, electronic order entries, and administrative records -- and was not available from the pre-litigation patient portal records, which included only provider clinical notes and not the underlying administrative forms, legal hold documentation, or electronic order entries.

## II. CORRECTIONS

5. The corrected proposed Second Amended Complaint, attached hereto as **Exhibit 1**, makes the following additions:

a. **Caption:** Adds Nicole Mann, RN, in her individual capacity, and Jonathan Wirjo, DO, in his individual capacity, as defendants.

b. **Parties:** Adds new paragraphs identifying Nicole Mann, RN, as the registered nurse who initiated the Application for Emergency Admission (L2K) under NRS 433A.160 on November 30, 2023, within two minutes of Plaintiff's triage and before any physician evaluation, and whose application materially overstated the severity of Plaintiff's presentation relative to the subsequent physician assessment; and Jonathan Wirjo, DO, as the physician who formalized the

1   involuntary legal hold status in the electronic medical record system and maintained the

2   involuntary hold through December 4, 2023.

3       **c. Factual Allegations:** Adds specific factual allegations regarding: (i) the internal

4   inconsistency between Mann's L2K application, which checked boxes for "Attempting Suicide"

5   and "Causing bodily injury" and described elaborate plans, and Dr. Bindrup's subsequent

6   physician assessment documenting suicidal ideation with a nonspecific plan; (ii) diagnostic code

7   manipulation between encounters, including the unexplained abandonment of a schizoaffective

8   disorder diagnosis; (iii) the use of ICD-10 code F64.0 ("Transsexualism") in the coding summary

9   despite the treating psychiatrist documenting "Gender Dysphoria"; (iv) the filing of a petition for

10  court-ordered involuntary admission on December 4, 2023 -- the same day the discharge

11  summary found Plaintiff low risk, euthymic, and safe for discharge; and (v) the administrative

12  insertion of "Major Depressive Disorder" as the reason for visit on the psychiatric encounter face

13  sheet, a diagnosis no treating provider rendered.

14      **d. Claims:** Adds Mann and Wirjo to the False Imprisonment and Fraud/Record

15  Falsification causes of action, and incorporates their conduct into the existing RICO pattern

16  allegations.

17

18      **6.**  In addition to the above, Plaintiff made minor factual refinements throughout the

19          proposed Second Amended Complaint to ensure accuracy and consistency with the

20          medical records, including correcting the sequence of Plaintiff's presentation and

21          admission at certain encounters and clarifying surgical history details. These refinements

22          do not add new claims, new defendants, or new legal theories. All substantive legal

23          theories and causes of action remain unchanged.

### III. PREJUDICE

**7.** This errata does not prejudice Defendants. The Motion for Leave has not yet been granted, no responsive pleading to the proposed Second Amended Complaint has been filed, and Defendants' right to oppose the Motion for Leave remains unaffected. The additions are based entirely on Defendants' own certified medical records production and do not alter the fundamental theories of the case.

### IV. REQUEST

**8.** Plaintiff respectfully requests that the Court treat the corrected proposed Second Amended Complaint attached hereto as the operative proposed pleading in connection with the pending Motion for Leave to Amend.

DATED: February 22, 2026

Respectfully submitted,

/s/ Jade Riley Burch
JADE RILEY BURCH
Plaintiff, Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2026, I electronically filed the foregoing **PLAINTIFF'S NOTICE OF ERRATA REGARDING PROPOSED SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record registered to receive electronic notifications in this case, including:

> Michael E. Prangle
> Zachary J. Thompson
> Hall Prangle, LLC
> 1140 N. Town Center Drive, Suite 350
> Las Vegas, NV 89144
>
> *Counsel for HCA Healthcare, Inc.;*
> *Sunrise Hospital & Medical Center, LLC;*
> *MountainView Hospital;*
> *and Southern Hills Hospital & Medical Center*

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se

# EXHIBIT 1

Jade Riley Burch
Plaintiff, Pro Se
222 Karen Avenue, Unit 1207
Las Vegas, NV 89109
Tel: (614) 725-9452
Email: jaderburch@gmail.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Jade Riley Burch,

              Plaintiff.

vs.

HCA HEALTHCARE, INC.; SUNRISE
HOSPITAL & MEDICAL CENTER, LLC;
MOUNTAINVIEW HOSPITAL, INC.;
SOUTHERN HILLS HOSPITAL & MEDICAL
CENTER, LLC; PARALLON BUSINESS
SOLUTIONS, LLC; HEALTHTRUST
WORKFORCE SOLUTIONS, LLC;
PLATINUM HOSPITALISTS, LLC;
FREMONT EMERGENCY SERVICES
(SCHERR), LTD.; RELIANT PHYSICIANS,
LLC; ALEXANDER F. AKHAVAN, MD,
LTD.; CINTHYA S. COOK, MSN/MHA, RN,
CPPS, in her individual capacity; JONATHAN
YAGHOOBIAN, MD, in his individual
capacity; BRENT J. WRIGHT, DO, in his
individual capacity; JAMES BINDRUP, MD, in
his individual capacity; ROWENA E. ACHIN,
MD, in her individual capacity; ALEXANDER
F. AKHAVAN, MD, in his individual capacity;
TARIK ALSHAIKH, DO, in his individual
capacity; NICOLE MANN, RN, in her
individual capacity; JONATHAN WIRJO, DO,
in his individual capacity; MICHAEL A.
ORBER, an individual; MICHAEL A. ORBER
& ASSOCIATES, INC., a California
corporation; DOES 1-50, inclusive,

              Defendants.

Case No.: 2:25-cv-01408-JAD-MDC

**SECOND AMENDED COMPLAINT FOR
CIVIL RIGHTS VIOLATIONS, EMTALA
VIOLATIONS, CIVIL RICO AND
RELATED STATE CLAIMS**

## I. INTRODUCTION

1. **This case is about a healthcare conglomerate that refused, five times across three hospitals over nineteen months, to accommodate a patient with a known seizure disorder.** Every federal claim turns on objective compliance questions that can be answered from the medical record alone: Was a contraindication review performed or documented before staff administered seizure-threshold-lowering drugs? Was consent obtained? Was a legally binding Psychiatric Advance Directive ("PAD") reviewed at the one encounter where it was on file? Did the billing match what actually happened? **These are yes-or-no questions. The missing documentation is itself the violation.** This is not a dispute about whether a particular drug or dosage was clinically optimal. It is a dispute about whether legal requirements for access and consent were met.

2. Plaintiff Jade Riley Burch is a transgender woman with a documented seizure disorder and PTSD. Between November 2023 and June 2025, she was subjected to the same pattern of operational noncompliance at three HCA Healthcare hospitals in Nevada. At each facility, staff administered chemical restraints without assessing seizure contraindications, without obtaining consent, and, at the one encounter where a legally binding PAD was in effect, without reviewing or honoring that directive. Staff refused to contact designated decision-makers during postictal incapacity. Staff entered pretextual psychiatric diagnoses to justify the restraints. Staff discharged Plaintiff without the capacity assessments her neurological condition required. At each facility, the noncompliant treatment generated billing that Parallon Business Solutions, LLC submitted electronically to CMS and private insurers as facility claims. At multiple encounters, physician Defendants independently submitted or caused to be submitted

professional claims through their own corporate billing entities, including out-of-network professional claims processed separately from the facility claims, creating parallel billing streams from the same underlying documentation.

3. **The pattern culminated in retaliation.** Within 48 hours of Plaintiff's final written complaint to HCA's Director of Risk Management in Nashville, staff at Southern Hills Hospital & Medical Center administered chemical restraints in violation of a legally binding PAD that had been in the EHR for 22 days, using drugs contraindicated for her known seizure disorder. **The result was at least 32 induced seizures and hypoxic episodes with oxygen saturation dropping into the 60s.** The facility restraint tracking system recorded a single non-violent restraint episode totaling 4,293 minutes attributed to the episode of care, and the system's own compliance fields indicate that orders were entered and monitoring was performed, **yet the 201-page certified litigation production contains zero restraint orders, zero flowsheets, zero monitoring entries, and zero renewal orders.** Wright documented 37 minutes of critical care that an eyewitness will testify never occurred, and his billing entity, Fremont Emergency Services (Scherr), Ltd., submitted a separate out-of-network professional claim for those fabricated services. More than 12 hours after a CT scan confirmed no acute intracranial abnormality, a nurse entered a diagnosis of "DIFFUSE TBI." Parallon assigned codes and submitted facility claims electronically from Nevada.

4. Plaintiff asserts claims under EMTALA, the ADA, Section 504, Section 1557, the ADA and Rehabilitation Act anti-retaliation provisions, the Civil RICO Act, and 42 U.S.C. Section 1985(3), together with supplemental state claims for battery, false imprisonment,

fraud, and intentional infliction of emotional distress. She seeks compensatory and treble damages, injunctive relief, and costs.

5. **No federal claim turns on breach of clinical standard of care; they turn on consent, access, documentation, orders, and compliance.** No federal claim requires an expert affidavit under NRS 41A.071. *Egan v. Chambers*, 129 Nev. 239, 242 (2013). Plaintiff alleges each claim against each Defendant only to the extent that Defendant's own conduct is specifically pled.

6. **Organization of this Complaint.** Sections I through III establish jurisdiction and identify the parties. Section IV defines key terms. Section V presents the factual allegations chronologically by encounter, followed by the billing predicates, the enterprise structure, and the post-litigation record alteration evidence. Section VI presents fourteen causes of action, each identifying the specific defendants and specific conduct at issue.

## II. JURISDICTION AND VENUE

7. This Court has federal question jurisdiction under 28 U.S.C. Section 1331 over claims arising under 42 U.S.C. Section 1395dd (EMTALA), 29 U.S.C. Section 794 (Section 504), 42 U.S.C. Section 18116 (Section 1557), 42 U.S.C. Section 12182 (ADA), 42 U.S.C. Section 12203 (ADA retaliation), 42 U.S.C. Section 1985(3), and 18 U.S.C. Sections 1962(c) and (d) (RICO). Supplemental jurisdiction over state claims lies under 28 U.S.C. Section 1367.

8. Venue is proper under 28 U.S.C. Section 1391(b)(2).

9. **Personal jurisdiction over HCA Healthcare, Inc.** is proper under *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). HCA purposefully directed conduct at Nevada through its agent

Cook, who received Plaintiff's complaints at Sunrise Hospital & Medical Center in Las Vegas and initiated an enterprise-wide response directed to HCA's centralized risk management infrastructure, and within 48 hours, Southern Hills Hospital & Medical Center escalated the same protocol with increased severity. HCA's direction and control are reflected in three ways: centralized risk management handling of Plaintiff's complaints; centralized policies governing advance directives and restraints applied at Nevada facilities; and integrated revenue-cycle governance through Parallon that submits Nevada facility claims to out-of-state payors.

10. **Defendants themselves confirmed HCA's control.** In their Certificate of Interested Parties (ECF 42), Defendants stated under penalty of perjury that HCA "indirectly owns at least 10% of the Co-Defendants" and holds a "direct, pecuniary interest in the outcome of this case," detailing 100% ownership of each hospital: Sunrise Hospital & Medical Center, LLC (legal entity: Sunrise Hospital and Medical Center, LLC) through AC Med, LLC through Healthtrust, Inc., The Hospital Company through HCA Inc. through HCA Healthcare, Inc.; MountainView Hospital (legal entity: Sunrise Mountainview Hospital, Inc.) through Galen Holdco, LLC through Healthtrust, Inc., The Hospital Company through HCA Inc. through HCA Healthcare, Inc.; Southern Hills Hospital & Medical Center (legal entity: Southern Hills Medical Center, LLC) through Healthtrust, Inc., The Hospital Company through HCA Inc. through HCA Healthcare, Inc. ECF 42 at 2. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

11. HCA's public representations are inconsistent with any litigation position that it functions solely as a passive holding company. HCA publicly represents that it operates or has an

ownership interest in a national hospital system generating approximately $70.6 billion in annual revenues. Exhibit T (HCA Healthcare, Inc. 2024 Form 10-K, excerpted).

**12.** Jurisdiction comports with fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985). Plaintiff is a disabled Nevada resident who cannot reasonably litigate in Tennessee.

**13. Specific personal jurisdiction** is proper over Michael A. Orber and Michael A. Orber & Associates, Inc. under *Calder*, 465 U.S. at 789-90. On information and belief, Orber directed or participated in communications intentionally aimed at Nevada decision-makers and Nevada treatment operations, and the foreseeable effects of those communications were felt in Nevada during the June 28 to 29, 2025 encounter. Specific personal jurisdiction is also proper over Parallon Business Solutions, LLC, which directs billing operations into and from Nevada; HealthTrust Workforce Solutions, LLC, which maintains staffing operations in Nevada; and Cook, who received Plaintiff's complaints at the Las Vegas facility level and escalated them through HCA's centralized risk management infrastructure, triggering the enterprise-wide response that preceded the retaliatory June 2025 encounter. The physician billing entities (Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Reliant Physicians, LLC; and Alexander F. Akhavan, MD, Ltd.) each transact business in Nevada and bill for physician services rendered at Nevada facilities to Nevada and out-of-state payors. Jurisdictional discovery will confirm the full extent of Orber's Nevada-directed communications.

### III. PARTIES

**A. PLAINTIFF**

14. Jade Riley Burch is an adult resident of Las Vegas, Nevada. She has a documented seizure disorder and PTSD, qualifying her as an individual with a disability under the ADA, Section 504, and Section 1557. Her seizure disorder creates functional limitations relevant to every encounter at issue: postictal cognitive impairment that renders her unable to process information or consent to treatment; susceptibility to seizure induction by Haldol and benzodiazepines; heightened injury risk during and after episodes; and the need for a designated decision-maker during postictal incapacity. She is a transgender woman, a protected class under Section 1557.

**B. THE HCA ENTERPRISE**

15. **HCA Healthcare, Inc.** is a Delaware corporation headquartered in Nashville, Tennessee. It is the 100% indirect owner of each defendant hospital. ECF 42. Its enterprise role is centralized command: risk management, complaint-response escalation, PAD and restraint policy, and revenue-cycle governance.

16. **Cinthya S. Cook, MSN/MHA, RN, CPPS** is Director of Risk Management / Patient Safety Officer at Sunrise Hospital & Medical Center, an HCA facility in Las Vegas, Nevada. She received Plaintiff's complaints and initiated what she described as an "enterprise-wide response." Sued in her individual capacity.

17. **Sunrise Hospital & Medical Center, LLC** (legal entity: Sunrise Hospital and Medical Center, LLC, per ECF 42) is a Delaware limited liability company operating in Nevada and owned by HCA through AC Med, LLC and Healthtrust, Inc., The Hospital Company. It is a federal financial assistance recipient and EMTALA participating hospital.

18. **MountainView Hospital** (legal entity: Sunrise Mountainview Hospital, Inc., per ECF 42) is a Nevada corporation owned by HCA through Galen Holdco, LLC and Healthtrust, Inc., The Hospital Company. It is a federal financial assistance recipient and EMTALA participating hospital.

19. **Southern Hills Hospital & Medical Center** (legal entity: Southern Hills Medical Center, LLC, per ECF 42) is a Nevada limited liability company owned by HCA through Healthtrust, Inc., The Hospital Company. It is a federal financial assistance recipient and EMTALA participating hospital.

20. **Parallon Business Solutions, LLC** is a Tennessee limited liability company registered to transact business in Nevada as a foreign limited liability company. It directs billing operations into and from Nevada and performs revenue-cycle functions including coding validation, claims assembly, and electronic submission of facility claims (837I/UB-04) to CMS and private insurers. Tiffaney Jackson, an Account Specialist at HCA's Richmond Shared Services Center in Virginia, attested under penalty of perjury that $799,833.00 in Sunrise charges was "reasonable." Exhibit P.

21. **HealthTrust Workforce Solutions, LLC** is a Delaware limited liability company that maintains staffing operations in Nevada. Its enterprise role is personnel supply to defendant hospitals. Its Privacy Policy directs inquiries to the "HCA Healthcare Data Protection Officer" in Nashville, confirming unified governance. Exhibit U. On information and belief, HealthTrust supplied the nursing and ancillary staff who administered chemical and physical restraints at the encounters at issue. HealthTrust's onboarding, training, and credentialing processes did not include protocols for seizure

contraindication review, PAD compliance, or decision-maker contact procedures for patients with documented seizure disorders.

## C. PHYSICIAN DEFENDANTS AND THEIR BILLING ENTITIES

22. **Jonathan Yaghoobian, MD** was the attending physician at Southern Hills Hospital & Medical Center on June 28 to 29, 2025. He had supervisory authority over the encounter and failed to intervene despite at least 32 induced seizures and SpO2 in the 60s. Sued in his individual capacity. Yaghoobian bills through Platinum Hospitalists, LLC.

23. **Platinum Hospitalists, LLC** is, on information and belief, a Nevada limited liability company that provides hospitalist physician services at HCA facilities. It is not owned by HCA. It maintains its own billing relationship with payors and submits professional claims (837P/CMS-1500) independently of Parallon's facility claims. Platinum Hospitalists billed for Yaghoobian's services at the June 28 to 29, 2025 Southern Hills Hospital & Medical Center encounter. **Enterprise role:** physician billing entity that independently monetized the encounter documentation and received direct financial benefit from claims generated by fabricated or noncompliant documentation at the June 2025 encounter. Platinum Hospitalists, LLC is a RICO "person" distinct from HCA.

24. **Brent J. Wright, DO** was a physician at Southern Hills Hospital & Medical Center on June 28 to 29, 2025. **He entered documentation claiming 37 minutes of CPT 99291 critical care that an eyewitness will testify never occurred.** Sued in his individual capacity. Wright bills through Fremont Emergency Services (Scherr), Ltd.

25. **Fremont Emergency Services (Scherr), Ltd.** is a Nevada limited company that provides emergency physician services at HCA facilities. It is not owned by HCA. It maintains its own billing relationship with payors, billed out of network, and submits

professional claims (837P/CMS-1500) through a separate billing channel independent of Parallon's facility claims. Fremont Emergency Services (Scherr), Ltd. separately billed for Wright's fabricated CPT 99291 critical care as an out-of-network professional claim, processed independently of Parallon's facility claim for the same June 28 to 29, 2025 encounter. The professional claim and the facility claim constitute separate interstate wire transmissions to separate payor processing queues, each containing false representations derived from the same fabricated documentation. **Enterprise role:** physician billing entity that independently monetized the encounter documentation and received direct financial benefit from a professional claim for services an eyewitness will testify were never rendered. Fremont Emergency Services (Scherr), Ltd. is a RICO "person" distinct from HCA.

26. **James Bindrup, MD** was the treating and supervising provider at Southern Hills Hospital & Medical Center from November 30 through December 4, 2023. His provider authority sustained detention and billing after the patient was documented as calm, cooperative, and low risk. Sued in his individual capacity. On information and belief, Bindrup bills through a corporate entity whose identity will be confirmed through discovery and whose identity is reserved under Does 1 through 50.

27. **Rowena E. Achin, MD** was the attending physician at MountainView Hospital from March 22 through 24, 2025. She authorized the unescorted discharge of a postictal seizure patient without a capacity assessment, without a wheelchair, without supervised transport, and without confirmation of safe discharge disposition. Sued in her individual capacity. Achin bills through Reliant Physicians, LLC.

28. **Reliant Physicians, LLC** is, on information and belief, a Nevada limited liability company that provides physician services at HCA facilities. It is not owned by HCA. It maintains its own billing relationship with payors and submits professional claims (837P/CMS-1500) independently of Parallon's facility claims. Reliant Physicians billed for Achin's services at the March 22 to 24, 2025 MountainView Hospital encounter. **Enterprise role:** physician billing entity that independently monetized the encounter documentation and received direct financial benefit from claims generated by noncompliant documentation at the March 2025 encounter. Reliant Physicians, LLC is a RICO "person" distinct from HCA.

29. **Alexander F. Akhavan, MD** was the requesting physician at Sunrise Hospital & Medical Center, LLC from April 17 through 22, 2025. He controlled the screening scope and ordered no pulmonary embolism workup despite post-surgical status, chest pain, dyspnea, supplemental oxygen, abnormal imaging, and reported hemoptysis. Sued in his individual capacity. Akhavan bills through Alexander F. Akhavan, MD, Ltd.

30. **Alexander F. Akhavan, MD, Ltd.** is, on information and belief, a Nevada professional corporation through which Akhavan bills for physician services at HCA facilities. It is not owned by HCA. It maintains its own billing relationship with payors and submits professional claims (837P/CMS-1500) independently of Parallon's facility claims. Akhavan Ltd. billed for Akhavan's services at the April 17 to 22, 2025 Sunrise Hospital & Medical Center, LLC encounter. **Enterprise role:** physician billing entity that independently monetized the encounter documentation and received direct financial benefit from claims generated by documentation that omitted hemoptysis, behavioralized

seizures, and foreclosed PE screening. Alexander F. Akhavan, MD, Ltd. is a RICO "person" distinct from HCA.

31. **Tarik Alshaikh, DO** was the attending physician for Plaintiff's inpatient psychiatric admission at Southern Hills Hospital & Medical Center from December 1 through December 4, 2023. As attending physician, Alshaikh was responsible for Plaintiff's treatment plan, medication management, monitoring, and continuation of the involuntary Legal 2000 hold during the hospitalization. Sued in his individual capacity.

32. **Nicole Mann, RN** was the registered nurse at Southern Hills Hospital & Medical Center who initiated the Application for Emergency Admission (Legal 2000) under NRS 433A.160 on November 30, 2023, at approximately 15:45. **Mann executed the emergency admission application within two minutes of Plaintiff's triage and before any physician evaluation, laboratory workup, or clinical assessment had been performed.** Mann's application checked boxes for "Attempting Suicide" and "Causing bodily injury," characterizing Plaintiff's presentation at a severity level that the subsequent physician evaluation directly contradicted. Specifically, Dr. Bindrup's medical examination found "SI with a nonspecific plan," a materially less acute characterization than Mann's application, which described elaborate, plan-based suicidal ideation and active physical dangerousness. Mann's materially inconsistent and unsupported characterization formed the sole legal basis for Plaintiff's involuntary detention and deprivation of liberty under Nevada's emergency admission framework. Sued in her individual capacity for her direct role in initiating a false imprisonment through a facially deficient and internally contradictory emergency admission application.

33. **Jonathan Wirjo, DO** was the physician at Southern Hills Hospital & Medical Center who formalized Plaintiff's involuntary legal hold status in the electronic medical record system at 01:07 on December 1, 2023. Wirjo entered the order set "Initial Legal Hold Status" designating Plaintiff as involuntary and is listed as the referring physician for the psychiatric encounter. Wirjo maintained the involuntary hold status that resulted in Plaintiff's continued detention in the behavioral health unit through December 4, 2023. Wirjo is sued in his individual capacity for his direct role in ordering and maintaining an involuntary psychiatric hold that was initiated on the basis of Mann's facially deficient and internally contradictory emergency admission application, without independent verification of the clinical basis for involuntary detention.

## D. OUTSIDE PARTICIPANTS

34. **Michael A. Orber and Michael A. Orber & Associates, Inc.** Orber is an individual and the principal of a California corporation based in Culver City, California. Orber is identified in the complaint-response chain and records-production pathway as a participant outside HCA's corporate family whose communications were directed at Nevada decision-makers and Nevada treatment operations in the period preceding the June 28, 2025 encounter. On information and belief, Orber participated in complaint-response and retaliation communications with Cook and/or Nevada facility leadership preceding the June 28, 2025 encounter and acted in coordination with HCA risk management and Nevada facility personnel. Plaintiff will seek confirmation through discovery, including communications, call logs, and EHR audit trails. Should Defendant Orber challenge jurisdiction, Plaintiff will seek targeted jurisdictional discovery to

confirm the factual basis for jurisdiction that is currently within Defendants' exclusive control.

35. **Does 1 through 50** are unknown participants whose identities will be established through discovery, including the Sunrise nurse who received physical evidence of hemoptysis and failed to document it, and physician billing entities not yet identified. **Jane Doe 1** is the registered nurse assigned to the Southern Hills Pavilion on December 1, 2023, who physically administered the B52 chemical restraint injection to Plaintiff at 15:48. Jane Doe 1 proceeded with the administration despite having access to the EHR documenting Plaintiff as calm and cooperative seven minutes prior, and without obtaining informed consent or documenting an emergency justification. Plaintiff will move to substitute the true name of Jane Doe 1 once the unredacted Medication Administration Record and login metadata are produced. Plaintiff will move to substitute all remaining true names once the unredacted Medication Administration Records, associated login metadata, and native EHR audit logs, which Defendants have not produced despite request, are obtained through discovery or court order.

## IV. DEFINITIONS

36. As used in this Complaint, the following terms have the meanings set forth below:

**"PAD"** means the Psychiatric Advance Directive executed by Plaintiff on June 6, 2025, notarized and filed in the HCA EHR, enforceable under NRS 449A.600 through 449A.645 and the Patient Self-Determination Act.

**"Portal Version"** means the medical records obtained by Plaintiff directly from each facility's patient portal before this action was filed.

**"Litigation Production" or "Discovery Production"** means the certified or Bates-stamped medical records subsequently produced by Defendants through litigation and discovery channels.

**"B52"** means the combination chemical restraint of Haloperidol (Haldol), Lorazepam (Ativan), and Diphenhydramine (Benadryl), administered by intramuscular injection.

**"EHR"** means the unified electronic health record system maintained by HCA Healthcare across its Nevada facilities.

**"Facility Claims"** means insurance claims (837I/UB-04) assembled and submitted by Parallon on behalf of HCA hospitals. **"Professional Claims"** means insurance claims (837P/CMS-1500) submitted independently by physician billing entities through their own billing channels for physician services rendered at the same encounters.

## V. FACTUAL ALLEGATIONS

## A. PLAINTIFF'S DISABILITIES, FUNCTIONAL LIMITATIONS, AND ADVANCE DIRECTIVE

**37.** Plaintiff has a documented seizure disorder and PTSD. At all relevant times, Defendants had actual notice of Plaintiff's seizure disorder through the unified HCA EHR problem list and through Plaintiff's presenting condition at each encounter.

**38.** Plaintiff's seizure disorder creates functional limitations that require specific operational accommodations in emergency settings. These accommodations are obvious from the disability itself, regardless of whether a formal written request exists. During postictal periods, Plaintiff cannot process information, communicate effectively, or consent to treatment, which requires a designated decision-maker. Haldol and benzodiazepines lower her seizure threshold and are contraindicated without seizure-risk assessment, a

fact ascertainable from the EHR problem list and standard pharmacological references. Discharge following seizure activity requires neurological capacity assessment because postictal impairment may persist for hours or days.

**39.** On June 6, 2025, after nineteen months of repeated failures to accommodate her known seizure disorder across three HCA facilities, Plaintiff executed a legally notarized PAD. **The PAD was in effect and present in the unified HCA EHR as of the June 28 to 29, 2025 Southern Hills Hospital & Medical Center encounter, 22 days after execution.** The PAD requires: Porscha Ryan designated as medical decision-maker; no chemical restraints without first contacting Ryan; no physical restraints except under documented conditions of imminent harm; staff review of the PAD before administering sedatives; and seizure contraindication assessment before any chemical intervention. The PAD is enforceable under Nevada's advance directive framework, NRS 449A.600 through 449A.645, and under the Patient Self-Determination Act, which requires Medicare-participating hospitals to document and comply with advance directives under state law. 42 U.S.C. Section 1395cc(f); 42 C.F.R. Sections 482.13(b)(3) and 489.102. Defendants' own EHR intake process accepted and stored the PAD, confirming institutional recognition of the directive.

**40.** For the pre-PAD encounters from November 2023 through May 2025, no formal written accommodation request was required. The ADA and Section 504 do not require one when the need for modification is obvious from the disability itself. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). Plaintiff's seizure disorder was documented in the EHR at every encounter. That Defendants failed to provide these modifications at

the pre-PAD encounters establishes that the problem was not lack of a written request but systemic refusal to accommodate.

41. For the June 2025 encounter, when the PAD was active, Defendants had the formal written directive in the EHR and still refused to review it, contact the designated decision-maker, or assess seizure contraindications. **After nineteen months of identical failures without a formal directive, and after a formal directive was executed and ignored, this constitutes deliberate indifference.**

## B. THE TWO LANES

42. **Lane A: Federal Discrimination.** Plaintiff's federal claims challenge operational failures: failure to perform or document any contraindication review; failure to obtain consent or contact a designated person; failure to modify standard restraint protocols; refusal to review and honor a legally binding PAD; and discharge without capacity assessment. These are denials of meaningful access to emergency services on equal terms.

43. **Lane B: Intentional Misconduct.** Plaintiff's state and RICO claims challenge intentional conduct: fabrication of billing for services not rendered; fabrication of diagnoses contradicted by imaging; entry of pretextual psychiatric labels; retaliation for protected activity; and battery through restraints administered without consent before the PAD, and after consent was expressly withdrawn once the PAD was in effect. No claim asks the Court to evaluate clinical reasonableness.

44. **No claim requires expert testimony** to establish that no contraindication review was performed or documented, that consent was not obtained, that a PAD was not reviewed,

that a diagnosis was fabricated after negative imaging, or that billed services were not provided.

## C. NRS 41A.071: THE MALPRACTICE LINE

45. **No NRS 41A.071 trigger exists for the federal counts.** Plaintiff does not plead medical negligence as the basis for any federal claim. Those claims turn on administrative and operational acts: failure to perform or document contraindication review before administering chemical restraints, failure to obtain consent, refusal to review and honor a PAD, use of restraints without required orders or monitoring per 42 C.F.R. Section 482.13, post-hoc fabrication of diagnoses, and billing for services not rendered.

46. Plaintiff's battery claim rests on two distinct theories depending on the encounter. For the June 28 to 29, 2025 Southern Hills Hospital & Medical Center encounter, the claim is premised on the express withdrawal of consent by a legally executed PAD. The PAD contains explicit conditional refusals and prerequisites. Defendants proceeded without satisfying those prerequisites and without obtaining any lawful substitute consent. This is intentional restraint after express refusal, not a consent-medical-judgment dispute. *De Becker v. UHS of Delaware, Inc.*, 140 Nev. Adv. Op. 58 (2024) (reaffirming gravamen test; informed-consent failures as battery where claim does not require professional-judgment evaluation). For the pre-PAD encounters at Southern Hills Hospital & Medical Center in November 2023 and Sunrise Hospital & Medical Center, LLC in May 2025, the battery claim is premised on the complete absence of consent: no informed consent for chemical restraint was obtained, no emergency justification sufficient to bypass consent was documented, and no substitute consent was sought. The battery claim here does not challenge the manner in which services were rendered. It challenges the complete

absence of lawful authorization under PAD statutes and federal regulations to render them at all. **Administering chemical restraints after express refusal through a legally binding PAD is unauthorized touching and confinement after express refusal, not a dispute over professional judgment, and falls outside the meaning of NRS 41A.071.**

47. To the extent any state-law count is construed as "professional negligence" under Nevada law, Plaintiff pleads that characterization in the alternative only. Such recharacterization does not convert the federal civil rights, EMTALA, or RICO claims into medical malpractice claims.

48. **Severability and Preservation of Federal Claims.** Should this Court determine that any state-law claim sounds in professional negligence and requires an expert affidavit under NRS 41A.071, Plaintiff respectfully requests that any such dismissal be entered without prejudice and with leave to seek amendment to attach a supporting affidavit in compliance with state procedural requirements. Plaintiff's federal claims under EMTALA (42 U.S.C. Section 1395dd), the ADA (42 U.S.C. Sections 12182 and 12203), Section 504 (29 U.S.C. Section 794), Section 1557 (42 U.S.C. Section 18116), RICO (18 U.S.C. Sections 1962(c) and (d)), and Section 1985(3) (42 U.S.C. Section 1985(3)) are independent of any state-law affidavit requirement and survive regardless of any recharacterization of the supplemental state counts. The state-law claims are supplemental under 28 U.S.C. Section 1367 and severable from the federal causes of action. **No federal claim in this Complaint turns on breach of a professional standard of care, and no federal claim is subject to NRS 41A.071 under any characterization.**

**D. ENCOUNTER ONE: SOUTHERN HILLS HOSPITAL & MEDICAL CENTER, NOVEMBER 30 THROUGH DECEMBER 4, 2023**

**49.** Plaintiff presented voluntarily on November 30, 2023 at the Southern Hills Hospital & Medical Center ED, accompanied by Porscha Ryan. Plaintiff recognized she was experiencing stress and sleep deprivation and made the affirmative decision to seek help. She arranged her own transportation and walked into the facility of her own accord. She was held in the psychiatric unit through December 4, 2023. The PAD did not exist at the time.

**50.** Plaintiff presented with sleep deprivation. The record documents sleep deprivation as the presenting concern. Plaintiff did not have a seizure diagnosis at the time of this encounter; her seizure disorder was diagnosed in 2024. The need for operational modifications at this encounter was obvious from the circumstances themselves: obtain consent or contact a designated person before administering forced medication, refrain from physical restraints absent documented imminent harm, and maintain gender-affirming care.

**51.** The charge nurse, ED staff, Dr. James Bindrup, Dr. Tarik Alshaikh, Nicole Mann, RN, and Jonathan Wirjo, DO had actual knowledge of Plaintiff's presenting condition through direct observation and the EHR.

**52. Initiation of Involuntary Detention.** At approximately 15:45 on November 30, 2023, **within two minutes of Plaintiff's triage and before any physician evaluation, laboratory workup, or clinical assessment had been performed,** Defendant Nicole Mann, RN executed an Application for Emergency Admission (Legal 2000) under NRS 433A.160, converting a voluntary help-seeking patient to involuntary status. Mann's

application checked boxes for "Attempting Suicide" and "Causing bodily injury," characterizing Plaintiff as actively engaged in elaborately planned suicidal behavior and physical dangerousness. Plaintiff had presented voluntarily, accompanied by her support person, seeking help for stress and sleep deprivation. The subsequent physician evaluation directly contradicted Mann's characterization. Dr. Bindrup's medical examination found "SI with a nonspecific plan" and no homicidal ideation, a materially less acute assessment that undermined the factual predicates of Mann's application. Mann's uncorroborated and internally contradictory characterization nonetheless formed the sole legal basis for Plaintiff's involuntary detention and deprivation of liberty. At 01:07 on December 1, 2023, Defendant Jonathan Wirjo, DO formalized the involuntary hold by entering the order set "Initial Legal Hold Status" in the EHR, designating Plaintiff as involuntary. Wirjo is listed as the referring physician for the psychiatric encounter. Wirjo maintained the involuntary hold status without independent verification of the clinical basis established by Mann's facially deficient application.

53. **What Defendants did.** At 16:00 on November 30, 2023, Bindrup ordered B52 (Haldol 5 mg, Lorazepam 2 mg, Diphenhydramine 25 mg) by simultaneously firing two order sets, "ED PSYCH MEDICAL STABILIZATION" and "ED ADULT AGITATION," before any Broset Violence Checklist score had been documented. The B52 was classified as PRN with Q4H dosing windows, **in violation of HCA Policy COG.COG.001's prohibition on PRN restraint orders.** The system required a "PRN Reason" at order entry; Bindrup selected "Moderate Agitation (Broset 1-2)" for the Haldol and Lorazepam and "EPS (Broset 1-2)" for the Diphenhydramine. These were pre-set dropdown selections, not contemporaneous clinical observations. **Every Broset Violence Checklist**

**score actually documented in the record scored zero, indicating "Small Risk,"** with specific findings of no boisterousness, no verbal threats, no physical threats, and no attacking objects. The order sat open for approximately 23.5 hours. On December 1, 2023 at 15:48, a nurse assigned to the behavioral health unit (the Pavilion), currently identified as Jane Doe 1, administered the B52 by intramuscular injection. **A physician note entered at 15:41 on December 1, seven minutes before administration, described Plaintiff as "calm, cooperative, and eager to go home."** Dr. Alshaikh's psychiatric evaluation earlier that day at 10:28 documented Plaintiff as "visible on the unit calm and cooperative." The discharge summary later confirmed the same characterization. There is no documentation in the record of any agitation, behavioral escalation, or clinical change between the 15:41 note and the 15:48 injection. The B52 was administered to a calm, cooperative patient who had been documented as such throughout the day, under a PRN reason code that the facility's own screening tool contradicted. Jane Doe 1 proceeded with the injection despite having access to the EHR reflecting the 15:41 physician note documenting Plaintiff as calm and cooperative, and despite the absence of any Broset Violence Checklist score exceeding zero. The Broset screening documented no boisterousness, no verbal threats, no physical threats, and no physical aggression. Despite this objective absence of agitation, staff bypassed less restrictive oral medications available under the same order set and proceeded directly to a high-potency intramuscular chemical restraint typically reserved for violent behavioral emergencies. The identity of Jane Doe 1 will be confirmed through production of the unredacted MAR, login metadata, and native audit logs, which Defendants have not produced.

**54. The Invasive Battery and Resulting Amnesia.** The administration of the B52 at 15:48 on December 1, 2023, was an intramuscular (IM) injection requiring the non-consensual physical exposure of Plaintiff's private person. Plaintiff has no memory of consenting to this exposure or the injection, a fact consistent with the rapid onset of anterograde amnesia caused by the 2mg of Lorazepam in the cocktail. Plaintiff alleges the use of this high-potency amnestic agent served to facilitate the battery and obscure the details of the physical violation, which was performed while Plaintiff was documented as "calm and cooperative" just seven minutes prior (15:41) and had an objective Broset Violence Checklist score of zero.

**55. Eyewitness Account.** Ryan accompanied Plaintiff to the ED on November 30, was present for approximately two hours during the initial intake, and will testify that Plaintiff was calm, conversational, and not agitated or combative at the time of the voluntary presentation. Ryan was not present at the Pavilion on December 1 when the B52 was administered.

**56. Absence of Consent and Continued Detention.** Staff did not obtain informed consent for the chemical restraint and did not document any emergency justification sufficient to bypass consent. Staff did not contact any designated person or advocate. Staff continued the Legal 2000 hold despite contemporaneous documentation reflecting calm, cooperative, and low-risk presentation and documented improvement, without documentation of ongoing imminent risk justifying continued detention.

**57. Internal Contradictions in Risk Assessment.** Wirjo's own intake risk assessment on November 30, 2023 at 22:02 noted that Plaintiff's "overall level of risk for suicide is low," yet he ordered the initial legal hold status and admitted Plaintiff involuntarily. Staff

documented "Schizoaffective disorder" and "Gender Identity Disorder," the latter having been removed from the DSM in 2013.

58. **Withdrawal of Gender-Affirming Care.** Dr. Rey Rueda, the admitting physician, recommended continuing gender-affirming hormones on discharge, yet Dr. Veerappan overrode this recommendation the following day and ordered Plaintiff's hormone therapy held without clinical justification. Plaintiff had undergone gender reassignment surgery, including gonadectomy, and had no endogenous hormone production. Withholding exogenous hormone therapy in a post-gonadectomy patient predictably induces acute hormone deprivation equivalent to surgical menopause, with symptoms including hot flashes, mood instability, cognitive disruption, sleep disturbance, and cardiovascular stress. Veerappan imposed this physiological harm on a patient who was already sleep-deprived and involuntarily detained, over the admitting physician's express recommendation to the contrary, and without documenting any medical necessity for the withdrawal.

59. **Documented Stability and the Billing Window.** Dr. Alshaikh's December 1 evaluation noted "calm and cooperative" and "low risk." The same December 1 Psychiatric Evaluation Note listed an estimated length of stay of 2 to 5 days for "stabilization of psychiatric symptoms and safe discharge planning," establishing the billing window that would govern the duration of Plaintiff's detention regardless of clinical progress. Notes from December 2 and 3 documented "euthymic," "sleeping well," and "significant improvement." By December 3, staff noted Plaintiff was "overly focused on discharge," and the plan documented was to monitor overnight with discharge the following day, December 4, if clinical status remained stable. **Clinical stability had been documented**

**since December 1, yet detention was extended through December 4, the outer boundary of the estimated length of stay, without any documentation of emergent risk.** The correlation between the projected billing window and the actual discharge date, despite three days of documented clinical stability, is consistent with detention driven by reimbursement optimization rather than clinical necessity.

60. **Retroactive Discharge Authorization.** Alshaikh signed his discharge note on December 4 at 13:16, approximately 45 minutes after Plaintiff had already been discharged at 12:31, meaning the physician authorization for discharge was entered after the patient had already left the facility.

61. **Diagnostic Code Manipulation.** The coding for the November 2023 encounter reveals a pattern of diagnostic inconsistency that cannot be attributed to clinical judgment. Dr. Rey Rueda diagnosed "Schizoaffective disorder," yet the encounter coding summary assigned ICD-10 F25.9 (Schizoaffective Disorder, Unspecified) for the initial encounter, then switched to ICD-10 F31.9 (Bipolar Disorder, Unspecified) for the subsequent psychiatric encounter, with no documented clinical justification for the diagnostic reclassification and no intervening physician evaluation supporting the change. The treating psychiatrist documented "Gender Dysphoria" as the clinical impression, yet the coding assigned ICD-10 F64.0 ("Transsexualism"), a more pathologizing diagnostic code than the one the treating clinician actually rendered, and a code that carries historical stigma inconsistent with contemporary clinical standards. The "Reason for Visit" on the psychiatric encounter face sheet was changed to "Major Depressive Disorder," a diagnosis that no treating provider at any point during the hospitalization rendered. **These diagnostic code manipulations operated in a single direction: escalating pathology, inserting**

**diagnoses no clinician rendered, and deploying more stigmatizing codes than the treating physicians used, all in service of billing justification and involuntary detention posture.**

62. **The Legal Notice and the Scrambled Discharge.** On the morning of December 4, 2023, while hospital staff were finalizing a Petition for Involuntary Court-Ordered Admission to extend Plaintiff's detention through December 10, Plaintiff explicitly notified staff of her intent to contact her attorney to challenge the legality of her detention, stating in sum and substance, "I am going to call my lawyer." Plaintiff alleges that this specific notice triggered an immediate risk-management pivot. The facility, aware that its own records documented Plaintiff as "calm and cooperative" as early as December 1, recognized it could not defend a court-ordered commitment in a judicial hearing. Consequently, the facility abandoned the petition and initiated a rushed, uncoordinated discharge. **The discharge summary and the petition are internally irreconcilable: one document concludes that Plaintiff is clinically stable and appropriate for release, while the other asserts that Plaintiff requires involuntary court-ordered commitment. Both documents were generated on the same day by the same facility, and both were entered into the official record.** This "scramble" to avoid litigation is objectively confirmed by the 45-minute gap between Plaintiff's physical departure at 12:31 and Dr. Alshaikh's retroactive signature on the discharge summary at 13:16.

63. **Objective Proof of Voluntary Stability.** The fraudulent nature of the facility's "emergency" court petition is further evidenced by a Case Management note entered at 10:31 AM on December 4, 2023. The record explicitly documents that Plaintiff, acting as a responsible and voluntary patient, had already arranged her own mental health follow-

up with her regular psychiatrist, Dr. Dustin Bui, for the very next day (December 5, 2023). The note states: "APPT SCHEDULED FOR 12/5/23 AS ARRANGED BY PATIENT." Plaintiff alleges that once staff realized she had secured a follow-up with an established outside provider and was asserting her legal rights to leave, the facility recognized its involuntary commitment posture was clinically and legally indefensible. The facility's sudden pivot from filing a court petition at 1:25 PM to abandoning it and allowing a 12:31 PM discharge proves that the detention was never based on a clinical risk to safety, but was an attempt at institutional control that collapsed the moment Plaintiff provided proof of her own arranged care and legal advocacy.

64. On or about December 1, 2023, Defendant Tarik Alshaikh, DO served as the attending physician for Plaintiff's inpatient psychiatric admission at Southern Hills Hospital & Medical Center. As attending physician, Alshaikh was responsible for Plaintiff's treatment plan, monitoring, and continuation of the involuntary Legal 2000 hold. Alshaikh personally evaluated Plaintiff on December 1 and documented "calm and cooperative" and "low risk," yet continued the involuntary hold and did not order discontinuation of chemical restraints, did not ensure a seizure contraindication review was performed, and did not document ongoing imminent risk justifying continued detention. Despite serving as the attending physician during the inpatient stay, the produced records do not contain physician restraint orders, clinical justification for restrictive interventions, or required documentation associated with the administration of chemical restraints and continued involuntary detention.

65. **Selective Enforcement of Safety Protocols.** The facility's own conduct contradicted its risk designation. The administrative record designated Plaintiff as "High Risk" under

"Suicide Precautions" in a "Safe Environment," a classification that clinically mandates removal of personal clothing and issuance of paper scrubs to mitigate ligature risk. Despite this designation, staff permitted Plaintiff to wear her own personal clothing for the majority of the detention. If the facility genuinely believed Plaintiff presented the level of risk its own paperwork described, it would have enforced its own ligature protocols. **The selective enforcement of safety restrictions, maintaining the high-risk administrative label while disregarding the operational requirements that label triggers, is consistent with a risk designation maintained for billing and detention justification rather than clinical necessity.**

66. **What the records reveal.** The certified litigation production (SHH-M000202 through SHH-M000451, 249 pages) contains material discrepancies from the pre-litigation portal version (6 pages, Encounter ID H89681403926). The portal version documents B52 administration on November 30, 2023 at 16:21. The litigation version contains no record of a B52 administration on November 30; the earliest documented administration is December 1, 2023 at 15:48, approximately 23.5 hours later. The portal version lists a dictation date of November 30, 2023; the litigation version lists December 2, 2023 for the same clinical note. Dr. Bhushan's co-signatures on APRN Sandhu's progress notes from December 2 and December 3, 2023 were not applied until January 26, 2024, fifty-five days after dictation, with no edit history, signature event metadata, or audit trail produced for the interval. Both notes contain voice recognition disclaimers acknowledging that "some unintentional errors may persist." The litigation version classifies the B52 medications as PRN despite HCA Policy COG.COG.001's prohibition on PRN restraint

orders. No audit trail documents were produced for this encounter. Exhibits A (portal version), G (certified litigation production).

**67.** Bindrup's provider authority appears on documentation supporting continued detention and chemical restraints. Contemporaneous entries show the patient was calm, cooperative, and low risk, yet Bindrup took no steps to discontinue the hold or ensure that a contraindication review was performed or documented. On information and belief, Bindrup authorized, ratified, or knowingly permitted these decisions.

**68. Injury.** Forced chemical restraint of a calm patient without consent or clinical justification. Four-day detention beyond documented necessity. Gender-affirming care withheld over the admitting physician's recommendation. Obsolete stigmatizing diagnoses entered in permanent record. Involuntary detention initiated on the basis of a facially deficient and internally contradictory emergency admission application. Diagnostic codes manipulated to escalate pathology, insert unrendered diagnoses, and deploy more stigmatizing codes than the treating physicians used.

**69.** The 2023 encounter placed HCA on actual notice that its standard B52 protocol was being applied to calm, non-agitated patients without consent and with pretextual psychiatric diagnoses. This encounter established the baseline failure pattern that repeated at every subsequent facility. When Plaintiff was later diagnosed with a seizure disorder in 2024, the same operational noncompliance, now compounded by the failure to assess seizure contraindications, continued at every subsequent encounter.

**E. ENCOUNTER TWO: MOUNTAINVIEW HOSPITAL, MARCH 22 THROUGH 24, 2025**

**70.** Plaintiff presented on March 22, 2025 at the MountainView Hospital ED with chest pain. Plaintiff has a family history of heart disease and sought cardiac evaluation. She was admitted for cardiac workup. The PAD did not exist at the time.

**71.** After admission, Plaintiff began experiencing seizures. She has no memory of the duration or number of seizures, no memory of eating, using the restroom, or any other activities during the hospitalization. Her last clear memory is seeing the inpatient room before aura onset triggered a seizure. The extent of her postictal incapacity was such that she reported the complete memory gap to her therapist. Plaintiff did not learn until she reviewed the medical records that staff had administered 8 mg of IV Lorazepam across four doses during the admission. She was unable to process information, communicate, or consent throughout the seizure and postictal period. The impairment was directly observable.

**72.** Dr. Achin and nursing staff had constructive notice of the seizure disorder through the EHR and actual notice through Plaintiff's seizure activity during the admission and her presenting cardiac complaints.

**73. What Defendants did.** Staff did not contact any designated person or advocate despite Plaintiff's postictal incapacity. No evaluation of administered sedatives' impact on neurological status or discharge safety was performed. The record was populated with cardiac-focused testing (Rubidium PET, EKG, both negative) responsive to the presenting chest pain complaint, but once seizure activity began during the admission, staff failed to shift clinical focus to the seizure emergency or initiate appropriate

neurological assessment. No contemporaneous capacity assessment preceded discharge. **Plaintiff was released without a wheelchair, without an escort, without supervised transport, and without any confirmation of safe discharge disposition.** Plaintiff, still postictal and sedated from 8 mg of IV Lorazepam, stumbled unassisted through hospital hallways and exited the facility alone. No staff member intervened, accompanied her, or assessed whether she was capable of ambulating safely, let alone navigating transportation. Plaintiff has no memory of the interval between leaving the facility and ultimately arranging her own rideshare at some later point. An eyewitness who observed Plaintiff after discharge described her as appearing intoxicated or heavily drugged. This was not a discharge. It was abandonment of a neurologically compromised patient into an uncontrolled environment with foreseeable risk of serious injury, including the possibility that Plaintiff could have operated a motor vehicle.

74. Achin authorized discharge without documenting that Plaintiff was alert, oriented, or capable of consent. No discharge escort was provided. No wheelchair was used. No staff member confirmed that Plaintiff had arranged safe transportation or was accompanied by a responsible party. The only proximate clinical justification is a cardiac stress test dictated on March 25, the day after discharge, by non-attending Dr. Majidi, addressing ischemia only. **The clinical basis for release was backfilled.**

75. **What the records reveal.** The certified litigation production (MVH-M000001 through MVH-M000254, 254 pages) contains material discrepancies from the pre-litigation portal version. The portal version contains a "Deprecated Plan of Care Note" dictated at 3:25 PM on March 24, 2025 that does not appear in the litigation production. In hospital EHR systems, a note is marked "Deprecated" when it has been retracted or replaced. The only

orientation assessment in the record ("Alert and Oriented x4") was documented at 1:38 AM on March 23, 2025, before the administration of 8 mg of IV Lorazepam across four doses. No updated capacity or orientation assessment was performed after the sedation and before discharge. The stress test interpretation was dictated by Dr. Farzad Majidi on March 25, 2025 at 8:03 AM, the day after discharge, meaning the clinical conclusion supporting discharge did not exist in the medical record at the time the patient was released. No audit trail documents were produced for this encounter despite production of summary audit trail documents for the Southern Hills encounter. Exhibits B (portal version), I (certified litigation production).

76. **Injury.** Discharge while cognitively impaired. Abandonment into an uncontrolled environment without escort, wheelchair, or safe transport confirmation. Exposure to foreseeable seizure risk and motor vehicle operation risk during unmonitored, unsupervised post-discharge interval.

77. MountainView Hospital failed to adapt its care when Plaintiff's clinical picture changed from a cardiac presentation to an active seizure emergency during the admission: no contraindication review performed or documented, no designated person contacted during postictal incapacity, discharge without capacity assessment or supervised transport. HCA's unified EHR contained the November 2023 encounter records.

## F. ENCOUNTER THREE: SUNRISE HOSPITAL & MEDICAL CENTER, LLC, APRIL 17 THROUGH MAY 29, 2025

### EMTALA Pre-Admission Screening Failure (April 17 through 22)

78. Plaintiff was an inpatient at Sunrise Hospital & Medical Center, LLC recovering from Facial Feminization Surgery (FFS). The FFS was performed in two stages totaling

approximately 18 hours of major surgery: an 11-hour craniofacial reconstruction (skull work) performed months earlier, followed by a 7-hour soft tissue procedure (facial skin work) performed at Sunrise during the April 2025 admission. Across all prior surgical procedures, Plaintiff had undergone more than 30 hours of surgery without any thromboembolic event, DVT, PE, or hypercoagulability history. During the post-surgical recovery from the 7-hour procedure, Plaintiff developed chest pain and respiratory compromise for the first time.

**79.** On information and belief, Sunrise's standard medical screening examination for post-surgical inpatients developing chest pain, dyspnea, hypoxia, abnormal chest imaging, and reported hemoptysis includes PE-rule-out testing. Sunrise provides this screening to similarly situated non-disabled post-surgical patients.

**80. Plaintiff received a portable chest X-ray only. No CTPA, D-dimer, V/Q, or any PE workup was performed.** Sunrise ruled in "pneumonia" without performing any PE-rule-out testing despite symptoms that trigger PE screening in non-disabled comparators and despite objective findings in its own imaging. The screening omission occurred at the ED stage, before any inpatient admission decision.

**81. How the omission happened.** The record introduced "nonepileptic psychogenic seizures," recasting Plaintiff's documented seizure disorder as behavioral. Once seizure activity was relabeled as psychogenic, concurrent chest pain, hypoxia, and respiratory distress were discounted as non-organic, and the PE workup that a non-disabled patient would have received was foreclosed.

**82.** Akhavan ordered a portable chest X-ray but no PE workup. The April 20 chest X-ray showed "moderate bilateral perihilar and left basilar airspace disease." **Plaintiff reported**

**hemoptysis and provided a blood container to nursing staff. The record documents dyspnea but contains no reference to hemoptysis, removing the strongest PE indicator from the chart.**

83. **What the records reveal.** The certified litigation production (SH-M000001 through SH-M000350, 350 pages) contains additional discrepancies. The April 20 Portable Chest X-Ray (SH-M000100) was performed at 8:33 PM CDT. The clinical interpretation was electronically signed by Dr. Galen Hewell at 6:35 PM PDT (8:35 PM CDT), approximately two minutes after the X-ray was taken, a timeline that requires image upload, transmission, viewing, and formal interpretation. The 350-page production contains no documentation of the hemoptysis specimen Plaintiff reports providing to nursing staff: no specimen collection record, no laboratory order, no lab accession, no chain-of-custody record, and no disposition record. The hospital generated a bill of $799,833.00 on April 27, 2025, five days after discharge, treating the record as final for billing purposes, while the Custodian of Records later certified the same production as potentially incomplete. No audit trail documents were produced for any Sunrise Hospital encounter. Exhibits C (portal version), J (certified litigation production).

84. **Injury.** Undiagnosed pulmonary embolism. Discharge on April 22 with a pneumonia diagnosis. **PE confirmed nine days later at Summerlin Hospital.**

**Sunrise Hospital & Medical Center, LLC: May 29, 2025**

85. Plaintiff was transported via 911 for repeated tonic-clonic seizures. Her Depakote (Valproic Acid) level was **7.0 micrograms per mL, approximately 86% below the minimum therapeutic range of 50 to 100 micrograms per mL.** Staff administered B52 (Haloperidol 5mg, Diphenhydramine 50mg, Lorazepam 2mg) without contacting Ryan,

without performing or documenting a contraindication review, and without documented necessity. Contradictory entries ("fell from chair" and "found on floor" versus "threw themselves from the chair") behavioralized seizure activity, a distinction that determines whether chemical restraint is justified under HCA Policy COG.COG.001. The restraint induced additional seizures. The 52-page certified production (SH-M000351 through SH-M000403) contains no neurology consult, no EEG, and no post-loading-dose Depakote level despite administration of a loading dose. The Provider Report in the litigation version focuses on "Acute Knee Pain" rather than the seizure presentation that prompted the 911 call. The discharge signature page (SH-M000403) contains "Verbal" in the patient signature field, an illegible caregiver/RN signature, and a blank date field, with no formal capacity assessment following the administration of Haloperidol and Lorazepam. **Plaintiff's toxicology screen was negative for opioids. The discharge instructions contain specific opioid medication warnings.** Exhibits D (portal version), K (certified litigation production).

## G. ENCOUNTER FOUR: SOUTHERN HILLS HOSPITAL & MEDICAL CENTER, JUNE 28 THROUGH 29, 2025 (RETALIATION)

**Protected Activity and Temporal Proximity**

**86.** On June 22 and 26, 2025, Plaintiff sent pre-litigation notices by email to Cook detailing the violation pattern across all HCA facilities. **This constitutes protected activity under the ADA, Section 504, and Section 1557.**

**87.** On information and belief, Cook received the June 22 notice and initiated an enterprise-wide response directed to HCA's centralized risk management infrastructure and Nevada facility personnel. The inference is drawn from the temporal proximity between

Plaintiff's complaints and the subsequent conduct at Southern Hills Hospital & Medical Center, and will be confirmed through discovery of internal communications, email logs, and escalation records.

88. On information and belief, Cook and Orber exchanged communications between June 23 and June 28 that preceded the Southern Hills conduct. **The temporal proximity is less than 48 hours, establishing prima facie causation.**

**EMTALA Screening and Stabilization Failure**

89. Plaintiff arrived at the Southern Hills Hospital & Medical Center ED on June 28, 2025, post-seizure. The PAD was in the unified EHR.

90. **Rather than stabilize, staff administered B52 contraindicated for her known seizure disorder, inducing at least 32 additional seizures and hypoxic episodes with SpO2 in the 60s.** Staff created a new emergency more severe than the presenting condition.

91. Plaintiff alleges that any nominal "admission" status recorded in the chart was not a bona fide inpatient admission terminating EMTALA duties. The record reflects the following: Plaintiff was not assigned an inpatient bed; she was not transferred from the Emergency Department to an inpatient unit; she received no inpatient-level attending orders; and she remained under Emergency Department management at the observation level throughout the encounter while Defendants administered restraints and generated the destabilization.

92. EMTALA defines "transfer" to include discharge and any movement outside the hospital's facilities. 42 C.F.R. Section 489.24(b). Defendants released Plaintiff while materially unstable, constituting a transfer without stabilization.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Accommodation and Denial**

**93.** The PAD was executed June 6, 2025. It was legally binding. It was present in the unified EHR. It constituted a formal written accommodation request specifying four requirements: contact Porscha Ryan before treatment decisions, review seizure contraindications before any chemical intervention, no physical restraints absent documented imminent harm, and maintain gender-affirming care. **Defendants had 22 days' notice.**

**94.** Yaghoobian (attending), Wright (treating), and ED nursing all had constructive notice of both the seizure disorder and the PAD through the EHR.

**95. What Defendants did.** The PAD was not reviewed before chemical restraints despite being accessible in the EHR. Ryan was not contacted. No contraindication review was performed or documented before B52 administration. The identical B52 protocol used on non-disabled patients was applied with no modification. Physical restraints were applied without required physician orders or monitoring per 42 C.F.R. Section 482.13. Unsupported psychiatric diagnoses were entered to justify the restraints. The record misgenders Plaintiff. Gender-affirming hormone therapy was withheld. **Yaghoobian did not intervene despite at least 32 induced seizures and SpO2 in the 60s.**

**96. Record fabrication.** Wright documented 37 minutes of CPT 99291 critical care on June 29. **Eyewitness Ryan was continuously present in the room. Wright did not perform the billed services, was not present for the claimed duration, and did not engage in the face-to-face care required by CPT 99291.** Contemporaneous nursing assessments corroborate this account. More than 12 hours after the June 28 CT scan confirmed "No

acute intracranial abnormality," a nurse entered **"DIFFUSE TBI with LOC STATUS UNKNOWN"** with no intervening trauma, imaging, or neurological exam.

97. **Injury.** At least 32 induced seizures. SpO2 in the 60s. Physical restraints without physician orders. Fabricated records. Fabricated billing. Gender-affirming care withheld. Misgendering. Pretextual psychiatric diagnoses.

98. **What the records reveal.** The certified litigation production (SHH-M000001 through SHH-M000201, 201 pages) and accompanying summary audit trail documents (SHH-AT000001 through SHH-AT000012) reveal the following:

(a) **The restraint documentation vacuum.** The facility restraint tracking system (Exhibit V) recorded a single non-violent restraint episode totaling **4,293 minutes** attributed to the episode of care. The system's own compliance fields report zero episodes without an order within 60 minutes, zero instances of RN monitoring not documented every two hours, and zero order/documentation mismatches, asserting that orders were entered, monitoring was performed, and documentation was compliant. **Yet neither the portal version nor the 201-page certified litigation production contains any reference to restraint:** no physician orders, no restraint flowsheets, no monitoring entries, no renewal orders, no documentation of less restrictive alternatives, and no discontinuation criteria. Either the underlying documentation exists and was not produced, or the system's compliance assertions are themselves fabricated. Under HCA Policy COG.COG.001, a non-violent restraint of this duration requires a minimum of 3 physician order renewals (every 24 hours), a minimum of 36 documented monitoring intervals (2-hour checks), and associated reassessments. **Zero pages of restraint documentation appear in the certified production.**

**(b) Document replacements.** The Consultation Report was replaced twice within 18 hours (June 28 at 4:33 PM and June 29 at 10:04 AM). The ED Physician Record was replaced once (June 29 at 10:18 AM), growing from 12 pages (Batch ID 10878075) to 13 pages (Batch ID 10950345). The additional page corresponds to the Critical Care Addendum. **Original versions of all replaced documents were not produced.**

**(c) Modification volume.** The summary audit reports document **343 total modification events** across multiple staff members, with actions occurring multiple times per minute in several instances.

**(d) The native log gap.** Plaintiff requested native EHR audit logs. Defendants produced summary audit reports generated through a reporting interface that allows parameter selection and filtering. If the underlying native logs contain deletion events, backdating, late authentication, or suppressed document types, the summary reports cannot reveal it.

**(e) The PAD audit gap.** The clinical narrative references Plaintiff's MPOA/PAD. **But the audit trail documents contain no log entry for any staff member accessing, viewing, or reviewing legal documents, advance directives, or PAD records.**

**(f) Sub-therapeutic Depakote mischaracterized.** The Depakote level was documented at 42.3 micrograms per mL, below the standard therapeutic range of 50 to 100. **The Neurology Note characterizes this result as "WNL" (Within Normal Limits).**

**(g) TBI diagnosis contradicted by imaging.** ICD-10 code S06.2XAA (Diffuse Traumatic Brain Injury) was applied to the encounter on July 2, 2025. **The imaging report for the same encounter states "no acute intracranial abnormality."**

Exhibits E (portal version), H (certified litigation production), V (restraint report), W (summary audit trail documents).

**Deliberate Indifference: Cumulative Notice**

**99.** By June 28, 2025, HCA had actual notice of the identical pattern at Southern Hills Hospital & Medical Center (2023), MountainView Hospital (2025), and Sunrise Hospital & Medical Center, LLC (April and May 2025). Plaintiff then executed a PAD on June 6, 2025, formalizing those accommodations in a legally binding directive, and it was still ignored 22 days later. Formal complaints to Cook constituted additional direct notice. **HCA's response was not remediation but an "enterprise-wide response" from Nashville. Within 48 hours of Plaintiff's final complaint, the identical pattern repeated with at least 32 induced seizures and fabricated billing.**

**100.**    Decision-makers with authority to correct the problem had notice and failed. At the pre-PAD encounters, facility leadership and attending physicians had the documented seizure disorder in the EHR and failed to modify protocols despite the obvious need. At the June 2025 encounter, the PAD was in the EHR for 22 days, and Yaghoobian as attending had both the documented disability and the formal written directive, yet took no steps to review the PAD, contact Ryan, or halt the B52 despite witnessing at least 32 seizures and critical desaturation. After Plaintiff's corporate complaints, Cook acknowledged receipt, yet no accommodation mechanism was implemented before the June 28 event.

**H. BILLING AND CLAIMS: RICO PREDICATE ACTS**

**101.**    The following identifies each of the twelve predicate acts with Rule 9(b) particularity.

**102.    Interstate Transmission Allegations.** Facility claims were transmitted through interstate wires using standardized HIPAA EDI transactions routed through third-party

claims infrastructure to payors located outside Nevada. Parallon assigned and validated codes based on physician documentation in HCA's integrated Meditech/HCIS EHR and submitted each facility claim electronically from Nevada. HCA's Shared Services Center in Richmond, Virginia provided sworn attestation supporting the Sunrise billing. Independent physician billing entities submitted or caused to be submitted separate professional claims through their own billing channels for the same encounters, creating parallel wire transmissions from the same underlying documentation. Each transmission constituted use of interstate wires within the meaning of 18 U.S.C. Sections 1343 and 1347.

**Predicate 1** | November 30 through December 4, 2023 | Southern Hills Hospital & Medical Center | Parallon (facility) | CMS/insurer | 837I. **False Representation:** Psychiatric hold and B52 medically necessary; "Schizoaffective disorder" and "GID" supported; involuntary detention legally justified. **Why False:** Patient documented as "calm, cooperative, low risk" by December 1. Eyewitness testimony that patient was calm and conversational at the time of B52 administration. Every documented Broset score was zero. "Gender Identity Disorder" removed from DSM in 2013. No consent obtained. No documented imminent harm. Detention continued three days past documented resolution. L2K application internally contradicted by physician assessment. Diagnostic codes manipulated: F25.9 reassigned to F31.9 without clinical justification; F64.0 "Transsexualism" substituted for clinician-documented "Gender Dysphoria"; "Major Depressive Disorder" inserted as reason for visit without any supporting clinical diagnosis. Petition for involuntary court-ordered admission filed the same day discharge summary found patient low risk, euthymic, and safe for discharge.

**Predicate 2** | November 30 through December 4, 2023 (post-litigation) | Southern Hills Hospital & Medical Center | Parallon (facility) | CMS/insurer | 837I; certified record. **False Representation:** Psychiatric evaluation upgraded with psychosis-coded "grandiose themes" not present in pre-litigation version. **Why False:** Portal version lacks "grandiose themes." Contemporaneous observations unchanged in both versions: calm, cooperative, goal-directed. Alteration supports billing posture contradicted by the facility's own data.

**Predicate 3** | March 22 through 24, 2025 | MountainView Hospital | Parallon (facility); Reliant Physicians, LLC (professional) | CMS/insurer | 837I; 837P. **False Representation:** Inpatient services with compliant discharge. **Why False:** No capacity assessment. No neurological clearance. No discharge escort, wheelchair, or supervised transport. Sedated postictal patient released unassisted into hospital hallways and exited the facility alone. Clinical basis backfilled by non-attending physician the day after discharge.

**Predicate 4** | March 22 through 24, 2025 (post-litigation) | MountainView Hospital | Parallon (facility); Reliant Physicians, LLC (professional) | CMS/insurer | 837I; DRG 880. **False Representation:** Admission reframed from cardiac to psychiatric. DRG 880 assigned. F64.0 "Transsexualism" inserted without clinical purpose. PNES elevated from historical consideration to primary diagnosis. **Why False:** Portal version reflects cardiac narrative with PNES as history and sedation impact documented. Discovery version reframes to psychiatric primary, minimizes cardiac workup, sanitizes sedation documentation, and inserts gender-identity diagnosis code.

**Predicate 5** | April 17 through 22, 2025 | Sunrise Hospital & Medical Center, LLC | Parallon (facility); Alexander F. Akhavan, MD, Ltd. (professional) | CMS/Anthem | UB-04/837I; 837P. **False Representation:** $799,833.00 billed as "reasonable." Diagnosis: pneumonia

(stable). **Why False:** Hemoptysis omitted from the record. PE screening not performed. Seizures behavioralized. PE confirmed nine days later at non-HCA facility.

**Predicate 6** | April 17 through 22, 2025 (post-litigation) | Sunrise Hospital & Medical Center, LLC | Parallon (facility); Alexander F. Akhavan, MD, Ltd. (professional) | CMS/Anthem | 837I; discovery production. **False Representation:** PNES elevated to structural diagnosis. "No shortness of breath" inserted contradicting oxygen data. Clinical timeline smoothed. **Why False:** Record conditioned to justify billing and retroactively justify PE screening failure. Custodian certification admits records may not reflect the timing of entries.

**Predicate 7** | May 29, 2025 | Sunrise Hospital & Medical Center, LLC | Parallon (facility) | CMS/insurer | 837I. **False Representation:** Chemical restraint medically necessary. Seizure activity characterized as behavioral. **Why False:** No consent obtained. No contraindication review performed or documented. Depakote level 7.0 micrograms per mL with no neurology consult or post-loading-dose level. Contradictory entries behavioralize seizure-related fall. Negative toxicology screen contradicts substance insinuation. Discharge signature page contains "Verbal" consent, illegible RN signature, and blank date field with no post-sedation capacity assessment.

**Predicate 8** | May 29, 2025 (post-litigation) | Sunrise Hospital & Medical Center, LLC | Parallon (facility) | CMS/insurer | 837I; discovery production. **False Representation:** B52 relabeled as routine treatment. Capacity fabricated post-sedation. Opioid involvement insinuated despite negative toxicology. Seizure severity minimized. **Why False:** Portal version describes B52 as restraint and flags neurological vulnerability. Discovery version relabels restraint, removes exposure elements, and attributes false substance involvement.

**Predicate 9** | June 28 through 29, 2025 | Southern Hills Hospital & Medical Center | Parallon (facility) | CMS/Anthem | 837I. **False Representation:** Facility services including restraints, monitoring, "DIFFUSE TBI WITH LOC STATUS UNKNOWN." **Why False:** "DIFFUSE TBI" entered more than 12 hours after negative CT with no intervening trauma, imaging, or exam. PAD not reviewed. At least 32 induced seizures. 71.5 hours of restraint documented in hospital logs with zero restraint documentation in 201-page certified production. Depakote 42.3 micrograms per mL characterized as "WNL" against 50 to 100 therapeutic range. ICD-10 S06.2XAA (Diffuse TBI) applied to encounter where imaging confirmed no acute intracranial abnormality.

**Predicate 10** | June 28 through 29, 2025 | Southern Hills Hospital & Medical Center | Fremont Emergency Services (Scherr), Ltd. (professional, out of network) | Anthem | 837P; CPT 99291. **False Representation:** 37 minutes of critical care by Wright. **Why False:** Eyewitness testimony that Wright was not present and did not perform billed services. Out-of-network professional claim processed through separate billing channel for fabricated services.

**Predicate 11** | June 28 through 29, 2025 | Southern Hills Hospital & Medical Center | Platinum Hospitalists, LLC (professional) | CMS/Anthem | 837P. **False Representation:** Attending hospitalist services by Yaghoobian during a period in which the patient experienced at least 32 induced seizures and oxygen saturation in the 60s. The professional claim necessarily represented that Yaghoobian provided attending-level oversight, management, and stabilizing intervention consistent with the billed service. **Why False:** The contemporaneous record documents at least 32 induced seizures and SpO2 in the 60s with no documented stabilizing intervention, no documented PAD review, no documented seizure contraindication assessment,

and no documented contact with the designated decision-maker by the attending physician. Specific claim fields to be confirmed through discovery of CMS-1500/837P claim data.

**Predicate 12** | June 28 through 29, 2025 (post-litigation) | Southern Hills Hospital & Medical Center | Parallon (facility); Fremont Emergency Services (Scherr), Ltd.; Platinum Hospitalists, LLC | CMS/Anthem | 837I; CPT 99291; Bates production. **False Representation:** Narrative smoothing. Retroactive restraint justification. Acuity-support signaling. **Why False:** Portal version shows restraint was abrupt and justification thin. Litigation version presents restraint as routine and implies stronger justification. Record conditioned to survive CPT 99291 audit.

Amounts for all predicates will be established through claim forms, remittance advice, UB-04 and 837 data, CMS-1500 data, Parallon billing extracts, and professional claim records obtainable through discovery.

103.    **Parallel Billing Infrastructure.** The parallel billing structure was not unique to the June 2025 encounter. It was the normal operating model. At MountainView Hospital in March 2025, the same encounter documentation generated both Parallon's facility claim (837I) and Reliant Physicians' professional claim (837P). At Sunrise Hospital & Medical Center, LLC in April 2025, the same encounter documentation generated both Parallon's facility claim (837I/UB-04) and Akhavan Ltd.'s professional claim (837P). At Southern Hills Hospital & Medical Center in June 2025, the same fabricated documentation generated three separate claims through three separate billing channels: (a) Parallon's facility claim (837I) to CMS/Anthem; (b) Fremont Emergency Services' out-of-network professional claim (837P/CPT 99291) to Anthem; and (c) Platinum

Hospitalists' professional claim (837P) to CMS/Anthem. At each encounter, the facility claim and the professional claim(s) traversed separate interstate wire pathways and arrived at separate payor processing queues. **These lanes are parallel, separately monetized, and independently transmitted. The parallel billing structure multiplied the wire transmissions and the fraud, and establishes that the scheme operated through legally independent entities, not through a single corporate actor.**

104.    **Continuity.** Twelve predicate acts across five encounters, three facilities, and four calendar years (2023 through 2025), involving multiple actors and multiple billing entities operating through the same enterprise infrastructure. The pattern is open-ended, with nothing preventing repetition. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

## I. THE RICO ENTERPRISE

105.    The enterprise is an association-in-fact: the integrated operational workflow connecting HCA's centralized risk management, Parallon's facility-level revenue-cycle operations, independent physician billing entities' professional-claim submissions, HealthTrust's staffing, and market-level hospital administration and clinical staff. The enterprise existed for the ostensibly legitimate purposes of providing emergency healthcare, staffing hospitals, and processing insurance claims. The enterprise was used to shape documentation and coding in a manner that supports reimbursement and litigation posture rather than reflecting the underlying events as recorded contemporaneously. The enterprise is the operational workflow itself (risk management, staffing, EHR documentation, coding validation, facility claims submission, and parallel professional claims submission), not any single corporate defendant in isolation.

**106.**    **Common Purpose.** To shape documentation and coding through the enterprise workflow in a manner that supports reimbursement and litigation posture, rather than reflecting the underlying events as recorded contemporaneously.

**107.**    **The Two Revenue Lanes.** The enterprise generates revenue through two parallel, separately monetized billing lanes that operate from the same underlying EHR documentation. The facility lane runs through Parallon, which assembles 837I/UB-04 claims, assigns DRG and ICD-10 codes, and transmits facility claims electronically to CMS and private insurers. The professional lane runs through the independent physician billing entities (Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Reliant Physicians, LLC; and Alexander F. Akhavan, MD, Ltd.), which assemble 837P/CMS-1500 claims, assign CPT codes, and transmit professional claims through their own billing channels to the same or different payors. These lanes are parallel, separately monetized, and independently transmitted. When the underlying documentation is fabricated or noncompliant, both lanes transmit false claims, multiplying the fraud.

**108.**    **Ongoing Organization and Roles.** HCA provides centralized command, risk management, and policy. Parallon provides coding validation and facility claims submission. The independent physician billing entities submit professional claims through separate channels using the same underlying EHR documentation. HealthTrust provides personnel supply. The hospitals provide facility infrastructure and administration. Individual Defendants provide physician authority, documentation, and orders.

109.    **Distinct RICO Persons.** The independent physician billing entities are not HCA subsidiaries. They maintain separate corporate identities, separate billing relationships with payors, and separate revenue streams. Fremont Emergency Services (Scherr), Ltd. billed out of network through a separate processing channel. Each entity's participation in the enterprise is voluntary and produces independent financial benefit. Each of these entities is a separate "person" that profited from the same episode of care through independent claim submission. This structure, legally independent entities coordinating through shared infrastructure to generate and monetize fraudulent documentation, satisfies the association-in-fact standard. The presence of non-HCA billing entities demonstrates that the enterprise is not reducible to a single corporation or its subsidiaries.

110.    **Longevity.** Five encounters, three facilities, November 2023 through June 2025, with multiple rotating actors and billing entities cycling through the same infrastructure.

111.    Each Defendant is a RICO "person" distinct from the enterprise. Per-defendant Reves participation is specified in Count Seven below.

## J. POST-LITIGATION RECORD ALTERATION

112.    Plaintiff possesses two versions of the medical records for every encounter at issue. Pre-litigation versions were obtained from each facility's patient portal before this action was filed. Litigation-produced versions were subsequently provided through Defendants' certified records and discovery channels. **In every comparison, the litigation-produced version contains material alterations not present in the portal version.**

113.    **The alteration pattern is consistent across all five encounters at three facilities. Every change operates in one direction:** escalating pathology, acuity,

psychiatric framing, billing justification, or implied consent, while minimizing seizure severity, restraint exposure, and screening failures. No change in any litigation-produced version reduces acuity, corrects a screening failure, acknowledges a restraint violation, or contradicts Defendants' litigation position.

**114.**      Specific alterations by encounter:

**(a) Southern Hills Hospital & Medical Center, November 2023** (Exhibits A, G). The litigation-produced version (SHH-M000202 through SHH-M000451, 249 pages, certified October 24, 2025) materially differs in scope and content from the 6-page pre-litigation portal version. The portal version contains only the Emergency Department provider report. The litigation production includes a Psychiatry Initial Evaluation (Report No. 1201-0321) containing psychosis-coded terminology ("grandiose themes") not present in the portal-accessible record. Behavioral observations documented contemporaneously in both records remain consistent: calm, cooperative, and goal-directed. Both versions document that the B52 was ordered on November 30, 2023 at 16:00 but not administered until December 1, 2023 at 15:48, approximately 23.5 hours later. The B52 sat as an open PRN order for nearly 24 hours. The litigation version classifies all three B52 components as PRN medications with Q4H dosing windows, despite HCA Policy COG.COG.001's prohibition on PRN restraint orders. No corresponding restraint order, flowsheet, or monitoring documentation for that PRN chemical restraint was produced. The dictation date for the same clinical note differs between versions by two days. Dr. Bhushan's co-signatures on APRN Sandhu's progress notes were applied 55 days after dictation. No edit history or audit trail documentation was produced. The Custodian of Records certified the production as "complete records" while including a disclaimer that the record may be "incomplete and/or preliminary." No audit trail documents were produced for this

encounter. The diagnostic coding layer reveals additional manipulation: ICD-10 F25.9 (Schizoaffective Disorder) was assigned for the initial encounter, then reclassified to F31.9 (Bipolar Disorder) for the psychiatric encounter without clinical justification; ICD-10 F64.0 ("Transsexualism") was substituted for the clinician-documented "Gender Dysphoria"; and "Major Depressive Disorder" was inserted as the reason for visit on the psychiatric encounter face sheet, a diagnosis no treating provider rendered at any point during the hospitalization.

**(b) MountainView Hospital, March 2025** (Exhibits B, I). The discovery production reframes a cardiac-driven admission as psychiatric DRG 880, elevates PNES from historical consideration to primary diagnosis, inserts ICD-10 F64.0 "Transsexualism" into the psychiatric coding cluster without clinical purpose, sanitizes sedation impact while the MAR still documents the sedating medications, and compresses the timeline into an outcome-driven narrative. **The clinical workup was cardiac. The billing is psychiatric.**

**(c) Sunrise Hospital & Medical Center, LLC, April 2025** (Exhibits C, J). The discovery production retroactively stabilizes the diagnostic framework that caused the PE screening failure by formalizing pneumonia as the explanatory cause, entrenching PNES as a structural diagnosis, smoothing the clinical timeline, and inserting "no shortness of breath" assertions contradicting earlier oxygen and hypoxia documentation. The custodian certification admits the records may not reflect the timing of entries.

**(d) Sunrise Hospital & Medical Center, LLC, May 2025** (Exhibits D, K). The discovery production relabels the B52 from "chemical restraint" to routine ED treatment, injects psychiatric framing post-sedation, insinuates opioid involvement despite a negative urine toxicology (opiates: NOT DETECTED) with no correction entered, minimizes seizure severity, and fabricates capacity with boilerplate consent language inserted after sedation.

**(e) Southern Hills Hospital & Medical Center, June 2025** (Exhibits E, H, V, W). The Bates-stamped production (SHH-M000001 through SHH-M000201) adds structural metadata, introduces clinical narrative smoothing, supplies retroactive restraint justification framing absent from the contemporaneous portal record, and adds acuity-support signaling consistent with conditioning to survive CPT 99291 audit. The summary audit trail documents 343 modification events, three document replacement events with originals not produced, and a Critical Care Addendum electronically signed approximately 20 hours after admission that was incorporated by replacing the ED Physician Record. An administrative user executed a "Print Patient Audit Log" command on December 23, 2025, approximately six months after discharge and after litigation commenced. Native EHR audit logs were requested but not produced.

115.    The repetition of the same modification signature across every encounter, at every facility, involving different clinical staff but the same centralized coding, abstracting, and production infrastructure, establishes enterprise-level process. **The common signature of unidirectional, post-litigation conditioning across separate facilities is consistent with enterprise governance, not isolated clinician judgment.**

116.    Only native EHR audit trails and metadata can establish when the altered language was inserted, by whom, under what authority, and whether the changes were tied to litigation, billing escalation, or corporate risk management. Defendants had a duty to preserve native ESI once litigation was reasonably foreseeable. To the extent audit trails are missing, incomplete, or produced in non-native form, Plaintiff will seek relief under Fed. R. Civ. P. 37(e). To the extent altered records were produced as certified business records with knowledge of the alterations, Plaintiff reserves the right to seek appropriate relief for fraud upon the court. The post-litigation alterations identified in

Predicates 2, 4, 6, 8, and 12 independently support wire fraud predicates, and in the alternative, they constitute evidence of spoliation and obstruction that supports adverse inferences under Rule 37(e)(2).

## K. PERMANENT PHYSIOLOGICAL INJURY

117.     Prior to April 2025, Plaintiff required no anticoagulation and had no hypercoagulability history despite more than 30 hours of prior surgeries without a single thromboembolic event. Following a 7-hour soft tissue procedure at Sunrise and Sunrise's failure to diagnose PE, Plaintiff was diagnosed at Summerlin Hospital on May 1, 2025 and later suffered severe upper-extremity DVT. **Hematology has recommended long-term or lifelong anticoagulation.**

118.     **Lifetime anticoagulation combined with a seizure disorder creates materially increased risk of fatal intracranial hemorrhage.** Post-Southern Hills, neurologists documented decreased seizure threshold and increased frequency. Each seizure now carries elevated mortality risk.

119.     The harm is cascading and irreversible: undiagnosed PE, subsequent thrombotic events, lifetime anticoagulation, decreased seizure threshold, elevated mortality. **This is permanent physiological alteration, not speculative future harm.**

120.     On November 6 and 7, 2025, Plaintiff suffered a second clotting event. Anthem denied coverage under Reason Code B67, assigning personal liability of $47,530.00.

## L. CONCRETE FINANCIAL INJURY

121.     **Plaintiff's assigned personal liability and related financial injury exceeds $483,000.** The Sunrise Hospital & Medical Center, LLC April 2025 encounter was billed

at $799,833.00, supported by Jackson's sworn affidavit from Virginia. Summerlin PE treatment was denied by Anthem as "not medically necessary," with personal liability assigned to Plaintiff. The November 2025 clotting event resulted in an additional Anthem denial of $47,530.00.

**122.**     Anthem's denial and assignment of personal liability were proximately caused by Defendants' false discharge narrative and coding. Anthem relied on Sunrise's "stable/pneumonia" characterization and the absence of PE-rule-out workup to treat later PE care as non-covered, assigning the resulting liability to Plaintiff. *Canyon County v. Syngenta Seeds*, 519 F.3d 969, 975 (9th Cir. 2008).

## M. ONGOING RISK AND PROSPECTIVE RELIEF

123.     Plaintiff's seizure disorder, anticoagulation status, and recurrent emergency episodes make future ED presentation medically foreseeable. The defendant hospitals are among the primary emergency facilities serving Plaintiff's geographic area. Plaintiff cannot guarantee avoidance of Defendants' facilities during emergency transport, and Defendants have not implemented any verifiable enterprise-wide mechanism ensuring PAD compliance.

124.     Plaintiff therefore faces a non-hypothetical, imminent risk of being subjected to the same denied modifications and restraint practices, satisfying Article III standing for prospective relief. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

1

**N. TIMELINESS**

2

**125.** All federal claims are timely. To the extent any state-law claim arising from the

3

November 30 through December 4, 2023 encounter is subject to a two-year limitation

4

period, that period is tolled by fraudulent concealment. Plaintiff did not discover, and

5

could not have discovered through reasonable diligence, the material discrepancies

6

7

between the portal version and the litigation-produced version of the Southern Hills

8

Hospital & Medical Center 2023 records until Defendants produced the certified

9

litigation version on or about October 24, 2025. The record alterations, including the

10

insertion of psychosis-coded terminology not present in the portal version, the

11

reclassification of chemical restraints as PRN medications in violation of HCA's own

12

policy, the dictation date discrepancy, and the diagnostic code manipulations, were

13

14

concealed within records exclusively within Defendants' custody and control.

15

Additionally, the pattern of noncompliance constitutes a continuing violation spanning

16

November 2023 through June 2025 across three facilities, with each subsequent

17

18

encounter renewing the limitation period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536

19

U.S. 101, 117 (2002).

20

### VI. CAUSES OF ACTION

21

**COUNT ONE: EMTALA, DISPARATE SCREENING, 42 U.S.C. SECTION 1395dd(a)**

22

**(Against Sunrise Hospital & Medical Center, LLC)**

23

24

**126.** Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as

25

though fully set forth herein.

26

**127.** Sunrise Hospital & Medical Center, LLC is a participating EMTALA hospital.

27

Plaintiff was an inpatient recovering from a 7-hour FFS soft tissue procedure when she

28

developed chest pain, dyspnea, supplemental oxygen requirement, abnormal imaging, and hemoptysis. Plaintiff had undergone more than 30 hours of prior surgeries without any thromboembolic event.

128.     Sunrise's standard screening for similarly situated post-surgical patients includes PE-rule-out testing. **Sunrise provided Plaintiff a materially different screening: portable chest X-ray only, no PE workup.** The disparity was caused by behavioralization of Plaintiff's seizure disorder as "psychogenic," which permitted dismissal of concurrent physiological symptoms.

129.     The violation was complete at the ED screening stage, before any inpatient admission decision. The litigation discovery production confirms that the behavioralization was retroactively reinforced after litigation commenced by entrenching PNES from historical consideration to structural diagnosis and inserting "no shortness of breath" assertions contradicting the record's own oxygen data.

130.     **Result: undiagnosed PE, confirmed nine days later at a non-HCA facility.**

**COUNT TWO: EMTALA, FAILURE TO STABILIZE, 42 U.S.C. SECTION 1395dd(b) AND (c) (Against Southern Hills Hospital & Medical Center)**

131.     Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

132.     On June 28, 2025, Plaintiff presented post-seizure. **Rather than stabilize, ED staff administered B52 contraindicated for her seizure disorder, inducing at least 32 additional seizures and SpO2 in the 60s.** Plaintiff was materially less stable at discharge than upon arrival. *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162 (9th Cir. 2002); *Cleland v. Bronson Health Care Grp.*, 917 F.2d 266, 269 (6th Cir. 1990).

**133.** Any nominal "admission" was not a bona fide inpatient admission terminating EMTALA duties. EMTALA defines "transfer" to include discharge. 42 C.F.R. Section 489.24(b). Defendants discharged Plaintiff while materially unstable. The record confirms: no inpatient bed was assigned; Plaintiff was never transferred from the Emergency Department to an inpatient unit; no inpatient attending orders were entered; and Plaintiff remained under ED-level management throughout the encounter. Unlike the genuine inpatient admission in *Bryant*, where the patient was transferred to an inpatient unit and received inpatient-level care, Plaintiff was destabilized rather than stabilized while remaining under ED management. **The "admission" was a billing status, not a clinical reality.**

## COUNT THREE: EMTALA, FAILURE TO STABILIZE, 42 U.S.C. SECTION 1395dd(b) AND (c) (Against MountainView Hospital)

**134.** Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

**135.** On March 22, 2025, Plaintiff presented with active seizures and remained postictal throughout the hospitalization. MountainView Hospital released Plaintiff without a wheelchair, without an escort, without supervised transport, without contemporaneous capacity assessment, without neurological clearance, and without postictal resolution confirmation. Plaintiff, sedated with 8 mg of IV Lorazepam and still postictal, stumbled unassisted through hospital hallways and exited the facility alone.

**136.** This claim is pleaded in the alternative. If the Court determines that bona fide inpatient admission terminated EMTALA's stabilization duty, Plaintiff's disability discrimination and state tort claims under Counts Four, Six, Eleven, Thirteen, and

Fourteen independently reach the identical discharge conduct. The discharge functioned as an EMTALA "transfer" because it moved Plaintiff outside the hospital while the emergency condition persisted. 42 C.F.R. Section 489.24(b). Plaintiff's postictal state following active seizures constituted an ongoing emergency medical condition because material deterioration, including recurrent seizures, was reasonably likely to occur during unsupervised transit, which is the stabilization standard under 42 U.S.C. Section 1395dd(e)(3)(A).

**COUNT FOUR: DISABILITY DISCRIMINATION, DENIAL OF MEANINGFUL ACCESS Section 504, 29 U.S.C. Section 794; ADA Title III, 42 U.S.C. Section 12182 (Against HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC; MountainView Hospital; Southern Hills Hospital & Medical Center; Parallon Business Solutions, LLC; and HealthTrust Workforce Solutions, LLC)**

**137.**     Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

**138.**     Plaintiff is a qualified individual with a disability who sought emergency services, a federally funded program. At each encounter, Defendants denied her the benefits of that program through the operational failures detailed in the encounter allegations above. At Southern Hills Hospital & Medical Center in November 2023: B52 administered to a calm, non-agitated patient without consent, designated person not contacted, detention sustained beyond necessity, involuntary hold initiated on the basis of a facially deficient and internally contradictory emergency admission application, gender-affirming care withheld over admitting physician's recommendation. At MountainView Hospital in March 2025: designated person not contacted, no capacity assessment, unescorted

discharge of sedated postictal patient. At Sunrise Hospital & Medical Center, LLC in April 2025: seizure disorder behavioralized, PE screening denied. At Sunrise Hospital & Medical Center, LLC in May 2025: B52 administered without PAD review, Ryan contact, or contraindication review. At Southern Hills Hospital & Medical Center in June 2025: PAD not reviewed, Ryan not contacted, B52 administered, inducing at least 32 seizures and SpO2 in the 60s.

139.     Defendants had actual notice through the PAD in the EHR, the documented seizure disorder, the November 2023 encounter establishing the pattern, and formal complaints to Cook in June 2025. Despite repeated notice and known risk, Defendants failed to implement PAD review procedures, modify restraint protocols, or ensure decision-maker contact. *Duvall*, 260 F.3d at 1139.

140.     These failures are operational, not clinical judgment. HCA failed to modify policies. Each hospital failed to implement PAD procedures. Parallon processed noncompliant billing. HealthTrust supplied personnel without required training or protocols.

141.     **Remedial framework.** Plaintiff seeks compensatory damages under Section 504 and Section 1557. Plaintiff seeks injunctive relief under ADA Title III, Section 504, and Section 1557. Plaintiff does not seek damages under ADA Title III. To the extent any element of this Count is recharacterized as professional negligence, the recharacterization applies only to the supplemental state-law theory, and the federal statutory claims survive independently.

**COUNT FIVE: RETALIATION, 42 U.S.C. SECTION 12203; 29 U.S.C. SECTION 794a (Against HCA Healthcare, Inc.; Southern Hills Hospital & Medical Center; Cinthya S. Cook; Jonathan Yaghoobian, MD; Brent J. Wright, DO; Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Michael A. Orber; and Michael A. Orber & Associates, Inc.)**

142.    Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

143.    **Protected activity:** pre-litigation notices to Cook on June 22 and 26, 2025.

144.    **Adverse action within 48 hours:** chemical restraints, physical restraints, PAD override, at least 32 induced seizures, SpO2 in the 60s, unsupported diagnoses, misgendering, gender-affirming care withheld, and fabricated CPT 99291 billing.

145.    **Causal chain per Defendant:** Cook directed the enterprise-wide response. Yaghoobian failed to intervene as attending. Wright fabricated billing. Platinum Hospitalists, LLC and Fremont Emergency Services (Scherr), Ltd. submitted professional claims derived from the retaliatory encounter. On information and belief, Orber participated in complaint-response and retaliation communications with Cook and/or Nevada facility leadership preceding the June 28 to 29, 2025 encounter. Discovery will clarify the full chain, including call logs, emails, and EHR audit-trail access and change history.

/

/

/

**COUNT SIX: SEX AND DISABILITY DISCRIMINATION, ACA SECTION 1557, 42 U.S.C. SECTION 18116 (Against HCA Healthcare, Inc.; Sunrise Hospital & Medical Center, LLC; MountainView Hospital; Southern Hills Hospital & Medical Center; Parallon Business Solutions, LLC; and HealthTrust Workforce Solutions, LLC)**

146.    Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

147.    **Disability discrimination:** accommodation denials as detailed in Count Four constitute independent violations of Section 1557's prohibition on disability discrimination in federally funded healthcare programs. **Sex discrimination,** as an independent and alternative theory: obsolete "Gender Identity Disorder" diagnosis at Southern Hills Hospital & Medical Center in 2023; withholding gender-affirming therapy at Southern Hills Hospital & Medical Center in 2023 and 2025; misgendering at Southern Hills Hospital & Medical Center in 2025; and post-litigation insertion of ICD-10 F64.0 "Transsexualism" into MountainView Hospital's psychiatric DRG coding cluster for a cardiac admission without clinical purpose, using a gender-identity diagnosis code as billing infrastructure. Section 1557 prohibits discrimination on the basis of sex. The Supreme Court held in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020), that discrimination based on transgender status is necessarily discrimination "because of sex." Multiple circuits have applied *Bostock* to healthcare contexts. *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024). Regardless of the current regulatory enforcement posture, *Bostock* is a statutory interpretation binding on this Court. In the further alternative, the conduct alleged, including sex-stereotyping documentation, withholding gender-affirming treatment, and using gender-identity diagnoses as billing infrastructure, constitutes sex-

stereotyping discrimination actionable under Section 1557 even under a reading of "sex" that does not expressly encompass gender identity. These claims are independent of one another.

**COUNT SEVEN: CIVIL RICO, 18 U.S.C. SECTION 1962(c) (Against All Defendants and Does 1 through 50)**

148.    Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein, including the predicate act identifications, parallel billing infrastructure, and enterprise structure.

149.    Each Defendant conducted or participated in the enterprise's affairs through predicate violations of 18 U.S.C. Sections 1347 and 1343, related by common purpose, participants, methods, and victim. Open-ended continuity. *H.J. Inc.*, 492 U.S. at 239.

150.    **Per-Defendant Reves Participation.**

**HCA Healthcare, Inc.:** Management-level direction through policies, risk management, and Cook's escalation.

**Parallon Business Solutions, LLC:** Operational execution; validated codes and submitted each facility claim.

**HealthTrust Workforce Solutions, LLC:** Personnel supply; staffed the restraint administration and documentation at each encounter without training or credentialing protocols for seizure contraindication review, PAD compliance, or decision-maker contact, enabling the enterprise's noncompliant documentation to be generated at the point of care.

**Sunrise Hospital & Medical Center, LLC; MountainView Hospital; and Southern Hills Hospital & Medical Center:** Facility-level administration for their respective predicates.

**Cinthya S. Cook:** Management-level direction of complaint-response preceding Predicates 9 through 12.

**Jonathan Yaghoobian, MD:** Physician authority sustaining the Predicate 9 encounter.

**Platinum Hospitalists, LLC:** Submitted separate professional claim (Predicate 11) for Yaghoobian's attending services; received direct financial benefit from claims generated by fabricated or noncompliant documentation while the attending failed to intervene during 32 induced seizures and SpO2 in the 60s.

**Brent J. Wright, DO:** Direct commission; fabricated CPT 99291 (Predicate 10).

**Fremont Emergency Services (Scherr), Ltd.:** Submitted separate out-of-network professional claim (Predicate 10) for Wright's fabricated CPT 99291 critical care; received direct financial benefit from a professional claim for services an eyewitness will testify were never rendered.

**James Bindrup, MD:** Physician authority sustaining Predicate 1 detention and billing.

**Tarik Alshaikh, DO:** Attending physician authority over inpatient psychiatric admission, treatment plan, medication management, and continued detention generating Predicate 1.

**Nicole Mann, RN:** Initiated the facially deficient Application for Emergency Admission that formed the sole legal predicate for Plaintiff's involuntary detention generating Predicate 1, providing the documentary foundation upon which the facility claim for involuntary psychiatric services was assembled and submitted.

**Jonathan Wirjo, DO:** Formalized the involuntary hold status in the EHR, maintaining the legal designation that sustained Plaintiff's continued detention and generated the billing predicate for involuntary psychiatric services in Predicate 1.

**Rowena E. Achin, MD:** Physician authority; noncompliant unescorted discharge generating Predicate 3.

**Reliant Physicians, LLC:** Submitted separate professional claim (Predicate 3) for Achin's attending services at MountainView Hospital; received direct financial benefit from claims generated by documentation supporting noncompliant unescorted discharge of a sedated postictal patient.

**Alexander F. Akhavan, MD:** Physician authority; screening scope creating the Predicate 5 diagnostic gap by omitting PE workup.

**Alexander F. Akhavan, MD, Ltd.:** Submitted separate professional claim (Predicate 5) for Akhavan's services at Sunrise Hospital & Medical Center, LLC; received direct financial benefit from claims generated by documentation that omitted hemoptysis, behavioralized seizures, and foreclosed PE screening.

**Michael A. Orber and Michael A. Orber & Associates, Inc.:** On information and belief, based on timing and subsequent conduct, participated in complaint-response and retaliation communications preceding Predicates 9 through 12.

151.     Plaintiff's assigned personal liability and related financial injury exceeds $483,000. Anthem's denial was proximately caused by Defendants' false discharge narrative and coding. **Treble damages under Section 1964(c).**

**COUNT EIGHT: RICO CONSPIRACY, 18 U.S.C. SECTION 1962(d) (Against All Defendants and Does 1 through 50)**

152.     Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

**153.**      Each Defendant agreed to the enterprise's objective and committed overt acts as specified in Count Seven.

**COUNT NINE: CIVIL RIGHTS CONSPIRACY, 42 U.S.C. SECTION 1985(3) (Against All Defendants)**

**154.**      Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein. This count is pleaded in the alternative.

**155.**      Defendants conspired to deprive Plaintiff of equal protection in access to emergency medical services and to punish her for invoking federal disability and sex-discrimination rights. *Griffin v. Breckenridge*, 403 U.S. 88 (1971). The agreement is inferred from coordinated documentation practices, parallel billing behavior, and retaliatory escalation immediately following protected activity.

**156.      Class-based animus** is evidenced by the following: use of obsolete "Gender Identity Disorder" diagnosis at Southern Hills Hospital & Medical Center in 2023; post-litigation insertion of ICD-10 F64.0 "Transsexualism" into a psychiatric DRG billing cluster for a cardiac admission at MountainView Hospital without clinical purpose; repeated misgendering and sex-stereotyping documentation; use of psychiatric labels to justify coercive restraints against a transgender woman asserting disability-rights protections; withholding gender-affirming care; and diagnostic code manipulation substituting more pathologizing codes than the treating clinicians rendered. Michael A. Orber, Platinum Hospitalists, LLC, Fremont Emergency Services (Scherr), Ltd., Reliant Physicians, LLC, and Alexander F. Akhavan, MD, Ltd., entities outside HCA's corporate family, participated in or profited from the conduct through independent billing and interstate communications, defeating any intra-corporate conspiracy defense.

**157.**     In the further alternative, Plaintiff invokes the hindrance clause: Defendants

conspired to hinder access to federal protections by making complaint dangerous and

futile. *Kush v. Rutledge*, 460 U.S. 719, 726 (1983).

**COUNT TEN: FRAUD, RECORD FALSIFICATION, AND BILLING**

**MISREPRESENTATION (Against All Defendants)**

**158.**     Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as

though fully set forth herein.

**159.**     Each Defendant knowingly made or enabled material misrepresentations as

identified in the Predicate Acts section above. Insurers and CMS relied on these

representations. Anthem relied on Sunrise's "stable/pneumonia" characterization to deny

PE treatment coverage. Subsequent providers relied on the corrupted chart. Plaintiff

relied on the integrity of her medical record in seeking follow-up care and insurance

coverage, and suffered damages when that record's false representations caused Anthem

to deny coverage and assign personal liability.

**160.**     Plaintiff's forensic comparison of pre-litigation and litigation-produced records

identified narrative insertions, terminology escalations, diagnostic code manipulations,

and coding-layer fabrications across all five encounters at three facilities, each operating

in the same direction: escalating pathology, acuity, and billing justification. The

November 2023 encounter alone reveals diagnostic code reassignment from F25.9 to

F31.9 without clinical justification, substitution of ICD-10 F64.0 "Transsexualism" for

clinician-documented "Gender Dysphoria," and insertion of "Major Depressive Disorder"

as the reason for visit without any supporting clinical diagnosis. **Every identified**

**modification supports Defendants' reimbursement posture and litigation defense.**

**None reduces acuity, corrects a screening failure, acknowledges a restraint violation, or contradicts Defendants' position.** The pattern of unidirectional, outcome-driven alteration, documented across every encounter at every HCA facility involved in this case over nineteen months, constitutes systematic record falsification in furtherance of the fraudulent billing scheme and obstruction of the fact-finding process.

**COUNT ELEVEN: BATTERY (Against Sunrise Hospital & Medical Center, LLC and Southern Hills Hospital & Medical Center)**

161.    Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

162.    Administration of chemical and physical restraints at Sunrise Hospital & Medical Center, LLC on May 29, 2025 and at Southern Hills Hospital & Medical Center in November 2023 and June 2025 constituted intentional, unauthorized, harmful touching. For the June 2025 encounter, the PAD explicitly withdrew consent and specified prerequisites that were not met. *Humboldt Gen. Hosp. v. Sixth Jud. Dist. Ct.*, 376 P.3d 167, 171 (Nev. 2016). For the November 2023 and May 2025 encounters, no informed consent was obtained and no emergency justification to bypass consent was documented. Hospitals are vicariously liable for employees' intentional torts committed within scope. *Rockwell v. Sun Harbor Budget Suites*, 112 Nev. 1217, 1223 (1996).

163.    **Plaintiff's theory is not failure to obtain informed consent. It is the absence of consent and intentional restraint after consent was expressly withheld unless specified prerequisites were met.**

**COUNT TWELVE: FALSE IMPRISONMENT (Against Southern Hills Hospital & Medical Center; James Bindrup, MD; Tarik Alshaikh, DO; Nicole Mann, RN; and Jonathan Wirjo, DO)**

164.    Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

165.    Intentional confinement by restraints and involuntary holds without consent or lawful authority in November 2023 and June 2025. Mann initiated the involuntary detention by executing an Application for Emergency Admission that was facially deficient and internally contradicted by the subsequent physician assessment. Wirjo formalized the involuntary hold status in the EHR without independent verification of the clinical basis. Bindrup's provider authority sustained the November 2023 detention after documented resolution of the emergency condition. Alshaikh, as attending physician for the inpatient psychiatric admission from December 1 through December 4, 2023, maintained the involuntary hold despite contemporaneous documentation reflecting calm, cooperative, and low-risk presentation, without documentation of ongoing imminent risk justifying continued detention.

**COUNT THIRTEEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against All Defendants)**

166.    Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

167.    **The following conduct was extreme and outrageous.** At Southern Hills Hospital & Medical Center in June 2025: abandoning a seizing patient with SpO2 in the 60s during at least 32 induced seizures (Yaghoobian, Wright, Southern Hills Hospital &

Medical Center, HealthTrust staff); fabricating CPT 99291 billing (Wright, Fremont Emergency Services (Scherr), Ltd.); fabricating "DIFFUSE TBI" after negative imaging (Jane Doe, RN; Southern Hills Hospital & Medical Center); billing for attending services while the attending failed to intervene (Platinum Hospitalists, LLC). At Southern Hills Hospital & Medical Center in November 2023: entering obsolete stigmatizing diagnoses, detaining Plaintiff three days past documented necessity, initiating involuntary detention on the basis of a facially deficient and internally contradictory emergency admission application (Mann), formalizing involuntary hold status without independent clinical verification (Wirjo), continuing involuntary detention without required documentation (Bindrup, Alshaikh, Southern Hills Hospital & Medical Center), and manipulating diagnostic codes to escalate pathology and deploy more stigmatizing codes than treating clinicians used. At Sunrise Hospital & Medical Center, LLC in April 2025: omitting hemoptysis, narrowing the narrative to avoid PE screening, and billing $799,833.00 through facility and professional channels (Akhavan, Alexander F. Akhavan, MD, Ltd., Sunrise Hospital & Medical Center, LLC, Parallon Business Solutions, LLC). At MountainView Hospital in March 2025: abandonment of a sedated postictal patient without escort, wheelchair, capacity assessment, or supervised transport (Achin, Reliant Physicians, LLC, MountainView Hospital). At the enterprise level: Cook responding to complaints with an "enterprise-wide response" that preceded the most severe retaliatory encounter (HCA Healthcare, Inc., Cook). Across all encounters: Parallon Business Solutions, LLC validating and submitting facility claims assembled from fabricated documentation.

**168.**      No expert is required. Each act is attributed to specific Defendants.

**COUNT FOURTEEN: FAILURE OF CORPORATE GOVERNANCE AND ADMINISTRATIVE OVERSIGHT (Against HCA Healthcare, Inc. and HealthTrust Workforce Solutions, LLC)**

169.     Plaintiff realleges and incorporates by reference paragraphs 1 through 125 as though fully set forth herein.

170.     This claim challenges corporate governance and administrative policy decisions, not clinical judgment. The November 2023 encounter placed HCA and HealthTrust on actual notice that their operational systems failed to ensure PAD review, seizure-related documentation compliance, designated decision-maker contact, and documented authorization before discharge of patients with active seizure disorders.

171.     Despite that notice, HCA and HealthTrust failed to implement PAD hard-stop alerts, modify restraint protocol training, implement decision-maker contact procedures, or audit restraint documentation practices. **These are corporate governance functions, not exercises of professional medical judgment.**

172.     This failure caused the foreseeable repetition at MountainView Hospital in March 2025, at Sunrise Hospital & Medical Center, LLC in April and May 2025, and at Southern Hills Hospital & Medical Center in June 2025. Claims challenging institutional administrative failures and corporate governance deficiencies, rather than the professional judgment of individual providers rendering patient care, fall outside the scope of NRS Chapter 41A's affidavit requirements. NRS 41A.015 (defining the professional negligence trigger by reference to providers of health care rendering services); *Egan*, 129 Nev. at 242. HCA Healthcare, Inc. and HealthTrust Workforce Solutions, LLC are sued here for failures of enterprise policy, training infrastructure, and compliance governance,

not for individual clinical decisions at the bedside. Even if this Court were to characterize this claim as sounding in professional negligence under Nevada law, it is pled only as a supplemental state-law claim under 28 U.S.C. Section 1367. The federal claims in Counts One through Nine are independent of this Count and are not predicated on any breach of professional standard of care.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

**A.** Compensatory damages including permanent physiological injury, lifetime anticoagulation, elevated mortality risk, loss of surgical safety, and reduced life expectancy;

**B.** Treble damages under 18 U.S.C. Section 1964(c);

**C.** Punitive damages under Nevada law;

**D.** Injunctive relief, narrowly tailored to preserve evidence and prevent recurrence:

**Evidence Preservation and Production:** (i) Order Defendants to produce native EHR audit logs, note-history exports, and version metadata for each document identified in Paragraphs 112 through 116; (ii) order Defendants to append a corrective addendum without altering original entries to Plaintiff's medical records, in accordance with 45 C.F.R. Section 164.526, identifying each document for which the pre-litigation portal version and the litigation-produced version materially differ, with complete audit trails documenting the timing, authorship, and authorization for each alteration;

**Prospective Accommodation and Operational Hard-Stops:** (iii) flag Plaintiff's PAD as a hard-stop alert in the EHR requiring documented physician acknowledgment before any sedative or physical restraint, and implement enterprise-wide protocols requiring seizure contraindication assessment before B52 or equivalent chemical restraint administration to any

patient with a documented seizure disorder; (iv) require neurological capacity assessment before unsupervised discharge of seizure patients; (v) prohibit B52 absent documented contraindication review for patients with seizure disorders; (vi) implement PE screening protocols for post-surgical patients presenting with chest pain and dyspnea; (vii) cease administering chemical restraints to Plaintiff absent PAD compliance and seizure contraindication review, and cease sex-stereotyping and misgendering in Plaintiff's medical record;

**E.** Attorneys' Fees and Costs: As provided by 18 U.S.C. Section 1964(c), 42 U.S.C. Section 12205, 29 U.S.C. Section 794a, 42 U.S.C. Section 1988, and any other applicable statute. In the event Plaintiff retains counsel or assigns this action at any stage, such counsel shall be entitled to recover reasonable attorneys' fees from the date of retention forward;

**F.** Pre-judgment and post-judgment interest;

**G.** Such further relief as the Court deems just.

## VIII. EXHIBIT INDEX

Plaintiff's exhibits are limited to source documents. Witness declarations are filed separately. This exhibit index is a living table that will be supplemented as additional exhibits are identified or produced through discovery.

### Medical Records (Pre-Litigation Portal Versions)

| Ex. | Description |
|-----|-------------|
| A | Southern Hills Hospital & Medical Center Records, Nov. 30 to Dec. 4, 2023 (pre-litigation portal version) |
| B | MountainView Hospital Records, Mar. 22-24, 2025 (pre-litigation portal version) |
| C | Sunrise Hospital & Medical Center, LLC Records, Apr. 17-22, 2025 (pre-litigation portal version) |
| D | Sunrise Hospital & Medical Center, LLC Records, May 29, 2025 (pre-litigation portal version) |

| Ex. | Description |
|---|---|
| E | Southern Hills Hospital & Medical Center Records, Jun. 28-29, 2025 (pre-litigation portal version) |
| F | Summerlin Hospital Records, PE Confirmation, May 1, 2025 (pre-litigation portal version) |

**Medical Records (Discovery Productions)**

| Ex. | Description |
|---|---|
| G | Southern Hills Hospital & Medical Center, Admit 11/30/23-12/04/23 (SHH-M000202 through SHH-M000451, 249 pages, certified litigation production) |
| H | Southern Hills Hospital & Medical Center, Admit 06/28/25 (SHH-M000001 through SHH-M000201, 201 pages, certified litigation production) |
| I | MountainView Hospital, Admit 03/22/25-03/24/25 (MVH-M000001 through MVH-M000254, 254 pages, certified litigation production) |
| J | Sunrise Hospital & Medical Center, LLC, Admit 04/17/25 (SH-M000001 through SH-M000350, 350 pages, certified litigation production) |
| K | Sunrise Hospital & Medical Center, LLC, Admit 05/29/25 (SH-M000351 through SH-M000403, 52 pages, certified litigation production) |

**Advance Directives**

| Ex. | Description |
|---|---|
| L | Psychiatric Advance Directive (Notarized, June 6, 2025) |
| M | PAD Addendum (Notarized, Sept. 2025) |

**Correspondence and Notices**

| Ex. | Description |
|---|---|
| N | Plaintiff's Pre-Litigation Notice to Cook, June 22, 2025 (with media escalation attachment) |
| O | Plaintiff's Final Pre-Litigation Notice to Cook, June 26, 2025 |

**Billing and Financial Documents**

| Ex. | Description |
|---|---|
| P | Jackson Affidavit of Business Records, $799,833.00 (Richmond, Virginia) |

| Ex. | Description |
|---|---|
| Q | Anthem EOB / Denial Letter, Summerlin PE Treatment ("not medically necessary") |
| R | Anthem EOB / Denial Letter, November 2025 Clotting Event (Reason Code B67, $47,530.00) |
| S | Physician Billing Entity Identification (EOBs, NPI records, and billing data identifying Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Reliant Physicians, LLC; and Alexander F. Akhavan, MD, Ltd.) |

### Corporate and Institutional Documents

| Ex. | Description |
|---|---|
| T | HCA Healthcare, Inc. 2024 Form 10-K (Excerpted) |
| U | HealthTrust Privacy Policy (reference to "HCA Healthcare Data Protection Officer," Nashville) |

### Facility-Generated Reports

| Ex. | Description |
|---|---|
| V | Southern Hills Hospital & Medical Center Restraint Report, June 28-30, 2025 (SHH-RESRPT000001) |
| W | Southern Hills Hospital & Medical Center Summary Audit Trail Documents (SHH-AT000001 through SHH-AT000012) |

## DEMAND FOR JURY TRIAL

**Plaintiff demands trial by jury on all issues so triable.**

I certify that Artificial Intelligence was used to prepare the foregoing document.

DATED: February 22, 2026

Respectfully submitted,

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2026, I electronically filed the foregoing **Second Amended Complaint** with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record registered to receive electronic notifications in this case, including:

> Michael E. Prangle
> Zachary J. Thompson
> Hall Prangle, LLC
> 1140 N. Town Center Drive, Suite 350
> Las Vegas, NV 89144
>
> *Counsel for HCA Healthcare, Inc.;*
> *Sunrise Hospital & Medical Center, LLC;*
> *MountainView Hospital;*
> *and Southern Hills Hospital & Medical Center*

I further certify that the following Defendants, who have not yet appeared in this action, will be served with process in accordance with Federal Rule of Civil Procedure 4:

> Parallon Business Solutions, LLC; HealthTrust Workforce Solutions, LLC;
> Platinum Hospitalists, LLC; Fremont Emergency Services (Scherr), Ltd.; Reliant
> Physicians, LLC; Alexander F. Akhavan, MD, Ltd.; Cinthya S. Cook,
> MSN/MHA, RN, CPPS; Jonathan Yaghoobian, MD; Brent J. Wright, DO; James
> Bindrup, MD; Rowena E. Achin, MD; Alexander F. Akhavan, MD; Tarik
> Alshaikh, DO; Nicole Mann, RN; Jonathan Wirjo, DO; Michael A. Orber; and
> Michael A. Orber & Associates, Inc.

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se