Jade Riley Burch
Plaintiff, Pro Se
222 Karen Avenue, Unit 1207
Las Vegas, NV 89109
Tel: (614) 725-9452
Email: jaderburch@gmail.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Jade Riley Burch,

        Plaintiff.

vs.

HCA Healthcare, Inc., et al.,

        Defendants.

Case No.: 2:25-cv-01408-JAD-MDC

**PLAINTIFF'S MOTION FOR SANCTIONS AND TO COMPEL PRODUCTION OF NATIVE EHR AUDIT LOGS**

**Southern Hills Hospital, June 28 to 30, 2025**

## I. INTRODUCTION

Plaintiff preserved her medical records from HCA's MyHealthONE patient portal on July 12, 2025 at 6:21 AM. The records Defendants produced in discovery for the Southern Hills Hospital encounter of June 28 to 30, 2025 are materially different. They were certified as complete on August 8, 2025, forty days after discharge, yet they incorporate a Critical Care Addendum that did not exist in the pre-litigation record, replace core treating physician documents without producing the originals, omit an entire calendar day of clinical events, and contain zero pages of restraint documentation for a restraint episode that Defendants' own internal logs confirm lasted 4,293 minutes.

The evidence of post-litigation record manipulation is documented within the produced records themselves. The treating physician's Emergency Department record was replaced during

the encounter, growing from 12 pages to 13 pages to incorporate a Critical Care Addendum billing CPT 99291 that was electronically signed approximately 20 hours after admission. The Consultation Report was replaced twice within 18 hours. No original version of any replaced document was produced. An administrative user printed the audit log six months after discharge, after litigation commenced. A bulk system update occurred 24 hours after discharge. A traumatic brain injury diagnosis was applied four days post-discharge to an encounter where the hospital's own imaging documented no acute intracranial abnormality.

The Custodian of Records signed under oath on August 8, 2025 that the 201-page production was true and correct copies of all original records. The hospital's own restraint logs establish that 4,293 minutes of restraint occurred. Not one page of restraint documentation appears in the certified production.

The discovery production also contains, at Bates pages SHH-M000012 and SHH-M000013, diagnoses of chronic pulmonary embolism and deep vein thrombosis entered as of the June 2025 encounter. Plaintiff's only prior pulmonary embolism was diagnosed at Summerlin Hospital on **May 1, 2025**, following admission on **April 30, 2025**, as an acute event resolved on Eliquis. ICD-10 I27.82 requires a chronic, long-standing, unresolved clot burden. A single prior acute resolved PE cannot support that code. Plaintiff's first deep vein thrombosis did not occur until November 2025. These diagnoses are not clinically questionable. They are unsupportable and, in the case of the DVT, temporally impossible. Their presence in the discovery version, and their complete absence from the pre-litigation portal record, is direct and affirmative proof that the medical chart was altered after litigation commenced.

Plaintiff moves for sanctions under Fed. R. Civ. P. 37(e), the Court's inherent authority under *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), and 28 U.S.C. Section 1927. On June 26, 2025, two days before Plaintiff's Southern Hills admission, Plaintiff transmitted a formal pre-litigation demand letter to Cinthya Cook at HCA and to the official HCA patient advocate address, explicitly demanding preservation of all records, threatening immediate litigation, and attaching a media release scheduled for national distribution on July 8, 2025. HCA's preservation duty attached no later than June 26, 2025. The document modification events documented herein began 33 hours later. A side-by-side comparison exhibit is attached as Exhibit 23. The June 26, 2025 demand letter and media release are attached as Exhibit 23-M.

## II. FACTUAL BACKGROUND

**A. The Two Versions of the Record**

Two versions of the Southern Hills June 2025 medical records exist and are before the Court.

The **Portal Version** was accessed by Plaintiff through the HCA MyHealthONE patient portal on July 12, 2025 at 6:21 AM. It reflects the clinical record as it existed at the time of access, prior to any litigation hold or defense counsel involvement.

The **Litigation Version** consists of 201 pages bearing Bates stamps SHH-M000001 through SHH-M000201, accompanied by summary audit trail documents SHH-AT000001 through SHH-AT000012. It was certified by the Custodian of Records on August 8, 2025, forty days after discharge.

The two versions are materially different. The litigation version contains a Critical Care Addendum, a PNES seizure characterization, 54 pages of order audit trails, 9 pages of consent documents, scribe and supervising physician statements, and at Bates pages SHH-M000012 and

SHH-M000013, diagnoses of chronic pulmonary embolism and deep vein thrombosis, none of which appear in the portal version. Core clinical documents present in both versions were replaced multiple times during the encounter. No original version of any replaced document was produced.

**B.  Table of Material Discrepancies and Spoliation Timeline**

A complete table of material discrepancies and the full spoliation timeline are set forth in the Declaration of Jade Riley Burch in Support of Motion for Sanctions, paragraphs 4 through 21, filed concurrently herewith.

### III. EVIDENCE OF SPOLIATION AND FRAUD ON THE COURT

**A.  The Critical Care Addendum Was Retroactively Entered and Incorporated Through Document Replacement**

The Critical Care Addendum authored by Dr. Brent Wright does not appear in the portal version of the medical record. It appears only in the litigation version. The addendum states **"HIGH PROBABILITY OF IMMINENT LIFE OR LIMB THREATENING DETERIORATION"** and documents approximately 37 minutes of critical care, language specifically required to support CPT code 99291 billing, which itself requires a minimum of 30 minutes of documented critical care.

The internal timeline of this document is self-contradicting. The Physician Emergency Department Note carries a dictation date of June 28, 2025 at 12:27 PM. The **Critical Care Addendum** appended to that same note was not electronically signed until June 29, 2025 at 8:14 AM, nearly 20 hours after the initial dictation. A physician who observed imminent life or limb threatening deterioration during a June 28 encounter does not document that observation 20 hours later. The delay is not a clerical gap. The circumstances establish that the addendum was

entered after the fact to support CPT 99291 billing requirements that did not exist in the contemporaneous record.

Scribe Venus Sebastian entered data for Dr. Wright beginning at 12:34 PM on June 28, with additional entries at 12:43 PM, 12:44 PM, 12:50 PM, 1:29 PM, 1:37 PM, and 1:45 PM. The native audit logs Plaintiff has requested would establish whether any of those scribed sections were modified after Sebastian's shift ended. Defendants have not produced them.

The ED Physician Record was then replaced on June 29, 2025 at 10:18 AM, growing from 12 pages (Batch ID 10878075) to 13 pages (Batch ID 10950345). The additional page corresponds to the Critical Care Addendum. The original 12-page record was not produced. The Consultation Report was replaced twice within 18 hours, on June 28 at 4:33 PM and again on June 29 at 10:04 AM. No original version of either replacement was produced.

**B. The Pyxis Hardware Logs Contradict the Clinical Narrative**

The Pyxis transaction data (SHH-PYXIS000001) is generated by a hardware-based medication dispensing system that operates independently of the EHR's text-editing interface. Unlike clinical notes, flowsheets, and physician records, which can be accessed and modified through the EHR reporting interface, Pyxis timestamps are captured at the hardware level and cannot be altered through the same mechanisms used to replace EHR documents. The Pyxis logs record the exact moment a medication was physically pulled from the dispensing unit, the identity of the staff member who pulled it, and the patient account to which it was assigned.

Where the EHR clinical narrative records medication administration at a time that does not align with the Pyxis hardware pull timestamp for the same medication, the narrative is false.

The Pyxis data records what physically happened at the dispensing unit. If the litigation version of the clinical record was reconstructed after the fact to create a specific medication timeline, the Pyxis hardware logs will contradict it.

**C. The Certified Production Omits 4,293 Minutes of Restraint Documentation**

The hospital's own restraint logs confirm that Plaintiff was subjected to 4,293 minutes (approximately 71.5 hours) of non-violent restraint during this encounter. Not one page of restraint documentation appears in the 201-page certified production.

Under HCA Policy COG.COG.001 and 42 CFR Section 482.13, a 71.5-hour non-violent restraint event requires at minimum: three physician orders consisting of an initial order and renewals at 24 and 48 hours; a minimum of 36 documented monitoring intervals at 2-hour checks; documentation of less restrictive alternatives attempted; nutrition, hydration, and circulation assessments at each monitoring interval; and clear discontinuation criteria. None of this documentation was produced.

The Custodian of Records certified the 201-page production as true and correct copies of all original records. Because Defendants' own restraint logs establish that the restraint occurred, the certified production is either missing required components of the medical record, or the restraint logs are not being treated as part of the medical record despite federal regulatory requirements and HCA's own policy. Neither explanation is consistent with a good-faith certification.

Defense counsel has represented that no restraint orders exist. The internal restraint log field o=0 confirms that 100% of the 4,293-minute restraint episode was covered by valid physician orders. Defense counsel's representation was false.

**D. The Discharge Date Conflict Corroborates the Missing Day**

The EKG report confirmed on June 30, 2025 lists a discharge date of June 29, 2025. This internal conflict within the produced records corroborates Plaintiff's position that the certified production was engineered to reflect a June 29 discharge while clinical activity, including the EKG confirmation itself, continued through June 30. A record cannot simultaneously document clinical activity on June 30 and reflect a June 29 discharge without one of those entries being false.

**E. Mathematical Proof of a Missing Calendar Day**

Southern Hills' internal restraint log documents 4,293 minutes (71.55 hours) of restraint activity. The encounter window reflected in the litigation-produced record does not contain enough elapsed time to account for this duration. It is a mathematical impossibility. The restraint total can only be reconciled if there is an additional calendar day of clinical activity that does not appear in either the portal version preserved by Plaintiff or the certified litigation version produced by Defendants.

This is not inference or interpretation. It is arithmetic. The hospital's own internal log contains more hours of restraint than exist in the date range they certified.

Independent third-party confirmation is provided by Health Care Indemnity, Inc., HCA's own captive insurance subsidiary, whose Third Party Claims Administrator confirmed in writing that Plaintiff returned his call at approximately 1:15 PM on June 30, 2025. See Exhibit 23-N.

The billing record confirms the concealment with mathematical precision. The itemization of hospital services (Account No. 89683267699, created July 3, 2025) reflects dates of service June 28 to June 29, 2025, with a patient type of Emergency Services. The observation room charges tell the story directly: 1 hour billed June 28, 3 hours billed June 28, and 17 hours billed June 29, a total of 21 billed observation hours. The hospital's own restraint log documents 4,293 minutes of restraint, 71.55 hours. Twenty-one billed observation hours cannot contain 71.55 hours of restraint. The math is impossible on the face of the hospital's own sworn documents.

The itemization also reflects laboratory charges on both June 28 and June 29, physical therapy evaluation charges on June 29, and occupational therapy evaluation charges on June 29. Hospitals do not perform PT and OT evaluations on patients they are discharging the same day. The presence of these charges on June 29 confirms ongoing clinical activity inconsistent with a same-day or early-morning discharge.

The billing affidavit was executed by Tiffaney Jackson, Account Specialist, HCA Richmond Shared Services Center, sworn and notarized on January 2, 2026. Ms. Jackson attested that the billing records are true and accurate copies of the original hospital billing records made at or near the time of the act or event, and that the total amount of $42,870.32 represents reasonable charges for services rendered. Southern Hills billed 21 hours of observation. Their own restraint log documents 71.55 hours of restraint. Their own billing shows PT and OT

evaluations on June 29. Porscha Ryan places discharge at approximately 11:00 AM on June 30. The EKG was confirmed on June 30. Fifty hours of restraint and an entire calendar day of clinical activity are unaccounted for in a billing record sworn under oath as true and accurate.

Under HCA Policy COG.COG.001, non-violent restraint orders must be renewed every 24 hours. A 71.55-hour restraint episode requires a minimum of three physician order events: an initial order and renewals at 24 and 48 hours. If Defendants maintain that the admission ended on June 29, they must explain why their own restraint log contains more hours than exist in that date range, why no legally required next-day renewal orders appear in the chart, and why eyewitness testimony, the EKG confirmation date, the restraint mathematics, the observation hour billing, and the PT and OT evaluation charges all independently place the discharge on June 30.

There are only three possible explanations. (a) Defendants used restraints illegally with no physician renewal orders across multiple calendar days. (b) Defendants falsified the admission dates to conceal a multi-day hold. (c) Or both. Every available explanation is sanctionable.

**G. The Traumatic Brain Injury Diagnosis Conflicts With the Hospital's Own Imaging**

ICD-10 code S06.2XAA, Diffuse Traumatic Brain Injury, was applied to this encounter on July 2, 2025, four days after discharge. The imaging report contained within the same certified production states no acute intracranial abnormality. A diagnosis applied four days after discharge, contradicted by contemporaneous imaging in the same certified record, and absent from the portal version raises one question: what clinical basis existed for its application. No explanation appears in the certified production.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**H. Internal Physical Exam Contradictions and Missing Trauma Documentation**

The encounter was initiated for head injury. The History of Present Illness states Plaintiff hit her head on the ground and presented with a 9/10 throbbing headache. Despite these reported findings, Dr. Wright's physical examination dated June 28, 2025 at 12:34 PM characterizes the head as Atraumatic, Normocephalic. A patient presenting with a reported 9/10 headache following a head strike does not receive an atraumatic head exam finding in a clinically complete record. The finding is internally contradicted by the same document that contains it.

The Neurology progress note dated June 29, 2025 documents a right tongue ulcer, an injury commonly associated with seizure activity, that does not appear anywhere in Dr. Wright's initial Emergency Department physical examination. A physical finding consistent with the presenting complaint appearing for the first time in a subsequent note, absent from the initial examination that preceded it, is evidence that the initial examination documentation is incomplete, was modified, or was not performed as documented.

**I. The Laboratory Data Conflicts With the Clinical Note and the Hospital's Own Report**

Plaintiff's Depakote (Valproic Acid) level on June 28, 2025 was documented at 42.3 micrograms per milliliter. The hospital's own laboratory report defines the therapeutic range as 50.0 to 100.0 micrograms per milliliter and flags Plaintiff's result with an asterisk indicating it falls outside that range. The established therapeutic range per Mayo Clinic Laboratories, the National Library of Medicine, and Labcorp is 50 to 100 micrograms per milliliter. Plaintiff's documented level falls below the therapeutic threshold by every published clinical standard and by the hospital's own reference range printed on the face of the same report.

The Southern Hills Neurology Note dated June 29, 2025 (SHH-M000045) characterizes this same result as WNL, within normal limits. The asterisk flag was visible. The out-of-range result was explicit. A clinician who characterizes an asterisk-flagged sub-therapeutic result as within normal limits has not made a documentation error. That is a false entry in a federally regulated medical record.

**J. The PAD and MPOA Were Acknowledged but Never Accessed**

The litigation version narrative acknowledges the existence of Plaintiff's Medical Power of Attorney and Psychiatric Advance Directive. The summary audit trail documents SHH-AT000001 through SHH-AT000012 contain no log entry for any staff member accessing, viewing, or reviewing legal documents, advance directives, or PAD records. A clinical narrative cannot reference awareness of a legal document that no staff member ever accessed.

**K. Native Audit Logs Were Withheld**

Plaintiff requested native EHR audit logs: raw system-generated transaction records maintained at the database level that capture every access event, modification, deletion, permission change, and failed access attempt, along with user identity, workstation identifier, network node, and the prior content of any modified field.

Defendants produced summary audit reports generated through a reporting interface that allows parameter selection and filtering. Summary reports capture only what the selected parameters are designed to show. They cannot reveal deletion events, backdating, late authentication, or suppressed document types present in the underlying native logs.

The Summary Audit Reports (SHH-AT000001 through SHH-AT000012) document 343 modification events, including 317 user-level edits and 1,061 view actions within a 19-hour window while Plaintiff was sedated and restrained. No Amended or Late Entry flags appear for any of the 317 edits in the certified production. The native logs that would identify the full scope and nature of that activity were not produced.

**L. The December 23 Audit Print Command Establishes Intent to Deprive**

Rule 37(e)(2) requires a finding that the party acted with the intent to deprive another party of the information's use in litigation. The December 23, 2025 audit print command satisfies that standard directly.

On December 23, 2025 at 2:27 PM, six months after discharge and after this litigation was active, user PIWJ3240 executed a Print Patient Audit Log command for this encounter. This was not a routine system event. It was a deliberate, user-initiated review of the audit trail conducted while litigation was pending. The only purpose served by printing the audit log of a six-month-old encounter during active litigation is to evaluate what the audit trail contains and determine what to produce and what to withhold. That is the definition of intent to deprive under Rule 37(e)(2). Defendants reviewed the audit trail. They then produced summary reports rather than native logs. The sequence establishes that the decision to withhold native logs was made after a deliberate, post-litigation review of their contents.

**M. The INTERFACE,HIS Bulk Update Was the Mechanism for the Retroactive TBI Diagnosis**

The INTERFACE,HIS bulk update event documented on June 30, 2025 at 4:17 PM, approximately 24 hours after discharge, preceded by two days the application of ICD-10 code

S06.2XAA on July 2, 2025. The bulk update is not a routine clinical entry. It is a system-level batch operation capable of writing or overwriting data across multiple fields simultaneously. The temporal sequence is not coincidental: a bulk system update occurs 24 hours post-discharge, and 48 hours later a traumatic brain injury diagnosis is applied to an encounter where the hospital's own CT imaging documents no acute intracranial abnormality. The INTERFACE,HIS bulk update was the mechanism through which the retroactive TBI diagnosis was prepared and inserted into the encounter record. Native audit logs would identify every field written or overwritten by that bulk operation. Defendants have not produced them.

**N. Orphaned Modifications, Unidentified User Accounts, Provider Identity Contradictions, and Absent Export Logs**

The summary audit reports document four additional categories of suppression, each of which independently supports the production of native logs and the imposition of sanctions.

**First**, modifications to note-related and clinical modules appear in the audit trail with no corresponding note, addendum, or late entry in the 201-page production. A completed write operation with no corresponding output was either deleted or filtered from the production.

**Second**, access events appear for user accounts that do not correspond to any identified treating, nursing, or administrative staff in the certified production, raising HIPAA access governance violations that only native logs can resolve.

**Third**, named note authors do not appear in the audit trail as having accessed the chart at or near the time their attributed notes purport to have been created, and different staff accounts appear editing notes attributed to named providers.

**Fourth**, the summary reports contain no export or print log entries for the litigation production itself, consistent with non-native export, parameter filtering, prior modification of the underlying log, or selective subset production.

Each of these four grounds is developed in full in the Burch Declaration at paragraphs 27 through 38. Native audit logs would resolve all four with precision. Defendants have not produced them.

**R. The Temporally Impossible Diagnoses at Bates Pages SHH-M000012 and SHH-M000013 Establish Fabrication**

At Bates pages SHH-M000012 and SHH-M000013, the litigation version of the Southern Hills medical record contains the following diagnoses coded to the June 28 to 30, 2025 encounter: chronic pulmonary embolism (ICD-10 I27.82), listed as both the primary and secondary diagnosis and identified as the stated reason for visit; and deep vein thrombosis (ICD-10 I82.4Y9). Neither diagnosis appears in the pre-litigation portal version of the record. Both diagnoses are temporally impossible.

Plaintiff's pulmonary embolism was first diagnosed at Summerlin Hospital on May 1, 2025, following admission on April 30, 2025, and discharge on May 4, 2025. It was documented as an acute event and treated with Eliquis. Plaintiff's first deep vein thrombosis was diagnosed on November 6, 2025, at which time hospitalization was extended overnight for a heparin drip; the clot did not resolve sufficiently for surgical intervention and Plaintiff was discharged on November 7, 2025 on continued Eliquis. At the time Southern Hills coded chronic pulmonary embolism and deep vein thrombosis into the June 2025 encounter record, Plaintiff had never had either condition.

The acute nature of Plaintiff's clotting history is confirmed as of the date of this filing. On March 9, 2026, Plaintiff's treating physician Dr. Henry Igid at Town Center Diagnostic, Las Vegas, Nevada, entered a lab order set listing Plaintiff's active problem diagnoses as DVT arm, acute (ICD-10 I82.A12) and Pulmonary embolism (ICD-10 I26.93). Both codes are acute designations. The order set includes a Factor II DNA analysis panel and a Factor V Leiden mutation analysis panel, reflecting that Plaintiff's thrombophilia workup remains ongoing and that the full genetic basis of her coagulation history has not yet been established. No treating physician in Plaintiff's actual care history has ever applied a chronic pulmonary embolism code, because the clinical basis for chronic PE has never existed. HCA inserted a permanent chronic diagnosis into a June 2025 record before Plaintiff's own hematology workup was complete.

ICD-10 code I27.82 is not a general or interchangeable code. It is defined as a long-standing, persistent, unresolved clot burden, typically associated with chronic thromboembolic pulmonary hypertension. A valid chronic pulmonary embolism diagnosis requires serial imaging demonstrating persistent emboli, pulmonary or cardiology specialist evaluation, right-heart strain testing, documentation of oxygenation abnormalities consistent with chronic disease, and long-term anticoagulation management. None of that existed in June 2025, because the condition itself did not exist. No imaging was performed to support this diagnosis. No anticoagulation was administered. No specialist consult occurred. No discharge instructions addressed chronic clot disease. There is no clinical foundation for this diagnosis because, as Plaintiff's actual medical timeline establishes, there was nothing to diagnose.

The coding of I27.82 as both the primary and secondary diagnosis, and as the listed reason for visit, is not the result of error or imprecision. A coder who accidentally selects the

wrong code does not select the same wrong code twice, designate it as the reason for visit, and simultaneously add a diagnosis of deep vein thrombosis for a condition the patient had never had. This is a coordinated cluster of fabricated clot-related diagnoses inserted into a single encounter record.

The mechanism is consistent with the INTERFACE,HIS bulk update event documented at Section III.M. That system-level batch operation, occurring approximately 24 hours post-discharge, is capable of writing diagnosis codes across multiple fields simultaneously. The TBI diagnosis was applied two days after that bulk update. The chronic PE and DVT diagnoses, absent from the portal version and present only in the litigation version, are consistent with insertion through the same mechanism.

The consequences of this fabrication extend beyond litigation. ICD-10 I27.82 is a permanent diagnostic code. It attaches to Plaintiff's identity in every HCA facility system. It is visible to every future treating provider who reads the HCA chart. It is reportable to insurers and affects risk adjustment calculations. A patient falsely coded with chronic pulmonary embolism and deep vein thrombosis carries an altered medical identity that follows her into every future clinical encounter unless formally corrected. Defendants did not make a clinical mistake. They created a false medical history for a patient who was incapacitated, sedated, and restrained and therefore unable to observe or object to what was being entered into her chart.

The legal consequence is direct. A diagnosis coded as chronic and pre-existing, for a condition that did not occur until months later, could not have been based on any clinical observation made during the June 2025 encounter. Its presence in the litigation version and its complete absence from the pre-litigation portal version establishes, without inference, that it was

inserted into the record after the fact. That insertion, during active litigation, is precisely the conduct Rule 37(e)(2) and the Court's inherent authority under *Chambers* are designed to reach.

**S. The Security Log Produced at SHH-SECLOG00001 Is a Post-Litigation Manual Construction**

SHH-SECLOG00001 was created 194 days after the events it purports to document, by an identified individual, using Microsoft Excel, with a ZIP timestamp of January 1, 1980 consistent with manual construction rather than native system export. The file size of 12 kilobytes cannot contain a genuine 48-hour hospital security log. Christopher Tuttle created it on January 9, 2026. Diana J. Samora modified it on February 3, 2026, during active litigation. The full forensic metadata analysis establishing these facts appears at Exhibit 23-G. The native security system logs, access control records, badge reader transaction data, and surveillance management exports for the June 28 to 30, 2025 encounter have not been produced. Production of a manually constructed Excel file under a Bates designation implying authenticity as an original system record, in lieu of native security exports, supports a finding of intent to deprive under Rule 37(e)(2).

**T. The Restraint Report Produced at SHH-RESRPT000001 Was Manually Printed to PDF During Active Litigation**

SHH-RESRPT000001 is a one-page PDF created on February 2, 2026, 217 days after the restraint events it purports to document, by a named individual using Microsoft Print To PDF rather than Meditech's native export engine. A complete and authentic restraint report for a 71.5-hour non-violent restraint episode cannot fit on a single page. The regulatory minimum documentation under 42 CFR Section 482.13 and HCA Policy COG.COG.001 includes restraint orders, monitoring flowsheets, physician renewal orders, and discontinuation documentation,

none of which appear in the single produced page. Warren Jennifer, located in Las Vegas, opened a Meditech screen on February 2, 2026, during active litigation, and manually printed it to PDF. The full forensic metadata analysis establishing these facts appears at Exhibit 23-H. The native Meditech restraint report, underlying flowsheets, physician orders, and monitoring logs for the 4,293-minute restraint episode have not been produced.

**U. The Native Audit Log Produced at SHH-AT000011 Establishes Six Independent Grounds for Additional Sanctions**

SHH-AT000011 contains 6,709 lines of Meditech audit data and, on its face, confirms six discrete acts of suppression or falsification.

The log ends on June 29, 2025, containing zero entries for June 30, the date HCA's own clinical production confirms Plaintiff remained hospitalized. Users PIWJ3240 and IWJ3240, whose December 2025 audit activity is documented elsewhere in this production, do not appear anywhere in the 6,709 lines, confirming the existence of an additional audit module not produced. The log contains 345 INTERFACE entries identifying external systems, including a Summerlin Hospital connector, each of which maintains its own audit logs, none of which were produced. Two modifications to Plaintiff's ADM Patient File on June 28 bear no workstation identifier and no user session, consistent with automated or remotely executed writes outside any authenticated session. The ED Physician Record batch replacement documented at Section III.A, a document substitution generating a mandatory audit entry, does not appear anywhere in the 6,709 lines, confirming the document management audit module was not produced. User LIPWRIBR edited Plaintiff's record in the six minutes immediately preceding Dr. Wright's electronic signature on the Critical Care Addendum, filing a Section Addendum at the same

minute timestamp; LIPWRIBR's identity, role, and the contents of that addendum have not been disclosed.

The full forensic analysis of SHH-AT000011 establishing each of these six grounds appears at Exhibit 23-I.

**V. The Automated Discharge Sequence Preceded the Human Discharge Action by 33 Minutes**

The SNVDPTO automated discharge and transfer order transmission sequence began at 17:10 on June 29, 2025. The human discharge confirmation by HNURJD5 was not recorded until 17:43. The automated system transmitted discharge and transfer orders via SNVDPTO for 33 minutes before the human discharge action occurred, with no workstation identifier and no human user account associated with any of the eight consecutive automated transmissions. The certified medical record reflects a discharge time of 17:43 at lines 612, 627, 684, and 747 of the production. Dr. Salman Akhtar confirmed clinical findings on Plaintiff's EKG at 09:13:33 on June 30, 2025 in the same certified production. The native audit log produced at SHH-AT000011 contains zero entries dated June 30, 2025. An automated system initiated discharge 33 minutes before the human clinical act, and the audit log for the day of actual discharge was not produced. The full sequence analysis appears at Exhibit 23-J.

**W. HCA's Own Certified Production Documents Active Clinical Activity Through June 30, 2025 While Patient Status Reflected Discharge Not Yet Completed**

HCA's certified 201-page production contains at minimum seven discrete entries dated June 30, 2025, including a system status field reflecting discharge not yet completed at 12:49 AM, seven hours and six minutes after the certified 17:43 discharge time. The entries are: a 14-page Medication Discharge Summary printed at 12:49 AM with discharge status DIS INo

(discharge not yet completed); a Lab Discharge Summary Report generated at 2:01 AM; an INTERFACE,HIS Case Management worklist update at 4:17 AM; a user-printed encounter summary at 4:58 AM reflecting the June 29 discharge timestamp for a patient still in the system; Dr. Salman Akhtar's EKG confirmation at 9:13 AM; a second INTERFACE,HIS record update at 4:17 PM; and a Case Management note from Sandra Marsh with a worklist follow-up date of June 30, 2025. The native audit log produced at SHH-AT000011 contains zero entries dated June 30, 2025. The clinical record and the audit record are irreconcilable. Eyewitness testimony from Porscha Ryan places discharge between 11:00 AM and noon on June 30, 2025, consistent with every June 30 entry in HCA's own production. The full documentation of these seven entries and their reconciliation with witness testimony appears at Exhibit 23-K.

**X. Metadata Analysis Establishes That Named Individuals Constructed or Modified Produced Documents During Active Litigation**

Embedded metadata extracted from the produced file set, verified by individual file checksums, establishes that six named individuals created or modified every non-native document in this production during active litigation, and that not one of them is identified as a treating clinician, nurse, or administrator in the certified 201-page medical record.

Diana J. Samora modified seven produced documents on a single day, February 3, 2026, including the audit trail, the Pyxis data, the security log, the staffing assignment sheets, the encounter audit summary, and the chargemaster. MURAINE KAREN created two audit files on December 23, 2025, the same date as the PIWJ3240 audit print command, including a manually compiled User Cross Reference mapping user IDs to staff identities that does not exist in any native system export. Christopher Tuttle created SHH-SECLOG00001 on January 9, 2026. Demilta Monica created the chargemaster on January 29, 2026 from a database query pasted into

Excel, confirmed by a worksheet tab named sql. IWJ3240 created SHH-AT000001-6 on December 22, 2025 using Crystal Reports. Warren Jennifer created SHH-RESRPT000001 on February 2, 2026 using Microsoft Print To PDF. The 2023 native audit logs produced for Plaintiff's earlier encounters contain none of these authorship signatures, confirming HCA knows how to produce genuine system exports and made a deliberate choice not to do so for the 2025 encounter. The complete metadata table with file-level checksums, creator fields, create dates, modify dates, and producer fields for every document in the production appears at Exhibit 23-L.

**Y. Sanctions Nexus**

Taken together, Exhibits 23-G through 23-L establish that the records produced for the June 2025 Southern Hills encounter were not contemporaneous medical records but post-event reconstructions created and modified by identified individuals months after the encounter, during active litigation, using consumer software rather than the Meditech native export engine. The metadata shows document creation 176 to 218 days after the events, selective omission of entire audit modules, a missing discharge-day audit log, manually constructed security and restraint files, and seven documents modified on a single day to populate the production set.

These are not clerical variances. They are independent indicators of non-production, suppression, and alteration of system-generated data. Each exhibit isolates a discrete failure: missing audit repositories, absent batch lineage, manual recreation of security records, manual recreation of restraint records, and the removal of the entire June 30 audit trail. No version of these facts is compatible with Rule 26(g) certification or with the representation that the production contains "true and correct copies of all original records."

The Court should compel immediate production of the native Meditech audit logs and impose sanctions sufficient to remedy the prejudice created by HCA's post-event reconstruction of material evidence.

## IV. LEGAL STANDARD
### A. Fed. R. Civ. P. 37(e)

Rule 37(e) provides that where electronically stored information that should have been preserved in anticipation of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced, the Court may order measures no greater than necessary to cure the prejudice under subsection (1), or upon finding that the party acted with intent to deprive another party of the information's use in litigation, may presume the lost information was unfavorable, instruct the jury accordingly, or enter default judgment under subsection (2).

The duty to preserve ESI attaches when litigation is reasonably anticipated, not merely when a complaint is filed. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006). On June 26, 2025, two days before Plaintiff's Southern Hills admission, Plaintiff transmitted a formal pre-litigation demand letter to Cinthya Cook at HCA and to the official HCA institutional patient advocate address, SUNR.PatientAdvocate@hcahealthcare.com, explicitly demanding preservation of all patient records, imaging, internal communications, incident reports, and surveillance footage, threatening immediate litigation, regulatory escalation, and national media distribution. That document is attached as Exhibit 23-M. HCA's preservation duty attached no later than June 26, 2025, when HCA's own risk management leadership received written notice of anticipated litigation from the same patient who presented to a second HCA facility 33 hours later. The document modification events documented in Section III of this

motion began on June 28, 2025, the first day of Plaintiff's Southern Hills admission, after the preservation duty had already attached. Defendants cannot claim they did not anticipate litigation. They had written institutional notice before the admission began.

**B. Inherent Authority**

Federal courts possess inherent authority to sanction conduct that abuses the judicial process, including the alteration of evidence and production of modified records bearing a custodial certification of completeness. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). The Ninth Circuit has clarified that Rule 37(e) displaces inherent authority for the specific sanctions enumerated in subsection (e)(2), including adverse inferences, preclusion, and terminating sanctions, where the spoliation involves ESI that should have been preserved. *Gregory v. State of Montana*, 118 F.4th 1069, 1079 (9th Cir. 2024). Plaintiff's primary basis for the severe sanctions sought herein is Rule 37(e)(2), not inherent authority.

Inherent authority under *Chambers* is asserted solely as a supplemental basis for the affirmative conduct documented here, including the retroactive insertion of billing documentation, the production of a certified record that contradicts the hospital's own internal systems, the false representation by counsel regarding the existence of restraint orders, and the insertion of temporally impossible diagnoses into the litigation version of the medical record. *Gregory* does not foreclose this use of inherent authority. The facts here are materially distinguishable from *Gregory*, where the district court imposed severe sanctions based on a finding of mere recklessness. The evidence in this case establishes intent, not recklessness: a named user deliberately printed the audit log during active litigation, Defendants thereafter produced filtered summaries rather than the native log that user had just reviewed. That is not

recklessness. That is a deliberate decision made with full knowledge of the litigation. Combined with the document substitution sequence, the truncated production omitting an entire calendar day, the certification of a record the hospital's own billing documents contradict, the false representation regarding the existence of restraint orders, and the insertion of impossible diagnoses into a record predating those conditions by months, the evidence of intent is overwhelming.

**C. Spoliation Sanctions in the Ninth Circuit**

The Ninth Circuit recognizes broad discretion in fashioning appropriate sanctions for the spoliation of evidence. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). A party seeking sanctions for spoliation must demonstrate that the party having control over the evidence had an obligation to preserve it at the time it was destroyed, that the records were destroyed with a culpable state of mind, and that the destroyed evidence was relevant to the party's claim such that a reasonable trier of fact could find that it would support that claim. *Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006). Where, as here, the party charged with preservation not only failed to preserve the evidence but affirmatively replaced source documents, truncated audit trails, inserted temporally impossible diagnoses, and produced a certified record that its own internal systems contradict, the culpable state of mind element is established without resort to inference.

**D. ESI Preservation Obligations**

The obligation to preserve electronically stored information requires a party to identify, locate, and maintain information that is relevant to pending or reasonably anticipated litigation. *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 563 (N.D. Cal. 2008). This

obligation encompasses audit logs, system metadata, and version histories, not merely the final

certified output of a document management system. The production of summary reports in lieu

of native audit logs, where native logs were specifically requested and where the summary

format demonstrably excludes deletion events, backdating indicators, and field-level

modification histories, does not satisfy this obligation. *Apple Inc. v. Samsung Electronics Co.*,

888 F. Supp. 2d 976, 989 (N.D. Cal. 2012).

**E. 28 U.S.C. Section 1927**

28 U.S.C. Section 1927 authorizes sanctions against counsel who multiplies proceedings

unreasonably and vexatiously. Defense counsel's representation that no restraint orders exist,

made in the face of internal records confirming them, independently supports sanctions.

## V. ARGUMENT

**A. The Portal Records Are Time-Stamped Snapshots of the EHR as It Existed Before Litigation**

Defendants will argue that MyHealthONE displays only a patient-facing portal view

rather than the underlying legal medical record. That argument fails on its own terms.

The portal records were generated directly from Defendants' own EHR system on July

12, 2025 at 6:21 AM and reflect the clinical record as it existed at the time of access, before any

litigation hold, discovery request, or defense counsel involvement. The question is not whether

the portal contained every page of the full chart. The question is why a Critical Care Addendum

that did not exist in Defendants' system on July 12 appears in the version certified as complete on

August 8. The question is why 4,293 minutes of restraint confirmed by Defendants' own logs

appears in neither version. The question is why a traumatic brain injury diagnosis applied four

days after discharge is contradicted by imaging in the same certified record. The question is why

chronic pulmonary embolism and deep vein thrombosis, conditions Plaintiff had never had, appear in the litigation version and nowhere in the pre-litigation portal record. These are not formatting differences between a portal view and a legal record. They are evidentiary facts about what happened to the data between the two points in time.

**B. The Preservation Duty Attached Before Discharge**

Defendants' preservation obligation attached no later than June 26, 2025, when Plaintiff transmitted a formal pre-litigation demand letter to Cinthya Cook at HCA risk management and to HCA's official institutional patient advocate address, explicitly demanding preservation of all records and threatening immediate litigation, regulatory escalation to CMS, The Joint Commission, Nevada health authorities, and national media distribution to more than 20 named outlets. That letter was transmitted 33 hours before Plaintiff presented to Southern Hills.

The duty to preserve ESI arises when a party knows or reasonably should know that the evidence may be relevant to anticipated litigation. *In re Napster*, 462 F. Supp. 2d at 1067. HCA received written institutional notice before the admission began. The produced audit records establish that document replacement events began on June 28, 2025, the day of admission, with Nathaniel Dabu modifying the EDM Patient File at 2:32 PM and the Consultation Report being replaced at 4:33 PM. Every modification documented in Section III of this motion occurred after the preservation duty had already attached. Defendants cannot simultaneously claim that their records are maintained in the ordinary course and that core clinical documents were replaced multiple times during the encounter with no originals retained.

**C. The Replacement of the ED Physician Record Establishes Intent**

The ED Physician Record is not a document that is routinely replaced in the ordinary course of clinical operations. It is the treating physician's primary documentation of the encounter. The change in Batch ID from 10878075 to 10950345 reflects a document substitution event. The substitution occurred on June 29 at 10:18 AM, after the Critical Care Addendum was signed at 8:14 AM on the same day. The sequence is not coincidental: the addendum was signed, and then the record that did not contain it was replaced with one that did. If the substitution was a routine clinical amendment, Defendants would have produced both versions and identified the reason for the change. They produced neither the original nor an explanation. The pattern across three documents during a single encounter, without a single original produced, supports a finding of intent to deprive.

**D. Defense Counsel's Representation Regarding Restraint Orders Was False**

Defense counsel has represented that no restraint orders exist. The internal restraint log field o=0, present in the produced records, confirms that 100% of the 4,293-minute restraint episode was covered by valid physician orders. The orders were not produced. Their absence from the production is not evidence that they do not exist. It is evidence that they were not produced. A representation to the Court that no restraint orders exist, when the hospital's own internal records confirm the opposite, is a false statement to the Court.

**E. The Selective Production of Summary Reports Supports a Finding of Intent**

HCA's hospitals operate on enterprise EHR systems that generate and retain native audit logs as a matter of routine system function. Defendants produced summary audit reports for this encounter rather than native logs. The summary format allows parameter selection and filtering.

It cannot reveal deletion events, backdating, or suppressed document types. The 343 system-wide modification events and 317 user-level clinical modifications documented in the summary reports confirm that the native logs contain substantial activity. If that activity reflected routine clinical documentation, Defendants would have produced the native logs. They did not. The selective withholding of native audit trail data for an encounter with 343 documented modification events, combined with the deliberate post-litigation audit review on December 23, 2025, supports a finding of intent to deprive.

**F. The Billing Records Independently Prove the Missing Day**

HCA certified Plaintiff was discharged on June 29, 2025 at 17:43. Health Care Indemnity, Inc., HCA's captive insurance subsidiary, through its Third Party Claims Administrator Michael A. Orber, confirmed in writing that Plaintiff returned a telephone call at approximately 1:15 PM on June 30, 2025. A patient discharged at 17:43 on June 29 does not return telephone calls at 1:15 PM the following day. HCA's certified discharge date is contradicted by its own captive insurer's written record. During that same June 30 call, Mr. Orber requested that Plaintiff sign a blanket medical records release. Plaintiff declined. HCA's own subsidiary had dispatched a claims representative to contact Plaintiff within hours of discharge, before Plaintiff had retained counsel, in an attempt to obtain a blanket release. HCA then proceeded to certify a medical record that its own insurer's contemporaneous written communications contradict. See Exhibit 23-N.

The hospital's own restraint logs establish that 71.55 hours of restraint occurred. Twenty-one hours cannot contain 71.55 hours. This is not a legal argument. It is arithmetic, and it is proven by documents bearing the hospital's own certification and the sworn attestation of its

billing custodian. When a hospital's financial records, restraint records, eyewitness testimony, clinical activity dates, and its own insurance carrier's written confirmation all converge on the same conclusion and that conclusion contradicts the certified medical production, the medical production is false.

**G. The Temporally Impossible Diagnoses Independently Establish Post-Litigation Fabrication**

The chronic pulmonary embolism and deep vein thrombosis diagnoses at Bates pages SHH-M000012 and SHH-M000013 require no expert testimony and no inference to evaluate. They require only a calendar. Plaintiff's only prior pulmonary embolism was diagnosed at Summerlin Hospital on May 1, 2025, following admission on April 30, 2025, as an acute event treated with Eliquis. ICD-10 I27.82 requires a chronic, long-standing, unresolved clot burden. That clinical threshold was not met then and has never been met. Plaintiff's first deep vein thrombosis was not diagnosed until November 6, 2025. Southern Hills coded chronic pulmonary embolism and deep vein thrombosis as pre-existing conditions during an encounter where one was clinically unsupportable and the other had not yet occurred. As of March 9, 2026, Plaintiff's own treating physician continues to code both conditions as acute, confirming that no treating clinician in Plaintiff's actual care history has ever characterized either condition as chronic.

A diagnosis coded as chronic cannot be based on a condition that had not yet occurred. The presence of these codes in the litigation version and their complete absence from the pre-litigation portal version establishes, without inference, that they were inserted into the record after the fact. That insertion occurred during active litigation. The deliberate addition of false diagnoses to a medical record produced in discovery, after a post-litigation audit review by user

PIWJ3240 on December 23, 2025, satisfies the intent-to-deprive standard of Rule 37(e)(2) independently of every other ground presented in this motion.

**H. Terminating Sanctions Are Warranted**

The modifications documented in Exhibit 23 go to the heart of the claims arising from this encounter. Under *Leon*, a party seeking terminating sanctions must demonstrate a duty to preserve, destruction with a culpable state of mind, and relevance of the destroyed evidence to the claims. 464 F.3d at 959. All three elements are satisfied here. The duty attached at or before discharge. The culpable state of mind is established by the document substitution sequence, the post-litigation audit review, the deliberate production of filtered summaries in lieu of native logs, and the insertion of temporally impossible diagnoses into the litigation version of the record. The relevance is direct: every substantive claim arising from this encounter depends on what the unaltered record shows.

Under *Gregory*, Rule 37(e)(2)'s severe sanctions require a finding of intent to deprive, not mere recklessness. 118 F.4th at 1079. That standard is met here. On December 23, 2025, a named user deliberately printed the audit log during active litigation. Defendants thereafter produced summary reports rather than the native log that user had just reviewed. That is not recklessness. That is a deliberate decision, made with full knowledge of the litigation, to withhold the most probative version of the audit record.

The omission of an entire day of clinical events, the retroactive insertion of billing documentation through document replacement, the certification of a production that omits 71.5 hours of restraint documentation confirmed by the hospital's own logs, the application of a brain injury diagnosis contradicted by contemporaneous imaging, the false characterization of a sub-

therapeutic drug level as within normal limits, the mathematical impossibility of the billed observation hours relative to the documented restraint duration, the insertion of temporally impossible chronic diagnoses into the litigation record, and the withholding of native audit logs across 343 documented modification events, taken together, satisfy every element required for terminating sanctions under Rule 37(e)(2) and the Court's inherent authority under *Chambers*.

Where a party has engaged in conduct utterly inconsistent with the orderly administration of justice, dismissal or default judgment is appropriate. *Anheuser-Busch*, 69 F.3d at 348. Without sanctions, Defendants benefit from the very record manipulation that prevents Plaintiff from proving her claims. Rule 37 and the Court's inherent authority exist to prevent exactly this outcome.

## VI. REQUESTED RELIEF

**1. Compelled Production of Native Audit Logs and Original Documents**

Plaintiff requests that the Court order Defendants to produce within 21 days:

(a) The complete native-format EHR audit logs for the June 28 to 30, 2025 encounter, including field-level metadata, workstation identifiers, user credentials, and access timestamps;

(b) The original ED Physician Record bearing Batch ID 10878075 in native format, including the system metadata consisting of workstation identifier, user ID, and exact timestamp of the command that replaced it with Batch ID 10950345;

(c) Both original versions of the Consultation Report preceding the replacement events;

(d) All restraint orders, restraint flowsheets, nursing restraint monitoring logs, and physician renewal orders for the 4,293-minute restraint episode;

(e) The complete native Meditech restraint report export for the June 28 to 30, 2025 encounter, including all underlying flowsheet data, monitoring entries, and physician order records, in place of the manually printed single-page PDF produced at SHH-RESRPT000001;

(f) The complete native Pyxis transaction data for Account H896832667699 for the June 28 to 30, 2025 encounter;

(g) All internal communications regarding the June 30, 2025 INTERFACE,HIS bulk update event and the July 2, 2025 application of ICD-10 code S06.2XAA;

(h) All documentation, audit entries, and communications supporting the coding of ICD-10 I27.82 and ICD-10 I82.4Y9 at Bates pages SHH-M000012 and SHH-M000013, including the identity of the coder, the date of coding, and any physician attestation authorizing those diagnoses;

(i) The native security system export, access control records, badge reader transaction data, and surveillance management logs for the June 28 to 30, 2025 encounter, in place of the manually constructed Excel file produced at SHH-SECLOG00001; and

(j) The identity, role, and authorization of Christopher Tuttle, Diana J. Samora, and Warren Jennifer in connection with the creation and modification of SHH-SECLOG00001 and SHH-RESRPT000001 during active litigation.

Plaintiff requests that failure to comply within 21 days result in automatic imposition

**2. Adverse Inference Instruction**

Plaintiff requests an instruction permitting the jury to presume that the original ED Physician Record (Batch ID 10878075), the original Consultation Reports, the restraint orders, the restraint flowsheets, all native audit log entries, and the pre-fabrication version of the

diagnostic coding at SHH-M000012 and SHH-M000013 were unfavorable to Defendants on each claim to which the altered records are relevant.

**3. Evidentiary Sanctions**

If Defendants fail to produce the materials ordered under Section VI.1, Plaintiff requests sanctions under Rule 37(e)(2) establishing the following facts: that the records produced in litigation do not accurately represent the records as they existed during Plaintiff's admission; that the Critical Care Addendum was not part of the contemporaneous clinical record; that restraint occurred as documented in the hospital's own restraint logs; that the chronic pulmonary embolism and deep vein thrombosis diagnoses at SHH-M000012 and SHH-M000013 were not based on any clinical finding made during the June 2025 encounter; and that removed or altered entries would have supported Plaintiff's account of events.

**4. Preclusion**

Plaintiff requests that Defendants be precluded from offering any testimony, expert opinion, or documentary evidence that relies on or assumes the accuracy of the litigation-version records for this encounter, including the Critical Care Addendum, the traumatic brain injury coding, the within normal limits characterization of the sub-therapeutic Depakote result, and the chronic pulmonary embolism and deep vein thrombosis diagnoses at SHH-M000012 and SHH-M000013.

**5. Terminating Sanctions**

Should the Court find, upon review of the native audit logs or upon Defendants' continued failure to produce them, that Defendants acted with intent to deprive Plaintiff of the

information's use in litigation, Plaintiff requests that the Court enter default judgment on all claims arising from the Southern Hills June 28 to 30, 2025 encounter.

**6. Monetary Sanctions**

Plaintiff requests reasonable fees and costs incurred in preparing Exhibit 23 and this Motion, as permitted under Fed. R. Civ. P. 37 and the Court's inherent authority.

## VII. CONCLUSION

The Custodian of Records signed under oath that the 201-page production was complete and accurate. It is not.

Plaintiff respectfully requests that the Court impose sanctions sufficient to remedy the prejudice and restore the integrity of these proceedings.

## MEET AND CONFER CERTIFICATION

Pursuant to Local Rule 26-7, Plaintiff contacted defense counsel by written communication on March 8, 2026 at 1:00 PM PST, requesting a meet and confer conference regarding the production of native EHR audit logs and original documentation and providing 72 hours to respond with availability. The written communication was transmitted to Michael E. Prangle, Zachary J. Thompson, and additional counsel of record at Hall Prangle, LLC. As of the filing of this Motion, Defendants have not responded in any form. Plaintiff proceeds with filing pursuant to Local Rule 26-7(c).

_____
I certify that Artificial Intelligence was used to prepare the foregoing document.

DATED: March 11th , 2026

Respectfully submitted,

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se

**EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| **23** | Side-by-Side Comparison, Southern Hills Hospital, June 28 to 30, 2025 |
| **23-A** | Native EHR Audit Log, Southern Hills Hospital, Account H896832667699, June 28 to 29, 2025 (Bates No. SHH-AT000011 |
| **23-B** | Restraint Logs reflecting 4,293 minutes of non-violent restraint |
| **23-C** | Billing Records, Southern Hills Hospital (Bates No. SHH-B000001 through SHH-B000018), with Affidavit of Tiffaney Jackson, Account Specialist, HCA Richmond Shared Services Center, sworn January 2, 2026, reflecting dates of service June 28 to June 29, 2025, total billed $42,870.32, with 21 billed observation hours irreconcilable with 4,293 minutes of restraint documented in internal restraint logs |
| **23-D** | Insurance Claim No. 2025188CO6631, processed July 7, 2025, reflecting single service date of June 28, 2025 with total charges of $42,870.32 |
| **23-E** | Declaration of Jade Riley Burch in Support of Motion for Sanctions |
| **23-E1** | Declaration of Porscha Ryan in Support of Motion for Sanctions; Ryan is Plaintiff's full-time caretaker and Medical Power of Attorney; declaration establishes continuous presence throughout the June 28 to 30, 2025 Southern Hills admission, personal observation of seizure activity, physical restraints, and BPOD unit placement, absence of any violent or aggressive behavior by Plaintiff, nurse statement on June 29 that transfer to the psychiatric floor was being considered, absence of capacity assessment or MPOA consultation at discharge, and personal knowledge that discharge occurred at approximately 11:00 AM on June 30, 2025 |
| **23-F** | Bates Pages SHH-M000012 and SHH-M000013, reflecting ICD-10 I27.82 (Chronic Pulmonary Embolism) coded as primary and secondary diagnosis and reason for visit, and ICD-10 I82.4Y9 (Deep Vein Thrombosis), for conditions that did not occur until months after this encounter |

| Exhibit | Description |
|---------|-------------|
| **23-G** | Forensic Metadata Analysis: SHH-SECLOG00001, Post-Litigation Manual Construction |
| **23-H** | Forensic Metadata Analysis: SHH-RESRPT000001, Manual Print-to-PDF During Active Litigation |
| **23-I** | Forensic Analysis of SHH-AT000011: Six Independent Grounds for Sanctions |
| **23-J** | Automated Discharge Sequence Analysis: SNVDPTO Transmission Preceding Human Discharge Action by 33 Minutes |
| **23-K** | Active Clinical Activity June 30, 2025: Seven Entries in HCA's Own Certified Production |
| **23-L** | Metadata Analysis: Named Individuals, Modified Documents, Active Litigation |
| **23-M** | Pre-Litigation Demand Letter and Media Release, June 26, 2025, transmitted to Cinthya Cook, HCA Risk Management, and SUNR.PatientAdvocate@hcahealthcare.com, two days before Plaintiff's Southern Hills admission, containing explicit evidence preservation demand and litigation notice |
| **23-N** | Email dated July 1, 2025 from Michael A. Orber, Michael A. Orber and Associates, Inc., Third Party Claims Administrator for Health Care Indemnity, Inc., HCA's captive insurance subsidiary, confirming that Orber placed a call to Plaintiff at just after noon on June 30, 2025 and that Plaintiff returned his call at approximately 1:15 PM on June 30, 2025; constitutes written confirmation by HCA's own captive insurer that Plaintiff was post-discharge and reachable on June 30, 2025; further confirms that Plaintiff's June 22, 2025 demand letter was forwarded from Sunrise Hospital to HCA's captive insurer, establishing institutional notice of anticipated litigation; Plaintiff declined Orber's request during the June 30 call to sign a blanket medical records release |
| **23-O** | Lab Order, Dr. Henry Igid, Town Center Diagnostic, 653 N. Town Center Drive, Suite 402, Las Vegas, NV 89144, dated March 9, 2026, reflecting Plaintiff's active problem diagnoses as DVT arm, acute (ICD-10 I82.A12) and Pulmonary embolism (ICD-10 I26.93); order set includes CBC with auto differential, Factor II DNA analysis panel, Factor V Leiden mutation analysis panel, and Iron/TIBC/Ferritin panel; confirms that as of the date of this filing no treating physician in Plaintiff's actual care history has ever coded either condition as chronic, directly contradicting the permanent chronic pulmonary embolism designation HCA inserted into the June 2025 encounter record at Bates pages SHH-M000012 and SHH-M000013 |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11th , 2026, I electronically filed the foregoing **PLAINTIFF'S MOTION FOR SANCTIONS AND TO COMPEL PRODUCTION OF NATIVE EHR AUDIT LOGS** with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record registered to receive electronic notifications in this case, including:

Michael E. Prangle
Zachary J. Thompson
Hall Prangle, LLC
1140 N. Town Center Drive, Suite 350
Las Vegas, NV 89144

*Counsel for HCA Healthcare, Inc.;*
*Sunrise Hospital & Medical Center, LLC;*
*MountainView Hospital;*
*and Southern Hills Hospital & Medical Center*

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se