## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **JADE RILEY BURCH,**<br>Plaintiff, Pro Se,<br><br>*vs.*<br><br>**HCA HEALTHCARE, INC.; SUNRISE HOSPITAL AND MEDICAL CENTER, LLC; MOUNTAINVIEW HOSPITAL; and SOUTHERN HILLS HOSPITAL AND MEDICAL CENTER,**<br>Defendants. | **Case No.:**<br>**2:25-cv-01408-JAD-MDC**<br><br>United States District Court<br>District of Nevada |

# EXHIBIT 23

## SIDE-BY-SIDE COMPARISON AND MODIFICATION ANALYSIS
### Southern Hills Hospital Medical Records
*Pre-Lawsuit Patient Portal Version vs. Certified Litigation Production*

| | |
|---|---|
| **Prepared By** | Jade Riley Burch, Pro Se Plaintiff |
| **Date Prepared** | February 16, 2026 |
| **Case Caption** | Burch v. HCA Healthcare, Inc., et al., Case No. 2:25-cv-01408-JAD-MDC |
| **Court** | United States District Court for the District of Nevada |

Jade Riley Burch  |  Plaintiff Pro Se  |  222 Karen Avenue, Unit 1207  |  Las Vegas, NV 89109

## I..  PURPOSE OF THIS EXHIBIT

This exhibit presents a factual, side-by-side comparison of two versions of the medical records from Plaintiff's hospitalization at Southern Hills Hospital ("SHH") in June 2025, supplemented by the hospital's own restraint logs, summary audit trail documents, and billing records:

1. The Portal Version -- Records accessed by Plaintiff through the HCA Healthcare patient portal ("MyHealthONE") on July 12, 2025, at 6:21 AM, representing the clinical record as it existed at the time of access.

2. The Litigation Version -- A 201-page certified production bearing Bates stamps SHH-M000001 through SHH-M000201, accompanied by summary audit trail documents SHH-AT000001 through SHH-AT000012, produced by Southern Hills Hospital in response to Plaintiff's litigation demands and certified by the Custodian of Records on August 8, 2025.

3. The Restraint Logs -- Hospital-generated restraint reports documenting 4,293 minutes (~71.5 hours) of non-violent restraint during Plaintiff's encounter.

4. Summary Audit Reports -- SHH-AT000001 through SHH-AT000012, produced in lieu of the native EHR audit logs requested by Plaintiff.

## II..  DOCUMENT METADATA AND AUTHENTICATION

| Element | Portal Version | Litigation Version |
|---|---|---|
| Source Identification | Digital headers with timestamp "7/12/25, 6:21 AM"; URLs from MyHealthONE patient portal | Internal tracking numbers (SHH-M000001 et seq.); formal "Certification of Medical Records" dated 8/8/2025 |
| Organization | Segmented by report type (e.g., "Neurology Note," "History and Physical Note") with individual page counts | Single file of 201 pages |
| Certification | None; automated portal export | Formal "Certification of Medical Records" signed by Custodian of Records, notarized in Clark County, Nevada on August 8, 2025 -- 40 days after discharge |
| Internal Routing Data | Generic portal headers | Admission records with Market URNs, room/bed assignment (H.521-A), and internal "VIP" status flags |

## III..  SIDE-BY-SIDE COMPARISON OF CONTENT

### A.  Critical Care Addendum — CPT 99291 Documentation

| Element | Portal Version | Litigation Version |
|---|---|---|
| Critical Care Documentation | Not present | **Contains "Critical Care Addendum" by Dr. Brent Wright, electronically signed June 29, 2025, at 08:14 AM -- approximately 20 hours after admission** |
| Acuity Language | Not present | **States: "HIGH PROBABILITY OF IMMINENT LIFE OR LIMB THREATENING DETERIORATION"; "High complexity of decision making was used to assess, manipulate and support vital system functions"** |

| Element | Portal Version | Litigation Version |
|---|---|---|
| Time Documentation | No critical care time logged | **States "approximately 37 minutes" of critical care** |

**Factual Note:** *CPT code 99291 requires a minimum of 30 minutes of documented critical care and specific language regarding life-threatening conditions. This language appears only in the litigation version.*

## B. Seizure Characterization

| Element | Portal Version | Litigation Version |
|---|---|---|
| Neurology Assessment | States: "Doing well overall, no further spells... clear for discharge from a Neurology standpoint" | Same neurology note present |
| PNES Characterization | Not prominently featured in discharge summary | **Includes Resident/Staff Addendum by Adriana Ramirez Roggio R3 stating "low suspicion for seizure" and that the event "seems PNES" (Psychogenic Non-Epileptic Seizures)** |

## C. Restraint Documentation

| Element | Portal Version | Litigation Version | Restraint Logs |
|---|---|---|---|
| Restraint Duration | No mention of restraint | No mention of restraint | **4,293 minutes (~71.5 hours / approximately 3 days)** |
| Restraint Classification | Not present | Not present | **Classified as "non-violent"** |
| Restraint Orders | Not present | Not present | **No physician orders linking restraint to clinical events** |
| Restraint Flowsheets | Not present | Not present | **No contemporaneous monitoring documentation** |
| Restraint Monitoring | Not present | Not present | **No reassessment entries** |
| Physician Renewal Orders | Not present | Not present | **No renewal chain documented** |
| Start/Stop Narrative | Not present | Not present | **No start/stop narrative tying duration to specific clinical events** |
| Alternatives Attempted | Not present | Not present | **No documentation of less restrictive alternatives** |
| Discontinuation Criteria | Not present | Not present | **No criteria for release documented** |

**Factual Note:** *Federal regulations (42 CFR Section 482.13) and Joint Commission standards require physician orders renewed at defined intervals, continuous monitoring documented at minimum 2-hour intervals, ongoing assessment of continued necessity, documentation of less restrictive alternatives attempted, and clear discontinuation criteria. A 71.5-hour non-violent restraint event under these standards*

*would generate a minimum of 36 documented monitoring intervals (2-hour checks), typically reflected as 36+ flowsheet entries plus associated reassessments, and multiple physician renewal orders. Under HCA Policy COG.COG.001, non-violent adult restraint orders must be renewed every 24 hours. A 71.5-hour restraint requires a minimum of 3 physician order events (initial order + renewal at 24 hours + renewal at 48 hours), and likely 4 if the restraint remained active past the 72-hour mark into day 4. The certified litigation production contains zero pages of restraint documentation across 201 pages. The Custodian of Records certified this production as "true and correct copies of all original records."*

**Expected Location of Missing Documentation:** Restraint flowsheets, restraint order set, nursing restraint monitoring logs, physician renewal orders, and MAR-linked restraint indication. These are standard EHR modules that generate and store restraint documentation in the medical record.

**Critical Finding:** Because the hospital's own restraint logs prove the restraint occurred, the certified "complete medical record" is either missing required components of the medical record or the restraint logs are not being treated as part of the medical record despite policy and federal requirements.

## D. Diagnostic Code vs. Imaging Conflict

| Element | Clinical Record | Billing Record |
|---|---|---|
| Diagnostic Imaging Finding | Imaging report states: "no acute intracranial abnormality" | **ICD-10 code S06.2XAA (Diffuse Traumatic Brain Injury) billed on July 2, 2025** |

**Conflict:** The imaging report and the billing code assigned to the same encounter are in direct conflict. The clinical record documents no acute intracranial abnormality. The billing record applies a diagnosis of Diffuse Traumatic Brain Injury.

## E. Laboratory Value vs. Clinical Note Conflict

| Element | Laboratory Data | Neurology Note |
|---|---|---|
| Depakote (Valproic Acid) Level | 42.3 mcg/mL | **States levels are "WNL" (Within Normal Limits)** |
| Standard Therapeutic Range | 50 to 100 mcg/mL | — |

| Authority / Source | Established Therapeutic Range | Status Relative to Range | |
|---|---|---|---|
| **Mayo Clinic Laboratories** | 50 to 125 mcg/mL | Sub-therapeutic | |
| **National Library of Medicine (NIH)** | 50 to 100 mcg/mL | Sub-therapeutic | |
| **Labcorp (Clinical Standard)** | 50.0 to 125.0 mcg/mL | Sub-therapeutic | |
| **SHH Neurology Note (06/29/25) (SHH-M000045)** | "WNL" (Within Normal Limits) | **Characterized as within normal limits** | |

**Finding:** The documented laboratory value of 42.3 mcg/mL falls below the established therapeutic range according to Mayo Clinic, NIH, and Labcorp. The SHH Neurology Note dated 06/29/25 characterizes this same result as "WNL" (Within Normal Limits).

### F.  PAD/POA Documentation vs. Access Logs

| Element | Clinical Narrative | Audit Trail |
|---|---|---|
| Psychiatric Advance Directive (PAD) / Medical Power of Attorney | The litigation version narrative acknowledges the existence of Plaintiff's MPOA | **The audit trail documents (SHH-AT000001 through SHH-AT000012) contain no log entry for staff accessing, viewing, or reviewing legal documents, advance directives, or PAD records** |

> **Finding:** The clinical narrative references awareness of Plaintiff's directive. The audit trail contains no corresponding access event.

### G.  Legal, Consent, and Administrative Records

| Element | Portal Version | Litigation Version |
|---|---|---|
| Conditions of Admission and Consent | Not included | 9 pages covering AI use, telemedicine consent, and financial agreements |
| Case Management Logs | Not present | Internal reports from Sandra Marsh (Case Manager) documenting inability to find a DME company to accept hospital bed referral |
| Scribe Identification | Not identified | **Identifies Venus Sebastian as scribe for Dr. Brent Wright; includes "Scribe Statements" and "Supervising Physician Notes"** |

### H.  Vital Signs, Monitoring, and Clinical Data

| Element | Portal Version | Litigation Version |
|---|---|---|
| Vital Signs | Summary tables showing most recent or relevant readings | Full "Welch Allyn Vitals Monitor" logs with time-stamped readings every 30 to 60 minutes; includes Mean Arterial Pressure (MAP) and specific oxygen delivery devices |
| EKG Interpretation | Summary results | Full formal EKG report confirmed by Salman Akhtar on 6/30/2025, comparing to previous EKG from 4/16/2025 |
| Emergency Data | Brief arrival status and chief complaint | 13-page "Emergency Provider Report" with 37-minute critical care addendum |

### I.  Medication and Order Documentation

| Element | Portal Version | Litigation Version |
|---|---|---|
| Medication Records | Flat lists of "Current Home Medications" and "Active Meds + DC'd Last 24 Hrs" | Full "Order's Audit Trail of Events" for every medication showing exact second of entry, physician signature, and pharmacy verification |
| Lab Orders | Results listed without process documentation | Multi-step audit trail for every test: TRANS, LOGGED, IN PRO, COMP with specific interface user IDs and timestamps |

| Element | Portal Version | Litigation Version |
|---|---|---|
| Order Audit Trails | Not present (0 pages) | 54 pages of audit trail data showing status changes for every order |

## IV..  APPLICABLE HCA POLICY: COG.COG.001 (PATIENT RESTRAINT/SECLUSION)

HCA Healthcare Policy COG.COG.001 governs the use of restraints -- including physical and chemical restraints -- at all HCA facilities, including Southern Hills Hospital. The following provisions are relevant to this encounter:

| Policy Provision | Requirement |
|---|---|
| Chemical Restraint Definition (p. 4) | A drug used as a "restriction to manage the patient's behavior or restrict the patient's freedom of movement and is not a standard treatment or dosage for the patient's condition" constitutes a chemical restraint. |
| Less Restrictive Alternatives (p. 1) | Restraint use is permitted only when "less restrictive interventions have been determined to be ineffective." Documentation of alternatives attempted is required. |
| Physician Order (p. 8, Section 3) | "Restraint or seclusion must be used only on the order of a physician or other licensed independent practitioner." Orders "cannot be written as a standing order or on an as needed basis (PRN)." Each order must be specific and time-limited. |
| Order Renewal | Physician orders for restraint must be renewed at defined intervals: every 4 hours for violent/self-destructive behavior in adults; every 24 hours for non-violent, non-self-destructive behavior. |
| 1-Hour Face-to-Face Evaluation (p. 10, Section 6) | For restraints used to manage "violent or self-destructive behavior," a physician must conduct a face-to-face evaluation within one hour of initiation. |
| Continuous Monitoring and Documentation (p. 15, Section 13) | Monitoring must be documented at specified intervals (every 15 minutes for violent behavior; every 2 hours for non-violent). Documentation must include: signs of injury, nutrition/hydration, circulation and range of motion, and readiness for discontinuation. |
| Medical Record Requirement (p. 16) | Monitoring documentation must be maintained in the "medical record." |
| Discontinuation (p. 17, Section 16) | Restraint must be discontinued "at the earliest possible time, regardless of the length of time identified in the order." Patient must be evaluated for readiness for discontinuation. |

### Application to the 71.5-Hour Restraint Event

**Confirmed:** The restraint logs confirm 4,293 minutes (~71.5 hours) of non-violent restraint. Under HCA Policy COG.COG.001, this duration would require the following minimum documentation:

| Required Documentation | Minimum Quantity for 71.5-Hour Non-Violent Restraint | Status in 201-Page Production |
|---|---|---|
| Physician Orders (renewed every 24 hours) | Minimum 3 orders (initial + 2 renewals); likely 4 if restraint remained active past the 72-hour mark into day 4 | **Not produced** |
| 2-Hour Monitoring Intervals | Minimum 36 documented monitoring intervals (2-hour checks), typically reflected as 36+ flowsheet entries plus associated reassessments | **Not produced** |

| Required Documentation | Minimum Quantity for 71.5-Hour Non-Violent Restraint | Status in 201-Page Production |
|---|---|---|
| Documentation of Less Restrictive Alternatives | Required before initiation | Not produced |
| Signs of Injury Assessments | Required at each monitoring interval | Not produced |
| Nutrition/Hydration Documentation | Required at each monitoring interval | Not produced |
| Circulation and Range of Motion Checks | Required at each monitoring interval | Not produced |
| Readiness for Discontinuation Assessments | Required at each monitoring interval | Not produced |
| Restraint Flowsheets | Required in medical record (p. 16) | Not produced |

**Critical Finding:** The Custodian of Records certified the 201-page production as "true and correct copies of all original records." HCA Policy COG.COG.001 requires that all of the above documentation be maintained in the "medical record." The restraint logs confirm the restraint occurred. None of the documentation required by HCA's own policy appears in the certified production.

## V..  AUDIT TRAIL EVIDENCE

### A.  Native Logs Requested vs. Summary Reports Produced

Plaintiff's discovery requests sought native EHR audit logs -- raw, system-generated transaction records maintained at the database level. Defendants produced summary audit reports (SHH-AT000001 through SHH-AT000012) instead.

| Element | Native EHR Audit Logs (Requested) | Summary Audit Reports (Produced) |
|---|---|---|
| Source | Raw database transaction logs generated automatically by the EHR system | Reports generated through the EHR's reporting interface by a human user selecting parameters |
| Completeness | Captures every event -- including deletions, permission changes, failed access attempts, and record view history | Captures only events included within the selected report parameters and filters |
| Selectivity | Cannot be filtered or curated | Can be filtered by date range, document type, user, or event type |
| Immutability | Database-level logs that cannot be altered without leaving forensic traces | Reports that reflect the underlying data at the time the report was generated |
| Forensic Value | Reveals deleted records, backdated entries, permission escalations, and full chain of custody | Reveals only what the report parameters were designed to show |

**Critical Gap:** Native EHR audit logs were not produced. If the underlying native logs contain deletion events, backdating, late authentication, or suppressed document types, the summary reports produced in their place cannot reveal it.

## B.  Document Replacement Events

The Audit Trail by Encounter Report documents the following replacement events:

| Document | Date/Time | Action | Detail |
|---|---|---|---|
| Consultation Report C | June 28, 2025, 4:33 PM | **REPLACED** | 1-page document replaced by 8-page version |
| Consultation Report C | June 29, 2025, 10:04 AM | **REPLACED** | 8-page version replaced again |
| ED Physician Record C | June 29, 2025, 10:18 AM | **REPLACED** | 12-page version (Batch ID 10878075) replaced by 13-page version (Batch ID 10950345) |

**Finding:** The additional page in the ED Physician Record corresponds to the Critical Care Addendum referenced in Section III.A. Original versions of the replaced documents were not produced.

### Chain of Custody of Replaced Documents:

| Document | Original Page Count | Replacement Page Count | Replacement Timestamp | Original Produced |
|---|---|---|---|---|
| **Consultation Report C** | 1 page | 8 pages | June 28, 2025, 4:33 PM | **No** |
| **Consultation Report C** | 8 pages | Unknown | June 29, 2025, 10:04 AM | **No** |
| **ED Physician Record C** | 12 pages (Batch ID 10878075) | 13 pages (Batch ID 10950345) | June 29, 2025, 10:18 AM | **No** |

## C.  Retroactive Entry Timing

| Entry | Timestamp |
|---|---|
| Scribe (Venus Sebastian) data entry | June 28, 2025, 1:45 PM |
| Dr. Brent Wright electronic signature on Critical Care Addendum | **June 29, 2025, 8:14 AM (~20 hours post-admission)** |
| Custodian of Records Certification | August 8, 2025 |

## D.  Identified Staff and Modification Activity

The CSV audit logs (SHH-AT000007/08 and SHH-AT000012) identify the following staff activity:

| User ID | Identified As | Activity | Date/Time |
|---|---|---|---|
| APPDABNA | Nathaniel Dabu | Modified "EDM Patient File" | June 28, 2025, 14:32 |
| APPDABNA | Nathaniel Dabu | Viewed "Branch to POM" | June 28, 2025, 17:12 |
| APPDABNA | Nathaniel Dabu | Viewed "Clinical Review," "Diagnostic Imaging," "Hematology," "Chemistry," and "Toxicology" within the same minute | June 28, 2025, 17:32 |
| DHP.VS | Venus Sebastian (Scribe) | Multiple data entry events | June 28 to 29, 2025 |

| User ID | Identified As | Activity | Date/Time |
|---|---|---|---|
| PIWJ3240 | [Administrative User] | **"Print Patient Audit Log" command** | **December 23, 2025, 14:27 (6 months post-discharge)** |

> **Note:** The summary audit reports document 343 total modification events across multiple staff members, with actions occurring multiple times per minute in several instances.

## E.  Post-Discharge System Activity

| Date/Time | User/Source | Action |
|---|---|---|
| June 30, 2025, 4:17 PM | INTERFACE,HIS (System) | Bulk update event -- approximately 24 hours after discharge |
| July 2, 2025 | [Billing] | **ICD-10 code S06.2XAA (Diffuse Traumatic Brain Injury) applied to encounter** |
| December 23, 2025, 14:27 | User PIWJ3240 | **"Print Patient Audit Log" command executed -- approximately 6 months after discharge, after litigation commenced** |

## F.  Selective Batch Indexing

The audit trails document processing through "Batch Prog [QCI]" and "Batch Prog [BDI]" with entries for "Scanned" documents showing "New Pages [1]" or "New Pages [9]" being indexed. The EHR system allows selection of which document types to include in a legal export by batch.

## VI..  SPOLIATION TIMELINE

| Date | Event |
|---|---|
| June 28, 2025 | Plaintiff admitted to Southern Hills Hospital. Scribe Venus Sebastian begins documentation at 1:45 PM. |
| June 28, 2025, 2:32 PM | User APPDABNA (Nathaniel Dabu) modifies "EDM Patient File." |
| June 28, 2025, 4:33 PM | Consultation Report C replaced -- 1-page original replaced by 8-page version. |
| June 28, 2025, 5:32 PM | User APPDABNA views Clinical Review, Diagnostic Imaging, Hematology, and Chemistry records within the same minute. |
| June 29, 2025, 8:14 AM | Dr. Brent Wright electronically signs Critical Care Addendum (~20 hours post-admission). |
| June 29, 2025, 10:04 AM | Consultation Report C replaced a second time. |
| June 29, 2025, 10:18 AM | ED Physician Record C replaced -- 12-page version (Batch ID 10878075) replaced by 13-page version (Batch ID 10950345). Original not produced. |
| June 30, 2025 | Plaintiff discharged. |
| June 30, 2025, 4:17 PM | INTERFACE,HIS bulk update event -- approximately 24 hours post-discharge. |
| July 2, 2025 | ICD-10 code S06.2XAA (Diffuse Traumatic Brain Injury) applied to encounter. Imaging report states "no acute intracranial abnormality." |
| July 12, 2025, 6:21 AM | Plaintiff accesses and preserves portal version of medical records. |

| Date | Event |
|---|---|
| **August 8, 2025** | Custodian of Records certifies 201-page litigation production as "true and correct copies of all original records." |
| **December 23, 2025, 2:27 PM** | User PIWJ3240 executes "Print Patient Audit Log" command -- approximately 6 months after discharge, after litigation commenced. |

## VII..  SUMMARY OF FACTUAL FINDINGS

1. **The portal version and the litigation version contain material differences.** The litigation version includes a Critical Care Addendum, PNES characterization, 54 pages of order audit trails, 9 pages of consent documents, and scribe/supervising physician statements that do not appear in the portal version.

2. **The Critical Care Addendum was entered retroactively.** Dr. Brent Wright's addendum -- containing CPT 99291 billing language and a 37-minute critical care claim -- was electronically signed approximately 20 hours after admission. The ED Physician Record was replaced to incorporate it, growing from 12 pages to 13 pages. The original 12-page version was not produced.

3. **Core clinical documents were replaced multiple times with originals not produced.** The Consultation Report was replaced twice within 18 hours. The ED Physician Record was replaced once. No original version of any replaced document was produced in the litigation production.

4. **The restraint logs confirm a 71.5-hour restraint event that appears in neither version of the medical record.** The hospital's restraint logs document 4,293 minutes of non-violent restraint. The portal version contains no reference to restraint. The 201-page certified litigation production contains no reference to restraint. The Custodian of Records certified the litigation production as "true and correct copies of all original records." Because the hospital's own restraint logs prove the restraint occurred, the certified "complete medical record" is either missing required components of the medical record or the restraint logs are not being treated as part of the medical record despite policy and federal requirements.

5. **The billing code conflicts with the clinical imaging.** ICD-10 code S06.2XAA (Diffuse Traumatic Brain Injury) was applied to the encounter on July 2, 2025. The imaging report for the same encounter states "no acute intracranial abnormality."

6. **The laboratory data conflicts with the clinical note.** The Depakote level was documented at 42.3 mcg/mL, below the standard therapeutic range of 50 to 100 mcg/mL. The Neurology Note characterizes this result as "Within Normal Limits."

7. **The clinical narrative references the PAD/MPOA, but the audit trail contains no access event.** The litigation version acknowledges Plaintiff's Medical Power of Attorney. The audit trail documents contain no log entry for any staff member accessing, viewing, or reviewing legal documents or advance directives.

8. **Native EHR audit logs were not produced.** Plaintiff requested native audit logs. Defendants produced summary audit reports generated through a reporting interface that allows parameter selection and filtering. Native logs were not produced. If the underlying native logs contain deletion events, backdating, late authentication, or suppressed document types, the summary reports cannot reveal it.

9. **Post-discharge system activity is documented.** An INTERFACE,HIS bulk update occurred on June 30, 2025, approximately 24 hours after discharge. The TBI billing code was applied on July 2, 2025. An administrative user executed a "Print Patient Audit Log" command on December 23, 2025, approximately six months after discharge and after litigation commenced.

10. **343 modifications are documented in the summary audit trails.** Multiple staff members entered modifications in rapid succession, with actions occurring multiple times per minute in several instances. Staff members are identified by user ID in the audit logs.

## VIII.. FORENSIC SIGNIFICANCE

The following observations are noted from a records integrity perspective:

- Restraint logs confirm 71.5 hours of non-violent restraint with zero pages of restraint documentation across a 201-page certified production and zero references to restraint in the portal version -- expected documentation includes restraint flowsheets, restraint order set, nursing restraint monitoring logs, physician renewal orders, and MAR-linked restraint indication.

- A 71.5-hour non-violent restraint requires minimum 3 physician order events (initial + renewals at 24 and 48 hours), likely 4 if the restraint remained active past the 72-hour mark into day 4; none were produced.

- Core clinical documents replaced multiple times during the encounter with no original versions produced in the litigation production.

- Critical Care Addendum containing CPT 99291 billing language entered retroactively approximately 20 hours after admission, corresponding to the additional page in the replaced ED Physician Record.

- ICD-10 code for Diffuse Traumatic Brain Injury applied to an encounter where imaging documented no acute intracranial abnormality.

- Sub-therapeutic Depakote level (42.3 mcg/mL) characterized as "Within Normal Limits" against established reference ranges of 50 to 100 mcg/mL.

- Clinical narrative references Plaintiff's MPOA with no corresponding audit trail entry for staff accessing or reviewing legal documents or advance directives.

- Native EHR audit logs requested but not produced; summary reports produced in their place allow parameter selection, filtering, and curation and cannot reveal deletion events, backdating, or suppressed document types present in the underlying native logs.

- 343 modification events documented in summary audit trails with actions occurring multiple times per minute across multiple staff members.

- Administrative user executed "Print Patient Audit Log" command approximately six months after discharge and after litigation commenced.

*These findings are based solely on the face of the produced records.*

> **Cross-Reference:** The forensic metadata analysis underlying the Section VIII observations is set forth in full detail in the following exhibits filed concurrently with this motion: Exhibit 23-G (SHH-SECLOG00001 metadata analysis), Exhibit 23-H (SHH-RESRPT000001 metadata analysis), Exhibit 23-I (SHH-AT000011 six-ground forensic analysis), Exhibit 23-J (automated discharge sequence analysis), Exhibit 23-K (June 30, 2025 clinical activity documentation), and Exhibit 23-L (full produced file set metadata analysis, six identified individuals, seven modified documents).

Respectfully submitted,

**/s/ Jade Riley Burch**
**Jade Riley Burch**
Pro Se Plaintiff