Jade Riley Burch
Plaintiff, Pro Se
222 Karen Avenue, Unit 1207
Las Vegas, NV 89109
Tel: (614) 725-9452
Email: jaderburch@gmail.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

Case No.: 2:25-cv-01408-JAD-MDC

Jade Riley Burch,

          Plaintiff.

vs.

HCA Healthcare, Inc., et al.,

          Defendants.

**PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS UNDER FED. R. CIV. P. 37(a) AND 37(c) AND THE COURT'S INHERENT AUTHORITY FOR DISCOVERY MISCONDUCT IN THE PRODUCTION OF SUNRISE HOSPITAL MEDICAL RECORDS**

**(Pulmonary Embolism Encounter, April 17 through 22, 2025)**

## I. INTRODUCTION

Defendants produced a 350-page certified medical record for Plaintiff's five-day hospitalization at Sunrise Hospital from April 17 through April 22, 2025. **Defendants finalized and billed the encounter as complete within five days of discharge, yet now claim the certified record may be incomplete.** The production omits entire categories of records that the hospital's own electronic medical record system necessarily maintains, including audit trail logs, monitoring telemetry records, laboratory accession records, and radiology/PACS metadata. These omissions prevent Plaintiff from determining whether pulmonary embolism screening was

ordered and cancelled or never ordered at all, and materially prejudice Plaintiff's ability to prove the central claim in this litigation.

**The production contains no D-Dimer test result, no CT Angiogram order or result, no Wells score, no PERC assessment, no PE protocol documentation, no hemoptysis specimen records, no continuous monitoring logs, no PACU monitoring logs, and no audit trail documents** that would allow reconstruction of the clinical decision-making during the hospitalization.

Defendants produced summary audit trail documents for the Southern Hills Hospital encounter but produced **no audit trail documents for any Sunrise Hospital encounter.** This selective production of audit trail data, present for encounters peripheral to the core claim and absent for the encounter that forms the heart of this case, is a pattern, not an oversight.

The Custodian of Records simultaneously certified the production as complete and disclaimed its completeness. The hospital was able to generate a final billing statement totaling **$799,833.00** within five days of discharge, demonstrating that the encounter record had reached a sufficiently finalized state for revenue-cycle submission. Months later, the same records are described as possibly incomplete.

Plaintiff seeks sanctions commensurate with the prejudice caused: an adverse inference instruction, preclusion of Defendants from offering evidence that PE screening was performed or considered during the Sunrise hospitalization, a supplemental production order, and costs.

## II. FACTUAL BACKGROUND

**A. The Sunrise Hospital Hospitalization (April 17 through 22, 2025)**

Plaintiff underwent facial contouring surgery at Sunrise Hospital on April 17, 2025, and remained hospitalized through April 22, 2025, a five-day post-surgical inpatient stay. During the hospitalization, Plaintiff developed **chest pain, tachycardia (documented heart rates up to 103 bpm), respiratory distress, and an oxygen requirement (nasal cannula at 2L).** Plaintiff also reported hemoptysis to multiple nursing staff members and provided a specimen in a cup to nursing staff for testing.

These symptoms constitute a recognized clinical presentation requiring pulmonary embolism to be included in the differential diagnosis. Post-surgical status is itself a recognized PE risk factor. The combination of post-operative status, tachycardia, respiratory distress, supplemental oxygen requirement, chest pain, and hemoptysis intensifies that clinical obligation.

An April 19, 2025 chest X-ray showed **"moderate bilateral perihilar and left basilar airspace disease."** The finding was attributed to pneumonia and treated with antibiotics (Azithromycin, Ceftriaxone). Pulmonary embolism was not documented as part of the differential diagnosis. The Provider Report characterizing the encounter as "Dyspnea, unspecified" and "Pneumonia" was dictated on April 22, 2025, the day of discharge, five days after admission. Plaintiff was discharged without PE workup or anticoagulation.

**B. The Pulmonary Embolism Diagnosis (May 1, 2025)**

On April 30, 2025, Plaintiff presented to Summerlin Hospital with chest pain and shortness of breath, the same symptoms documented at Sunrise Hospital. Summerlin Hospital performed both a D-Dimer test and a CT Angiogram. **The D-Dimer result was 1.32 mcg/mL**

**FEU (elevated; normal less than 0.50 mcg/mL).** At 5:19 AM on May 1, 2025, the CT Angiogram confirmed **an acute pulmonary embolism in the right lower lobe.** Anticoagulation therapy was initiated that morning (Exhibit C, authenticated by Elena Rodriguez).

The pulmonary embolism that Sunrise Hospital failed to diagnose was confirmed nine days after discharge at a non-HCA facility using standard diagnostic tools, tools that are conspicuously absent from the 350-page Sunrise production.

**C. What Summerlin Did That Sunrise Did Not**

| Diagnostic Action | Sunrise Hospital (April 17 through 22, 2025) | Summerlin Hospital (April 30 through May 1, 2025) |
|---|---|---|
| D-Dimer Test | Not located in 350-page production | Performed: 1.32 mcg/mL FEU (elevated) |
| CT Angiogram | Not located in 350-page production | Performed: Confirmed acute PE, right lower lobe |
| PE Risk Assessment / Wells Score | Not located in 350-page production | Performed |
| Anticoagulation Therapy | Not initiated | Initiated May 1, 2025 |
| Pulmonary Embolism Diagnosed | No -- discharged with "Pneumonia" | Yes -- May 1, 2025, 5:19 AM |

**D. The Certified Production and Its Deficiencies**

On July 7, 2025, fifteen days after Plaintiff transmitted a pre-litigation demand letter to HCA Risk Management containing an explicit evidence preservation demand and litigation

notice, the Custodian of Records certified the 350-page production. The certification was executed by L. Stiles, HIMD, Health Information Management Director, signed in Clark County, Nevada, and notarized by Celeste Kamaka, Notary Public, State of Nevada, Appointment No. 24-1301-01, commission expiring August 7, 2028. The declaration form contains a blank line reading "I, _____, am the duly authorized Custodian of Records of the above named facility." **That line was not completed.** The identity of the declarant appears only in a stamp above the declaration, not within the sworn text itself.

The billing records for the same encounter were certified separately on July 15, 2025, eight days later, by Tiffaney Jackson, Account Specialist, HCA Richmond Shared Services Center, Richmond, Virginia, the same individual who certified the billing records for the Southern Hills Hospital June 2025 encounter. The Richmond shared services function is operated through Parallon, an HCA Healthcare Inc. wholly-owned subsidiary that performs revenue cycle management, billing, and records certification functions on behalf of HCA facilities nationwide. **Two different custodians. Two different states. Eight days apart. One patient encounter.**

The production contains periodic vital signs but no continuous monitoring logs or PACU monitoring logs, records that are standard for a post-surgical inpatient patient experiencing respiratory distress and tachycardia. The production contains no hemoptysis specimen documentation of any kind: no specimen collection record, no lab order, no lab accession, no chain-of-custody record, and no disposition record.

The radiology interpretation for the April 20, 2025 portable chest X-ray (SH-M000100) was electronically signed by Dr. Galen Hewell at 6:35 PM PDT, two minutes after the X-ray was performed at 8:33 PM CDT (8:33 PM CDT = 6:33 PM PDT). A signed clinical interpretation

requires image upload, transmission, viewing, and formal interpretation. **The two-minute turnaround is consistent with either pre-templated reporting or post hoc timestamping** and cannot be evaluated for accuracy without the underlying PACS audit metadata.

### III. DISCOVERY HISTORY AND MEET AND CONFER CERTIFICATION

**A. Initial Production and Identification of Deficiencies**

Defendants produced the 350-page certified Sunrise Hospital production bearing Bates stamps SH-M000001 through SH-M000350. Upon receipt and review, Plaintiff identified the absence of D-Dimer test results, CT Angiogram orders and results, PE protocol documentation, Wells score calculations, PERC assessments, hemoptysis specimen documentation, continuous monitoring logs, PACU monitoring logs, and audit trail documents.

**B. Selective Production of Audit Trail Documents**

Defendants produced summary audit trail documents for the Southern Hills Hospital encounter but produced **no audit trail documents for any Sunrise Hospital encounter.** Plaintiff requested audit trail documents for all encounters. The selective production, providing audit trail data for encounters not at issue in the PE claim while withholding it for the encounter that forms the core of this litigation, has no legitimate explanation.

**C. Certification Deficiency**

Plaintiff identified the self-contradicting certification described in Section II.D and provided Defendants with written notice that the certification simultaneously asserts and disclaims completeness and does not satisfy the requirements of a custodian certification sufficient to authenticate a complete record.

**D. Meet and Confer**

Pursuant to Fed. R. Civ. P. 37(a)(1) and Local Rule 26-7, Plaintiff transmitted a written meet and confer demand to defense counsel Michael E. Prangle, Zachary J. Thompson, and Reina Iniguez on March 8, 2026, via electronic mail. The letter identified with particularity the deficiencies in Defendants' production across all five HCA encounters and requested native EHR audit logs, native MAR exports, physician progress notes, restraint documentation, ADT transaction logs, Pyxis override logs, litigation hold documentation, and the native audit log for the CONF VIP designation applied to Plaintiff's account across all five encounters. Plaintiff expressly requested a response within 72 hours and notified Defendants that failure to respond by 12:08 PM PST on March 11, 2026 would result in filing without further notice.

**Defendants did not respond.**

This Motion is Plaintiff's third sanctions filing arising from HCA's discovery conduct. ECF No. 78 (filed March 7, 2026) addressed the Southern Hills 2023 encounter. ECF No. 79 (filed March 11, 2026) addressed the Southern Hills June 2025 encounter. Responses to ECF No. 78 are due March 21, 2026. Responses to ECF No. 79 are due March 25, 2026. Three additional sanctions motions covering the remaining HCA encounters are in preparation. **Defendants have been on notice of the systemic nature of these production failures since the March 8, 2026 meet and confer letter and have taken no action to cure any deficiency across any encounter.**

**IV. LEGAL STANDARD**

**A. Rule 37 Sanctions**

Rule 37(a) authorizes a motion to compel when a party fails to produce documents responsive to a proper discovery request. Fed. R. Civ. P. 37(a)(3)(B). Rule 37(c)(1) authorizes

sanctions, including the exclusion of evidence, when a party fails to provide information required by Rule 26(a) or (e). Rule 37(b)(2) authorizes additional sanctions when a party fails to comply with a court order regarding discovery, including directing that specified facts be taken as established, prohibiting the disobedient party from introducing designated matters in evidence, striking pleadings, dismissing the action, or rendering a default judgment. Fed. R. Civ. P. 37(b)(2)(A). Although Rule 37(b) addresses violations of court orders, the same sanctioning principles apply where a party fails to produce discoverable information and refuses to cure the deficiency after a meet-and-confer demand under Rule 37(a). All three provisions apply here.

Rule 37(e) separately authorizes sanctions for the loss, destruction, or selective withholding of electronically stored information that should have been preserved. Where a party fails to take reasonable steps to preserve ESI and the ESI cannot be restored or replaced, the court may order measures no greater than necessary to cure the prejudice or, upon finding intent to deprive, may presume the information was unfavorable, instruct the jury accordingly, or dismiss the action. Fed. R. Civ. P. 37(e).

In the Ninth Circuit, the district court has broad discretion to impose Rule 37 sanctions. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). The court considers: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).

**B. Court's Inherent Authority**

Courts possess inherent authority to impose sanctions for bad-faith conduct in litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 through 46 (1991). The court's inherent power reaches conduct that is fraudulent, in bad faith, or an abuse of the judicial process. *Id.* at 44 through 45. Certification of records as complete while simultaneously disclaiming completeness, and selective production of audit trail data, are precisely the kind of conduct that implicates the court's inherent authority.

**C. Adverse Inference**

An adverse inference sanction is appropriate where: (1) the party that should have produced evidence had a duty to preserve or disclose it; (2) the evidence was destroyed or withheld with a culpable state of mind; and (3) the evidence was relevant to the opposing party's claim or defense. *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 993 (N.D. Cal. 2012). Where a party produces records for one encounter but not another, and where the withheld records relate to the central dispute in the litigation, the relevance element is readily satisfied.

**V. ARGUMENT**

The Sunrise Hospital production is not an isolated discovery failure. Plaintiff has filed sanctions motions concerning the Southern Hills Hospital 2023 encounter (ECF No. 78, filed March 7, 2026) and the Southern Hills Hospital June 2025 encounter (ECF No. 79, filed March 11, 2026). In each instance, Defendants produced certified medical records while withholding the native audit trail data necessary to determine whether those records were modified, supplemented, or selectively compiled after litigation commenced. The Sunrise encounter

presents the identical deficiency in the context of the most clinically significant event in this case. **This is not coincidence. It is a production pattern.**

**A. The 350-Page Certified Production Is Materially Incomplete**

The following documents and data categories are absent from the 350-page certified production, are standard records for a patient with Plaintiff's presentation, and would be expected to exist if proper clinical care was rendered:

| Missing Document | Clinical Standard | Significance |
|---|---|---|
| D-Dimer Test | Standard PE screening for chest pain, tachycardia, respiratory distress | Elevated result confirmed at Summerlin nine days later (1.32 mcg/mL FEU) |
| CT Angiogram | Standard diagnostic when PE clinical suspicion exists | Confirmed PE at Summerlin -- whether ordered or cancelled at Sunrise is unknown without audit trail |
| PE Protocol Documentation | Standard workflow for ruling out PE | Would document whether PE was considered and excluded vs. never considered |
| PE Risk Assessment / Wells Score | Standard risk stratification tool | Post-surgical patient with tachycardia, respiratory distress, oxygen dependency |
| Hemoptysis Specimen Records | Specimen collection, lab order, accession, chain-of-custody, disposition | Hemoptysis is a recognized PE indicator; specimen reportedly provided to nursing staff |

| Missing Document | Clinical Standard | Significance |
| --- | --- | --- |
| Continuous Monitoring Logs | Standard for post-surgical patients with respiratory distress | Would document severity and duration of tachycardia and oxygen fluctuations |
| PACU Monitoring Logs | Standard for all post-surgical patients | Would document immediate post-surgical status |
| Radiology / PACS Audit Metadata | Documents image upload, transmission, viewing, signature events | Would verify or refute the two-minute interpretation timestamp on SH-M000100 |
| Audit Trail Documents | Produced for Southern Hills encounter; withheld for Sunrise | Would reveal whether PE screening was ordered and cancelled or never ordered |

**Either these tests were performed and not produced, or they were never performed.** Without audit trail data, that determination cannot be made. Defendants chose not to produce the audit trail for Sunrise Hospital.

Hospitals maintain electronic audit trails precisely to reconstruct clinical decision-making after the fact. Epic, Cerner, and other modern EHR systems automatically generate order-entry, order-cancellation, access, and modification logs for every patient encounter as standard system output. When those audit trails are withheld in litigation concerning the very clinical decisions they document, **the absence of those logs is itself probative.** The absence of native audit trail data and system logs constitutes the loss, destruction, or selective withholding of electronically

stored information necessary to reconstruct clinical decision-making, **triggering sanctions under Fed. R. Civ. P. 37(e).** The audit trail for this encounter would answer the central question in this case. Defendants have not produced it. **Defendants produced 350 pages of curated clinical documentation while withholding the system-generated audit logs necessary to determine how those records were created, modified, or compiled.**

**B. The Selective Production of Audit Trail Data Is Sanctionable**

Defendants produced summary audit trail documents for the Southern Hills Hospital encounter while producing no audit trail documents for any Sunrise Hospital encounter. This is not a blanket policy of withholding audit trail data. **It is a targeted withholding of audit trail data for the encounter at the center of this litigation.**

The distinction between the portal version and the litigation production is not merely cosmetic. Patient portal exports and legal medical record productions are generated by architecturally distinct export pipelines within Epic's system. The portal version reflects the patient-facing reporting layer accessed closer in time to the encounter. The litigation production is generated by Epic's health information management legal export tool, a separate pipeline that can apply different filters, exclude certain data categories, and pull from the structured database at a point in time selected by the producing party. **The audit spreadsheet produced by Defendants reflects this dynamic directly: document metadata shows a creation date of December 23, 2025 and a last-modified date of February 3, 2026, eight months after the April 2025 encounter and squarely within the litigation period.** What Defendants produced is not the contemporaneous clinical record. It is a report generated from the EHR database during

litigation, by a person named in the document metadata, without the underlying audit logs that would show how the chart evolved between April 2025 and the date of export.

Audit trail data for the Sunrise encounter would reveal one of two things: (a) whether PE screening tests were ordered and subsequently cancelled, and by whom, and when, and with what clinical justification; or (b) whether PE screening was never ordered at all. Either answer is material to Plaintiff's claims. The absence of this data, while audit trail data for a different encounter was produced, raises the inference that the Sunrise audit trail contains information damaging to Defendants.

Selective disclosure, producing audit trail data for peripheral encounters while withholding it for the central encounter, supports a finding of bad faith sufficient for adverse inference sanctions. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (affirming terminating sanctions for willful withholding of ESI); *see also Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d at 994 (selective production raises inference of unfavorable evidence).

**C. The Self-Contradicting Certification Does Not Satisfy Authentication Requirements**

The Sunrise Hospital PE encounter produced two separate certifications executed by two different custodians in two different states eight days apart. The medical records certification (SH-M000001) bears the stamped designation of L. Stiles, HIMD, Health Information Management Director, signed July 7, 2025 in Clark County, Nevada, and notarized the same day by Celeste Kamaka, Notary Public, State of Nevada, Appointment No. 24-1301-01, commission expiring August 7, 2028. The billing records certification was executed on July 15, 2025 by Tiffaney Jackson, Account Specialist, HCA Richmond Shared Services Center, Richmond,

Virginia, the same individual who certified the billing records for the Southern Hills Hospital June 2025 encounter.

**Two different custodians. Two different states. Eight days apart. One patient encounter.** The clinical records were certified at the facility level in Nevada. The billing records were certified eight days later through HCA's centralized shared services operation in Virginia. This split certification structure confirms that the production is not a unified complete record maintained by a single custodian with personal knowledge of its contents. It is a composite assembled from at least two separate operational nodes of HCA's corporate infrastructure, neither of which has complete visibility into the other's records.

The Virginia billing certification is executed through Parallon, an HCA Healthcare Inc. wholly-owned subsidiary operating out of 7300 Beaufont Springs Drive, Richmond, Virginia, that performs revenue cycle management, billing, and records certification functions on behalf of HCA facilities nationwide. Tiffaney Jackson's sworn affidavit states: "I am the custodian of records for Sunrise and work as an Account Specialist in the HCA Richmond Shared Services Center." She is not a Sunrise Hospital employee. She has no physical presence at the Las Vegas facility. Her personal knowledge of Sunrise Hospital records is limited to billing and revenue cycle data routed through Parallon's centralized shared services hub in Virginia, 2,500 miles from the facility whose records she certified under penalty of perjury.

**A billing processor receiving records through a corporate pipeline is not a custodian with personal knowledge.** The personal knowledge requirement for custodian certification under Fed. R. Evid. 902(11) and 28 U.S.C. § 1746 is not satisfied by an Account Specialist at a remote shared services center whose familiarity with the records derives entirely from her

employer's revenue cycle function. **HCA Healthcare Inc. cannot simultaneously structure its facilities as independent LLCs for liability purposes and operate them through a single wholly-owned subsidiary for billing, records certification, and revenue cycle management.** The presence of Parallon-executed billing certifications for multiple HCA facility LLCs in this same litigation, Sunrise Hospital and Southern Hills Hospital, demonstrates that the corporate parent exercises direct operational control over the records and billing infrastructure of each named defendant facility. That control is relevant to both the discovery obligations at issue in this Motion and to the underlying liability of HCA Healthcare Inc. as the named corporate defendant.

The declaration form itself contains a blank line reading "I, _____, am the duly authorized Custodian of Records of the above named facility." That line was not completed. The identity of the declarant appears only in a stamp above the declaration, not within the sworn text itself.

The certification was executed on July 7, 2025, fifteen days after Plaintiff transmitted a pre-litigation demand letter to HCA Risk Management on June 22, 2025, which contained an explicit evidence preservation demand and litigation notice. July 7, 2025 is also the date Insurance Claim No. 2025188CO6631 was processed, the same day the medical records were certified and the insurance claim was finalized. The billing records were certified eight days later on July 15, 2025.

The medical records certification checks the box stating "The complete records for the time period beginning 04/17/2025 and ending 04/22/2025 consists of 349 pages" while simultaneously including the following disclaimer: "We are not aware of any omissions;

however, due to the timing of this request it is possible that a portion of the medical record may be incomplete and/or preliminary at this time." **These statements cannot simultaneously be true.** A declarant who is not aware of any omissions cannot simultaneously represent that the record may be incomplete. The hospital was able to generate a final billing statement totaling **$799,833.00** within five days of discharge, demonstrating that the encounter record had reached a sufficiently finalized state for revenue-cycle submission. **If the record was complete enough to generate an $800,000 bill in April, it was complete enough to certify without disclaimer in July.**

**D. The Two-Minute Radiology Interpretation Raises Record Integrity Concerns**

The portable chest X-ray documented at SH-M000100 was performed at 8:33 PM CDT on April 20, 2025. The clinical interpretation was electronically signed by Dr. Galen Hewell at 6:35 PM PDT on the same date, which converts to **8:35 PM CDT.** The elapsed time between image acquisition and signed clinical interpretation is approximately **two minutes.**

Whether a two-minute turnaround is clinically plausible **cannot be evaluated for accuracy without the underlying PACS audit metadata documenting image upload, routing, and access timestamps.** A signed clinical interpretation requires, at minimum, image upload to the PACS system, transmission to the interpreting radiologist, physician review of the image, and execution of the formal interpretation document. This compressed interval **is consistent with either pre-templated reporting or post hoc timestamping** and cannot be verified or refuted without the PACS audit logs Defendants declined to produce.

The timestamp irregularity extends beyond the two-minute interpretation window. **The imaging record embeds a Central Daylight Time timestamp for a procedure performed at a**

**Las Vegas facility that operates on Pacific Time.** HCA Healthcare's corporate headquarters and primary data infrastructure are located in Nashville, Tennessee, Central Time. The presence of CDT timestamps in the Sunrise Hospital imaging record indicates the imaging data was routed through HCA's centralized corporate infrastructure in Tennessee. PACS audit metadata would identify the originating server, document when the study was transmitted between the Las Vegas facility and HCA's Nashville infrastructure, and establish whether the certified production reflects a native record export or a composite document assembled from multiple source systems. **The audit logs responsive to Plaintiff's discovery requests therefore exist on HCA corporate servers in Tennessee, not solely at Sunrise Hospital. Defendants' production scoped to Sunrise Hospital records is facially incomplete on this basis alone.**

**E. The Lovenox Order Contradicts Defendants' Implied Defense**

The Medication Administration Record (Exhibit 25-A, Bates No. SH-M000034) reflects that Enoxaparin (Lovenox) 40mg was ordered on April 22, 2025, the day of discharge. Enoxaparin is an anticoagulant used to prevent venous thromboembolism in patients assessed to be at elevated risk.

The decision to initiate anticoagulation at discharge reflects recognition of thromboembolism risk at the conclusion of the hospitalization. **Defendants cannot recognize thromboembolism risk sufficient to justify anticoagulation and simultaneously contend that PE diagnostic evaluation was not clinically indicated during the preceding hospitalization.** The same risk factors that justify prophylactic anticoagulation also trigger diagnostic evaluation when symptoms such as dyspnea, tachycardia, and hemoptysis are present. Defendants ordered neither during the four days it mattered most.

**F. The Discharge Summary Was Sanitized**

The discharge summary, authored by Tristan T. Tran, APRN, with subsequent physician attestation by Alexander Akhavan, MD, characterizes Plaintiff as "doing well," with "incisional pain controlled" and "stable for discharge." **The discharge summary does not mention dyspnea, oxygen requirement, or decreased breath sounds,** symptoms that appear in contemporaneous chart entries authored closer in time to the clinical events. The omission of these respiratory findings, combined with Defendants' failure to produce the audit logs that would document when and how the discharge summary was edited, **prevents reconstruction of the record's evolution and supports an inference that the omission was not inadvertent.** The discharge summary as produced reads as a clean exit from a routine post-surgical stay. The underlying chart does not support that characterization.

**G. The EHR System Confirms Audit Logs Exist**

Every report footer in the certified production includes language stating that edits or amendments must be made electronically in the EHR system. **This language is an admission by the hospital's own records that the system maintains edit history, author timestamps, and modification logs.** The discharge summary omits critical respiratory findings that appear in contemporaneous chart entries, and that same document explicitly confirms that all edits occur within the electronic system. **The same document that sanitized the discharge narrative confirms the existence of the audit trail that would show what was removed.** Defendants cannot produce records bearing this footer language and simultaneously represent that audit trail data does not exist or is unavailable. The absence of those logs from Defendants' production reflects a decision in the discovery process, not a limitation of the underlying system.

**H. EHR Audit Log Retention Requirements**

Hospitals are required to retain electronic health record audit logs under standard health system record-retention policies and federal health IT certification requirements under 45 C.F.R. § 170.315(d)(2), which mandates audit log generation and protection capabilities for certified EHR technology. These logs document user access, order entry, order cancellation, and modification history for each patient encounter. **The absence of such logs in the Sunrise production cannot be attributed to system limitations.** It reflects a discovery production decision. Defendants produced audit logs for the Southern Hills encounter. The same system generated the same logs for the Sunrise encounter. The absence of those logs from Defendants' production reflects a decision in the discovery process, not a limitation of the underlying system.

**I. Appropriate Sanctions**

**1. Adverse Inference Instruction**

The Court should instruct the jury that it may infer, and upon a finding of intent or bad faith, must infer, that the missing audit trail documents, PE workup records, and hemoptysis specimen records contained information adverse to Defendants' interests. Plaintiff has demonstrated: (a) Defendants' duty to preserve and produce these records; (b) the records' absence from the production despite constituting standard documentation for a patient with Plaintiff's clinical presentation; and (c) the direct relevance of these records to Plaintiff's claims. The selective production of audit trail data for a separate encounter satisfies the culpability element.

**2. Issue Preclusion -- PE Screening**

The Court should preclude Defendants from offering evidence, argument, or expert testimony that: (a) PE was considered and excluded during the Sunrise hospitalization; (b) a

clinical decision was made not to order PE screening based on the available clinical picture; or (c) the absence of PE screening documentation in the 350-page production reflects a clinical determination rather than a documentation failure or records withholding. Defendants cannot benefit from the absence of records they failed to produce.

### 3. Supplemental Production Order

The Court should order Defendants to produce within fourteen (14) days: (a) all audit trail documents for the Sunrise Hospital encounter, including EHR access logs, order entry logs, order cancellation logs, and modification logs for the April 17 through 22, 2025 encounter; (b) radiology/PACS audit metadata for the April 20, 2025 chest X-ray interpretation by Dr. Hewell; (c) lab accession logs for any respiratory specimens collected from Plaintiff during the hospitalization; and (d) PACU monitoring logs and continuous vital sign monitoring logs for the hospitalization period.

### 4. Costs

Rule 37(a)(5)(A) requires the Court to award reasonable expenses incurred in bringing this Motion, including costs, unless Defendants' failure to produce was substantially justified or other circumstances make an award unjust. Defendants ignored a written meet-and-confer demand with a hard deadline, made no supplemental production, and have now forced Plaintiff to file a third sanctions motion addressing the same systemic discovery failure. Neither substantial justification nor equitable exception applies here.

### 5. Escalating Relief

In the alternative, should the Court determine that the missing electronically stored information cannot be restored or replaced, Plaintiff requests that the Court consider issue-

terminating sanctions sufficient to remedy the prejudice caused by the permanent loss of evidence necessary to reconstruct the clinical decision-making at the center of this case.

## VI. PREJUDICE TO PLAINTIFF

Plaintiff's central claim is that Sunrise Hospital failed to diagnose a pulmonary embolism that was confirmed nine days after discharge. The ability to prove that failure is directly dependent on records that document, or fail to document, the clinical decision-making during the hospitalization. **The complete absence of PE workup documentation, combined with the withholding of audit trail data that would explain that absence, places Plaintiff in an impossible evidentiary position.**

Without audit trail data, Plaintiff cannot determine whether physicians at Sunrise ordered PE screening and cancelled it, which would be its own form of misconduct, or whether they never considered it at all. Without hemoptysis specimen records, Plaintiff cannot prove or disprove that the specimen was processed, analyzed, or discarded. Without continuous monitoring logs, Plaintiff cannot demonstrate the full duration and severity of the tachycardia and respiratory distress events that should have triggered PE screening.

The prejudice is concrete, quantifiable, and directly caused by Defendants' deficient production. The requested sanctions are calibrated to restore, as nearly as possible, the evidentiary balance that Defendants' production failures have destroyed.

## VII. CONCLUSION

Defendants produced a 350-page certified record for a five-day post-surgical hospitalization during which Plaintiff developed the classic signs and symptoms of pulmonary

embolism. **The record contains none of the standard clinical documentation that would exist had proper PE screening been performed or considered.** Defendants produced audit trail data for a different encounter while withholding it for this one. The Custodian certified the records as complete while disclaiming that certification. The records contain timestamps that cannot be reconciled with ordinary clinical workflow. The billing and medical records were certified by two different custodians in two different states through a corporate subsidiary with no physical presence at the Las Vegas facility.

These are not isolated deficiencies. They are a pattern of production conduct that has deprived Plaintiff of the ability to prove, or Defendants to disprove, the core clinical failure at the center of this case.

**Defendants had one obligation in discovery: to produce the record as it exists in their own system. They did not.**

**WHEREFORE, Plaintiff respectfully requests that the Court:**

1. Issue an adverse inference instruction directing the jury that it may infer, and upon a finding of intent or bad faith must infer, the missing records contained information adverse to Defendants;

2. Preclude Defendants from introducing evidence, argument, or expert testimony that PE screening was considered or performed during the April 17 through 22, 2025 Sunrise Hospital hospitalization;

3. Order Defendants to produce all audit trail documents, PACS audit metadata, lab accession logs, PACU logs, and continuous monitoring logs for the April 17 through 22, 2025 encounter within fourteen (14) days;

4.  Award Plaintiff the reasonable costs of this motion; and

5.  Grant such other and further relief as the Court deems just and proper, including issue-terminating sanctions should the missing electronically stored information be found irretrievably lost.

_____

I certify that Artificial Intelligence was used to prepare the foregoing document.

DATED: March 16th , 2026

Respectfully submitted,

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se

**<u>EXHIBIT LIST</u>**

| Exhibit | Description |
|---|---|
| **25** | Side-by-Side Comparison and Modification Analysis -- Sunrise Hospital Medical Records, April 17 through 22, 2025 (Pulmonary Embolism Encounter); Pre-Lawsuit Patient Portal Version vs. Certified Litigation Production |
| **25-A** | Medication Administration Record (Bates No. SH-M000034) reflecting Enoxaparin Sodium (Lovenox HIGH ALERT) 40mg order with start date of April 22, 2025 -- the day of discharge -- with no thromboembolism prophylaxis ordered or administered during the preceding four days of post-surgical hospitalization |
| **25-B** | Discharge Summary authored by Tristan T. Tran, APRN, with physician attestation, omitting documented dyspnea, oxygen requirement, and decreased breath sounds present in earlier chart entries |
| **25-C** | EHR report footers reflecting system language confirming edit history, author timestamps, and modification logs are maintained electronically in the EHR system |
| **25-D** | Admission documentation reflecting comorbidities including diabetes mellitus, hypertension, seizure disorder, psychiatric history, and post-surgical status as thromboembolism risk factors |
| **25-E** | Sequential problem list entries reflecting absence of pneumonia diagnosis in early entries and addition of pneumonia diagnosis following April 19, 2025 radiology impression |
| **Exhibit B** | Pre-Lawsuit Patient Portal Version -- HCA MyHealthONE records preserved by Plaintiff |
| **Exhibit C** | Summerlin Hospital Records -- Pulmonary Embolism Diagnosis, May 1, 2025, at 5:19 AM; D-Dimer result 1.32 mcg/mL FEU; CT Angiogram confirming acute PE, right lower lobe; authenticated by Elena Rodriguez |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 16th , 2026, I electronically filed the foregoing **PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS UNDER FED. R. CIV. P. 37(a) AND 37(c) AND THE COURT'S INHERENT AUTHORITY FOR DISCOVERY MISCONDUCT IN THE PRODUCTION OF SUNRISE HOSPITAL MEDICAL RECORDS** with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record registered to receive electronic notifications in this case, including:

Michael E. Prangle
Zachary J. Thompson
Hall Prangle, LLC
1140 N. Town Center Drive, Suite 350
Las Vegas, NV 89144

*Counsel for HCA Healthcare, Inc.;*
*Sunrise Hospital & Medical Center, LLC;*
*MountainView Hospital;*
*and Southern Hills Hospital & Medical Center*

/s/ Jade Riley Burch
**JADE RILEY BURCH**
Plaintiff, Pro Se